Kristine M. Akland
Center for Biological Diversity
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
kakland@biologicaldiversity.org

Marc Fink, *application for pro hac vice pending*
Center for Biological Diversity
209 East 7th Street
Duluth, MN 55805
(218) 464-0539
mfink@biologicaldiversity.org

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ALLIANCE FOR THE WILD ROCKIES, and COUNCIL ON WILDLIFE AND FISH.<br>　　　　　Plaintiffs,<br>vs.<br>U.S. FOREST SERVICE; LEANNE MARTEN, Regional Forester of U.S. Forest Service Region 1; and MARY ERICKSON, Supervisor of the Custer Gallatin National Forest,<br>　　　Defendants. | CV-<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## I.　　INTRODUCTION

1.　　The Greater Yellowstone Ecosystem ("GYE") is one of the last remaining large and nearly intact temperate ecosystems on Earth. The majority of forested lands within the GYE contain mature and old growth stands which not only

provide important habitat to a plethora of wildlife species, including the iconic grizzly bear and Canada lynx, but hold and sequester a significant amount of carbon.

2.      This August, the Custer Gallatin National Forest authorized a major commercial logging project in the GYE known as the South Plateau Landscape Area Treatment Project ("South Plateau Project" or "Project"). The South Plateau Project will clearcut mature forest, destroy and fragment habitat, displace wildlife, alter hydrology, and adversely affect grizzly bears and lynx in an area that directly borders the western boundary of Yellowstone National Park.



3.      The South Plateau Decision Notice authorizes clearcutting on more than 5,500 acres (more than 6 square miles) and commercial logging on another 6,600 acres of mature forests. The Project would bulldoze over 56 miles of roads through old forests and remove over 83 million board feet of commercial timber— significantly more than allowed under the Custer Gallatin National Forest Plan.

4.      Despite the Project's massive scale, the Forest Service authorized the Project without any site-specific information and without determining where and when these activities will take place. The Forest Service claims that the precise location, timing, and scope of the treatments will be decided when the Project is implemented but without any further opportunity for public comment.

5.      Thus, the Forest Service will not know or disclose the precise nature of the approved activities until years after the public comment period has closed and the agency decision has been made, hampering informed decision-making and meaningful public participation.

6.      Regarding the Project, the U.S. Environmental Protection Agency stated, "The [Forest Service] lacks site-specific information about existing conditions, analysis of impacts, and mitigation measures. . .Given this information, we are unable to evaluate the likelihood that significant effects will be avoided. . . Although conditions vary throughout the planning area, and so impacts would be

expected to vary as well, the [Project] does not contain the actual locations of the timber sales and harvest units or where the temporary roads will be built and therefore cannot disclose, analyze, or described the localized impacts that can potentially occur."

7.      In their review of this massive Project, the Forest Service prepared a mere "environmental assessment," and concluded that this major Project would not require preparation of the more detailed "environmental impact statement" as required by the National Environmental Policy Act (NEPA) because it would have "no significant impacts." The Forest Service reached this arbitrary conclusion despite the vast amount of clearcutting of the forest ecosystem directly adjacent to Yellowstone National Park and damage to habitat for threatened grizzly bears and lynx.

8.      The Project Decision Notice authorizes an amount of clearcutting and road building that far exceed the limitations of the Custer Gallatin National Forest Plan set to protect grizzly bear and lynx, and the Forest Service failed to demonstrate how the Project complies with these required standards and failed to adequately consider the impacts to these iconic species.

9.      The Forest Service also failed to take a "hard look" at the carbon and climate impacts of removing hundreds of thousands of trees from the Forest. The Forest Service dismissed the impacts of logging these mature forests as "infinitesimal,"

ignoring years of science and agency guidance, and failed to address the climate pollution caused by cutting, hauling, and processing timber.

10.    Because the Forest Service's approval of the South Plateau Project violates federal law, this Court should vacate the agency's approval and enjoin any ground disturbing activities authorized by the Forest Service's actions.

11.    The Forest Service approved the Project on August 8, 2023. As of the date of this filing, the Forest Service has not yet advertised a sale under this Project. Additionally, the Project does not authorize winter logging.

## II.    JURISDICTION

12.    This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), and 2202 (declaratory judgment and further relief).

13.    Venue in this case is proper under 28 U.S.C. § 1391(e) and Local Rule 3.2 because Defendant Marten resides within the Missoula Division of the United States District Court for the District of Montana.

## III.    PARTIES

14.    Plaintiff Center for Biological Diversity (the "Center") is a non-profit organization that is dedicated to the protection of native species and their habitats

through science, policy, and environmental law. The Center is headquartered in Tucson, Arizona, with additional offices throughout the country, including in Montana. The Center has more than 89,000 active members, including more than 500 members in Montana, some of which reside, recreate and have an interest in the conserving the lands and wildlife in the Custer Gallatin National Forest and in the South Plateau Project area. The Center and its members have a long-standing interest in conserving native species and have consistently advocated for the conservation and protection of native species, including the grizzly bear and lynx.

15.    Plaintiff Alliance for the Wild Rockies (the "Alliance") is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion; its native plant, fish, and animal life; and its naturally functioning ecosystems. The Alliance's registered office is located in Missoula, Montana. The Alliance has more than 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Custer Gallatin National Forest. The Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these

ecosystems as set forth below. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

16.     Plaintiff Council on Wildlife and Fish (the "Council") is a public interest organization (tax-exempt, non-profit) formed to insure the maintenance of biological diversity and the ecological integrity of all natural ecosystems through the enforcement and administration of laws such as the Endangered Species Act, National Forest Management Act, National Environmental Policy Act, Clean Water Act, and all other laws that require the recognition, discussion and conservation of such ecosystems and protect the organic or inorganic components that comprise such natural ecosystems. The Council's registered office is in Bozeman, Montana. The Council's members are in Montana and enjoy, and appreciate indigenous wildlife, fish, spiritual connection and renewal, clean water, and high-quality aquatic and terrestrial habitat. Council members expect to continue these practices well into the future, including in the South Plateau Project area in the Custer Gallatin National Forest. The Council's members' professional, spiritual and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below. Council on Wildlife and Fish brings this action on its own behalf, on behalf of its adversely affected members and on behalf of numerous, voiceless life forms eminently threatened with displacement, injury, and/or death.

17.    Over the past three years, Plaintiffs have participated actively in available public processes concerning the South Plateau Project and its effects on forests, grizzly bears, lynx, and the climate crisis, including by filing extensive comments on the environmental assessments issued by the Forest Service on the project, and by filing two sets of objections to Forest Service proposed project decisions.

18.    An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Custer Gallatin National Forest and the South Plateau Project area for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future. Plaintiffs' members and staff are concerned with protecting the wildlife, scenery, air quality, and other natural values of the South Plateau Project area.

19.    For example, George Kimbrell is a member of Center for Biological Diversity and has a summer cabin near the South Plateau Project. He regularly visits forest stands in the Custer Gallatin National Forest that the Forest Service authorizes cutting down as part of the Project. George visits these areas primarily to flyfish on the South Fork of the Madison River in and around the Project area and enjoy the scenic, unspoiled, natural values of the river and surrounding forests. He also visits the forests within the Project area to hike and seek out and observe

wildlife, including grizzly bears, and lynx, as well as raptors like osprey, red-tail hawks, and bald and golden eagles. His ability to enjoy these areas in their natural state and to find the wildlife he enjoys will be irreparably harmed by the Forest Service's authorization of the South Plateau Project. He regularly ventures into the Project area to enjoy the solitude and natural state of the area and will continue to do so.

20.     Michael Garrity, Executive Director of Alliance for the Wild Rockies and a member of the Center, lives in Montana and visited the South Plateau Project area in the spring of 2022 and in the fall of 2021. He visited the area to enjoy the peace and solitude of the forest in its natural state and with the hopes of seeing wildlife. Michael enjoys being in the mature and old growth trees within the Project area. The Project area is special to him because it contains habitat for whitebark pine, lynx and grizzly bears. He has specific plans to visit the Project area again in the fall of 2024 and fall of 2027. His ability to enjoy this area will be forever damaged by the logging and road building authorized by the South Plateau Project.

21.     Steve Kelley is the President of Council on Wildlife and Fish and a Center member, who lives in Montana and has been to the Project area in the past to walk, photograph wildlife, and contemplate the spiritual aspects of nature. Steve plans to visit the Project area in 2026, if not sooner, for a similar experience and also to look for whitebark pine and photograph their presence and condition.

22.    The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members and employees have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NEPA, the National Forest Management Act ("NFMA"), and the Administrative Procedures Act ("APA"). The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202 and 5 U.S.C. §§ 705 & 706.

23.    Defendant U.S. Forest Service is an agency of the United States and a division of the U.S. Department of Agriculture. The Forest Service is responsible for the management of lands and resources within the Custer Gallatin National Forest, including those within the South Plateau Project area in accordance and compliance with NFMA and NEPA and other federal laws and regulations.

24.    Defendant Leanne Marten is the Regional Forester of USFS Region 1 and the Forest Service official responsible for the March 24, 2022 decision rejecting Plaintiffs' objections to the South Plateau Project. Ms. Marten is sued in her official capacity as the office of the Regional Forester located in Missoula, Montana.

25.    Defendant Mary Erickson is the Supervisor of the Custer Gallatin National Forest. Supervisor Erickson is sued in her official capacity.

## IV.   LEGAL FRAMEWORK

26.     Because NEPA and NFMA do not include a citizen suit provision, this case is brought in part pursuant to the APA. 5 U.S.C. §§ 551-559, 701-706.

27.     The APA allows persons and organizations to challenge final agency actions in the federal courts. *Id*. §§ 702, 704. The APA declares that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* § 706(2)(A).

**The National Environmental Policy Act**

28.     Congress enacted NEPA, 42 U.S.C. §§ 4321-4370h, to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." *Id.* § 4321. As a general matter, NEPA requires that federal agencies analyze and disclose to the public the environmental impacts of their actions. *Id*. § 4332(2)(C).

29.     To this end, the Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA. Among other things, the rules are intended to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a) (2020).

30.     To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly

affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40

C.F.R. § 1501.4. Where an agency is uncertain whether it must prepare an EIS, it

may prepare an environmental assessment ("EA") to determine whether the action

may have significant impacts and thus require preparation of an EIS. 40 C.F.R.

§ 1501.3(a)(2).

31.     In an EA, NEPA requires the agencies to discuss the environmental impacts

of the proposed action and alternatives and provide sufficient evidence and

analysis for determining whether to prepare an EIS or finding of no significance.

32.     In an EIS, NEPA requires that agencies "succinctly describe the

environment of the area(s) to be affected or created by the alternative under

consideration." *Id.* § 1502.15. NEPA also requires the action agency to set an

appropriate baseline detailing the nature and extent of the resources in the area:

"The concept of a baseline against which to compare predictions of the effects of

the proposed action and reasonable alternatives is critical to the NEPA process."

CEQ, *Considering Cumulative Effects under the National Environmental Policy*

*Act* 41 (January 1997).

33.     An EA must also identify the direct, indirect, and cumulative impacts of

each reasonable alternative, including a project's ecological, aesthetic, economic,

social, and health effects. 40 C.F.R. §§ 1508.1(g)(3) (defining cumulative impact),

1508.1(g)(4) (defining effects), 1501.5(c)(2) (requiring EAs to disclose the

"environmental impacts of proposed action and alternatives"). Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." *Id.* § 1508.1(g)(1). Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.1(g)(2). Cumulative impacts are "are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non–Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

34.    An EIS is required if substantial questions are raised whether a project may cause significant degradation of some human environmental factor.

**The National Forest Management Act**

35.    Through NFMA, Congress established a two-step process for managing national forests. First, NFMA directs the U.S. Forest Service to prepare and implement comprehensive Land Resource Management Plans (commonly called "Forest Plans") for each national forest. 16 U.S.C. § 1604(a). Each Forest Plan (including any associated amendments) establishes management direction for resources, uses, and protective measures through standards, guidelines, goals, and objectives for that forest. Second, the Forest Service must ensure that all site-

specific projects within each forest, including but not limited to logging, road construction, and motorized use, are consistent with the relevant Forest Plan. *Id.* § 1604(i).

36.   The Custer Gallatin National Forest's current Forest Plan was approved in 2022.

## V.   FACTUAL ALLEGATION

**Greater Yellowstone Ecosystem and South Plateau Project Area**

37.   The Forest Service published its scoping letter and draft EA for the South Plateau Project on August 16, 2020.

38.   A Biological Opinion for the Project could not be completed before implementation of the new 2022 Forest Plan and therefore the objection process for the Project was cancelled.

39.   The Project was reanalyzed under the 2022 Forest Plan and a Revised Environmental Assessment was published on October 6, 2022.

40.   The Forest Service published an updated EA and draft Decision Notice and Finding of No Significant Impact on March 15, 2023.

41.   The Final Decision Notice and Finding of No Significant Impact was published on August 8, 2023.

42.     The South Plateau Project area is located within the Greater Yellowstone Ecosystem, which is one of the last remaining large and nearly intact temperate ecosystems on Earth.

43.     The Greater Yellowstone Ecosystem, including the Project area, currently has all of the wildlife species that existed in pre-Columbian times, including grizzly bears and lynx.

44.     The Project area is in the Hebgen Lake Ranger District of Gallatin County and on the western border of Yellowstone National Park, south and west of the town of West Yellowstone and extends from U.S. Highway 20 on the north end, to the Montana-Idaho border on the west and south, and the Yellowstone National Park boundary on the east.

45.     The South Plateau Project area is 39,909 acres, 91% of which has forested cover (36,098 acres) and 91% of forested cover is lodgepole pine.

46.     The Decision Notice authorizes treatment actions on 16,462 acres, including:

a.  clearcut harvest on 5,551 acres;

b. commercial thinning on 6,593 acres;

c. non-commercial thinning on 2,514 acres;

d. temporary road construction of 56.8 miles of roads; and

e. fuels treatment on 1,804 acres.

47.     The Project will result in the removal of 83 million board feet of timber from the Project area, mostly via clearcuts (marked in light blue on the map below).



48.     The Decision authorizes these activities without identifying and disclosing the location of units and roads, the timing of implementation, or adequate site-specific information. In other words, the Forest Service finalized the Project before

16

identifying specific locations for logging, road construction, prescribed burns, and other fuel reduction activities.

49.    In preparing the Project EA, the Forest Service analyzed two alternatives: a no action alternative, and the proposed action alternative. The proposed action alternative "describes a suite of activities available" to manage the Project area over a period of approximately 15 years.

50.    The Forest Service states that it will make decisions about location in which treatments occur based on conditions at the time of implementation.

51.    The Forest Service delineated four "priority areas" within the Project "to streamline the application of grizzly bear design features."

52.    The EA states that four to six timber sale or other contracts could be awarded within the Project area and each contract will "typically be five years in length, during which time temporary roads will be built, used, and obliterated, and harvest and other management activities will be completed."

53.    The Decision Notice states that the "Total treatment acreage and temporary road extent will not exceed the maximum limits shown in Table 1."

**Table 1. Proposed action maximum extent.**

| Proposed Action | Maximum Extent |
|---|---|
| Total Treatment[1] | 16,462 acres |
| Clearcut Harvest | 5,551 acres |
| Commercial Thinning | 6,593 acres |
| Non-Commercial Thinning | 2,514 acres |
| Temporary Road | 56.8 miles |
| Fuels Treatment[2] | 1,804 acres |

[1] Total Treatment is the combined total acreage of all the proposed actions (clearcut, thinning, and fuels treatments).
[2] Fuels treatment acres are for units treated with the primary goal of fuels management; fuels treatments may be applied as a secondary treatment to any unit. Total fuels acres may be increased: if another type of treatment unit is dropped, it may be treated for fuels if the treatment is analogous or less intensive than the previously proposed type.

54.     The Forest Service states in the EA and Decision Notice that this "maximum footprint" *may* be reduced but "any treatment may include the commercial or non-commercial removal of material."

55.     Neither the Project EA nor the Decision Notice discloses the type of on-the-ground activities or the locations of units. Instead, the Forest Service "identified areas as preliminarily suitable for treatment actions" and asserts that prior to implementation "resource specialists will survey suitable areas to determine where within them to place smaller treatment units."

56.     The post-decision process for identifying where, when, and how logging and road building will occur will involve the following:

57.     The treatment actions will be identified by "the interdisciplinary team of resource specialists." "The type of treatment will be determined by applying the Treatment Matrix" and the "precise location and size of the treatment units will be

determined by applying the Design Features" at some point in time after the Decision Notice is issued and prior to Project implementation.

58.     The "Treatment Matrix" is a list of types of treatments that may occur in different stand types that may be encountered. The Forest Service states that following the Decision, treatment units and roadbuilding will be developed by applying the Treatment Matrix. Those activities "will then be assessed with remote data and necessary field visits by specialists on the interdisciplinary team to ensure that proposed treatments are consistent with Design Features."

59.     The "Design Features" are apparent sideboards for the activities that are authorized by the Decision Notice. The majority of the Design Features merely reiterate Forest Plan standards.

60.     The Forest Service states that important factors including existing transportation system, primary haul route locations, and type of vegetation management will be considered "during the development of silvicultural prescriptions."

61.     The Forest Service claims that by "planning and implementing management actions using the Treatment Matrix, Design Features, Resource Review Checklists, and Monitoring Plan[], the extent of the project actions and associated effects will be appropriately limited such that the need for action will be met while no effects threshold are crossed."

62.     The Forest Service will provide no further opportunity for public comment. There will be no public comment period after the Forest Service has determined what and where specific on-the-ground activities will take place.  There will be no further public comment period prior to implementation of the Project.

63.     The Forest Service's 2023 EA states that the majority of the 5,551 acres of proposed clearcut harvest will be in lodgepole pine dominated stands more than 80-90 years old and more than 6 inches in diameter at breast height. Therefore, the majority of the stands to be logged are mature lodgepole pine.

64.     The Forest Service states that the 6,593 acres of commercial thinning will remove "a portion of the trees that are large enough to have commercial value: six inches or greater in diameter at breast height (DBH) for lodgepole pine and seven inches or greater DBH for other species." Therefore, the majority of lodgepole stands to be logged by commercial thinning are mature lodgepole pine; other species logged are also likely to be mature stands.

65.     The Forest Service states in the EA that residual tree distribution and density resulting from commercial thinning "will be determined by a Forest Silviculturist through prescription base on unit specific conditions." In other words, the Forest Service does not know how many trees it will log nor how many it will leave under the commercial thinning treatments.

66.    The Forest Service states in the EA that the 2,514 acres of non-commercial thinning will remove trees "too small to be sold" and reduce density to 15-25 foot spacing.

67.    The Forest Service states that the 1,804 acres of fuel treatment is "prescribed where specialists found management necessary based on fuels characteristics" and "designed to reduce potential wildland fire intensity."

68.    The "expected treatment actions within the primary fuels treatment acres" are as set forth in Table 2 of the EA:

Table 2. Expected treatment acreage within the 1,804-acre primary fuels reduction area.

| Fuels Treatment Actions | Expected Extent |
|---|---|
| Fuels (Small Diameter) Thinning | 1,048 acres |
| Prescribed Burning | 594 acres |
| Aspen Enhancement | 162 acres |

69.    The EA states, "Fuels treatments may be applied to any treatment unit as a secondary treatment." The Forest Service discloses that "fuels thinning" removes trees less than seven inches DBH by hand or machine, including mastication. Therefore, the authorized "fuels treatments" allows for more commercial harvest of mature trees.

70.    The Forest Service states that "56.8 miles of temporary project roads may be constructed to a standard appropriate for their intended use to support project

actions." The Forest Service discloses that "the exact locations of [the 56.8 miles of] temporary roads are not yet known."

71.     The Forest Service states, "The temporary road maximum extent was projected on maps for the purpose of analysis (such as in the Wildlife Report), but locations have not been vetted and are entirely subject to change. Draft temporary road locations that have been field verified will be released with draft/preliminary sale layouts on the project webpage."

72.     The Forest Service states, "roads associated with sales must be constructed, used, and obliterated during the estimated 5-year contract period" for each proposed sale within the Project.

73.     The Forest Service states that the Project will meet the Project "need" to "[c]ontribute to a sustained yield of timber products and improve the productivity of forested timber stands" because the Project "is estimated to produce about 83 million board feet of sawtimber if the project is implemented."

74.     A significant amount of public comment and objections raised concerns with the Forest Service's decision not to disclose and analyze the Project's site-specific activities prior to making a decision.

75.     Additionally, the U.S. Environmental Protection Agency ("EPA") raised concerns regarding the Project's significant impacts, stating that the Project cannot

take the "hard look" NEPA requires. The EPA stated in a letter to the Forest

Service:

> Given the lack of site-specific information and analysis, and potential for significant water quality, air quality and ecological impacts, it is unclear how the EA and FONSI will ensure significant impacts will be avoided for this project. We recommend the Forest develop this as a programmatic NEPA document that commits to tiered, site-specific NEPA analyses that provides opportunities for public involvement and comment on individual treatment projects
>
> The Draft EA lacks site-specific information about existing conditions, analyses of impacts, and mitigation measures. Instead, the Forest proposes to use an implementation plan, treatment matrix, and design features to manage each individual treatment and logging area. Given this information, we were unable to evaluate the likelihood that significant effects will be avoided for the EA and FONSI. NEPA requires a "hard look" at potential environmental impacts of a proposed action and public disclosure of those impacts prior to implementation. The impacts associated with the proposed action will vary based on site-specific conditions including: vegetation community composition, soil-types, slopes, proximity to residences, proximity to aquatic resources, proximity to Class I airsheds, road construction needs, road maintenance status, volume and type of material burned, equipment used, volume of truck traffic, sensitive species habitat, etc., and those site-specific conditions are varied across the South Plateau landscape.
>
> Although conditions vary throughout the planning area, and so impacts would be expected to vary as well, the Draft EA does not contain the actual locations of the timber sales and harvest units or where the temporary roads will be built and therefore it cannot disclose, analyze, or describe the localized impacts that can potentially occur. Individual treatment project design and impact assessment will occur post-FONSI, years after the public comment period on this Draft EA. This lack of site-specificity hampers informed decision-making as part of the NEPA process, and therefore meaningful public participation on the individual treatment projects,

both important for understanding the potential for significant impacts and determining mechanisms for avoiding them.

76.    The Forest Service did not remedy the defects the EPA identified.

77.    The Project is also expected to have negative effects on travelers on the Continental Divide Trail as 1,200 acres of treatment is expected to occur in the trail corridor.

78.    The EA states, "Vegetation management activities could temporarily affect summer recreationalist, including travelers on the Continental Divide National Scenic Trail, while activities are ongoing because they may experience the sights and sounds of vegetation management."

79.    The EA states, "The sights of management may last for the period of the Project implementation plus five years." In other words, the Project will affect recreation on the Continental Divide Trail for 20 years.

**Grizzly Bears in the Project Area**

80.    The South Plateau Project area lies entirely within the Greater Yellowstone Ecosystem Recovery Zone ("GYE") as identified and explained in the Grizzly Bear Recovery Plan, the Custer Gallatin National Forest Plan, and the 2022 Custer Gallatin National Forest Plan Biological Opinion for grizzly bears.

81.    The GYE Recovery Zone is divided into bear management units ("BMU") for habitat evaluation and population monitoring. The BMUs are further divided into subunits.

82.    The Agencies believe that the BMUs approximate the lifetime size of a female grizzly bear's home range and the subunits approximate the annual home range of a female grizzly bear.

83.    The South Plateau Project area lies within the Madison #2, Henry's Lake #2, and Plateau #1 Subunits.

84.    In the Greater Yellowstone Ecosystem, grizzly bears rely heavily on four primary food sources: cutthroat trout, ungulates (elk, deer, and bison), army cutworm moths, and whitebark pine seeds.

85.    Food resources for grizzly bears are especially important during the period leading up to denning (August-October) when bears must consume energetically rich foods to build up fat reserves to survive the denning and also when bears, particularly females with cubs, emerge from their dens in spring (March-May) and must replenish fat stores.

86.    The U.S. Fish and Wildlife Service ("FWS") has found that roads likely pose the most imminent threat to grizzly bear habitat today and that the management of roads is one of the most powerful tools available to balance the needs of people with the needs of bears. 1993 Recovery Plan; Interagency Grizzly Bear Committee, Taskforce Report: Grizzly Bear–Motorized Access Management (1994).

87.    Roads pose a significant threat to grizzly bears because roads provide

humans with access into grizzly bear habitat, which leads to direct bear mortality from accidental and defense-of-life shootings and intentional poaching.

88.    Human access also leads to indirect bear mortality by creating circumstances in which bears become habituated to human food and are later killed by wildlife managers.

89.    Roads and human access also result in indirect mortality by displacing grizzly bears from good habitat into areas that provide sub-optimal habitat conditions.

90.    Displacement may have long-term effects: "Females who have learned to avoid roads may also teach their cubs to avoid roads. In this way, learned avoidance behavior can persist for several generations of bears before they again utilize habitat associated with closed roads."

91.    Grizzly bears are displaced from areas with open and closed roads: "[G]rizzlies avoided roaded areas even where existing roads were officially closed to public use[]. Females with cubs remained primarily in high, rocky, marginal habitat far from roads. Avoidance behavior by bears of illegal vehicular traffic, foot traffic, and/or authorized use behind road closures may account for the lack of use of areas near roads by female grizzly bears in this area. This research demonstrated that a significant portion of the habitat in the study area apparently remained unused by female grizzlies for several years. Since adult females are the

most important segment of the population, this lack of use of both open-roaded and closed-roaded areas is significant to the population."

92.    Displacement may negatively impact the survival rates of grizzly cubs: "[S]urvivorship of the offspring of females that lived in unroaded, high elevation habitat was lower than that recorded in other study areas in the [Northern Continental Divide Ecosystem]. The majority of this mortality was due to natural factors related to the dangers of living in steep, rocky habitats. This is important in that the effects of road avoidance may result not only in higher mortality along roads and in avoidance of and lack of use of the resources along roads, but in the survival of the young when their mothers are forced to live in less favorable areas away from roads."

93.    FWS's 1993 Recovery Plan further finds that "[t]imber management programs may negatively affect grizzly bears by (1) removing thermal, resting, and security cover; (2) displacement from habitat during the logging period; and (3) increases in human/grizzly bear confrontation potential or disturbance factors as a result of road building and management. New roads into formerly unroaded areas may cause bears to abandon the area."

94.    In light of these harms, current peer-reviewed science finds that roads pose significant threats to grizzly bear survival: "[o]f all the covariates we examined, the amount of secure habitat and the density of roads in nonsecure habitat on public

lands had the greatest effect on grizzly bear survival."

95.   The Interagency Grizzly Bear Committee ("IGBC") has found that secure habitat (or "core areas"), which are areas free of motorized access, are an important component of grizzly bear survival and recovery. The IGBC states that secure habitat must be in place and undisturbed for at least 10 years, which is based on the generation time for a female grizzly bear to replace herself in the population.

96.   Agencies and courts have found that grizzly bear movement and connectivity between the various recovery zones in the lower 48 states, which is needed for long-term recovery, has yet to be restored. Grizzly bears in the Greater Yellowstone Ecosystem remain an isolated population.

97.   The 2022 Custer Gallatin National Forest Plan sets standards to protect this isolated grizzly bear population. Specifically, the Forest Plan sets specific standards required when a project temporarily reduces grizzly bear secure habitat.

98.   Under these standards, the Forest Service must meet and maintain secure habitat for grizzly bears as it was in 1998 when, as the Forest Service maintains, the grizzly population was doing well and meeting recovery goals. This is commonly referred to as the "1998 baseline."

99.   In effect, the Forest Plan standards that incorporate the 1998 baseline require bear management unit subunits to reach and maintain secure habitat – defined as

areas greater than 10 acres in size that are more than 500 meters away from open or gated motorized routes – at levels that existed in 1998.

100.   However, the Forest Service and the FWS determined that for three subunits on the Forest, the 1998 baseline secure habitat levels were not enough to protect the grizzly bears within those units. These subunits are Gallatin #3, Henry's Lake #2, and Madison #2.

101.   Two of these subunits (Henry's Lake #2 and Madison #2) occur in the Project area.

102.   For these three subunits, the Forest Plan set baseline levels at full implementation of the 2007 Gallatin National Forest Travel Plan.

103.   The Forest Plan sets secure habitat baseline levels for the subunits within the Project area as below:

| Subunit | 1998 Secure Habitat Baseline |
|---|---|
| Henry's Lake 2 | 52% |
| Madison 2 | 67.4% |
| Plateau 1 | 68.6% |

104.   Standard FW-STD-WLGB 03 states that inside the recovery zone, Project activities must meet three specific conditions for temporary reductions in secure habitat.

29

105.   FW-STD-WLGB 03(a) states that "only one project affecting secure habitat below baseline values may be active within a given bear management subunit at any one time."

106.   The Wildlife Report discloses that the North Hebgen Project also lies in Madison #2 subunit and began in 2020 and is still on going.

107.   The Wildlife Report notes that remaining activities associated with the North Hebgen Project "would reduce secure habitat below baseline when implemented" for the Madison #2 Subunit.

108.   FW-STD-WLGB 03(b) states that baseline values of secure habitat within a BMU shall not be reduced beyond 1% of the largest subunit of that BMU.

109.   The largest subunit in the Henry's Lake BMU is 128,539 acres.

110.   To comply with FW-STD-WLGB 03(b), the maximum amount of secure habitat that may be treated in Henry's Lake #2 is 1,285 acres.

111.   The Decision Notice authorizes 2,417 acres of secure habitat reduction in Henry's Lake #2.

112.   The Wildlife Report concedes, "The Henry's Lake #2 Subunit would be 2,426 acres below the baseline level (resulting from a temporary reduction of 2,417 acres under the Proposed Action and an existing deficit of 9 acres below the baseline under the existing condition). This would equate to a reduction of 1.9%

below the baseline level over the life of the project relative to the largest subunit in the BMU."

113.   The Forest Service nonetheless states that, "Because the project will adhere to all design features, the 1% Rule will not be exceeded."

114.   Design Feature 12 repeats the standard FW-STD-WLGB 03(b) but does not demonstrate how the Project complies with this standard.

115.   The Forest Service states that "while the proposed action includes potential units that will affect more than 1% of the acreage of the largest subunit below baseline, when implementation occurs, the Wildlife Biologist and implementation groups will work together to ensure no greater than 1% will be affected below baseline."

116.   Design Feature 12 states, "treatment units that will result in more than a 1% temporary reduction below baseline will be dropped or implementation of the project will be staged so that effects to secure [sic] below baseline never exceeds 1% of the acreage of the largest Subunit. If implementation is staged, temporary roads in one stage will be effectively decommissioned (and secure habitat restored) before moving onto another stage or area."

117.   The EA states that "the first two sales could occur concurrently in the Henry's Lake #2 subunit and the Plateau #1 subunit."

118.   Further, the Forest Service discloses that another timber sale project, the Yale Creek Project, is being or will be implemented in the Henry's Lake BMU at the same time as the South Plateau Project.

119.   The Yale Creek Project began in July of 2023.

120.   The Yale Creek Project Wildlife Report states that the Yale Creek Project will reduce secure habitat in the Henry Lake BMU by 1,012 acres. The Forest Service fails to disclose this in the South Plateau EA or Wildlife Report.

121.   Instead, the Forest Service states "Implementation of the South Plateau Project depends on the Yale Creek Project's impact to the 1%."

122.   Together, the Yale Creek Project and the South Plateau Project authorize a 3,429 reduction of secure habitat in Henry's Lake BMU.

123.   Despite this, the Forest Service concludes, without support, that "the 1% rule will not be exceeded, so in Henry's Lake #2 subunit, either treatment acreage will be reduced, or project activities will be implemented in stages."

124.   The Forest Service fails to disclose and consider how removing 3,420 acres of secure habitat in Henry's Lake BMU will impact grizzly bears in the area.

125.   FW-STD-WLGB 03(c) states that Project activities shall not reduce secure habitat below baseline levels for more than four consecutive years.

126.   FW-STD-WLGB 03(c) states that "the collective set of temporary roads that affect secure habitat below baseline levels shall be closed to all motorized use after

three years. Temporary roads shall be decommissioned such that secure habitat is restored within one year after closure."

127.   The EA states that "miles of temporary road construction for the Project will not all be constructed and in use at one time because timber or stewardship sale contracts will be staggered (as previously described), and roads associated with sales must be constructed, used and obliterated during the estimated 5-year contract period."

128.   The EA acknowledges that the South Plateau project will take 15 years to implement all the actions associated with the project including revegetation, restoration, and non-mechanized treatments.

**Canada Lynx in the Project Area**

129.   The U.S. Fish and Wildlife Service listed the Canada lynx as a threatened species under the Endangered Species Act in the lower 48 in 2000. The FWS also designated critical habitat for the lynx.

130.   After lynx were listed as threatened, the Forest Service, the FWS, and Bureau of Land Management entered into an interim agreement called the Lynx Conservation Assessment and Strategy, which guided lynx conservation actions on federal lands.

131.   Best available science indicates that logging can negatively impact lynx productivity and foraging habitat.

132.   When analyzing impacts to lynx, the Canada Lynx Conservation Assessment and Strategy recommends the use of the "lynx analysis unit" as the appropriate scale for investigating the effects of a project on lynx.

133.   The FWS's species list for the Project indicates that lynx may be present in the Project area.

134.   The South Plateau Project lies entirely within the South Madison lynx analysis unit, which is 39,944 acres in size.

135.   In 2007, the Forest Service published the Northern Rockies Lynx Management Direction ("Lynx Direction") which set forth goals, standards, and guidelines relating to "vegetation management activities and practices" that apply to vegetation management projects in lynx habitat within a lynx analysis unit. The Lynx Direction was incorporated in the 2022 Custer Gallatin Forest Plan.

136.   Lynx Direction Standard VEG S2 states that no more than 15% of lynx habitat within a lynx analysis unit may be subject to regeneration harvest within a 10-year period.

137.   The Lynx Direction exempts compliance with this standard for activities within the "wildland urban interface" ("WUI").

138.   The Lynx Direction incorporates the definition of WUI that is found in the Healthy Forest Restoration Act. The Healthy Forest Restoration Act defines WUI

as "an area within or adjacent to an at-risk community that is identified in recommendations to the Secretary in a community wildfire protection plan."

139.   A community wildfire protection plan's definition and mapping of WUI cannot provide justification for exemptions from the Lynx Direction.

140.   The South Plateau Project uses the WUI as mapped and defined by the Gallatin County Community Wildfire Protection Plan (Gallatin County Plan). The Gallatin County Plan utilizes a definition of WUI that is inconsistent with the Healthy Forest Restoration Act.

141.   As a result, the Gallatin County Plan's WUI is plainly overinclusive and results in the majority of the Project area being classified as WUI, inappropriately exempting the majority of the Project from compliance with the Lynx Direction, in violation of NFMA and NEPA.

142.   The Forest Service discloses that a total of 14,572 acres of lynx habitat will be affected by activities authorized by the Decision Notice.

143.   The Forest Service acknowledges that to satisfy Standard Veg S2, "no more than 15% of lynx habitat on NFS lands in the lynx analysis unit may be regenerated over a 10-year period. To satisfy this Standard, a maximum of 4,600 acres of regeneration harvest is allowed in lynx habitat in the lynx analysis unit."

144.   However, the Wildlife Report states that a total 7,737 acres of lynx habitat will be regenerated in the lynx analysis unit by the activities that are authorized in the Decision Notice.

145.   The Forest Service states that this total is "expected to decrease during implementation due to the fact that sideboards (e.g. limits on acres of regeneration harvest in lynx habitat under Lynx Direction, limits due to grizzly bear secure habitat standards, etc.), design features (40 acres maximum size of regeneration harvest, at least 500 feet between regeneration harvest units, etc.), and other requirements/realities (e.g. accessibility/feasibility) will further reduce the actual number of treatment acres that occur on the landscape."

146.   "For example, there are currently 8,787 acres of clearcut identified in the standpool in the [lynx analysis unit]. In order to meet Standard VEG S2, no more than 15% of lynx habitat on NFS lands in the lynx analysis unit may be regenerated over a 10 year period. To satisfy this Standard, a maximum of 4,600 acres of regeneration harvest would be allowed in lynx habitat in the lynx analysis unit."

147.   The Wildlife Report concedes that "Regeneration harvest, thinning, and fuels treatment (potentially) would have direct effects that alter lynx habitat so that it no longer provides the structure favorable for denning habitat."

148.   According to the Wildlife Report, "[i]t was assumed that existing denning habitat within these prescription types (and broadcast burning) would no longer be suitable for denning post-implementation."

149.   The Design Feature relating to regeneration of lynx habitat, Design Feature 1, repeats Standard Veg S2 but does not demonstrate how the Project complies with it.

150.   Design Feature 1 states, "This Project will regenerate no more than 4,600 acres of lynx habitat to comply with this standard."

151.   However, the Forest Service concedes that the Decision Notice authorizes a total of 7,737 acres of clearcuts in lynx habitat.

**Climate Change and Removal of Mature trees**

152.   The Forest Plan also sets a Forest wide standard which limits the quantity of timber that may be sold per decade within the Custer Gallatin National Forest.

153.   FW-STD-TIM 07 states "The quantity of timber that may be sold per decade from lands both suitable and not suitable for timber production shall not exceed the sustained yield limit 8.08 million cubic feet average annual volume (approximately 38 million board feet) with the exception of salvage or sanitation cutting of trees…"

154.   In other words, the Forest may not sell more than 38 million board feet per decade, averaged annually over 10 years.

155.   The Forest Service states that one of the "needs" of the Project is to "Contribute to a sustained yield of timber products and improve the productivity of forested timber stands."

156.   The Forest Service states that the Project will meet this need because it "is estimated to produce about 83 million board feet of sawtimber if the Project is implemented."

157.   The Project is not a salvage or a sanitation cutting of trees.

158.   The Forest Service does not disclose and analyze past, current or future projects that contribute to the total quantity of timber sold within the Custer Gallatin National Forest.

159.   The Forest Service states in the EA that "the majority of surveyed lodgepole pine stands that are proposed for clearcutting treatments have been confirmed to be over 90 years old." This indicates that the majority of the Project's 5,551 acres of clearcuts will occur in mature forests.

160.   The Forest Service concedes that through time, climate change will affect how forested vegetation is distributed across the landscape as well as the species distribution of that vegetation.

161.   The Forest Service expects lodgepole pine to retract from dry sites and move higher in elevation as the climate warms. This means that the 5,551 acres of clearcut lodgepole pine will likely not regenerate where it is cut.

162.   The Forest Service has also acknowledged that the Project area's forests "are currently acting as carbon sinks," meaning they are storing more carbon than they are emitting.

163.   To evaluate the Project's impact on climate change, including on carbon storage and sequestration, the Forest Service relied on a "Carbon Report" that fails to adequately consider years of climate science and does not adequately analyze the Project's broader climate impacts.

164.   The Forest Service's analysis of the Project's climate impacts is twenty sentences and is based on a document titled "Carbon Storage and Sequestration" and on two programmatic analyses for the 2020 Custer Gallatin Forest Plan EIS.

165.   The Forest Service's analysis of the Project's climate impacts tiers to the Forest Plan revision's Final EIS, which dismisses the impacts of management actions on the Custer Gallatin National Forest as "negligible," and compares them to total global and national emissions.

166.   The Forest Service fails to quantify the Project's impacts on the loss of carbon storage and sequestration.

167.   The Forest Service's decision declining to address the Project's impacts because they are allegedly "negligible" in comparison to the role the world's (or nation's) forests play in climate change is thus not only misleading, it masks the fact that every additional bit of climate pollution, or elimination of carbon

sequestration ability, makes the problem worse, and that every bit of sequestration and storage is critical to the solution.

168.   The Forest Service's approach does not adequately consider the Project's impacts on climate change.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*The Forest Service violates NEPA because it fails to take a hard look at the South Plateau Project impacts on the environment and fails to disclose sufficient information to the public.*

169.   All previous paragraphs are incorporated by reference.

170.   NEPA requires the Forest Service to discuss direct, indirect, and cumulative effects of the Project. 40 C.F.R. §§ 1502.16; 1508.1(g).

171.   NEPA requires that agencies take a "hard look" at the environmental consequences of its proposed actions *before* the agency chooses a particular course of action, without favoring a pre-determined outcome.

172.   NEPA further requires that relevant information be made available to the public so that they may play a role in both the decisionmaking and implementation of the Project.

173.   The Forest Service does not provide site-specific information about the South Plateau Project or its impacts. The South Plateau EA does not disclose specific locations where logging, road construction, or prescribed burns will occur within the Project area.

174.   The EA does not adequately address the direct, indirect, and cumulative effects of the Project on the human environment.

175.   The Forest Service therefore violates the hard-look and public disclosure requirement of NEPA and fails to provide sufficient site-specific information or analysis about the Project and it's impacts to foster informed decisionmaking and public participation.

176.   The Forest Service therefore violates NEPA and is not in accordance with law and without observance of procedure required by law under the APA. 5 U.S.C. §§ 706(2)(A)(D).

## SECOND CLAIM FOR RELIEF

*The Forest Service violates NFMA, NEPA and the APA because it fails to take a hard look at the Project's impacts to grizzly bears and fails to demonstrate compliance with the Custer Gallatin Forest Plan Standards for grizzly bears.*

177.   All previous paragraphs are incorporated by reference.

178.   The Custer Gallatin National Forest Plan contains standards relating to temporary changes in secure habitat for grizzly bears at FW-STD-WLGB 03.

179.   The Forest Service fails to demonstrate that the Project complies with these standards.

180.   The North Hebgen Project and the South Plateau Project are authorized to occur at the same time in the Madison #2 bear management subunit.

181.   The Forest Service is unable to demonstrate compliance with the Forest Plan standard FW-STD-WLGB 03(a) which prohibits more than one project affecting

41

secure habitat below baseline values to be active within a bear management subunit at any one time.

182.   The Forest Service concedes that activities authorized by the South Plateau Project Decision Notice in the Henry's Lake #2 subunit exceeds 1% of the Henry Lake Bear Management Unit.

183.   Further, the Yale Creek Project authorizes significant reductions in secure habitat within Henry's Lake BMU.

184.   The Forest Service is unable to demonstrate compliance with the Forest Plan standard that prohibits a temporary reduction of secure habitat below baseline values within a bear management unit to exceed 1% of the acreage in the largest subunit of that bear management unit and further fails to adequately consider the direct, indirect, and cumulative impacts of the South Plateau Project and the Yale Creek Project on secure habitat.

185.   The South Plateau Project will be implemented over 15 years and the collective set of temporary roads authorized by the Decision Notice will be in use for over 3 years.

186.   The Forest Service is unable to demonstrate compliance with the Forest Plan standard that prohibits the reduction of secure habitat below baseline levels for more than four consecutive years and requires that the collective set of temporary roads affecting secure habitat below baseline be closed to all motorized used after three

and further fails to consider direct, indirect, and cumulative impacts of the Project's collective temporary road use on grizzly bears.

187.   The Forest Service's failure to demonstrate compliance with provisions of the Forest Plan, its failure to take a hard look and to inform the public of the Project's environmental impact violates NFMA and NEPA, and is arbitrary and capricious, in violation of the APA.

### THIRD CLAIM FOR RELIEF
*The South Plateau Project violates NFMA, NEPA and the APA because it utilizes an incorrect definition of WUI, fails to demonstrate compliance with the Northern Rockies Lynx Management Direction, and take a hard look at impacts to lynx.*

188.   All previous paragraphs are incorporated by reference.

189.   The Lynx Direction was incorporated in the 2022 Custer Gallatin Forest Plan and sets standards for vegetation management in occupied lynx habitat.

190.   The Forest Service's uses an incorrect definition of WUI which results in a significant more amount of the Project area being classified as WUI than is authorized by the Lynx Direction and the Healthy Forest Restoration Act.

191.   Because the mapping, definition, and information related to the WUI areas as it relates to lynx, was misleading and inadequate, the Forest Service thus failed to take a hard look at the Project impacts on lynx.

192.   Lynx Direction Veg S2 states that "no more than 15% of lynx habitat on NFS lands in the lynx analysis unit may be regenerated over a 10-year period."

193.   The Forest Service concedes that "To satisfy this Standard, a maximum of 4,600 acres of regeneration harvest is allowed in lynx habitat in the lynx analysis unit."

194.   The Decision Notice authorizes "regeneration" logging on at least 7,737 acres of lynx habitat in the lynx analysis unit.

195.   The Forest Service fails to demonstrate compliance with the Lynx Direction and fails to adequately consider the direct, indirect, and cumulative impacts of the Project on lynx.

196.   The Forest Service's failure to demonstrate compliance with provisions of the Forest Plan and its failure to inform the public of the Project's environmental impact is a violation of NFMA and NEPA, and is arbitrary and capricious, in violation of the APA.

### FOURTH CLAIM FOR RELIEF
*The South Plateau Project violates NFMA, NEPA and the APA because it fails to demonstrate compliance with Custer Gallatin Forest Plan standard limiting the quantity of timber sold per decade.*

197.   All previous paragraphs are incorporated by reference.

198.   NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of NFS lands shall be consistent with" the applicable Forest Plan. 16 U.S.C. § 1604(i).

199.   The Custer Gallatin Forest Plan contains a standard, FW-STD-TIM-07, which prohibits the quantity of timber sold per decade to exceed 8.08 million cubic feet average annual volume (approximately 38 million board feet).

200.   The logging authorized by the South Plateau Project is estimated to produce 83 million board feet of sawtimber.

201.   The Forest Service fails to adequately consider the direct, indirect, and cumulative impacts of quantity of timber logged and sold by the South Plateau Project.

202.   The Forest Service fails to consider other past, present, and reasonably foreseeable logging projects on the Custer Gallatin National Forest that could contribute to the total amount of timber sold.

203.   The Forest Service's failure to take a hard look and to inform the public of the Project's environmental impact is a violation NEPA and cannot demonstrate compliance with the Forest Plan in violation of NFMA, and is arbitrary and capricious, in violation of the APA.

## FIFTH CLAIM FOR RELIEF
*The South Plateau Project violates NEPA because it fails to take a hard look at Climate Impacts*

204.   All previous paragraphs are incorporated by reference.

205.   NEPA requires federal agencies, including the Forest Service, to take a "hard look" at the direct, indirect, and cumulative impacts of proposed major

federal actions. 42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16 (1978), 1508.25(c) (1978). Among the impacts NEPA requires agencies to disclose are climate impacts.

206.   The Forest Service fails to adequately disclose the climate change impacts of the South Plateau Project. Specifically, the Forest Service fails to disclose the Project's impacts on carbon storage, sequestration and impacts to global climate change.

207.   Further, the Forest Service fails to disclose the climate pollution impacts of project implementation – the use of fossil fuel engines to build roads, cut trees, and remove and transport cut logs to mills – compared to the no action alternative. The Forest Service thus failed to take a "hard look" at the South Plateau Project's climate pollution impacts, in violation of NEPA.

208.   The failure of the Forest Service to take the required "hard look" at the climate pollution impacts of the South Plateau Project violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## SIXTH CLAIM FOR RELIEF
*The Forest Service's refusal to prepare a full EIS for the South Plateau Project violates NEPA and the APA.*

209.   All previous paragraphs are incorporated by reference.

210.   An EIS is required under NEPA to examine any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

211.   In assessing the appropriate level of NEPA review, the Forest Service is required to determine whether the project "is likely to have significant effects and is therefore appropriate for an environmental impact statement."

212.   The Forest Service failed to prepare an EIS to analyze the impacts of the South Plateau Project despite the fact that, among other things: (1) the Project may significantly harm unique characteristics of the area, including its proximity to Yellowstone National Park, its impacts to the Continental Divide Trail, and is an ecologically critical area; 2) the Project is highly controversial, including because the EPA concluded that the Forest Service had not justified its use of an EA for this Project; 3) the Project's possible effects are highly uncertain because the Forest Service itself does not yet know the actions and activities it will be taking; 4) the volume of timber together with other timber sales on the Forest will be significant; 5) the Project may have long term direct, indirect, and cumulatively significant adverse impacts; 6) the Project will likely adversely affect grizzly bears and lynx; and 7) the Project will result in violation(s) of the Custer Gallatin National Forest Plan.

213.   The Forest Service's "Finding of No Significant Impact," and its failure to complete an environmental impacts statement, despite the fact that the South Plateau Project may significantly affect the quality of the environment, violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## VII.   RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.   Declare that the Project decision violates the law;

B.   Either vacate the Project decision or enjoin implementation of the Project;

C.   Award Plaintiffs costs and reasonable attorney's fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and any other statute; and

D.   Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 20th day of September, 2023.


*/s/ Kristine M. Akland*
Kristine M. Akland
CENTER FOR BIOLOGICAL DIVERSITY

Marc Fink

CENTER FOR BIOLOGICAL DIVERSITY

*Attorneys for Plaintiffs*