Matthew K. Bishop (Mont. Bar No. 9968)
Sarah McMillan (Mont. Bar No. 3634)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 324-8011
bishop@westernlaw.org
mcmillan@westernlaw.org

*Counsel for Plaintiffs in Member Case No. 23-154*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al., | Lead Case: CV-23-110-DLC-KLD |
| Plaintiffs, | |
| vs. | Member Case: CV-23-154-M-DLC-KLD |
| U.S. FOREST SERVICE, et al., | |
| Federal-Defendants, | BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| and | |
| SUN MOUNTAIN LUMBER, INC., | |
| Defendant-Intervenor. | |
| GALLATIN WILDLIFE ASSOCIATION, et al., | |
| Plaintiffs, | |
| vs. | |

MARY ERICKSON, et al.,

      Federal-Defendants,

      and

SUN MOUNTAIN LUMBER, INC.,

      Defendant-Intervenor.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................iii

LIST OF ATTACHMENTS.................................................................................. vii

INTRODUCTION.................................................................................................. 1

BACKGROUND..................................................................................................... 3

    I.    Grizzly bears in the GYE.......................................................................... 3

    II.    The 2022 revised forest plan .................................................................11

    III.    The South Plateau project .....................................................................12

STANDARD OF REVIEW....................................................................................15

ARGUMENT.........................................................................................................16

    I.    ESA violations........................................................................................16

        A. Defining "secure habitat" as 10-acres conflicts with the best available
           science .................................................................................................. 18

        B. The 1998 baseline conflicts with the best available science .................23

    II.    NFMA violations ...................................................................................30

        A. Failure to ensure compliance with the one-at-a-time standard .............31

        B. Failure to ensure compliance with the 1% standard  ...........................33

        C. Failure to properly apply the 1% standard at the larger BMU level ....36

        D. The project likely violates the 1% standard ..........................................39

        E. The project violates the four-year standard  ..........................................43

    III.    NEPA violations....................................................................................46

A. Failure to adequately analyze the effects of over 56 miles of road work ..................................................................................47

B. Failure to adequately analyze cumulative effects ...................................49

C. An EIS is required .................................................................................56

IV.    This Court should vacate the challenged decision .....................................60

CONCLUSION.............................................................................................................61

CERTIFICATE OF COMPLIANCE ..........................................................................61

# TABLE OF AUTHORITIES

**CASES**

*Alaska Oil & Gas Ass'n v. Pritzker,*
    840 F.3d 671 (9th Cir. 2016) ........................................................ 23

*All. for the Wild Rockies v. Gassmann,*
    678 F. Supp. 3d 1249 (D. Mont. 2023) ...................................... 56, 59

*All. for the Wild Rockies v. Marten,*
    2021 WL 4551496 (D. Mont. Oct. 5, 2021) .......................... 39, 42, 45

*All. for the Wild Rockies v. U.S. Forest Serv.,*
    907 F.3d 1105 (9th Cir. 2018) ..................................................... 30, 60

*Appalachian Voices v. U.S. Dep't of Interior,*
    25 F.4th 259 (4th Cir. 2022) .......................................................... 17

*Blue Mountains Biodiversity Project v. Blackwood,*
    161 F.3d 1208 (9th Cir. 1998) ...................................................... 47, 53

*Cabinet Res. Grp. v. U.S. Fish and Wildlife Serv.,*
    465 F. Supp. 2d 1067 (D. Mont. 2006) .......................................... 21

*Cal. Cmties. Against Toxics v. Env't Prot. Agency,*
    688 F.3d 989 (9th Cir. 2012) ......................................................... 60

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ....................................................................... 15

*Grand Canyon Trust v. Fed. Aviation Admin.,*
    290 F.3d 339 (D.C. Cir. 2002) ....................................................... 55

*Great Basin Mine Watch v. Hankins,*
    456 F.3d 955 (9th Cir. 2006) ........................................................ 49, 54

*Great Basin Res. Watch v. Bureau of Land Mgmt.,*

844 F.3d 1095 (9th Cir. 2016) ..................................................................50

*Greater Yellowstone Coal., Inc. v. Servheen,*
    665 F.3d 1015 (9th Cir. 2011) ......................................................... 16

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*
    857 F.2d 505 (9th Cir. 1988) .........................................................50

*Hanly v. Kleindienst,*
    471 F.2d 823 (2d Cir. 1972)..........................................................50

*Helena Hunters & Anglers Ass'n v. Marten,*
    470 F. Supp. 3d 1151 (D. Mont. 2020).............................................60

*Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Eng'rs,*
    2023 WL 6226387 (S.D. Tex. July 27, 2023).....................................50

*Kern v. U.S. Bureau of Land Mgmt.,*
    284 F.3d 1062 (9th Cir. 2002)  .......................................................54

*Kern Cnty. Farm Bureau v. Allen,*
    450 F.3d 1072 (9th Cir. 2006) ........................................................23

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.,*
    387 F.3d 989 (9th Cir. 2004) ...................................................... 54-55

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976)....................................................................50

*Marsh v. Oregon Nat. Res. Council,*
    490 U.S. 360 (1989)....................................................................46

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) .........................................................15

*Native Ecosystems Council v. U.S. Forest Serv.,*
    418 F.3d 953 (9th Cir. 2005) .....................................................34, 39

*Native Ecosystems Council v. Weldon,*
        697 F.3d 1043 (9th Cir. 2012) ......................................................... 30

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
        137 F.3d 1372 (9th Cir. 1998) ......................................................... 38

*Ocean Advocs. v. U.S. Army Corps of Eng'rs,*
        402 F.3d 846 (9th Cir. 2005) ..........................................46, 56, 59-60

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
        523 U.S. 726 (1998)......................................................................... 41

*Robertson v. Methow Valley Citizens Council,*
        490 U.S. 332 (1989)......................................................................... 46

*Solar Energy Indus. Ass'n v. FERC,*
        80 F.4th 956 (9th Cir. 2023) ........................................................... 47

*Te-Moak Tribe v. U.S. Dep't of Interior,*
        608 F.3d 592 (9th Cir. 2010) ........................................................... 53

*W. Watersheds Project v. Kraayenbrink,*
        632 F.3d 472 (9th Cir. 2011)  .................................................... 16, 49

*WildEarth Guardians v. Jeffries,*
        370 F. Supp. 3d 1208 (D. Or. 2019)................................................ 42

*WildEarth Guardians v. Steele,*
        545 F. Supp. 3d 855 (D. Mont. 2021)...................................46, 47, 49

## STATUTES

5 U.S.C. § 706(2)(A)...........................................................................15
16 U.S.C. § 1536(a)(2)....................................................................16, 17
16 U.S.C. § 1600 *et seq.*......................................................................30
42 U.S.C. § 4332(2)(C) .......................................................................56
42 U.S.C. § 4332(2)(C)(v) ...................................................................46

## REGULATIONS

36 C.F.R. § 219.15(b) .................................................................................... 30
36 C.F.R. § 219.15(d) .................................................................................... 30
36 C.F.R. § 220.4 ........................................................................................... 50
36 C.F.R. § 220.7(a) ...................................................................................... 47
36 C.F.R. § 220.7(b) ...................................................................................... 47
36 C.F.R. § 220.7(b)(3)(iii) ...................................................................... 56-57
40 C.F.R. § 1501.3(a)(3) (2020) .................................................................. 56
40 C.F.R. § 1501.3(b) .................................................................................... 57
40 C.F.R. § 1501.3(b)(1) ................................................................................ 57
40 C.F.R. § 1501.3(b)(2) ................................................................................ 57
40 C.F.R. §§ 1508.27(b)(1)-(10) (2019) ...................................................... 56
40 C.F.R. § 1508.7 (2019) ............................................................................. 50
50 C.F.R. § 17.11(h) ...................................................................................... 10
50 C.F.R. § 402.02 ......................................................................................... 17
50 C.F.R. § 402.14(a) ..................................................................................... 17
50 C.F.R. § 402.14(g) ..................................................................................... 17
50 C.F.R. § 402.14(g)(4) ................................................................................ 17
50 C.F.R. § 402.14(g)(8) ................................................................................ 17

## FEDERAL REGISTER

40 Fed. Reg. 31,734 (July 28, 1975) ............................................................. 4
82 Fed. Reg. 30,502 (June 30, 2017) ........................................................... 57
85 Fed. Reg. 43,304 (July 16, 2020) ............................................................ 50

# LIST OF ATTACHMENTS[1]

Declaration of Sara Johnson

Declaration of Phil Knight

Declaration of George Wuerthner

---

[1] These declarations are properly before this Court because they are submitted solely to demonstrate Plaintiffs satisfy the minimum requirements for Article III standing.

## INTRODUCTION

Human-caused mortality is a significant threat to grizzly bears in the Greater Yellowstone. These mortalities are largely a function of how often grizzly bears encounter people. Most bears are killed within 500 meters of a road; nearly all are killed within 1,000 meters of a road. Grizzly bear conservation efforts, therefore, are largely focused on providing large, intact habitat blocks away from roads and other human intrusions. These areas of "secure habitat" are places a female grizzly bear can forage over the course of 1-2 days free from encounters with people. That is, areas where bears can meet their energetic requirements while avoiding humans.

Here, the Forest Service adopted a revised forest plan with new standards for "secure habitat" that were taken directly from a 2016 conservation strategy developed by state and federal agencies. The new standards: (1) define secure habitat as patches of land as small as 10-acres; and (2) require maintaining "secure habitat" at or above the amount present in 1998. The best available science, however – indeed, *all* the science – reveals this approach will not provide for the actual security needs of grizzly bears.

Nonetheless, the U.S. Fish and Wildlife Service ("FWS") adopted and signed off on this approach in its biological opinion for the revised forest plan in violation of the Endangered Species Act ("ESA"). FWS did the same thing in its related

1

biological opinion for the South Plateau project. This is a 15-year logging project that includes over 56 miles of new roads and over 16,000 acres of logging in an important area for grizzly bears in the Greater Yellowstone but also an area that is problematic for bears, due mainly to low amounts of secure habitat and high road densities. The project will make an already bad situation worse.

The Forest Service's South Plateau project authorization also violates the National Forest Management Act ("NFMA") and National Environmental Policy Act ("NEPA") for distinct but related reasons. The project will further reduce security for grizzly bears beyond levels and for a longer time than allowed in the revised forest plan's standards for managing secure habitat. The Forest Service also failed to take a hard look at the effects of the project's new roads on grizzly bears, failed to adequately analyze the cumulative effects, and failed to prepare an environmental impact statement ("EIS") given the project's likely significant environmental effects.

# BACKGROUND

## I.    Grizzly bears in the Greater Yellowstone.

Grizzly bears are a subspecies of brown bear characterized by humped shoulders and a concave facial profile. FWS-000780.



SP-043889. Grizzly bears have three life stages: dependent young, subadult, and adult. FWS-000781. Dependent young still depend on their mother for food, protection, and survival. *Id.* After two years, cubs leave their mothers and become subadults. *Id.* After four years, grizzly bears are adults and reach sexual maturity. *Id.*

Grizzly bears have one of the slowest reproductive rates among terrestrial mammals, due to their "late age of first reproduction, small average litter size, and

the long inter-birth interval." FWS-000785. Given these factors, it may take a female 10 or more years to replace herself in a population. *Id.*

The home range size for grizzly bears is generally affected by resource availability, sex, age, and reproductive status. FWS-000783. Grizzly bears use a variety of habitats and their daily movements are largely driven by the search for food, water, mates, cover, security, or den sites. FWS-000782. They typically travel 720 to 2,200 acres in a 1-2 day period to forage. SP-046202. Other factors influencing habitat use include food distribution, quality, and abundance, and the availability of habitat components like cover and denning areas. FWS-000782.

Historically, there were an estimated 50,000 grizzly bears in the western lower-48 States. FWS-000789. With the arrival of Europeans, however, grizzly bears were seen as a threat and shot, poisoned, and trapped wherever found. WS-ESA-000790. Grizzly bears were reduced to only two percent of their historic range. *Id.*

In 1975, grizzly bears were listed under the ESA. 40 Fed. Reg. 31,734 (July 28, 1975). In 1993, FWS designated six recovery zones where conservation efforts would be focused: the North Cascades, Selkirk, Cabinet-Yaak, Bitterroot, Northern Continental Divide, and Greater Yellowstone. FWS-000796.

4



FWS-000777.

In the Greater Yellowstone, grizzly bear management is broken down into bear management units ("BMUs") and subunits. FWS-000797. BMUs approximate the size of a female's lifetime home range and the smaller subunits approximate a female grizzly bear's annual home range. FWS-000797-98. BMUs and subunits are used to track distribution and habitat-based criteria. FWS-000797. This map displays the BMUs and subunits in the Greater Yellowstone:

5



FWS-001679.

The primary threat to grizzly bears in the Greater Yellowstone has been and

remains humans: human-access to areas occupied by grizzly bears results in "excessive

human-caused mortality and human-activity that reduces the quality and quantity of

habitats." FWS-000782; *see also* FWS-000848-51 (describing effects). As explained in

Schwartz (2010), humans "are the primary agent of death in grizzly bears." FWS-

002862. The numbers are troubling: "In areas with human-bear overlap, a large

majority of grizzly bears over the age of 2 are eventually killed by people and almost

6

all are killed near roads (shot, not hit by vehicles)." SP-027114. Humans cause between 77% and 90% of all grizzly bear mortalities and most bears – including females (which have the greatest influence on population trends) – are killed near roads. *Id.*

In the Greater Yellowstone, grizzly bear mortalities have spiked since 2008 (despite static population levels). SP-046202. From 1980-2001, there were an average of 8 human-caused grizzly bear mortalities a year. FWS-001107. In 2021 alone, there were at least 59 known human-caused mortalities. FWS-000643; *see also* SP-007608 (Dr. Mattson comment discussing alarming trend); SP-046202 (discussing same). Such levels of mortality can "determine the trajectories of most grizzly bear populations." FWS-002862.

The most important predictor of grizzly bear survival is the "amount of secure habitat within a bear's home range and road densities outside of secure habitat." FWS-002869. Secure areas, i.e., areas away from roads and development, have lower rates of female grizzly bear mortality. FWS-002868-70. These are considered "source" areas. *Id.* Conversely, less secure areas, i.e., areas with more roads and access, experience significantly higher mortality levels. *Id.* These are "sink" areas where more bears are killed than replaced, leading to a net loss of grizzly bears in these areas. *Id.*

7

This illustration shows source (in white) and sink (in blue) areas in the Greater

Yellowstone:



FWS-002870; *see also* SP-046204 (discussing same and providing maps).

The key to conserving grizzly bears in the Greater Yellowstone, therefore, is to

identify and protect secure areas away from roads and human access and intrusion.

FWS-000849; FWS-002869 (discussing same); FWS-003893-94 (discussing same);

SUPP-FWS-0008471 (discussing same); SP-027114 (discussing same). As Gibeau

(2001) explains, there is increasingly a "strong case for preserving 'security' areas

where grizzly bears will be relatively free from encounters with humans; that is,

where bears can meet their energetic requirements while at the same time choosing

to avoid people." SUPP-FWS-008471. "Such security areas would foster the wary

behavior in grizzly bears that most managers consider desirable . . . given that habituated bears have a significantly elevated mortality risk." *Id.*

Efforts to identify and protect secure areas emerged in Mattson (1993). FWS-003892. In 1994, the Interagency Grizzly Bear Committee recommended, based on the best available science, that secure areas be at least 500 meters (0.3 miles) from roads, include habitat to meet grizzly bears' seasonal needs, remain intact for at least 10 years, and be large enough to support a female grizzly bear for at least 24 hours of foraging. FWS-003693-94.

In 2003, Montana, Idaho, and Wyoming, along with the Forest Service, FWS, and other federal agencies, prepared a "conservation strategy" for grizzly bears in the Greater Yellowstone to guide management post-delisting. SUPP-FWS-008073, 8077. The 2003 conservation strategy included a commitment to identify and protect patches of "secure habitat" for grizzly bears. SUPP-FWS-008074-75. The states and federal agencies defined "secure habitat"– for the first time – as a patch of land more than 500 meters from an open or gated motorized access route (or reoccurring helicopter flight line) and "greater than or equal to 10 acres in size." SUPP-FWS-008075.

The 2003 conservation strategy also committed the state and federal agencies to strive to maintain secure habitat at levels present on the landscape in 1998–

9

commonly referred to as the "1998 baseline." *Id.* 1998 was chosen because it represented a time when the grizzly bear population and range were growing. SUPP-FWS-008088-89; *see also* FWS-000015 (describing the same). Under this approach, the percent of secure habitat within each subunit would be maintained at or above levels that existed in 1998, subject to a few exceptions. SUPP-FWS-008107; *see also* SUPP-FWS-008108 (describing exceptions).

The 2003 conservation strategy was updated in 2007 and 2016, and the secure habitat definition and 1998 baseline management objective (and exceptions) were carried forward. SUPP-FWS-007200, 7240-41; FWS-002253, 2258.[1] The 2016 conservation strategy, however, which was agreed to by the states and federal agencies, never took effect because grizzly bears remained listed as threatened under the ESA. 50 C.F.R. § 17.11(h); *see* FWS-002210. Nor was the 2016 conservation strategy ever implemented. *See* FWS-002210.

---

[1] The baseline for three subunits – including the Henry's Lake #2 and Madison #2 subunits – were increased to reflect full implementation of the 2006 Custer-Gallatin National Forest Travel Plan because conditions in these subunits were deficient in 1998 and, as such, not considered sufficient until additional road closures occurred following travel plan implementation. FWS-000015.

II.     **The 2022 revised forest plan.**

In 2022, the Forest Service revised its forest plan for the Custer-Gallatin National Forest ("revised forest plan"), which includes large portions of the Greater Yellowstone.

Relevant here, the revised forest plan formally adopted the 2016 conservation strategy's approach for identifying and managing "secure habitat" for grizzly bears, including the 10-acre secure habitat size and 1998 baseline, as binding standards. SP-000063; *see also* SP-000489 (describing same). New revised forest plan standard FW-STD-WLGB-01, for example, prohibits management actions from reducing the "percent of secure habitat" in each grizzly bear subunit below 1998 baseline levels. SP-000064. Standards FW-STD-WLGB-02 and FW-STD-WLGB-03 provide limited exceptions for permanent and temporary reductions in secure habitat below baseline, respectively, subject to strict conditions. SP-000064-65.

In 2022, the Forest Service prepared a final EIS for the revised forest plan, SP-000121, and obtained a biological opinion from FWS on how the plan may affect grizzly bears. FWS-001116. FWS determined the revised forest plan, including the "secure habitat" standards, was not likely to jeopardize the continued existence of grizzly bears. FWS-001273. FWS, however, made compliance with the revised forest plan's standards non-discretionary. FWS-001279.

11

### III.    The South Plateau project.

In 2023, the Forest Service issued a final environmental assessment ("EA") and final decision approving the South Plateau project. SP-004326; SP-004470. The Forest Service also obtained a biological opinion from FWS about how the project may adversely affect grizzly bears. FWS-000001.

The South Plateau project is adjacent to Yellowstone National Park, just south and west of West Yellowstone, Montana. SP-004334. The project area includes portions of the Custer-Gallatin National Forest, the Continental Divide Trail, and private and state lands. *Id.*; SP-041099.



SP-004335. Most of the project area is heavily forested with lodgepole pine dominated stands and a healthy understory of various grasses, forbs, and berry-producing shrubs. SP-004404. There are also large and old stands of whitebark pine, aspen, and numerous riparian areas. *Id.*



SP-010116.

The project area lies within three grizzly bear subunits active with bears, including females with cubs, solitary males, and numerous denning sites. SP-004403; FWS-002129; *see also* FWS-002132 (map showing the same). The three subunits include: Henry's Lake #2, Madison #2, and Plateau #1:



FWS-000173. Habitat conditions in the Henry's Lake #2 and Madison #2 subunits

are generally considered problematic and in need of improvement, due mainly to

low amounts of secure habitat and high road densities. SP-046204.

The project calls for roughly 16,462 acres of logging in these three subunits.

SP-004476. Approximately 5,500 acres will be clearcut. SP-004478. This will occur

14

primarily in older, lodgepole-dominated stands using ground-based heavy equipment. *Id.* The project also calls for roughly 6,500 acres of commercial thinning, 2,500 acres of non-commercial thinning, and 1,800 acres of fuels treatment. SP-004476. The Forest Service estimates the project will require approximately 56.8 miles of new temporary roads. SP-004479. The agency explains temporary roads will be constructed, used, and then decommissioned once project use is complete. *Id.* The project is estimated to take place over 15 years. SP-004490.

The Forest Service maintains the location of the logging units and 56 miles of roads are not yet known, SP-004479; SP-004344, and "may change" during project implementation. FWS-000010; *see also* SP-004476 (explaining the same); SP-004344 (same).

**STANDARD OF REVIEW**

ESA, NFMA, and NEPA claims are reviewed under the Administrative Procedure Act ("APA"). *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). The APA directs courts to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA, courts must not substitute their judgment for that of the agency but must nonetheless engage in a "thorough, probing, in depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402,

15

415 (1971). Courts must "ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011). An agency's action is arbitrary if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## ARGUMENT[2]

### I.      ESA violations.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). The heart of the ESA is Section 7, *id.,* which directs all federal agencies to consult with FWS to ensure its actions are "not likely to jeopardize the continued existence" of listed species. 16 U.S.C. § 1536(a)(2). To "jeopardize" means "to engage in an action that reasonably would be

---

[2] To avoid duplicating arguments, Plaintiffs in No. 23-154 incorporate by reference Plaintiffs in No. 23-110's claims that FWS: (1) failed to adequately analyze effects to grizzly bears; (2) failed to properly define the environmental baseline; and (3) arbitrarily relied on unspecified mitigation measures.

expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

When a federal action is "likely to adversely affect" a listed species the agency must obtain a biological opinion from FWS on whether the action is likely to result in jeopardy. 50 C.F.R. §§ 402.14(a), (g). Biological opinions must be based solely on the best available science. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

When formulating its biological opinion, FWS must undertake three steps. *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022). FWS must review all relevant information on the species and then carefully evaluate the status of the species, the environmental baseline, cumulative effects, and the effects of the action. *Id.* at 270. FWS must then add the effects of the action and cumulative effects to the baseline and formulate its jeopardy finding. 50 C.F.R. § 402.14(g)(4).

Here, as previously mentioned, the Forest Service obtained a biological opinion on its revised forest plan and new secure habitat standards for grizzly bears, which were adopted from the 2016 conservation strategy. FWS-001116; SP-000063. This resulted in a no jeopardy finding from FWS. FWS-001273. The biological opinion, however, made following the revised forest plan's grizzly bear secure habitat

17

standards mandatory. FWS-001279. This new biological opinion superseded the previously issued biological opinions for the forest. FWS-001212. In 2023, the Forest Service also obtained a biological opinion for the South Plateau project, which tiered to the revised forest plan biological opinion. FWS-000009. This also resulted in a no jeopardy finding from FWS due mainly to the revised forest plan's "sideboards" for managing secure habitat. FWS-000033, 0047-50.

As outlined below, FWS's biological opinions for the revised forest plan and South Plateau project are arbitrary and violate the ESA for *two* reasons.

### A. Defining "secure habitat" as 10-acres conflicts with the best available science.

In 2022, the Forest Service took the bold step of formally adopting the 2016 conservation strategy's secure habitat standards – including defining "secure habitat" as patches of land as small as 10 acres – into the revised forest plan. SP-000063; SP-000489. FWS then adopted and signed off on this approach in its biological opinions on the revised forest plan and South Platea project. In fact, in the biological opinions, the agency doubles down and defends the standards, noting the 10-acre threshold "provides greater sensitivity for determining loss of secure habitat." FWS-001242.

The problem, however, is that there is *no scientific support* for the notion that patches of land as small as 10 acres provide security for grizzly bears. Nor is there any

18

support in the 2003, 2007 or 2016 conservation strategies. On the contrary, the best available science reveals 10-acres is well below the size of security areas needed for grizzly bears, as it is magnitudes smaller than what a female grizzly bear covers during a single day of foraging.

The concept of identifying and protecting secure areas for grizzly bears emerged from Mattson (1993). FWS-003896. There, the author reviewed research on the habitat needs and threats to grizzly bears and recommended establishing "security" areas "where grizzly bears will be secure from encounters with humans; where bears can meet their energetic requirements while at the same time choosing to avoid people." FWS-003896. Mattson (1993) then proposed dimensions for secure habitat areas that are: (1) a certain distance from roads; and (2) encompass a sufficient size that corresponds to the "average 24-48 hour foraging radius of a Yellowstone grizzly bear." FWS-003897. "This would hypothetically allow a grizzly bear the space to forage while concurrently maintaining its wariness to humans." *Id.* Mattson (1993) explained that the average size of a 24-48 hour foraging radius for grizzlies in the Greater Yellowstone was 237 acres. *Id.* According to the authors, security areas should thus be roughly 7,000 acres in size, with a 237-acre core area surrounded by a 2-4 km buffer from roads. *Id.*

19

Following Mattson (1993), a 1994 Interagency Grizzly Bear Committee report recommended identifying and managing secure areas for grizzly bears free from motorized access (what the 1994 report then called "core areas"). FWS-003693. The report recommended secure areas be at least 0.3 miles (500 meters) from a road and "meet seasonal bear habitat needs by assuring that spring, summer, fall and denning habitat within the core areas are representative of these seasonal habitats . . . ." *Id.*; *see also* SUPP-FWS-005147 (explaining the same). The 1994 report also emphasized that the minimum patch size for secure areas be at least "that area necessary to support a female grizzly bear for 24 hours of foraging." FWS-003694. This recommendation was, and remains, generally consistent with the best available scientific literature, including Mattson (1993), FWS-003897, Gibeau (2001), SUPP-FWS-008476, and Proctor (2019), SP-027111.

As Dr. Mattson explained, the "logic of defining patches of secure habitat so as to encompass a typical 1-2 day forging bout has been affirmed in several authoritative documents." SP-046203. Research indicates bears "use areas 720-2,220 acres in size during 1-2 day periods." SP-046202. Gibeau (2001), for instance, noted that daily foraging requirements for grizzly bears are roughly 2,224 acres. SUPP-FWS-008474. Proctor (2019) explained that secure habitat should be patch sizes greater than or equal to 2,471 acres (10 km squared). SP-027111. A South Fork

20

Grizzly Bear Study defined "secure habitat as polygons greater than 2,000 acres . . . all farther than a mile from any road or trail." SUPP-FWS-005147.

In the 2018 Northern Continental Divide conservation strategy, the agencies went even further and defined secure habitat as areas 2,500 acres. SUPP-FWS-005031; *see also* FWS-000825 (noting same). This is consistent with how security is defined in the Cabinet-Yaak and Selkirk ecosystems. *See Cabinet Res. Grp. v. U.S. Fish and Wildlife Serv.*, 465 F. Supp. 2d 1067, 1090-91 (D. Mont. 2006) (discussing study). There, secure habitat for grizzly bears is generally considered to be between 1,280 acres and 5,120 acres, and roughly 95 percent of the grizzly habitat used occurred in secure areas 2,560 acres or larger. *Id.*

Here, however, the Forest Service and FWS took a drastically different approach, defining secure habitat as small *as 10-acres* in size. This is well below the foraging needs of a female grizzly bear, well below the size recommended by Mattson (1993), Gibeau (2001), or Proctor (2019), well below the Interagency Grizzly Bear Committee recommendations, and well below the amount used in the Northern Continental Divide and Cabinet-Yaak and Selkirk.

Indeed, there is *no scientific support*, justification, or research behind this significantly smaller, 10-acre threshold for secure habitat. In fact, no scientific literature is cited in the biological opinions at issue here, or in the 2003, 2007, or

21

2016 conservation strategies where the 10-acre patch size emerged. Nor could there be. As explained by Dr. Mattson, 10 acres "is far smaller than any research has shown bears to use for periods even as short as a day." SP-007599. "The few available studies of movements at this scale have, in fact, shown grizzly bears to use areas . . . 720-2,220[] acres in size during 1-2 day periods," or roughly "70-220 times larger" than the 10-acre standard. *Id.*

Notably, FWS's adoption of the 10-acre threshold has significant consequences for grizzly bears because it creates a fragmented landscape comprised of small, 10-plus acre islands of "secure" habitat. Foraging grizzly bears will thus need to cross several roads daily and spend significant time within 500 meters of roads as they travel between these habitat islands.

For example, a bear that uses 720 acres during a 1-2 day period, which is on the small end for a foraging bear, would need to cross over 70 roads during that period to satisfy its needs. There is nothing "secure" about such habitat. FWS-002869. As explained in Schwartz (2010), when secure habitat areas become "isolated islands surrounded by heavily roaded areas" grizzly bear travel "among secure islands then becomes more hazardous, effectively fragmenting the landscape." *Id.*; *see also* SUPP-FWS-008477 (Gibeau (2001) explaining that decreasing the size of secure habitat areas is likely a long-term viability threat). The 10-acre threshold

22

inflates "secure habitat" numbers above the amount of truly secure areas on the landscape and, by so doing, creates an artificial or false sense of "security" where none exists. SP-046203.

In sum, the best available science – in fact, *all* the available scientific literature – reveals there is no scientific support for defining secure habitat as small as 10-acres. Not a single study supports the approach taken by FWS in the biological opinions and what available information does exist reveals it is inadequate. The ESA's best available science requirement means the agency must consider the best and most reliable scientific data. *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016). It does not require "ironclad and absolute" science, *id.* at 680, but it does prohibit FWS from disregarding superior scientific evidence or scientific evidence "that is in some way better than the evidence [it] relies on." *Kern Cnty. Farm Bureau v. Allen*, 450 F. 3d 1072, 1080 (9th Cir. 2006). This is precisely what FWS did here. The 10-acre threshold is "faith-based rather than evidence-based and contravenes the best available science." SP-046203.

**B.  The 1998 baseline conflicts with the best available science.**

The Forest Service's "1998 baseline" management objective for secure grizzly bear habitat – which FWS also adopted and signed off on in the revised forest plan and South Plateau biological opinions – also conflicts with the best available science.

23

As previously mentioned, the revised forest plan objective is to maintain grizzly bear "secure habitat" at or above levels that existed in 1998. In justifying use of this 1998 baseline, FWS explains that the "key to establishing habitat criteria that will maintain a healthy population is to look at habitat factors in the past that produced a grizzly bear population" in the Greater Yellowstone that was increasing in numbers and range. FWS-001215. FWS explained that since the grizzly bear population was increasing at approximately 4-7 percent between 1983 and 2001, habitat conditions in 1998 "were chosen as a meaningful baseline." FWS-001215. FWS's biological opinions thus rely heavily on the 1998 baseline for its no jeopardy findings. *See, e.g.,* FWS-000015-16, 0032-34; FWS-001269.

FWS's continued use of and reliance on the 1998 baseline 25 years on conflicts with the best available science for *three* reasons.

First, the 1998 baseline adopts the same flawed definition of "secure habitat" as including patches of land as small as 10-acres in size which, as previously explained, has *zero support* in the scientific literature. *See* supra § I.A.

Second, the 1998 baseline is not a proxy for secure habitat conditions because it fails to account for the key habitat variables that the best available science says are needed for actual security.

As explained by the Interagency Grizzly Bear Committee, grizzly bear habitat security cannot be defined solely as areas a certain distance from roads. FWS-003694. "Other factors such as vegetation (food, cover), concentrated human use locations (e.g., town sites, campgrounds), heavily used non-motorized trails and areas of high levels of dispersed human use will also influence the effectiveness of area[s] in regards to habitat security." *Id.*; *see also* FWS-003568 (explaining the same); SP-007601-02 (explaining that all roads are not equal and how grizzly bears respond depends on traffic levels and other factors). Secure habitat, therefore, "should meet the seasonal habitat needs of the bear and should be representative of seasonal habitats in the entire analysis area." SUPP-FWS-008211. The 1998 baseline, however, fails to account for such needs – at all.

The 1998 baseline, for example, fails to include *any* requirement that secure habitat include vegetation or cover required for functional grizzly bear habitat. *See* FWS-000787 (describing the importance of cover, especially for bed sites concealed from humans); SP-046197 (explaining that visual screening from cover may affect security levels); SP-014726 (explaining how loss of cover affects security). As one commentor noted, the "complete lack of any criteria for hiding cover in security areas means that there is no limit to the amount of hiding cover that can be removed in security areas." SP-014726. That means large clear cuts more than 500

25

meters from an open road, including heavily trafficked roads – like those proposed

here – qualify as secure habitat under the 1998 baseline *even if* they provide no cover

or high-quality food sources for grizzly bears.

The South Plateau project is a prime example of why this approach is

deficient. The project will reduce hiding cover on nearly 18,379 acres, or *over 45%*,

of the project area. SP-004334; SP-041088. The project will also subject virtually all

patches of existing secure habitat to some level of industrial logging, resulting in

"loss or reduction of visual cover affecting most 'secure' areas as well as roaded

habitats in between," SP-046212, as this figure illustrates:



*Id*. But because the 1998 baseline fails to include any vegetative or cover component,

such aggressive logging practices will purportedly have *zero effect* on "secure habitat"

26

levels. SP-004406-07; *see also* SP-014726 (questioning how this can be).  There is simply no scientific support for this approach.

Third, the 1998 baseline is outdated. The Greater Yellowstone area has experienced significant changes in the past 25 years, including increased population, recreation, and private residential development, as well as climate change and changes in grizzly bear range, food sources, and habitat, that have significantly impacted grizzly bears and led to increased mortalities in areas such as the South Plateau project area. But none of these changes are accounted for under the static 1998 baseline.

For example, grizzly bears in the Greater Yellowstone rely on four main food sources: whitebark pine seeds, army cutworm moths, ungulates (elk, deer, bison), and spawning cutthroat trout. SUPP-FWS-007144. But the amount and distribution of these important, high-quality food sources have changed dramatically since 1998, including in the project area. SP-046198-99. The central Yellowstone bison herd has "declined by nearly 60%, with most of this decline happening after 2005." *Id.* Local populations of elk also plummeted between the 1990s and 2010. SP-007607. At roughly the same time, "most mature whitebark pine died during an outbreak of mountain pine beetles driven by hot weather between 2000 and 2009." *Id.* Losses

27

were most dramatic in the western portion of the Greater Yellowstone, where the project is located. *Id.*

These losses in important food sources had a profound effect on the diet and habitat use patterns for grizzly bears and, predictably, likely resulted in a spike in human-caused grizzly bear mortalities in the Greater Yellowstone since 2008. SP-046202. This "jump in grizzly bear mortality since . . . 2008 further calls into question any equivalence between the 1998-baseline . . . and [the] fitness of Yellowstone grizzly bears." *Id.*

Climate changes are also occurring, including warmer and drier summers. SP-046198. Such changes have resulted in larger and more frequent wildfires in the region, especially since 2000. SP-007607. This has implications for both habitat selection by grizzly bears and the abundance of food sources such as fruit-bearing shrubs. *Id.* Climate change also effects the "extent to which bears need forest cover to thermoregulate during the day," "especially in areas impacted by human disturbance." SP-046198.

The number of people living and recreating in or near the Greater Yellowstone has also significantly increased since 1998, especially over the last decade. SP-007606; *see also* FWS-000671-72 (explaining same); SP-046199 (Figure 3(B), (C) showing increases). The population of Gallatin County has roughly

doubled since 1998, resulting in a significant increase in dispersed recreation in grizzly bear habitat. SP-046201. Annual visitation to Yellowstone National Park has also "increased from an average near 3 million during the 2000s to nearer 3.7 million during the 2010s, with visitation surpassing 4 million each year [from] 2015-2019." SP-007606. In 2021, recreational visits to Yellowstone surpassed 4.8 million – a new record. FWS-000671. Many of these new visitors arrive and depart from the west entrance near the South Plateau project area. SP-046201.

In sum, all of these changes since 1998 have had, and will continue to have, "demonstrable effects on grizzly bear diets, distributions, and habitats." SP-046198. "These dynamics, in turn, have implications for not only the adequacy of current levels of presumed habitat security in and near the [South Plateau] project area, but also for the effects of planned roads and vegetation treatments on individual grizzly bears and the Yellowstone grizzly population." *Id.* None of these changes, however, are captured in the 1998 baseline FWS utilized in this case.

For these reasons, using 1998 as a "snapshot" to guide grizzly bear management in 2023 is arbitrary and conflicts with the best available science. Indeed, even in the now outdated 2016 conservation strategy, the agencies recognized the need to update the 1998 baseline, noting that it has "not kept pace" with more recent changes, including significant increases in visitor use to the

29

Greater Yellowstone. FWS-002252. A proposal was made to re-evaluate and revise the 1998 baseline, *id.*, but that never occurred.

## II.   NFMA violations.

NFMA "charges the Forest Service with the management of national forest land." *All. for the Wild Rockies v. U. S. Forest Serv.*, 907 F.3d 1105, 1109–10 (9th Cir. 2018) (citing 16 U.S.C. § 1600 *et seq*). Management occurs at two levels: the forest level and project level. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). At the forest level, the Forest Service develops a forest plan consisting of long-term plans and objectives for the forest. *Id.* The Forest Service then implements the plan when approving site-specific projects, *id.*, which must comply with forest plan standards. 36 C.F.R. § 219.15(b), (d). Forest plan standards are binding on the agency and must be "strictly" complied with. *All. for the Wild Rockies*, 907 F.3d at 1110.

Here, the revised forest plan includes binding standards for managing secure habitat for grizzly bears. Revised forest plan standard FW-STD-WLGB-03 states that temporary reductions in grizzly bear secure habitat below 1998 baseline conditions are only permitted if they meet the following conditions:

(a) only one project affecting secure habitat below baseline conditions may be active within a subunit at a time;

30

(b) the total acreage of secure habitat below baseline values within a BMU shall not exceed 1% of the acreage of the largest subunit within that BMU; and

(c) project activities, including temporary roads, shall not reduce secure habitat for grizzly bears below baseline levels for more than four consecutive years and the collective set of temporary roads reducing secure habitat below baseline must be closed within three years (and effectively decommissioned such that secure habitat is restored within one year of closure). SP-000065 (forest plan); *see also* SP-041106 (discussing standards).

The Forest Service's approval of the 15-year South Plateau project – which will temporarily reduce secure habitat below baseline levels in two subunits – violates FW-STD-WLGB-03 for *five* reasons.

### A.    Failure to ensure compliance with the one-at-a-time standard.

First, the Forest Service is violating the one-at-a-time standard, FW-STD-WLGB-03(a). The existing conditions in the Henry's Lake #2 and Madison #2 subunits are already below baseline levels. SP-004433. That means only one project with *any effect* on secure habitat can operate in these subunits at a time.

The record reveals at least five ongoing projects in the Madison #2 subunit that may already be affecting secure habitat below baseline levels: conifer tree removal efforts, noxious weed control, work on the Rendezvous Nordic ski area, the

31

Black Mountain salvage project, and the North Hebgen project. FWS-000022; *see also* FWS-000579-80 (discussing same); SP-014728, 14732 (Rendezvous Nordic ski area will affect 1,670 acres).

In the record, the Forest Service only briefly mentions these projects. It does, however, admit the North Hebgen project would also affect secure habitat below baseline levels in the Madison #2 subunit. SP-041106. That project includes over 2,000 acres of logging and new roads, SP-006145, and will affect 862 acres below baseline. SP-004432. The current status of the North Hebgen project is unclear, however. The wildlife report states work "began in 2020" and work in the Madison #2 subunit is "largely complete," SP-041090, but the record also indicates the project had not begun as of early 2022 and would be implemented over a 5-10 year period. SP-005386. Regardless, the project continues to impact secure habitat below baseline and even the Forest Service's most optimistic assessments recognize the project is ongoing and temporary roads have not been decommissioned. SP-041090; *see also* SP-006145 (explaining the same). Secure habitat, in turn, will not be restored until a year after decommissioning is complete. SP-041090.

The Forest Service nonetheless insists that activities "affecting secure habitat below baseline" – like the North Hebgen project or others in the same subunit – would not occur at the same time in the same subunit "in order to be consistent"

32

with the forest plan standard. SP-041106. But no assurances are provided in the record and what evidence is included is inconsistent.

Further, the revised forest plan standard is not limited to individual "activities" that are part of larger projects. *See* SP-041106. The standard, rather, speaks to projects: "Only *one project* affecting secure habitat below baseline values may be active within a given bear management subunit at any one time." SP-000065 (emphasis added); *see also* SP-041106 (discussing same). If the North Hebgen project or others continue to be implemented or work still needs to be done, then no activities included in the South Plateau *project* can proceed without violating the forest plan's one-at-a-time standard. SP-000065.

## B.   Failure to ensure compliance with the 1% standard.

Second, on its face, the Forest Service cannot ensure compliance with the 1% standard in the revised forest plan, FW-STD-WLGB-03(b), because it does not know where the 56.8 miles of roads will be located, how long they will be used, or when and how they will be closed.

As previously explained, the location of roads is determinative in calculating secure habitat for grizzly bears in BMUs and subunits. SP-004406. This is because secure habitat is defined as blocks of habitat at least 500 meters from a road. *Id.* Secure habitat is assessed at the BMU and subunit levels, with new roads—temporary

or permanent—decreasing secure habitat by bisecting or otherwise infringing on previously secure areas. *See* SP-000065; SP-041078-79. It is thus axiomatic that ensuring compliance with secure habitat standards in the project area requires knowing *where* roads will be located, how long they will be used, and when and how they will be removed. *See* SP-000065. This information is critical and necessary for ensuring compliance with the 1% standard and the only way for courts to "reasonably ascertain" from the record that the agency is complying with the standard. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 963 (9th Cir. 2005).

Yet, here, this critical information is missing. The Forest Service does not know where the 56.8 miles of roads will be located, which subunits they will be in, how long they will be used, or when they will be obliterated. SP-004479. The Forest Service produced a road map, but it comes with the caveat that road locations "have not been vetted" and "are entirely subject to change." SP-004344.

34



FWS-0000175. Such maps, therefore, are of limited value, beyond showing those

impacts will likely be significant. *See id.* This is particularly true here, where it is

imperative to know how much each subunit will be impacted.

EPA recognized this fact when commenting on the project, noting the EA

"does not contain the actual locations of the timber sales and harvest units or where

the temporary roads will be built and therefore it cannot disclose, analyze, or

35

describe the localized impacts that can potentially occur." SP-009300. This was an "overarching concern" for EPA. SP-009298; *see also* SP-016504 (similar comment from Montana DNRC). Other members of the public raised similar concerns, explaining that the Forest Service cannot logically claim it is following forest plan standards when critical information on roads is missing. SP-014730. As one commentor aptly noted, "some roads could be built here, others there; the Forest Service doesn't know where, and won't say where." SP-012025.

The Forest Service explains that its approach is generally considered the "worst case" scenario. SP-041089. Presumably, it means all 56.8 miles of temporary roads on the landscape at the same time. But the agency never explains what this "worst case" means or how it was applied. *See id.*

C.    **Failure to properly apply the 1% standard at the larger BMU level.**

Third, the Forest Service misapplied the 1% standard. The 1% standard is to be assessed at the scale of the larger BMU, not the subunit. SP-004432; SP-000065. In other words, compliance with the 1% standard requires knowing the existing levels of secure habitat in the Henry's Lake, Madison, and Plateau BMUs and comparing those levels to baseline levels for each BMU. SP-041106. This information will provide the existing condition of secure habitat in each BMU relative to baseline. The Forest Service must then calculate 1% of the total acreage in

36

the largest subunit within each BMU. *Id.* As per the 1% standard, this will then provide the maximum acreage below baseline that may be temporarily impacted in each BMU at any given time, subject to other conditions. *Id.* Only by acquiring this information can the Forest Service determine if the project complies with the 1% threshold. *Id.*

Yet, here, the Forest Service failed to collect and calculate secure habitat levels for *each BMU* impacted by the project and instead mistakenly applied the 1% standard at the subunit level. In fact, *nowhere* does the agency determine the existing secure habitat levels for *any* BMU impacted by the project, determine how these levels compare to baseline, or how the project will impact secure habitat below baseline at the BMU level.

For example, when evaluating compliance with the 1% standard, *see, e.g.*, SP-041106 and SP-004433 (Table 12), the Forest Service explains the standard is met in the Madison #2 subunit because the largest subunit in the Madison BMU is 145,847 acres, meaning the project can reduce security below baseline levels up to 1,458 acres without violating the 1% standard. SP-041106; SP-004433 (Table 12). But in reaching this conclusion, the Forest Service never compared the 1,458-acre threshold against "the total acreage of secure habitat below baseline values" within the larger Madison BMU (which includes two subunits). Instead, the agency mistakenly

compared the 1,458-acre threshold only against the total acreage of secure habitat below baseline in the Madison #2 subunit. SP-004433 (Table 12).

The same mistake was made in the Henry's Lake BMU. There, the Forest Service determined the project can reduce security up to 1,285 acres without violating the 1% standard. *Id.* But again, the Forest Service never compared this 1,285-acre threshold against the total acreage of secure habitat below baseline values in the larger Henry's Lake BMU. *See id.*

The Forest Service also omitted any further analysis of the Plateau #1 subunit after concluding "the secure habitat reduction in the Plateau #1 subunit would not result in the subunit dropping below the baseline level." SP-041089. But again, the correct approach is to evaluate reduction below baseline at the BMU, not subunit, level. The project may reduce secure habitat below baseline and violate the 1% threshold in the larger Plateau BMU if conditions are already below baseline in the other Plateau subunit. The Forest Service, however, did not undertake that assessment and is thus unable to determine if the project would comply with the 1% standard for that subunit as well.

The Forest Service's failure to properly assess compliance with the 1% standard at the required BMU level is a major oversight and violation of NFMA. *See, e.g., Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1377-78 (9th

38

Cir. 1998) (agency used wrong geographic area); *Native Ecosystems Council*, 418 F.3d at 963 (agency used wrong denominator); *All. for the Wild Rockies v. Marten*, 2021 WL 4551496 at *4 (D. Mont. Oct. 5, 2021) (agency failed to use proper calculations). The Forest Service's calculations "need not be perfect" but the court "must still be able reasonably to ascertain" the Forest Service complied with the forest plan. *Native Ecosystems Council*, 418 F.3d at 963. That is impossible with respect to the 1% standard here.

### D.    The project likely violates the 1% standard.

Fourth, the South Plateau project will likely violate the 1% standard. As noted above, the 1% standard prohibits reducing secure habitat more than 1,458 acres below baseline values in the Madison BMU. SP-004433. The existing condition in the Madison #2 subunit (not counting conditions in the Madison #1 subunit) is already 20 acres below secure habitat baseline. SP-004433 (Table 12). The South Plateau project will result in 248 acres of additional impacts below baseline, SP-041106, and the North Hebgen project in the same subunit "is affecting 862 acres below baseline." SP-004432. Between the existing condition and these two projects, roughly 1,130 acres of secure habitat will be below baseline, means *only an additional 328 acres* of secure habitat in *the entire* Madison BMU can be reduced below baseline before exceeding the 1% standard.

39

The Forest Service insists the project falls under this 1% threshold, but the agency never accounted for other projects in the same Madison BMU that likewise impact secure habitat below baseline. No information on other projects or activities in the Madison #1 subunit, for example, are included in the analysis even though evidence in the record reveals they may exist. *See, e.g.*, FWS-000579-80 (discussing other projects in the Madison BMU); FWS-000022 (same).

The same is true with respect to the Henry's Lake #2 subunit. As noted above, the 1% standard prohibits reducing secure habitat more than 1,285 acres below baseline values in the Henry's Lake BMU. SP-004433. Existing condition in the Henry's Lake #2 subunit (not counting the other subunit, Henry's Lake #1) are already 9 acres below baseline. SP-004433 (Table 12). The South Plateau project would reduce secure habitat an additional 2,426 acres below baseline, which easily exceeds the 1% standard and 1,285-acre threshold. SP-041106. And this does not include other projects in the Henry's Lake #2 subunit and larger Henry's Lake BMU. *See* FWS-000580 (discussing projects); FWS-000022 (same).

For example, information on the amount of secure habitat reduced below baseline levels from the Yale Creek project, which is also located in the Henry's Lake BMU, is missing from the analysis. The record reveals the Yale Creek project involves both logging and temporary road construction in the Henry' Lake BMU,

40

SP-013011-13, and will also affect secure habitat "below baseline on up to 1% in the Henry's Lake #1 subunit." FWS-000142.

For this reason, the Forest Service concedes that all project activities for the Yale Creek project "must be completed and temporary roads decommissioned" prior to the South Plateau project being implemented in the Henry's Lake #2 subunit. FWS-000142; *see also* SP-041106 (explaining same). The Forest Service also concedes that – by itself – the South Plateau project would violate the 1% standard in the Henry's Lake #2 subunit because the amount of secure habitat lost would exceed the 1,285-acre threshold and amount to a 1.9% reduction. SP-041106. The agency explains, however, that it will likely make changes at some future date during project implementation to comply with the 1% standard. *Id.* This could include dropping various units or implementing activities "affecting secure below baseline" in "staged or phased" approaches. *Id.* But this "take-our-word-for it" approach and promise to make possible future changes during project implementation and coordinate with the neighboring Yale Creek project is illegal under NFMA.

Compliance with forest plan standards must be evaluated at the time the decision is made: "*Before* the Forest Service can permit the logging, it must . . . ensure that the project is consistent with the [forest plan]." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729–30 (1998) (emphasis added). Compliance is based on

41

evidence before the agency when it approves the project. *Marten*, 2021 WL 4551496, at *4. In other words, "the duty to demonstrate Forest Plan consistency applies at the time of the decision, not at a speculative future date." *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1234 (D. Or. 2019).

This Court's recent decision in *Marten*, 2021 WL 4551496 at *4, is instructive. There, the Forest Service acknowledged issues with forest plan compliance but said it would make future changes to avoid any conflict. *Id.* But this Court rejected that approach because no details were provided about how forest plan standards would be met going forward. *Id.* The Forest Service failed to "show their work." *Id.* The same situation exists here.

There is no detailed information about the Yale Creek project (or other projects or activities in the same Henry's Lake BMU), including information on the project's timing or how many acres of secure habitat it will impact below baseline, or information on how the Forest Service will coordinate and make changes to ensure compliance with the 1% standard. There are also no details or assurances about what possible future changes may be made to the South Plateau project to bring it into compliance with the forest plan standards. Information on which units will be dropped, what roads will not be constructed, or other modifications is also missing.

E.     The project violates the four-year standard.

Finally, the South Plateau project also violates the forest plan's four-year standard, FW-STD-WLGB-03(c). SP-000065. This standard limits the time project activities may reduce secure habitat below baseline to four consecutive years and requires the "collective set" of temporary project roads that affect secure habitat below baseline be closed to all motorized use after three years and decommissioned, and secure habitat restored, within one year of closure. SP-000065. This standard is intended to ensure project reductions below baseline are "in fact temporary." SUPP-FWS-002519.

The South Plateau project is a 15-year project that will require over 56 miles of roads and will result in temporary reductions in grizzly bear secure habitat below baseline levels during its lifespan. SP-041106. In the Henry's Lake #2 subunit, the agency admits the project would reduce secure habitat 2.7% below baseline. SP-004406. As this would violate the 1% standard, the Forest Service proposes reducing treatment acreage or implementing project activities *in stages*. SP-004432. Staging would involve reducing secure habitat below baseline for four years, returning conditions to baseline to reset the clock, and then implementing a new phase, with additional roads, that reduces secure habitat back below baseline for another four years. SP-041090. This staging approach, however, runs afoul of the four-year

43

standard which is in place to prevent just these types of prolonged or long-term reductions in secure habitat. This is true for at least three reasons.

First, the four-year standard requires the "collective set" of temporary roads impacting secure habitat below baseline be closed after three years. SP-000065. As the Forest Service explained, for a project like South Plateau, the "collective set of temporary roads affecting secure habitat below baseline can only be used for implementation for up to 3 years; one additional year is allowed to effectively obliterate these roads and make them unusable." SP-017999. In other words, the standard places a firm upper limit – four years – on the amount of time *all* temporary project roads collectively may impact secure habitat below baseline.

The agency acknowledged as much in an email with FWS. When asked if "the collective set of temporary roads for all sales of the [timber] project that affect secure habitat" must be closed after 3 years and decommissioned within 1 year of closing to comply with this standard, the Forest Service responded in the affirmative. SUPP-FWS-002519-20 (emphasis in original).

Second, the Forest Service's staging approach attempts to by-pass the four-year time limit by treating each individual timber sale authorized by the South Plateau project as a separate "project." *See* FWS-000581 (email describing approach). In other words, solely for assessing compliance with the four-year standard, the Forest

44

Service considers individual timber sales implementing the project as their own "projects" and then staggers or phases the reductions in secure habitat that result from the timber sales ("projects") into four-year timeframes (or less). But this approach is inconsistent with the analysis throughout the EA and nearly all of the record, where the agency routinely treats the full scope of the South Plateau project's proposed forest treatment and road building activities as a "project" that must be evaluated for compliance with forest plan standards. *See, e.g.,* SP-004338-52 (defining the proposed action); SP-041106 (analyzing "South Plateau Project" for compliance with FW-STD-WLGB-03).

Further, it is only in an internal email that the Forest Service reveals its approach. FWS-000581. This is inappropriate. The agency should not be allowed to hide its approach from the public. It must show its work and demonstrate compliance with applicable standards. *Marten*, 2021 WL 4551496 at *4. The Forest Service failed to do so here.

Third, if allowed to stand, the Forest Service's staging approach would undermine the very purpose of the four-year standard. A short, momentary return to baseline every four years, only for a subsequent phased sale to return the area back below baseline, defeats the purpose of the forest plan standard and fails to ensure reductions are indeed "temporary." SUPP-FWS-002519. The forest plan standard is

45

designed to ensure reductions to secure habitat are actually temporary in nature, i.e., less than four years. Allowing reductions in secure habitat below baseline *every* four years (after a short reset) is just the opposite and suggests that temporary changes will simply become indefinite. *See WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 877 (D. Mont. 2021), (warning against similar concerns). Indeed, taken to its logical conclusion, the Forest Service's approach would allow reductions in secure habitat in the Greater Yellowstone in perpetuity so long as roads are obliterated and baseline levels restored every four years, temporarily paused, only to be reduced again. This defeats the very purpose of the standard.

## III.    NEPA violations.

NEPA prevents damage to the environment by "focusing Government and public attention on the environmental effects of proposed agency action." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). NEPA achieves its purpose through procedures requiring agencies take a hard look at environmental consequences before they occur. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted); 42 U.S.C. § 4332(2)(C)(v).

Under NEPA, federal agencies must prepare an EIS if the action may cause significant effects. *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005). Agencies prepare an EA for other actions not categorically excluded

from documentation and where they determine an EIS is not needed. 36 C.F.R. §

220.7(a); *see also Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 991 (9th Cir. 2023)

(explaining same). An EA must also analyze the effects of the proposed action. 36

C.F.R. § 220.7(b). "If an agency decides not to prepare an EIS, it must supply a

'convincing statement of reasons' to explain why a project's impacts are

insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212

(9th Cir. 1998). Here, the Forest Service violated NEPA for three reasons.

### A.  Failure to adequately analyze the effects of over 56 miles of road work.

First, the Forest Service failed to adequately analyze the effects of authorizing

over 56 miles of roads on grizzly bears (including security). As previously mentioned,

roads, motorized access, and human intrusions are a significant threat to the species.

*See supra* § I (Background); *see also Steele*, 545 F. Supp. 3d at 860 (discussing the

effects of roads).

The South Plateau project will authorize up to 56.8 miles of roads, SP-

004406, in an area that is already heavily roaded and problematic for grizzly bears.

*See* SP-039394. The Forest Service recognizes that such roads will reduce secure

habitat for grizzly bears (even below baseline) levels, at least during project

implementation. SP-004406. The agency insists, however, that the effects will be

minor because any changes will be consistent with the revised forest plan standards. But as previously explained, this is inaccurate. *See supra* **§** II.

Further, as previously mentioned, the exact location, timing of use, and when and how the roads will be closed and removed from the landscape is unknown, making it impossible to take a hard look at the effects such roads will have on grizzly bears. As explained by FWS, the level of effects to grizzly bears will "depend on such things as the location of the routes, length of the routes, and the frequency and intensity of use." FWS-000032. None of this information, however, is included or provided in the EA. Nor was it made available for public review and comment. This concern was raised by EPA and other members of the public. *See* SP-009300; *see also* SP-016504 (noting the same); SP-014730 (same); SP-012025 (same).

The Forest Service highlights its staggered approach to road work, explaining that it will occur in phases with roads open for no more than three years at a time, then restored, and only then more roads then constructed. SP-004407; SP-041090. Yet, nowhere in the EA does the Forest Service analyze how this staggered approach may adversely affect grizzly bears, secure habitat, and bears use and occupancy of the project area. The best available science reveals that prolonged human disturbance in a particular area – even if staggered – may result in grizzly bears avoiding the area

48

"for several generations" because "females pass on the avoidance behavior to their cubs." SP-041077 (citing papers).

As explained by FWS, many grizzly bears underutilize or avoid otherwise preferred habitats frequented by people, and if "road densities, and associated secure habitat" reach certain levels, "grizzly bears may experience significant impacts." FWS-000026. "Grizzly bears that experience such negative consequences learn to avoid the disturbance and annoyance generated by motorized routes" and some may not "change this resultant avoidance behavior *for long periods after road closures*." *Id.* (emphasis added); *see also Steele*, 545 F. Supp. 3d at 867 (explaining same).

The Forest Service's staggered approach, therefore, may not work and may result in grizzly bears having to avoid or learning to avoid the project area for a long period of time, well beyond the 15-year project schedule. This aspect of the problem was overlooked in violation of NEPA. *W. Watersheds Project*, 632 F.3d at 493.

**B.     Failure to adequately analyze cumulative effects.**

NEPA requires agencies take a hard look at the cumulative or synergistic effects of its proposed actions. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006). Cumulative effects are the "impact on the environment which results from the incremental impact of the action when added to other past, present,

49

and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7 (2019).[3]

Here, the Forest Service failed to adequately analyze the cumulative effects of the South Platea project on grizzly bears for *two* reasons.

First, the Forest Service failed to account for the existing, degraded baseline conditions for grizzly bears. This is critical to properly analyze effects. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). "Without establishing the baseline conditions which exist ... before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

---

[3] The 2020 NEPA regulations used in this case, SP-004502, removed reference to cumulative effects but this did not eliminate the need to analyze cumulative effects so long as they are "reasonably foreseeable" and have a "reasonably close causal relationship to the proposed action." 85 Fed. Reg. 43,304, 43,343 (July 16, 2020); *see also Indigenous Peoples of Coastal Bend v. U. S. Army Corps of Eng'rs*, 2023 WL 6226387, at *28 (S.D. Tex. July 27, 2023) (evaluating cumulative effects under the 2020 regulations). The regulatory change also had no effect on the Forest Service's NEPA regulations, which retained the cumulative effects requirement. 36 C.F.R. § 220.4. The obligation to analyze cumulative effects is also a statutory (not regulatory) requirement. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); *see also Hanly v. Kleindienst*, 471 F.2d 823, 830–31 (2d Cir. 1972).

For example, while the project area is actively occupied by grizzly bears, the area remains problematic due to low levels of secure habitat, high road densities outside of secure areas, and high levels of grizzly bear mortality. FWS-002132; SP-039394; SP-046204. This is why the area is considered a "population sink" where grizzly bear deaths exceed recruitment. SP-046204; *see also* SP-017196 (noting same); SP-011164 (identifying area as sink); FWS-002862 (same). As explained by Dr. Mattson, *every* reckoning of habitat security for grizzly bears in the subunits affected by the project (referred to as "SPLAT") shows secure habitat levels are "inadequate" and "among the most deficient" in the Greater Yellowstone. SP-046204. They are "sinks for the Yellowstone grizzly bear population." *Id.*



*Id.*; *see also* FWS-002869 (same). These project area "encompasses one of the least secure areas" in the Greater Yellowstone." *Id.* Yet, these degraded baseline conditions are not described or analyzed in the EA's cumulative effects analysis.

Second, the Forest Service failed to combine this degraded baseline condition with all current and future activities occurring in *the same* area and same grizzly BMUs (and subunits).

As noted above, the Yale Creek project will also reduce secure habitat with more logging and road work in the Henry's Lake BMU. FWS-000580; *see also* SP-013009. There are also at least two private subdivisions in this same area: the Yale Creek subdivision and Old West Ranches subdivision. SP-013009. In fact, the amount of private and non-federal land in the project area and projected development and growth is not insignificant. There are roughly 13,584 acres of non-federal lands in the three subunits: 6,584 acres in the Henry's Lake #2 subunit, 2,851 acres in the Madison #2 subunit, and 3,149 acres in the Plateau #1 subunit. SP-041099.

Schwartz (2010) found that "the number of homes per section and the roads associated with those developments were the best predictors of grizzly bear survival on private lands" in the Greater Yellowstone. FWS-002869. FWS also notes that increases in residential development of private lands within the action area "can

52

result in habitat loss, habitat fragmentation, and increases in human-grizzly bear conflicts." FWS-000044. Such development and related road work also have a direct impact on grizzly bear security. Indeed, FWS recognized that one area of secure habitat in the area that is "approximately 150 acres in size" may be affected by further development. *Id.*

The EA, however, includes no analysis of the Yale Creek project or how other private land subdivisions, housing developments, or private land activities in the project area, when *combined* with the South Plateau project (and other past, current, and future logging projects), increased recreational visitors, and population growth, may cumulatively affect grizzly bears or secure habitat. Nor is this information incorporated by reference or otherwise disclosed in the EA. The EA is where the analysis must be found. *Blue Mountains Biodiversity Project*, 161 F.3d at 1214.

As explained by the Ninth Circuit, agencies must "give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Te-Moak Tribe v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010). Some "quantified or detailed information" is required; general statements "about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be

53

provided." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002). And the "analysis 'must be more than perfunctory; it must provide a useful analysis of the cumulative impacts...'" *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004).

Cataloguing or listing other projects or providing general statements about possible effects from private land developments in the area is helpful information. But it is not the quantified analysis required by NEPA. And it is not enough to simply list or catalogue other projects in the same area. *Great Basin Mine Watch*, 456 F.3d at 971. Nor is it sufficient to merely calculate the total acreage of other projects (or amount of private lands) or even provide a map of their location. *Id.* at 973. This information might be a "necessary component" of a cumulative effects analysis "but it is not a sufficient description of the actual environmental effects that can be expected . . ." *Id.* at 973. A meaningful analysis – a "quantified assessment" of combined environmental effects – is required. *Id.* at 972. No such analysis exists here.

This is particularly problematic here considering the degraded baseline and sink conditions that already exist. SP-046204. The South Plateau project's clear-cuts, commercial logging, and over 56 miles of new roads may be the straw that breaks the camel's back. "Even a slight increase in adverse conditions that form the existing

54

environmental milieu may sometimes threaten harm that is significant . . ." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 343 (D.C. Cir. 2002). "Cumulative impacts of multiple projects can be significant in different ways." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 994. "Sometimes the total impact from a set of actions may be greater than the sum of the parts." *Id.* The same principle applies here.

The key for grizzly bear conservation in the Greater Yellowstone region is avoiding the proverbial death by a thousand cuts through accounting for all cumulative effects. As the Interagency Grizzly Bear Study Team lead explained: the "cumulative effect of many such projects could eventually result in an overall decrease of habitat quality, potentially reducing 'carrying capacity' and leading to lower bear densities." SP-044298. A useful analogy is that if one "supermarket closed in the neighborhood in Bozeman, people there would adjust their shopping patterns and go to other supermarkets, etc. But if supermarkets all around town closed, it would start to have a cumulative effect." *Id.*

The Forest Service insists that any potential cumulative effects will be mitigated by the revised forest plan's secure habitat standard, FW-STD-WLGB-03. SP-004409. But this standard is not a proxy for analyzing cumulative effects. Nor could it be. But even if it was, the South Plateau project violates the standard. *See supra* § II.

55

### C.    An EIS is required.

NEPA requires a federal agency prepare an EIS for actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A plaintiff need only raise "substantial questions" about whether a project may cause significant effects to trigger the need for an EIS. *All. for the Wild Rockies v. Gassmann*, 678 F. Supp. 3d 1249, 1293 (D. Mont. 2023).

To determine whether an action significantly affects the environment, agencies consider the context and intensity of a project; "intensity refers to the severity of the project's impact and is evaluated using ten factors." *Id.*; *see also* 36 C.F.R. § 220.7(b)(3)(iii) (same). These factors include the unique characteristics of the area, the degree to which effects are likely to be highly controversial or highly uncertain, whether there will be "individually insignificant but cumulatively significant impacts," and the degree to which the action may adversely affect listed species. 40 C.F.R. §§ 1508.27(b)(1)-(10) (2019). The presence of one factor alone is enough to warrant an EIS. *Ocean Advocs.*, 402 F.3d at 865. If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" explaining why a project's impacts are insignificant. *Gassmann*, 678 F. Supp. 3d at 1293.[4]

---

[4] The 2020 NEPA regulations require an EIS if the proposed action "is likely to have significant effects," 40 C.F.R. § 1501.3(a)(3) (2020), which requires evaluating the

56

Here, the South Plateau project's size, prescriptions, related road work, and likely effects over the next 15 years warrant an EIS (regardless of the regulations used) because the likely effects are significant for at least *five* reasons.

First, the project is in an ecologically important area, including the Greater Yellowstone recovery zone which FWS considers a unique and ecologically critical area for grizzly bears. 82 Fed. Reg. 30,502, 30,519 (June 30, 2017). The project area is also important for grizzly bear conservation and includes denning sites and females with dependent young. FWS-002132. The project is also adjacent to an important link for wildlife between Yellowstone National Park, a recommended wilderness area, the Two Top Inventoried Roadless Area ("IRA"), and within the Dry Canyon IRA. SP-004377; SP-039383. Timber hauling on roads and related road maintenance will occur in the IRA, SP-004377, and visitors to the IRA will "see evidence of timber harvest" in adjacent areas "for up to 20 years" after the project is complete. SP-039389. There will also be impacts to wilderness attributes and opportunities for solitude. *Id.* The project area also includes large portions of

---

affected environment and degree of the effects. *Id.* at § 1501.3(b). Degree refers to the affected area and its resources, listed species, whether the effects are short or long-term or adverse, and whether the effects would violate laws protecting the environment. *Id.* at §§ 1501.3(b)(1), (2). The Forest Service's NEPA regulations, however, still require all EAs to describe the effects using the old significance factors. 36 C.F.R. § 220.7(b)(3)(iii).

"unroaded areas" and three wilderness inventory areas. SP-039391. Most of the logging will occur on unroaded lands. SP-039392.

Second, the effects to grizzly bears are not insignificant and substantial questions have been raised. As previously mentioned, this area is "among the most deficient" grizzly bear habitat in the Greater Yellowstone and a population sink. SP-046204. The project will make this already bad situation worse. FWS-000043. There are also likely additional, cumulative effects that were never considered and properly analyzed by the Forest Service in the EA. *See supra* § III.B.

When consulting on grizzly bears, the Forest Service conceded the project is "likely to adversely affect" grizzly bears, which triggered the need for formal consultation and a biological opinion. FWS-000152. In fact, due to the already occurring "adverse effects" from existing motorized access conditions, FWS determined the project's anticipated effects on grizzly bears would not be insignificant: the project "would affect secure habitat to a point where additional adverse effects to individual female grizzly bears and/or their dependent offspring may occur . . ." FWS-000043.

The Forest Service downplays these effects due to its alleged compliance with the revised forest plan standards for grizzly bears. SP-004432. The FWS does the same thing in its biological opinion. *See, e.g.,* FWS-000042, 0050. But as previously

explained, there is no guarantee such standards will be complied with. *See supra* § II. When viewed in this context, the effects to grizzly bears weigh in favor of requiring an EIS. *See, e.g., Gassmann*, 678 F. Supp. 3d at 1295 (relying on likely to adversely affect finding and unreliable no-jeopardy finding to find factor satisfied).

Third, there is a high degree of controversy and uncertainty over the effects of the project given the agency's adoption of a "wait-and-see" approach and lack of specificity in the EA on where, when, and how logging will occur and where and when the project roads will be constructed (or when and how they will be removed from the landscape). *See supra* §§ II.B, III.A. The Forest Service's definition of "secure habitat" and continued reliance on a 1998 baseline for the South Plateau project is also highly controversial and, as noted above, conflicts with the best available science. *See supra* § I. Such questions, uncertainty, and controversy would benefit from further review and analysis in an EIS. *Ocean Advocs.*, 402 F.3d at 865. The purpose of an EIS is to obviate the need for speculation. *Id.* at 870. That is precisely the situation here.

Finally, as previously explained, the project will also likely violate the forest plan's standards for managing secure habitat for grizzly bears which is a violation of NFMA – a federal law. *See supra* § II.

For these reasons, an EIS is warranted. Substantial questions have been raised on a number of relevant factors even though only one is needed for an EIS. *Ocean Advocs.*, 402 F.3d at 865.

## IV. This Court should vacate the challenged decision.

Plaintiffs respectfully request this Court declare FWS and the Forest Service violated the ESA, NFMA, and NEPA as alleged above and vacate the challenged biological opinions, decision, and EA and remand this matter back for a new analysis, consistent with its opinion.

Vacatur normally accompanies a remand under the APA. *All. for the Wild Rockies*, 907 F.3d at 1121. When equity demands, a court may elect not to vacate an illegal action, *id.*, or elect to "fashion a more limited remedy," including only partial vacatur. *Helena Hunters & Anglers Ass'n v. Marten*, 470 F. Supp. 3d 1151, 1181 (D. Mont. 2020). The court must evaluate the seriousness of the agency's errors and the "disruptive consequences of an interim change." *Cal. Cmties. Against Toxics v. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012).

Here, FWS's and the Forest Service's errors are serious and will result in additional and significant harm to grizzly bears. The disruptive consequences of vacatur, by contrast, which include maintaining the status quo and not allowing the South Plateau project to proceed pending compliance with the law, are relatively

minor. This is a 15-year project that can be postponed pending compliance with the law.

## CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion for summary judgment and the relief requested.

Respectfully submitted this 17th day of May, 2024.

/s/ Matthew K. Bishop
Matthew K. Bishop

*Counsel for Plaintiffs in Member Case No. 23-154*

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 12,000 words in accordance with this Court's March 3,2024 order (Doc. 39).  I relied on Microsoft Word to obtain the word count.

/s/ Matthew K. Bishop
Matthew K. Bishop

61