TODD KIM, Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
READE E. WILSON, Trial Attorney (ME Bar No. 4992)
CHRISTIAN H. CARRARA, Trial Attorney (NJ Bar No. 317732020)
Natural Resources Section, Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0299 (Wilson)
Tel: (202) 305-0217 (Carrara)
Fax: (202) 305-0275
Email: reade.wilson@usdoj.gov
Email: christian.carrara@usdoj.gov

*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Plaintiffs,<br><br>and<br><br>GALLATIN WILDLIFE ASSOCIATION, et al.,<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>U.S. FOREST SERVICE, et al.,<br><br>Federal Defendants,<br><br>and | Lead Case No.<br>9:23-cv-110-DLC-KLD<br><br>Member Case No.<br>9:23-cv-00154-DLC-KLD<br><br>FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 46, 48) |

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.

SUN MOUNTAIN LUMBER, INC.,

Defendant-Intervenor.

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................... 1

II. FACTUAL BACKGROUND ......................................................................................... 2

III. LEGAL BACKGROUND ............................................................................................ 11

    A. NEPA ...................................................................................................................... 11

    B. National Forest Management Act ("NFMA") ......................................................... 12

    C. ESA ........................................................................................................................ 13

IV. STANDARD OF REVIEW ......................................................................................... 14

V. ARGUMENT ............................................................................................................... 15

    A. USFS Complied with NFMA ................................................................................ 17

        1. The Project Complies with the Forest Plan's Grizzly Bear Standards ............. 19

            a. FW-STD-WLGB-03(a) ................................................................................. 20

            b. FW-STD-WLGB-03(b) ................................................................................. 22

            c. FW-STD-WLGB-03(c) ................................................................................. 27

        2. The Project Complies with the Forest Plan's Lynx Standards ......................... 28

    B. USFS Complied with NEPA ................................................................................. 29

        1. The EA Took a Hard Look at the Project's Potential Effects ......................... 29

            a. Grizzly bears ................................................................................................. 34

            b. Canada Lynx ................................................................................................. 37

            c. Climate impacts ............................................................................................ 38

        2. USFS Complied with NEPA by completing an EA ........................................ 46

    C.  FWS Complied with the ESA ............................................................................... 49

        1. The Record Supports FWS's Methodology for Evaluating the Effects of
Temporary Motorized Roads on Grizzly Bears .............................................. 51

            a. The Record supports FWS's secure habitat analysis .................................... 52

            b. The Record supports FWS's evaluation of Forest Plan standards in its no
jeopardy determination ................................................................................. 57

2. FWS Properly Analyzed the Environmental Baseline and Effects of the Action in Its No Jeopardy Determination ....................................................................................... 60

    a. FWS adequately considered the effects from the Yale Creek Project..................................... 60

    b. The Record supports FWS's use of the 1998 baseline............................................................. 62

D. Remedy ................................................................................................................................................. 65

VI. CONCLUSION.......................................................................................................................................... 65

# TABLE OF AUTHORITIES

**Cases**                                                                                                                                   **Page(s)**

*All. for the Wild Rockies v. Bradford*,
   864 F. Supp. 2d  (D. Mont. 2012) ........................................................................ 17

*Anderson v. Evans*,
   371 F.3d 475 (9th Cir. 2004)............................................................................... 47

*Ariz. Cattle Growers' Ass'n v. Salazar*,
   606 F.3d 1160 (9th Cir. 2010)............................................................................. 55

*Bark v. Northrop*,
   607 F. App'x 652 (9th Cir. 2015) ....................................................................... 47

*Barnes v. U.S. Dep't of Transp.*,
   655 F.3d 1124 (9th Cir. 2011)....................................................................... 42, 46

*Blue Mountains Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998)............................................................................. 46

*B.R. v. Garland*,
   26 F.4th 827 (9th Cir. 2022)................................................................................ 59

*Center for Biological Diversity v. U.S. Forest Service*,
   687 F. Supp. 3d 1053 (D. Mont. 2023) ............................................... 42, 43, 44, 45

*Earth Island Inst. v. Gibson*,
   834 F. Supp. 2d 979 (E.D. Cal. 2011)........................................................... 41, 42

*Env't Prot. Info. Ctr. v . U.S. Forest Serv.*,
   451 F.3d 1005 (9th Cir. 2006)............................................................................. 48

*Forest Guardians v. Veneman*,
   392 F. Supp. 2d 1082 (D. Ariz. 2005)................................................................. 59

*Friends of the Wild Swan v. U.S. Forest Serv.*,
   875 F. Supp. 2d 1199 (D. Mont. 2012) ................................................... 18, 19, 28

*Gifford Pinchot Task Force v. FWS*,
   378 F.3d 1059 (9th Cir. 2004).............................................................................. 51

*Hapner v. Tidwell*,
   621 F.3d 1239 (9th Cir. 2010)....................................................................... 41, 44

*Hunters v. Moore*,
No. 22-126-M-DWM, 2023 WL 6626158 (D. Mont. Oct. 11, 2023) ....................................... 58

*Idaho Sporting Cong., Inc. v.Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) ................................................................... 12

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) .................................................................. 54

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ....................................................... 15, 17, 43

*Lands Council v. McNair*,
629 F.3d 1070 (9th Cir. 2010) .................................................................. 51

*Morongo Band of Mission Indians v. EPA*,
161 F.3d 569 (9th Cir. 1998) ................................................................... 14

*N. Cascades Conservation Council v. U.S. Forest Serv.*,
2024 WL 188374 (E.D. Wash. Jan. 17, 2024) ....................................... 30, 32, 33, 38

*Nat. Res. Def. Council v. Haaland*,
102 F.4th 1045 (9th Cir. 2024) ................................................................. 60

*Nat. Res. Def. Council v. Kempthorne*,
506 F. Supp. 2d 322 (E.D. Cal. 2007) ....................................................... 65

*Native Ecosystem Council v. U.S. Forest Service*,
418 F.3d 953 (9th Cir. 2005) ................................................................... 25

*Native Ecosystems Council v. Marten*,
883 F.3d 783 (9th Cir. 2018) ................................................................... 63

*Native Ecosystems Council v. Weldon*,
697 F.3d 1043 (9th Cir. 2012) .................................................................. 12

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) .................................................. 35, 46, 48, 49

*Neighbors of Cuddy Mountain v. Alexander*,
303 F.3d 1059 (9th Cir. 2002) .................................................................. 36

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
137 F.3d 1372 (9th Cir. 1998) .............................................................. 29, 41

*Nw. Ecosystem All. v. FWS*,
   475 F.3d 1136 (9th Cir. 2007)...................................................................... 14

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
   957 F.3d 1024 (9th Cir. 2020)............................................... 13, 14, 18, 29

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010)...................................................................... 15

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ...................................................................................... 11

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014)........................................................................ 56

*Swomley v. Schroyer*,
   484 F. Supp. 3d 970 (D. Colo. 2020) ...................................................... 41, 44

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
   671 F.3d 1113 (9th Cir. 2012)...................................................................... 29

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ...................................................................................... 11

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004)........................................................................ 11

*WildEarth Guardians v. Conner,*
   920 F.3d 1245 (10th Cir. 2019) ............................................................. passim

*WildEarth Guardians v. Jeffries*,
   370 F. Supp. 3d 1208 (D. Or. 2019)............................................................. 12

**STATUTES**

5 U.S.C.  § 706(2)(A).......................................................................................... 14

16 U.S.C. § 475..................................................................................................... 1

16 U.S.C. § 531(a) .............................................................................................. 12

16 U.S.C. § 1532(19) .......................................................................................... 13

16 U.S.C. § 1536(a)(2)............................................................................. 13, 49, 54

16 U.S.C. § 1536(b)(4) ....................................................................................... 13

16 U.S.C. § 1536(o)(2) ........................................................................................ 14

16 U.S.C. § 1604 .................................................................................................. 12

16 U.S.C. § 1604(e)(1) ........................................................................................ 12

42 U.S.C. § 4321 .................................................................................................. 11

42 U.S.C. § 4332(2)(C) ........................................................................................ 12

42 U.S.C. § 4336(2) .............................................................................................. 12

## REGULATIONS

40 C.F.R. § 1501.1 ............................................................................................... 11

40 C.F.R. § 1501.3(b) ..................................................................................... 46, 47

40 C.F.R. § 1502.2(b) ........................................................................................... 41

50 C.F.R. § 402.02 .......................................................................................... 49, 60

50 C.F.R. § 402.14 ............................................................................................... 13

50 C.F.R. § 402.14(a) ........................................................................................... 13

50 C.F.R. § 402.14(h) ........................................................................................... 13

50 C.F.R. § 402.14(i)(1)(ii) .................................................................................. 14

50 C.F.R. § 402.14(i)(1)(iv) ................................................................................. 14

## FEDERAL REGISTER

85 Fed. Reg. 43304 (July 16, 2020) ..................................................................... 11

## I.    INTRODUCTION

The United States Forest Service's ("USFS") South Plateau Area Landscape Project ("Project") is a landscape-level forest management project to increase resilience to insects and disease, treat hazardous fuels, and contribute to sustained-yield timber production while protecting riparian areas, water quality, and grizzly bear secure habitat. Pest management and hazardous fuels are moving targets, and the Project is designed to enable a flexible response to shifting threats while adhering to the strict parameters of the decision and the agency's core statutory obligation to provide a continuous supply of timber for the nation. 16 U.S.C. § 475.

Plaintiffs challenge the Project on the assumption that implementing activities will exceed the scope of the authorized decision. This is not—and cannot—be the standard. As the Record reveals, only activities that conform to the Project's Design Features will be implemented, ensuring consistency with the 2022 Custer Gallatin National Forest Land Management Plan ("Forest Plan") and its standards to protect wildlife. Federal Defendants thoroughly evaluated the Project's maximum potential effects on grizzly bears, lynx, and other resources in accordance with the National Environmental Policy Act ("NEPA"). And Federal Defendants relied on the best available science in determining that the Project would not jeopardize grizzly bears under the Endangered Species Act ("ESA"). Plaintiffs' arguments to the contrary misread the best available science and the

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    1

Record. The Court should reject these attempts to usurp the expert analysis of

USFS and United States Fish and Wildlife Service ("FWS"), and instead grant

summary judgment in favor of Federal Defendants on all claims.

## II.   FACTUAL BACKGROUND

The Custer Gallatin National Forest (Forest") covers more than three million

acres in southern Montana and the northwest corner of South Dakota. SP_001060.[1]

The Forest contains a series of island mountain ranges and is characterized by

western mountainous terrains and eastern pine savanna areas. *Id.* This varied

landscape is home to hundreds of species, including grizzly bears and Canada lynx.

SP_001061; SP_001065.

The Forest is managed in accordance with the Forest Plan. SP_001115. The

Forest Plan provides an integrated set of plan directions to provide for social,

economic, and ecological sustainability and multiple uses of the combined Custer

and Gallatin National Forests. SP_000009-10. This management direction includes

desired conditions, goals, standards, and guidelines for the Forest, including for

grizzly bears and Canada lynx. SP_000063-68 (grizzly bears); SP_000060-61

(Canada lynx). Site-specific projects and activities are used to move towards

---

[1] Federal Defendants lodged the Administrative Records on February 9, 2024, and supplements on May 7, 2024, and May 9, 2024. ECF Nos. 31, 41, 42. Citations to USFS's Record are "SP_[bates number]." Citations to FWS's Record are "FWS_[bates number]."

achieving the Forest's desired conditions. SP_000021.

*Grizzly Bears*

Grizzly bears on the Forest are part of the Greater Yellowstone Ecosystem ("GYE") population that occurs in parts of Idaho, Montana, and Wyoming. SP_000062. First listed as a threatened species under the ESA in 1975, *id.*, the grizzly bear population's size and range within the GYE has since expanded considerably. FWS_001514; FWS_002253 (between 1983 and 2001, the GYE grizzly bear population increased from 4.2% to 7.6% per year).

USFS, in collaboration with FWS, the National Park Service, Bureau of Land Management, and state agencies in Idaho, Montana, and Wyoming, participated in the development of the 2016 Conservation Strategy for Grizzly Bears in the GYE. FWS_002210-11. The Strategy states that, within the GYE, grizzly bears and their habitat are managed based on the Primary Conservation Area ("PCA"). FWS_002212; FWS_002214 (PCA map). The PCA is divided into 18 Bear Management Units ("BMUs") and 40 subunits. FWS_002253-54. BMUs approximate the average lifetime range of an adult female grizzly bear in the GYE while subunits approximate the average annual home range of an adult female grizzly bear. FWS_002254. The Strategy defines grizzly bear secure habitat as "any contiguous area ≥ 10 acres in size and more than 500 m from an open or gated motorized access route . . . ." FWS_002258. Secure habitat is measured in

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    3

each subunit and compared to habitat conditions in 1998. FWS_002254. Habitat

conditions inside the PCA in 1998 were "relatively constant" and thus considered

"representative" of the "robust rate" of recovery from 1983 to 2001. FWS_002253.

The Strategy dictates that secure habitat be maintained within the PCA at or above

1998 baseline levels with a few exceptions. FWS_002223; FWS_002258.

The Forest Plan largely adopts the definition of grizzly bear secure habitat in

the 2016 Conservation Strategy. SP_000236; SP_001537; SP_005200; *see also*

SP_044554 (2007 Conservation Strategy). The following figure shows secure

habitat relative to motorized routes in the Forest:



SP_001546. Like the 2016 Conservation Strategy, the Forest Plan calls for secure

habitat to be maintained at or above the 1998 baseline with a few exceptions. SP_000064.

In January 2022, FWS issued a Biological Opinion on the Forest Plan. FWS_001110-1290. In evaluating the status of grizzly bears, the environmental baseline for the action area, the effects of the action, and the cumulative effects, FWS concluded that management of the Forest under the Forest Plan is not likely to jeopardize the continued existence of the species. FWS_001273.

### Canada Lynx

The Canada Lynx was listed as an ESA threatened species in March 2000. SP_000513. While no evidence exists of long-term occupancy or reproduction of lynx in the Greater Yellowstone Area, it is possible that the area "historically supported resident lynx only ephemerally." SP_042313-14. Verified records of lynx are not common in the Forest. SP_042360.

In 2007, USFS approved the Northern Rockies Lynx Management Direction ("NRLMD") to promote recovery of the lynx by incorporating lynx and snowshoe hare habitat management direction into National Forest land management plans. SP_000513-14. In developing the NRLMD, USFS analyzed risk factors which affect lynx productivity, mortality, and movement. SP_000514-15. The NRLMD is incorporated into the Forest Plan. SP_000061.

*South Plateau Area Landscape Project*

In August 2020, USFS proposed a "series of activities" to "increase resiliency to insect and disease infestation while providing wood products to local mills" and initiated a combined scoping and draft Environmental Assessment ("EA") comment period. SP_016464. USFS reevaluated the proposal following issuance of the Forest Plan in 2022 and prepared an updated EA, which was subject to an additional 30-day comment period. SP_004487. The Final EA was published along with a draft decision notice and finding of no significant impact on March 15, 2023, and a 45-day objection period ensued. *Id.* USFS issued its Decision Notice ("Decision") and Finding of No Significant Impact ("FONSI") approving the Project on August 7, 2023. SP_004503.

The Project authorizes a suite of forest treatments to increase resilience to insects and disease, treat hazardous fuels, and contribute to sustained-yield timber production—while protecting riparian areas and water quality, and increasing grizzly bear secure habitat—on up to 16,462 acres over 15 years. SP_004475-78. The Project area, approximately 39,900 acres southwest of West Yellowstone, Montana (shown in the following map), SP_004475, is relatively homogenous, dominated by lodgepole pine, and "highly likely to experience a severe mountain pine beetle outbreak." SP_004353. Treatments are designed to move the Project area towards achieving Forest Plan desired conditions, including resistance to

"natural disturbances;" "[t]reating hazardous fuels to support low-intensity fire;" and sustained timber yield. SP_004485-6. Treatments will "reduce the likelihood of a high severity [pine beetle] outbreak from 93% to 61% or less." SP_004485.



SP_004335.

USFS identified areas preliminarily suitable for treatment, and resource specialists will survey and determine the specific locations of smaller treatment

units within these suitable areas by applying the Treatment Matrix, which

determines the type of treatment, and the Design Features, which further limit the

location and size of treatments. SP_004340; SP_004504; SP_006168 (draft map of

first two sales).



SP_004339 (map of areas suitable for treatment). Treatments will not occur in

Wilderness or Inventoried Roadless Areas. SP_004476. Timber contracts will be prioritized based on stand vulnerability to pests and wildfire, with between 500 to 1,500 acres of treatment expected annually. SP_004344. Four to six contracts are anticipated in total. *Id.*

The Project also allows for construction of up to 56.8 miles of temporary roads to support Project activities. SP_004479. Any temporary roads will be constructed, used, closed, and obliterated as part of a timber sale or stewardship contract. *Id.* The placement of temporary roads will be consistent with Design Features and subject to resource review, grizzly bear secure habitat, and road density restrictions. *Id.* At any one time, only the temporary roads needed for a contract will exist on the ground. *Id.* The Project further provides for 8.2 miles of permanent roads to be decommissioned, which will result in increased water quality and secure habitat for grizzly bears. SP_004480-82.

USFS identified the "maximum extent" of authorized activities, which will not be exceeded, and all activities must comply with the Design Features. SP_004475-76; SP_004479.

**Table 1. Proposed action maximum extent.**

| Proposed Action | Maximum Extent |
|---|---|
| Total Treatment[1] | 16,462 acres |
| Clearcut Harvest | 5,551 acres |
| Commercial Thinning | 6,593 acres |
| Non-Commercial Thinning | 2,514 acres |
| Temporary Road | 56.8 miles |
| Fuels Treatment[2] | 1,804 acres |

SP_004476.

The Forest Service consulted with FWS under the ESA on the Project's potential effects to listed species, which concluded with FWS's issuance of a Biological Opinion on August 2, 2023. FWS_000001-84. The Biological Opinion found that the Project is not likely to jeopardize the continued existence of the grizzly bear. FWS_000080. In reaching that conclusion, FWS considered the existing motorized access conditions and construction of temporary roads, FWS_000048, the maximum acreage of secure habitat that could be temporarily affected compared to the baseline, FWS_000049, and the potential disturbance related to human activity, FWS_000050, among other factors. *See* FWS_000025-47 (effects and cumulative effects). FWS explained that the "overall habitat conditions for grizzly bears in the [Yellowstone grizzly bear ecosystem] is excellent with large amounts of secure habitat in the majority of subunits." FWS_000052. Indeed, "[w]ith a total population estimate of 1,063 grizzly bears in

the GYE for 2021 . . . and increased grizzly bear densities in the GYE . . . the status of the GYE grizzly bear population is robust and at or near recovery." FWS_000053.

## III.    LEGAL BACKGROUND

### A.    NEPA[2]

Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m-12, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA is a procedural statute that requires analysis and public disclosure of environmental effects to ensure informed decision-making; it does not require that agencies reach a particular result. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351. As a result, a "court must avoid passing judgment on the substance of an agency's decision." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing *Robertson*, 490 U.S. at 350).

---

[2] The claims in this case arise under the Council on Environmental Quality's 2020 regulations, 85 Fed. Reg. 43304, 43369 (July 16, 2020). SP_004502. All citations to Council on Environmental Quality regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500-1508 (2020).

NEPA requires preparation of an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). Where the environmental impacts are either insignificant or significance is unknown, NEPA allows an agency to prepare an environmental assessment, which is a "concise public document" setting forth either the "basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary." *Id.* § 4336(2).

**B.      National Forest Management Act ("NFMA")**

NFMA directs USFS to develop land and resource management plans for National Forests. 16 U.S.C. § 1604. The land and resource management plan (i.e., forest plan) contains "broad, long-term plans and objectives for the entire forest," *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012), and "must provide for multiple uses of the forest, including recreation, range, timber, wildlife and fish, and wilderness." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 961 (9th Cir. 2002) (citing 16 U.S.C. § 1604(e)(1)). "The Forest Service has broad discretion to determine how to balance these uses to 'best meet the needs of the American people.'" *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1232 (D. Or. 2019) (quoting 16 U.S.C. § 531(a)). The Forest Service then implements the forest plan through site-specific projects. *Weldon*, 697 F.3d at 1056. "While NFMA requires that the proposed site-specific actions be consistent

with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Id*.; *see also Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020).

### C.    ESA

Under Section 7(a)(2), federal agencies must ensure that any action funded, authorized, or carried out by the agency is "not likely to jeopardize the continued existence of any endangered species or threatened species" or to destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2). The ESA requires that action agencies consult with FWS or the National Marine Fisheries Service (or consulting agency) whenever the agency's action "may affect" a listed species. *Id*.; 50 C.F.R. § 402.14(a). If the action is "likely to adversely affect" listed species or critical habitat, the agencies must engage in formal consultation. *Id.* § 402.14. Formal consultation culminates in the issuance of a "biological opinion" by the consulting agency. *Id.* § 402.14(h).

If the consulting agency reaches a no-jeopardy decision and finds that the destruction or adverse modification of critical habitat is not likely, but the action will result in "take"[3] of a listed wildlife or fish species, the agency must issue an

---

[3] "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

incidental take statement. 16 U.S.C. § 1536(b)(4). This statement will contain reasonable and prudent measures with implementing terms and conditions deemed necessary or appropriate to minimize "take" and with which the action agency must comply. 50 C.F.R. § 402.14(i)(1)(ii), (iv). Any taking in compliance with the statement is exempt from liability under ESA Section 9. 16 U.S.C. § 1536(o)(2).

## IV.   STANDARD OF REVIEW

Challenges to agency action are reviewed under the Administrative Procedure Act ("APA"). A court may set aside an agency action only if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider," failed to consider important factors, offered an explanation inconsistent with the record, or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Or. Nat. Desert Ass'n v.*, 957 F.3d at 1033 (citations omitted).

This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quotation and citation omitted). "The court may not substitute its judgment for that of the agency[.]" *Morongo Band of Mission Indians v. EPA*, 161 F.3d 569, 573

(9th Cir. 1998). This is especially true in management of National Forests, for "Congress has consistently acknowledged that [USFS] must balance competing demands in managing National Forest System lands." *Lands Council v. McNair*, 537 F.3d 981, 990 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental effects." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (citations omitted).

## V.   ARGUMENT

Federal Defendants complied with NFMA, NEPA, and the ESA in approving the Project. In arguing otherwise, Plaintiffs attempt to paint the Project as a "wait-and-see" analysis full of unenforceable "promises." But the Project authorizes only those activities that comply with the rigid decision framework, including the Treatment Matrix, Design Features, Resource Checklists, monitoring, and reporting. SP_004475-76. This landscape-level approach provides USFS with flexibility to respond to changing conditions, including increased risk of beetle infestations. SP_004490-91; SP_018037. Like with any other project, USFS has defined the scope of activities permitted and anything outside that scope is not authorized by the Decision.

Throughout their briefing, Plaintiffs misconstrue the Project and the Record

by claiming that the location of treatments and roads is unclear. However, the EA identifies the areas preliminarily suitable for treatment—this is the maximum treatment area. SP_004339-40. USFS then limits the scope and acreage of activities authorized within this area. SP_004476 ("maximum extent"). The type of treatment is determined by the Treatment Matrix, which may provide for less-intensive treatment, and the Design Features, which further limit the location and size of treatment units. SP_004340; SP_004476. Resource specialists then confirm consistency of proposed activities with the Design Features, SP_004537 (Resource Checklists), and Conditional NEPA Project Monitoring ensures that the conditions on the ground with respect to wildlife are consistent with the EA, Biological Assessment, and the Decision. SP_004756 (Conditional NEPA Project Monitoring Form); SP_005246-47 (requiring submittal of Conditional NEPA Project Monitoring Form to FWS prior to implementation of a sale or set of activities). This extensive review process is required by the Decision. SP_004475 (stating the Decision "includes and makes binding the application of the Treatment Matrix, Design Features, Resource Review Checklists, and the Monitoring Plan found in Appendices A-D of [the Decision] and the EA."). In short, the Project *is* this comprehensive approval process.

Similarly, the EA identifies the *maximum* number of temporary road miles based on current roads, GIS data, and field surveys. SP_004344. As the Treatment

Matrix and Design features reduce the intensity of treatments, the mileage of temporary roads will likely decrease as well. *Id.*; SP_041232. Viewed through the proper lens of the approved Project, all of Plaintiffs' claims fail.

Plaintiffs also repeatedly cite the opinions of their hired "expert," David Mattson, throughout their brief as if they were *facts* and ask the Court to defer to his conclusions over those of the agencies. *See e.g.*, ECF No. 48 ("WELC Br.") at 16, 18, 28-31, 60;[4] *see also* SP_046213-4 (Mattson Declaration offering his "expert opinion" on the Project). However, "[t]he Ninth Circuit directs district courts to stay out of scientific debates." *All. for the Wild Rockies v. Bradford*, 864 F. Supp. 2d 1101, 1021 (D. Mont. 2012) (citing *Lands Council*, 537 F.3d at 984). Courts should be their "most deferential" when reviewing scientific matters within the agency's area of expertise. *Lands Council*, 537 F.3d at 981, 993. Federal Defendants are entitled to rely on their own experts, and Plaintiffs' arguments to the contrary do not render the agency actions arbitrary, capricious, or a violation of law.

### A.    USFS Complied with NFMA

The Record demonstrates that the Project is consistent with the Forest Plan by incorporating binding Design Features that require compliance with grizzly bear secure habitat and lynx habitat Forest Plan standards. SP_003211 (incorporating

---

[4] Page citations refer to the ECF page number.

FW-STD-WLGB-03 into Design Features); SP_004511; SP_004475 (noting Design Features are binding); SP_004508 (incorporating Forest Plan lynx standards into Design Features); *see generally*, SP_003092-268 (Plan Consistency Table). Because any activities authorized under the Project must comply with the Design Features, those activities are necessarily consistent with the Forest Plan. SP_003092-268. Further, before implementing a Project treatment, USFS completes a Resource Checklist to confirm that the proposed activity meets the Design Features. SP_004504. If the proposed activity and conditions on the ground are "irreconcilable" with Design Features, treatment will not occur. *Id.* USFS also completes and submits a Conditional NEPA Project Monitoring Form to FWS. SP_004535. The form requires USFS to provide an updated assessment of how the proposed activity meets the grizzly bear and lynx Forest Plan standards both in isolation and given any other activities that may cumulatively impact grizzly bear and lynx. SP_004756-58. Finally, USFS has committed to post Resource Checklists and annual updates on the Project website, which will keep the public apprised of Project activities and Forest Plan consistency. SP_004491.

USFS is entitled to "substantial deference" in the interpretation and implementation of its Forest Plan. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. A USFS decision will only be found to be arbitrary and capricious "when the record plainly demonstrates that the Forest Service made a *clear error in judgment* in

concluding that a project meets the requirements of NFMA and relevant Forest Plan." *Id.* (emphasis added). Plaintiffs have the burden of proof. *Friends of the Wild Swan v. U.S. Forest Serv.*, 875 F. Supp. 2d 1199, 1204 (D. Mont. 2012), *vacated in part on other grounds* 650 F. App'x 400 (9th Cir. 2016). Since only treatment activities that comply with the Design Features, Resource Checklists, and Conditional NEPA Reporting Forms are authorized, Plaintiffs cannot show that USFS made a "clear error in judgment" or that the Project otherwise violates NFMA.

### 1. The Project Complies with the Forest Plan's Grizzly Bear Standards

The Forest Plan contains limits on the amount and timing of temporary reductions to grizzly bear secure habitat below baseline, FW-STD-WLGB-03. SP_000065. Under these standards, project activities causing temporary reductions to secure habitat below baseline must meet three conditions: (a) "only one project affecting secure habitat below baseline may be active within a given bear management subunit at any one time"; (b) total acreage below a subunit's baseline cannot exceed 1% of acreage of the largest subunit in the BMU; and (c) new temporary roads shall not reduce secure habitat below baseline for more than four years. *Id.* These standards *do not* apply to activities that will not reduce secure habitat below baseline and, notably, not all projects affect secure habitat. *Id.* The Project is consistent with these standards.

### a.     FW-STD-WLGB-03(a)

First, Design Feature 11 dictates that only one project affecting secure habitat below baseline may be active within a subunit at any time, ensuring Project consistency with FW-STD-WLGB-03(a). SP_004511. The Project falls into three subunits—Plateau #1, Madison #2, and Henry's Lake #2. *Id.*



SP_004402. The only project within these subunits affecting secure habitat below

baseline is the North Hebgen project in Madison #2.[5] SP_004432. No Project activities will commence in Madison #2 until it is restored to baseline. SP_004511; SP_041090; SP_041106. Since the North Hebgen project is in the same Forest and ranger district USFS can easily track when Madison #2 has returned to baseline, SP_041090, and confirm baseline using the Resource Checklists and Conditional NEPA Project Monitoring Form. SP_004534-35; SP_004537-42.

FWS terms and conditions, which are binding and incorporated into the Decision, require USFS to submit a Conditional NEPA Project Monitoring Form to FWS before implementing proposed Project treatments. SP_004499; SP_004534. The Form asks USFS to identify whether there are any ongoing projects or activities (including other Project activities) that would affect secure habitat below baseline in that subunit. SP_004541. USFS must therefore confirm completion of the North Hebgen project in Madison #2 before implementing any Project activities in that subunit. *Id.* Design Feature 11, coupled with FWS's mandatory reporting requirements, confirms Project activities will be consistent with FW-STD-WLGB-03(a).

Plaintiffs claim that no Project activities can begin anywhere in the Project area—including other subunits—while the North Hegben Project is ongoing,

---

[5] Although Plaintiffs identify other projects within the Project area, WELC Br. 40-41, there is no evidence that any of these projects impact secure habitat below baseline.

WELC Br. 42, but Plaintiffs misinterpret the standard. FW-STD-WLGB-03(a) is focused on temporary reductions of secure habitat *within a subunit*, not the activities in adjacent subunits or the duration of a landscape-scale project. The Project will not be "active" within Madison #2 until that subunit returns to baseline and Project activities are reviewed and implemented. USFS's interpretation of FW-STD-WLGB-03(a) is reasonable and entitled to substantial deference.

### b.     FW-STD-WLGB-03(b)

Second, Design Feature 12 limits the temporary reduction in secure habitat acreage below baseline to 1% of the acreage of the largest subunit in the BMU in accordance with FW-STD-WLGB-03(b). SP_004511. For example, the largest subunit in the Plateau BMU is 275,711 acres, so the total acreage permitted below a subunit's baseline within that BMU is 2,757 acres. SP_004433. Plateau #1 currently has 3,645 acres of secure habitat above its baseline of 125,685 acres. *Id.* Assuming no other activities within the Plateau BMU that reduce secure habitat below a subunit's baseline, secure habitat can be temporarily reduced in Plateau #1 by 6,402 acres.[6] *Id.*

The EA identifies the 1% threshold for each BMU as well as the baseline for

---

[6] Plaintiffs repeatedly use the term "removed" rather than "temporarily reduced," but this is not accurate. Project activities will temporarily reduce secure habitat, but there will be no permanent removal of secure habitat. In fact, the Record indicates that Project activities will increase secure habitat in the long term.  SP_004407; SP_041095.

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    22

the three subunits in this Project area. *Id*. The Project complies with this standard because there are no activities in the Plateau BMU affecting secure habitat below baseline; no activities will commence in Madison #2 until North Hegben activities in that subunit are complete and baseline is restored; and no activities will commence in Henry's Lake #2 until the Yale Creek Project in Henry's Lake #1 is complete and baseline in that subunit is restored. SP_000065 (FW-STD-WLGB-03 only applies to "temporary reductions in secure habitat below baseline"); SP_004511-12; SP_041091 (noting coordination required with Caribou Targhee Nation Forest [Yale] Creek Project).

Because activities impacting secure habitat below baseline within an individual subunit of the greater BMU may change, USFS must review and report to FWS whether there are other activities impacting secure habitat below baseline *before* implementing a contract. SP_004537-39 (Resource Checklists); SP_004499; SP_004534-35. The Form requires USFS to complete an updated 1% calculation with every contract. SP_004540-1. In fact, changes in secure habitat outside the Project area is a prime reason for this dynamic approach: in the time required to prepare a NEPA analysis, projects authorized in another subunit—on or off federal land—may change the amount of secure habitat below baseline.

Plaintiffs argue that the Project authorizes treatments greater than 1% below baseline for Henry's Lake #2, ECF No. 46 ("CBD Br.") at 34, but that statement is

not supported by the Record. Plaintiffs cite the Wildlife Report, which considered the impacts to secure habitat if *all areas suitable for treatment* were implemented at the same time. SP_041090. The Decision then limits the total temporary reduction in secure habitat in Henry's Lake #2 from 2,426 to 1,276 acres at a time. SP_004511. Plaintiffs also cite the Yale Creek project—which temporarily reduces secure habitat below baseline in Henry's Lake #1—but the Decision mandates that Project activities will not commence in Henry's Lake #2 until the completion of the Yale Creek project and restoration of that subunit to baseline, at which point additional acreage is available for other projects in the BMU. SP_004511-12.

The Project only authorizes activities that comply with the Design Features, such that no more than 1,276 acres may be below Henry's #2 baseline at a given time. *Id.* FWS terms and conditions, which are incorporated into the Decision, SP_004499, further require a two-year "rest period" between Project activities in a subunit that reduce secure habitat below baseline. SP_005246. Implementing the Project in stages allows the subunit to return to baseline—and stay at baseline for two years—before additional Project activities temporarily reducing secure habitat below baseline are implemented. *Id.* The standards address temporary reductions to secure habitat within a subunit at a given time, not total reductions over the course of a project. SP_000065 (stating 1% threshold applies to "project activities" not "projects"). Nothing in the Forest Plan prohibits staging, and USFS's interpretation

of its Forest Plan standards is entitled to substantial deference.

Plaintiffs cite several cases in support of their NFMA claim, CBD Br. 29, but these cases are all distinguishable because they involve records that did not disclose calculations. *See All. for Wild Rockies v. Marten*, No. 20-cv-156, 2021 WL4551496, at *4 (D. Mont. Oct. 5, 2021) ("[T]he issue in this case is that Defendants have not provided any updated calculation at all."); *Native Ecosystem Council v. U.S. Forest Service*, 418 F.3d 953 (9th Cir. 2005) (noting the EIS and decision lacked hiding cover calculation). Unlike those cases, the Record here demonstrates plan consistency by disclosing (1) the 1% threshold for each BMU; (2) the baseline for each subunit in the Project area; (3) status above or below baseline for each subunit; and (4) the Project acreage in each subunit. SP_004432-33. For Plateau #1 and Madison #2, the Project complies with the 1% limit by authorizing less than the allowable acreage. SP_004511-12; SP_041106-07. For Henry's #2, Project activities will be implemented in stages, or treatments dropped, to comply with the 1% limit. *Id.* The Decision calls for additional checks—Resource Checklist, Conditional NEPA Monitoring, and two-year rest period—to ensure compliance with the 1% threshold.

Plaintiffs argue that USFS cannot show consistency with FW-STD-WLGB-03(b) because the exact location of the roads has not been determined. But USFS produced a map with the maximum temporary roads based on its expectation of

where those roads will be needed. SP_041208; *see also* SP_006168 (draft map of first two sales). Temporary roads are associated with specific contracts, 36 CFR § 212.1, and their exact location depends on the contracts awarded. The Decision does not authorize any temporary road construction that would conflict with the Design Features, which require compliance with FW-STD-WLGB-03(b). USFS will complete a Resource Checklist and submit a Conditional NEPA Monitoring Form in advance of any Project activities to verify consistency with FW-STD-WLGB-03(b).

Plaintiffs misconstrue FW-STD-WLGB-03(b) by suggesting that each BMU has a baseline for secure habitat, WELC Br. 42, but baselines are determined at the subunit, not the BMU level. SP_000064; SP_000489. The BMU is relevant to FW-STD-WLGB-03 only in terms of defining the 1% acreage (based on the largest subunit in the BMU) and assessing the cumulative acreage below baseline for all subunits within that BMU. The Decision complies with FW-STD-WLGB-03(b) by limiting activities affecting secure habitat below baseline in Henry's Lake #2 to 1,276 acres at a time and delaying Project implementation in Henry's Lake #2 until Henry's Lake #1 is restored to baseline. SP_004511-12; SP_0041091 (stating Yale Creek project must be complete and restored to baseline prior to Project activities affecting secure habitat below baseline in Henry's Lake #2); SP_004708 (Biological Assessment stating same); SP_005221 (Biological Opinion stating

same).

### c.       FW-STD-WLGB-03(c)

Third, Design Feature 13 provides that all temporary roads affecting secure habitat below baseline be closed within three years and fully decommissioned one year later in compliance with FW-STD-WLGB-03(c). SP_004512. Temporary roads are those associated with a contract, 36 C.F.R. § 212.1, not a project. Contracts are anticipated to be five years long, "during which time temporary roads will be built, used, and obliterated . . . ." SP_004344. While the EA identified the maximum temporary road mileage over 15 years, these roads will not all be open concurrently because the Project will be implemented in phases, with individual contracts issued based on priority areas, changing conditions, and compliance with other Design Features and Forest Plan standards. SP_004343-45.

In consultation with FWS on the Forest Plan, USFS explained that this standard applies whether a Project consists of multiple sales or not: "any reduction below baseline secure habitat levels . . . must be brought back up to (or above) baseline within 4 consecutive years . . . .  Other project work may proceed or continue so long as secure habitat stays at or above baseline levels." Supp-FWS_002519. USFS does not interpret FW-STD-WLGB-03(c) to apply to all temporary roads in a project. Rather, regardless of whether the Project is staged, the standard applies only to temporary roads that reduce secure habitat below

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    27

baseline at any given time: they must be decommissioned within four years. A contrary interpretation would eliminate long-term projects entirely.

### 2. The Project Complies with the Forest Plan's Lynx Standards

Likewise, lynx Forest Plan standards are incorporated into the Design Features, Resource Checklists, and Conditional NEPA Monitoring Form. Forest Plan standard FW-STD-WLLX-01 incorporates the NRLMD into the Forest Plan. SP_000060. NRLMD Veg S2 provides that "[t]imber management projects shall not regenerate more than 15 percent of lynx habitat on NFS lands within an [Lynx Analysis Unit] in a ten-year period." SP_000567. Accordingly, Design Feature 1 of the Decision limits clearcutting to "no more than 15% of lynx habitat on Forest Service lands in the South Madison Lynx Analysis Unit ("LAU") in a ten-year period (Standard VEG S2)." SP_004508.

There are 31,309 acres of lynx habitat on National Forest System lands within the South Madison LAU and thus the Decision limits regeneration to no more than 4,600 acres in 10 years. *Id.* Up to 4,696 acres could be regenerated over 10 years and comply with Veg S2. *Id.* (providing calculation). Although the Decision authorizes clearcutting on up to 5,551 acres over *15 years*, SP_004478, only 4,600 acres are authorized within a 10-year period within USFS lands in the LAU. SP_004508.

Plaintiffs argue that USFS must "disclose the precise location and size of the

clearcuts units" to "demonstrate compliance with this standard." CBD Br. 40. But again, Plaintiffs attempt to shift the burden. *Friends of the Wild Swan*, 875 F. Supp. at 1199. Regardless, this is not a situation where USFS has failed to complete or disclose the necessary calculations—those are clearly in the Decision. SP_004508. The Decision also limits clearcut openings to 40 acres. SP_004478. The binding Design Features will determine the "precise location and size" of treatment units and ensure compliance with Veg S2. SP_004477; SP_004508.

Compliance with the Forest Plan is enshrined in the Design Features, and confirmed through Resource Checklists, Conditional NEPA Monitoring Forms, and reporting requirements. USFS's interpretation and implementation of Plan Standards is entitled to substantial deference, and Plaintiffs have not met their burden of proving a "clear error in judgment." *Or. Nat. Desert Ass'n*, 957 F.3d at 1035.

**B.      USFS Complied with NEPA**

**1.      The EA Took a Hard Look at the Project's Potential Effects**

An EA satisfies NEPA's hard-look mandate if it contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences," *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998), and provides the "public with sufficient environmental information, considered in the totality of the circumstances, to permit members of

the public to weigh in with their views and thus inform the agency decision-making process." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (citation omitted). Using an interdisciplinary team of specialists, USFS considered the environmental impacts of the "maximum extent" of authorized activities in the Project area. SP_004354; SP_004364; SP_004397; SP_004407. The Design Features and conditions on the ground, as verified by Resource Checklists and reporting obligations, will further reduce the scope and scale of Project activities that are implemented over the 15-year project. SP_004340; SP_004475 ("My decision authorizes the implementation of the proposed action . . . and includes and *makes binding* the application of the Treatment Matrix, Design Features, Resource Review Checklists, and the Monitoring Plan . . . ."). By analyzing the maximum potential effects from the Project, USFS provided sufficient information to allow the public to comment on the Project and properly inform the decision-making process.

Plaintiffs argue the EA failed to take a hard look at the potential effects on grizzly bears, lynx, and climate change, essentially arguing that condition-based management is somehow irreconcilable with NEPA. But Plaintiffs misunderstand or misconstrue the EA's detailed analysis and the condition-based management approved by the Project. When properly understood, it is clear the EA took a hard look at the Project's maximum potential environmental effects. Further, courts

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                          30

have upheld this type of condition-based management as compliant with NEPA. *WildEarth Guardians v. Conner ("Tennessee Creek")*, 920 F.3d 1245 (10th Cir. 2019); *N. Cascades Conservation Council v. U.S. Forest Serv.*, No. 2:22-cv-292, 2024 WL 188374 (E.D. Wash. Jan. 17, 2024).

In *Tennessee Creek*, the Tenth Circuit reviewed an EA that identified an area suitable for treatment to reduce beetle kill but did not determine the exact locations to be treated over the 10-to-15-year project. 920 F.3d at 1255. Rather, the project provided a "flexible approach necessary for reacting to on-the-ground conditions, such as a beetle infestation or fire risk." *Id.* Plaintiffs in that case challenged the project under NEPA for failure to complete an EIS and consider the impacts to lynx. *Id.* at 1251.

The Tenth Circuit held that an agency is *not* required to identify the exact locations of treatments in dynamic projects intended to respond to on-the-ground changes. *Id.* at 1258. In *Tennessee Creek*, USFS considered the effects from the worst-case scenario, i.e., the maximum extent, and thus the environmental effects from whatever sites were ultimately chosen had already been analyzed. *Id.* The nature of the project—responding to changing conditions over 10 to 15 years— made identification of specific sites for treatment and analyzing those effects "impracticable" and USFS's decision was reasonable given its history of studying impacts to lynx. *Id.* at 1261.

Like in *Tennessee Creek*, USFS has been studying the effects of timber treatments on lynx and grizzly bears in the GYE for decades. *See e.g.* SP_022651; SP_022662; SP_043595 (noting Interagency Grizzly Bear Committee, which includes USFS representatives, was created in 1983); SP_0044331 (noting development of grizzly bear conservation strategy began in 1993). The proposed treatments are not unusual, and logging, with associated roads, has occurred in this region for over a century. SP_004354; SP_004490 ("The actions in this project are routine and well-understood based on the experience gained through repeated implementation of similar projects, interdisciplinary team members' expertise, and the scientific literature."). And, like in *Tennessee Creek*, USFS needs flexibility to respond to changing insect, disease, and wildfire risks over the longer term. SP_004490.

In *North Cascades Conservation Council v. U.S. Forest Service*, plaintiffs challenged a condition-based management project to address insect and disease infestations and wildfire risk that entailed a "suite of proposed treatments based on pre-identified management requirements and specific resource conditions across a broad area[.]" 2024 WL 188374, at *2, *8. Like in this case, "the heart" of plaintiffs' challenge was the "use of condition-based management." *Id* at *7.

The court concluded that plaintiffs did not establish that condition-based management violated NEPA. *Id*. The EA in that case disclosed the project area and

the types of treatments authorized, and detailed "the decision criteria that will be applied to determine what to do when the ground conditions may differ from the expected conditions, thereby disclosing to the public the *maximum potential effects* of the project." *Id*. The court reasoned that this approach ensures that the "actual conditions on the ground meet the expected conditions disclosed in the Final EA." *Id.* The project also included design features, monitoring, and mitigation measures. *Id.* The court found that the "use of condition-based management is not arbitrary or capricious as a matter of law" or as applied to that case. *Id.*

The same analysis applies here. The Project identifies the areas suitable for treatment and analyzes the environmental effects based on the maximum treatments authorized under the Decision. SP_004340 (Table 1, identifying "maximum extent" of proposed action, and noting "maximum project footprint may be reduced"); SP_004364 ("Analysis was based on the project maximum extent"); SP_004397-400 (analyzing impact of "maximum" acreage on lynx); SP_004406-7 (analyzing impact of "maximum" acreage on grizzly bears). Like in *North Cascades Conservation Council*, the EA provides "sufficient information to the public to understand the scope of the [project] and its potential environmental consequences." 2024 WL 188374, at *7.

USFS took a hard look at the Project's potential effects by considering the maximum potential effects of the Project on grizzly bears and lynx, and by

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    33

providing a reasonably thorough discussion of the Project's minimal potential effects on climate. That is all that NEPA requires.

### a.    Grizzly bears

The EA and supporting Wildlife Report analyzed the direct, indirect, and cumulative effects of the Project on grizzly bears by considering the Project's impacts on food, habitat conditions, and secure habitat as well as the impacts from other projects. SP_004400-9; SP_041077; SP_041083-103 (effects analysis). As detailed in the Wildlife Report, USFS considered the displacement of individual grizzly bears from temporary roads and concluded that the effects would not be significant because of the temporary nature of silviculture project disturbance, the phased implementation of Project activities, and the abundance of surrounding habitat and food sources. SP_041092-93; SP_041102. "Once activities are completed, associated disturbance ends, and temporary roads are effectively decommissioned, bears would again use these areas." SP_041092. While the Project may temporarily affect individual grizzly bears, it will also (1) increase permanent secure habitat by over 1,173 acres by closing 8.2 miles of existing roads to motorized travel and (2) improve the quality of habitat in the long-term. SP_004401; SP_004407; SP_004486; SP_041094.

Plaintiffs argue that USFS failed to adequately consider the impacts of temporary roads on grizzly bears because the exact location of roads is subject to

change. But this misunderstands the analysis in the EA and Wildlife Report. That analysis considered the effects from the *maximum extent* of the temporary roads, SP_041089 ("[T]his set of temporary routes is generally considered the 'worst case' scenario, or the maximum mileage of temporary routes that would be constructed under the project."), including changes to total and open road density. SP_041089-103. Further, grizzly bears can "adjust[] their spatial and/or temporal use patterns" in response to temporary silviculture projects. SP_044298. The possibility that the precise locations may change does not render USFS's NEPA analysis arbitrary or capricious.[7] *Tennessee Creek*, 930 F.3d at 1258; *see also infra* V.C.1.a. Plaintiffs have not explained how the definitive location of temporary roads would change USFS's otherwise rational analysis.

Plaintiffs further argue that USFS used the incorrect baseline, WELC Br. 50-52. But the Wildlife Report thoroughly evaluated the existing condition of grizzly bears, explaining that the Project area sees "frequent, consistent, and long-term use . . . by all cohorts of grizzly bears." SP_041073; SP_044023 (Karabensh 2019). Almost all suitable habitat in the GYE is now occupied and the grizzly population "remains stable to increasing." SP_043895. The population has "gr[own] robustly" against a backdrop of past actions temporarily and permanently impacting secure

---

[7] Conditional NEPA Monitoring Forms ensure that the effects assessed in the EA, including the Wildlife Report, are unchanged prior to implementing a Project activity. SP_004540.

habitat. SP_004409. Plaintiffs' attempt to challenge these well-supported findings through their expert's opinion does not render them arbitrary or capricious. *See Native Ecosystems Council*, 428 F.3d 1233, 1244 (9th Cir. 2005) (noting courts do not "take sides in a battle of the experts" (quotation omitted)).

Finally, Plaintiffs contest the cumulative impacts analysis, referencing private development within the BMU and the Yale Creek project. USFS defined the spatial boundary for its effects analysis as the three subunits intersected by the Project area: Plateau #1, Madison #2, and Henry's Lake #2. SP_041072. Agencies are entitled to deference in the geographic scope of their cumulative effects analysis. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002). NEPA therefore does not require analysis of the entire BMU, and Plaintiffs cite no relevant caselaw requiring USFS to somehow predict and quantify the effects of future private development. Nevertheless, USFS did consider the cumulative effects from private development within the applicable subunits. SP_004712-4714 (discussing impacts of other projects and development and noting most private land "already generally developed"); SP_041100-01 (discussing effects of private and municipal development). And the Record is clear that Project activities will not commence until Yale Creek—which is in a different subunit, on a different National Forest, and well outside the analysis area—is

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                36

complete to ensure compliance with secure habitat standards. SP_004511-12; SP_041091; SP_041106.

In short, the EA and supporting Wildlife Report contain extensive analysis of the Project's potential effects on grizzly bears, providing the reasonably thorough discussion that NEPA requires.

### b.    Canada Lynx

Similarly, the EA and Wildlife Report complied with NEPA by considering the maximum potential environmental impacts on lynx. SP_004398. In fact, the Wildlife Report goes one step further, considering the direct, indirect, and cumulative effects on lynx of implementing the Project in all areas suitable for treatment, even though the Decision reduces the scope and extent of authorized activities. SP_041120-28; SP_041122 ("A total of 14,572 acres of lynx habitat would be affected based solely on an intersection of the current stand pool with the mapped lynx habitat in the LAU."); SP_041123 ("As noted previously, it is expected that project sideboards, design features, and other restrictions will reduce these impacts . . . ."); SP_041124 (table of lynx habitat affected if all areas suitable for treatment were treated). USFS concluded that, while the short-term impacts to lynx foraging habitat will be relatively large, over time Project activities "will encourage the growth of understory vegetation that snowshoe hare"—lynx primary prey—"are dependent on and provide suitable habitat for snowshoe hare."

SP_004398.

Plaintiffs argue that USFS violated NEPA by not identifying the exact location of treatments. But the exact sites for treatment are impractical in condition-based management projects designed to respond to changing conditions on the ground—like insects and disease. *Tennessee Creek*, 920 F.3d at 1261. Further, Figure 13 in the Wildlife Report shows the overlay of areas suitable for treatment (referred to as the "stand pool") with existing lynx habitat in the LAU. SP_041122; SP_041213 (map). Notably, approximately 89% of the acres suitable for treatment do not support snowshoe hare. SP_041122 (referred to as "'other' structural stage"); SP_041125 (noting majority of the acreage affected by the Project is "other structural stage" unsuitable for snowshoe hare). And the preliminary map for the first two sales, which was provided with the EA, SP_004344, indicates that the Project activities will generally coincide with this "other structural stage." SP_006167-70. By analyzing the maximum extent of Project activities, USFS has analyzed the maximum potential effects that could occur. *Tennessee Creek*, 920 F.3d at 1261; *N. Cascades Conservation Council*, 2024 WL 188374, at *7. Plaintiffs have not established that greater site specificity is necessary given USFS's experience and this relatively homogenous landscape. *Tennessee Creek*, 920 F.3d at 1258.

### c. Climate impacts

The EA examined the potential effects of the Project on carbon and climate change by looking at carbon storage and sequestration. SP_004371. The EA did this by tiering to the 2022 EIS for the Forest Plan. SP_004372. All alternatives considered by the 2022 EIS incorporated "an ecologically based approach to vegetation management, including direction to manage for conditions that would occur under a natural disturbance regime, and be more resilient in the face of future uncertainties." SP_001438; *see also* SP_001297. Consistent with this approach, the alternatives had the same desired conditions, standards, and guidelines but varied the intensity of management actions based on the "[o]bjectives and suitability of lands for timber harvest." SP_001371. This resulted in alternatives that varied "the total number of acres treated through vegetation management actions (such as, timber harvest, prescribed burning, etc.)" from around 50,000 acres to 80,000 acres per decade. SP_001374.

The EIS detailed the estimated baseline carbon stocks across the Forest and discussed potential carbon effects "qualitatively, with supporting estimates where possible." SP_001434; *see* SP_001434-37 (detailing existing condition); SP_038644-72 (2019 carbon assessment of the Forest). Based on this, the EIS explained that "even the maximum potential management levels described by the plan alternatives would have a negligible impact on national and global emissions and on forest carbon stocks," meaning "a quantitative analysis of carbon effects is

not warranted and thus is not meaningful for a reasoned choice among plan alternatives." SP_001437-38.

The EIS further explained that, although management actions such as timber harvest would minimally reduce carbon stocks on the Forest in the short term, "this initial effect would be mitigated or even reversed with time, reducing the potential for negative indirect and cumulative effects." SP_001439. Additionally, by managing the Forest for increased resilience, vegetation management activities "would generally maintain and improve forest health and supply wood forest products, thus having positive indirect effects on carbon storage." *Id.*; *see also* SP_039262 (explaining wood products "can account for a significant amount of offsite carbon storage"). In short, vegetation management under the Forest Plan would affect "less than 0.25 percent of the forested area [on the Forest] and much less than 1 teragrams of carbon annually." SP_001440. This would "not substantially, adversely, or permanently affect forest carbon storage, but would rather achieve a more resilient forest condition that will improve the ability of the [Forest] to maintain carbon stocks and enhance carbon uptake." *Id.*

Just as contemplated by the Forest Plan EIS, the Project provides for "forest resilience treatments designed to meet the need to increase landscape resilience to insects and disease, treat hazardous fuels, and contribute to a sustained yield of timber products." SP_004475. This approach is consistent with "internationally

recognized climate change adaptation and mitigation practices identified by the

IPCC (Intergovernmental Panel on Climate Change 2007)," SP_038617, as well as

the Northern Rockies Adaptation Partnership, which recommends the

implementation of "science-based adaptation strategies to mitigate the negative

effects of climate change." SP_004372; *see* SP_039261-63. As summarized by

USFS, the Project

> impacts a relatively small amount of forest land and carbon on the [Forest] and, in the near-term, might contribute a small quantity of carbon relative to the forests carbon uptake and stores which would be mitigated by a more resilient forest condition and future carbon uptake. This [Project] will not convert forestland to other non-forest uses, thus any carbon initially emitted from [the Project's] actions will only have a temporary influence on atmospheric CO2 concentrations as carbon will be removed from the atmosphere over time as the forest regrows. Some proposed vegetation treatments will also produce wood products which will provide long term storage of carbon.

SP_038618; *see also* SP_038637-43 (climate change and carbon storage report).

All this information and analysis provides the "reasonably thorough

discussion of the significant aspects of probable environmental consequences" that

NEPA requires. *Neighbors of Cuddy Mountain*, 137 F.3d at 1376. Indeed, the

Ninth Circuit previously upheld an EA for a project that authorized timber harvest

"to reduce likely fire intensity" that included *no* discussion of climate change.

*Hapner v. Tidwell*, 621 F.3d 1239, 1242, 1245 (9th Cir. 2010). In doing so, the

court correctly noted that potential "[i]mpacts shall be discussed in proportion to

their significance." *Id.* at 1245 (quoting 40 C.F.R. § 1502.2(b)); *see also Swomley*

*v. Schroyer*, 484 F. Supp. 3d 970, 975-77 (D. Colo. 2020) (upholding EA's discussion of climate impacts of forest resilience project). USFS's well-reasoned explanation of the Project's negligible potential climate impacts is consistent with this proportionality standard and is subject to deference. *See Earth Island Inst. v. Gibson*, 834 F. Supp. 2d 979, 990 (E.D. Cal. 2011) (deference to agency's assessment of climate impacts of fuel reduction project); *see also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011) (upholding analysis of greenhouse gas emissions).

Plaintiffs cite *Center for Biological Diversity v. U.S. Forest Service ("Black Ram")*, 687 F. Supp. 3d 1053 (D. Mont. 2023), to support a different conclusion. CBD Br. 54-58. But that case is distinguishable. Although it also addressed a project that authorized timber harvest to promote forest resiliency, the court found the EA's discussion of climate impacts inadequate because the Forest Service "could always skirt 'hard look' analysis when doing a carbon impacts review by breaking up a project into small pieces and comparing them to huge carbon stocks such as those contained within the over two million acres of land in the Kootenai National Forest." *Black Ram*, 687 F. Supp. 3d at 1075. But, unlike that case, the EA here tiered to the Forest Plan EIS's assessment of potential climate impacts that considered implementation of projects across the Forest and explained that, even in the aggregate, the potential effects of all those projects would be negligible.

Further, even if it were not materially distinguishable from this case, *Black Ram* is unpersuasive for multiple reasons. First, it fails to defer to USFS expertise in assessing the potential climate impacts of a forest resiliency project. But this is precisely the type of assessment that requires courts to be at their "most deferential." *See Lands Council*, 537 F.3d at 993. And this failure is reflected in the court's facile framing of the issue: "logging causes immediate carbon losses, while re-sequestration happens slowly over time, time that the planet may not have." *Black Ram*, 687 F. Supp. 3d at 1076. This ignores that harvested timber continues to store carbon when converted to wood products. And removal of fuels is specifically designed to prevent or reduce the severity of insect infestations, disease outbreaks, and wildfire, all of which contribute to carbon emissions and limit sequestration. The Forest Service properly relied on its expertise to consider all potential carbon impacts of the Project and reasonably determined they would be negligible. *Black Ram* erred by myopically focusing solely on re-sequestration through new vegetation growth.

Second, *Black Ram* improperly disregarded *Hapner* and *Swomley* while relying on *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022). 687 F. Supp. 3d at 1075-76. Notably, *Black Ram* is the only case in which a court has found an EA's discussion of potential climate impacts for a forest resiliency project to be inadequate. In doing so, *Black Ram* found neither *Hapner* nor *Swomley* applicable

because those cases involved 810 acres and 1,631 acres of timber harvest respectively, while the project in *Black Ram* involved 3,902 acres.[8] *Id.* at 1076. But the court did not explain why the potential carbon impact of a project involving 3,902 acres is meaningfully different from a project involving 810 acres or 1,631 acres. Further, *Black Ram* ignored that the EA in *Hapner* provided no assessment of climate impacts. 621 F.3d at 1245. In doing so, the court failed to explain why a project involving 810 acres of timber harvest requires no analysis of potential climate impacts while a project involving 3,902 acres requires more than the qualitative analysis provided in that case. USFS is best suited to make such determinations.

And, in making those determinations, USFS guidance explains that "[a]s with any environmental impact, [greenhouse gas] emissions and carbon cycling should be considered in proportion to the nature and scope of the Federal action in question and its potential to either affect emissions or be affected by climate change impacts." SP_039347. While quantitative analysis may be useful for certain

---

[8] The court also noted that 45% of those acres were "set to be clearcut." *Black Ram*, 687 F. Supp. 3d at 1076. But the court ignored that about two-thirds of the acreage in *Swomley* would also be clearcut. *Swomley*, 484 F. Supp. 3d at 973. And this further illustrates the need for deference in this context, as not all clearcuts are alike. Here, for example, clearcutting "is the best option to mimic the natural disturbance regime (i.e. stand replacing fire) [for lodgepole pine] and ensure regeneration." SP_035091; *see also* SP_035077-78 (explaining benefits of clearcutting in lodgepole pine stands); SP_004363 (same).

types of projects such as "energy facilities, transmission lines, [or] oil & gas development or leases," such an analysis is "not necessary . . . for most projects." SP_039347-48. Instead, a qualitative discussion of a project's impacts "couched in the ecosystem's role in the carbon cycle" that discloses "the nature and direction (short-term and long-term) of the impact as opposed to the specific magnitude of the impact" would be appropriate. SP_039348-49. Consistent with this guidance, USFS provided some quantitative information while providing a qualitative explanation of the potential carbon impacts of the Project's forest resiliency treatments. This satisfied NEPA.

*Black Ram* and Plaintiffs' reliance on *350 Montana* to suggest otherwise is misplaced. 687 F. Supp. 3d at 1075; CBD Br. 57-58. Unlike the project intended to improve forested ecosystem functions at issue in *Hapner* (and *Swomley*, *Earth Island Institute*, and here), *350 Montana* addressed an EA for a coal mine expansion that would "generate more [greenhouse gases] annually than the largest single point source of [greenhouse gas] emissions in the United States," totaling nearly 0.5 percent of annual *global* greenhouse gas emissions. 50 F.4th at 1265-66. The court faulted the agency for not citing "any scientific evidence supporting the characterization of the project's emissions as 'minor' compared to global emissions," nor identifying "any science-based criteria the agency used in its determination." *Id.* at 1266. But that case presented a qualitatively different

scenario than the limited potential effects of forest resiliency projects that will have, at most, minor potential carbon-storage impacts from the removal of vegetation followed by improved carbon sequestration from healthier forests. USFS complied with NEPA.

### 2. USFS Complied with NEPA by completing an EA

Plaintiffs argue that the FONSI was arbitrary or capricious and that USFS was required to prepare an EIS for the Project. As explained below, the FONSI and the Record fully support USFS's reasonable finding that the Project will not have significant environmental effects and that an EIS was not required. Under NEPA, "an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). In assessing significance, agencies consider the potentially affected environment and resources; short- and long-term effects; beneficial and adverse effects; and effects that would violate environmental laws. 40 C.F.R. § 1501.3(b). An EIS is required only where "substantial questions" exist as to the significance of a project's environmental effects. *Barnes*, 655 F.3d at 1136. "[I]nformation merely favorable to [Plaintiffs'] position in the NEPA documents does not necessarily raise a substantial question about the significance of the project's environmental effects" or mean a project is "highly controversial or highly

uncertain." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d at 1240. Instead, an agency can "reasonably rel[y] on its own expert reports and technical expertise in concluding that the impact of the project would be insignificant." *Bark v. Northrop*, 607 F. App'x 652, 655 (9th Cir. 2015). A FONSI "may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004).

Here, USFS considered all the required factors under 40 C.F.R. § 1501.3(b). SP_004492-94. Recognizing the short-term disturbance during Project implementation, USFS notes that "[o]ver a longer-term, implementation of the project will benefit the ecological resilience of the project area, which will benefit many resources." SP_004493. These benefits include tree stand age diversification, which will reduce mountain pine beetle hazard, support a natural fire regime, and "increase understory forage production to benefit wildlife." SP_004494. Environmental impacts from timber treatments are well understood, and the Project's binding Design Features, Resource Checklists, and Conditional NEPA Monitoring ensure that impacts will not be significant. SP_018037.

Plaintiffs argue USFS should have completed an EIS because the Project is in an "ecologically important area," WELC Br. 66, but they have failed to establish that the *effects* on this "ecologically important area" will be *significant*. Arguing that the Project area is "ecologically important" is insufficient. 40 C.F.R.

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                47

§ 1501.3(b) (dictating appropriate level of NEPA review). As discussed in the Wildlife Report, the "spatial scale" of project activities is "relatively small in relation to the scale at which grizzly bears operate across the landscape." SP_041103. USFS determined the Project will not create barriers to other wildlife, including ungulates, lynx, or wolverines. SP_0041104; SP_0041115; SP_0041147. And no vegetation or fuel treatments will occur in Wilderness or Inventoried Roadless Areas. SP_004476.

Plaintiffs next claim that there are "substantial" questions about the effect on grizzly bears. WELC Br. 67. But in assessing significance under NEPA, an agency is "to consider the degree of adverse effect on a *species*, not the impact on individuals of that species." *Env't Prot. Info. Ctr. v . U.S. Forest Serv.* 451 F.3d 1005, 1010 (9th Cir. 2006) (emphasis added) (citing *Native Ecosystems*, 428 F.3d at 1240) ("[I]t does not follow that the presence of some negative effects necessarily rises to the level of demonstrating a significant effect on the environment."). USFS explained why the effects do not rise to the level of significance, based on the habitat in surrounding landscapes, temporary nature of the Project, and the long-term benefits to the species from the Project. SP_004400; SP_0041103; SP_041107-8. In short, there will be no adverse effects to the species

that would support preparation of an EIS.[9]

USFS adequately analyzed the effects to grizzly bears, and there is no evidence the effects are "highly" uncertain. *Native Ecosystems*, 428 F.3d at 1240; *see also Tennessee Creek*, 920 F.3d at 1263-64 ("[Plaintiff] has utterly failed to show what could be accomplished through an EIS that would be material to whether the Project should proceed as planned."). The Record supports the FONSI and Plaintiffs have not met their burden of showing substantial questions exist as to the significance of the Project's potential effects.

### C. FWS Complied with the ESA

FWS's Biological Opinion thoroughly examined the effects of the Project on grizzly bears. FWS_000001-84. In undertaking formal consultation, FWS's task is to analyze whether the Project is "likely to jeopardize the continued existence of" a listed species or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2). A jeopardy or adverse modification determination requires an appreciable reduction in "the survival and recovery of a listed species in the wild." 50 C.F.R. § 402.02. Here, FWS reasonably concluded that the effects of the Project are not likely to jeopardize grizzly bears. FWS_000047.

As relevant here, FWS acknowledged that motorized access has long been a

---

[9] Formal consultation with FWS does not affect this finding. *Env't Prot. Info. Ctr.*, 451 F.3d at 1012 (stating a "may adversely affect" finding does not necessarily require an EIS because NEPA and ESA involve different standards).

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.           49

factor affecting grizzly bears. FWS_000013. FWS first analyzed the environmental baseline, which represents the factors that have led to the current status of the species. FWS_000012-25; *see* 50 C.F.R. § 402.02. FWS then analyzed the effects of the action, FWS_000025-43, and cumulative effects of future state, tribal, local, or private actions reasonably certain to occur in the action area, FWS_000043-47.

Regarding motorized access, FWS acknowledged that the Project "may result in some level of adverse effects to individual female grizzly bears and/or dependent offspring." FWS_000048. Based on the best available science, however, FWS concluded that "considering the large size of the GYE recovery zone, favorable land management within the recovery zone, [and] the robust status of the GYE grizzly bear population, adverse effects on grizzly bears as a result of implementing the [Project] would not have negative effects on the status of the GYE grizzly bear population." FWS_000053; FWS_000047 (large blocks of wilderness will reduce impacts on grizzly bears).

Despite FWS's robust analysis, Plaintiffs attack FWS's conclusions, arguing the agency should have employed a different methodology and provided more detail analyzing the Project's effects on grizzly bears. Plaintiffs' arguments fail for two main reasons. First, Plaintiffs argue that FWS's no jeopardy determination depends on FWS discussing the exact location of where temporary roads will be, CBD Br. 43, but—in addition to considering temporary road placement—FWS's

consideration of secure habitat is eminently reasonable and supported by the best available science and the record. Second, Plaintiffs' suggestion that FWS failed to consider other factors in its jeopardy analysis, WELC Br. 32-39, ignores the record which shows FWS considered all relevant factors and relied on the best available science.

    **1.    The Record Supports FWS's Methodology for Evaluating the Effects of Temporary Motorized Roads on Grizzly Bears**

Plaintiffs assert two main arguments against FWS's methodology for evaluating the effects of temporary motorized roads on grizzly bears. CBD Br. 43. First, Plaintiffs argue that FWS must know the exact location of future temporary roads to properly evaluate Project effects on secure habitat. *Id.* at 43-45. Second, Plaintiffs assert that FWS cannot base its no jeopardy determination on the Forest Plan's standards. *Id.* at 51-54. In addition to misconstruing FWS's analysis, these arguments are impermissible attacks on the agency's methodology for determining effects. "[T]he ESA does not prescribe how the jeopardy prong is to be determined." *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1066-67 (9th Cir. 2004). FWS is owed substantial deference in its methodology for determining jeopardy. *Id.*; *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) ("We do not act as a panel of scientists that instructs the [the agency] how to validate its hypotheses[.]" (cleaned up)).

###### a.       The Record supports FWS's secure habitat analysis.

As a threshold matter, FWS fully analyzed the effects of temporary motorized access on grizzly bears using secure habitat. SP_005401. Consistent with the 2007 Conservation Strategy, SP_044555, and 2016 Conservation Strategy, FWS_002258, the agencies defined secure habitat here as areas more than 500 meters from an open or gated motorized access route or reoccurring helicopter flight line that are greater than or equal to 10 acres in size. SP_005200.

In both the Forest Plan and Project biological opinions, FWS's methodology focused on identifying secure habitat because, in the GYE, studies show the most important predictors of grizzly bear survival is the amount of secure habitat within a bear's home range and road density outside secure habitat. SP_005402; FWS_000029; *see also* SP_001559 (Schwartz et al. (2010) concluding the same). FWS explained that, while motorized route density provides a useful threshold to describe human-caused effects to grizzly bears, route density alone fails to consider how road placement affects habitat patch size. FWS_000014. Patch size of secure habitat is important because small patch size may facilitate movement by bears and provide greater sensitivity for determining loss of secure habitat. SP_005403. Thus, a minimum patch size of 10 acres "would be much more sensitive to net losses in secure habitat from additional roads" than larger sizes. *Id.*

In evaluating the effect of temporary roads on grizzly bears, FWS assessed

the *maximum* mileage of temporary roads that could be constructed under the Project so as not to miss any effects to the grizzly bear. FWS_000032-41. FWS explained that, although the Project authorizes up to 56.8 miles of temporary roads, the actual number of temporary roads constructed and used are expected to be less due to sideboards, design measures, and other standards. FWS_000032-33; SP_005220. In addition, the Decision requires standards for maintaining secure habitat levels, like requiring only one project may affect secure habitat below baseline within a subunit at any one time and activities be coordinated across projects to ensure that temporary roads are effectively decommissioned within allowable timeframes. SP_005219; SP_005223 (activities would occur in phases within different locations). In considering the temporary road use authorized by the Project, FWS explained that the maximum levels of secure habitat that could be temporarily affected would be constrained by these components. *See* FWS_000048-49 (explaining effects from temporary roads in Henry's Lake #2 and Madison #2 subunits would be limited by these measures and that no adverse effects are expected in the Plateau #1 subunit associated with motorized access). Thus, FWS reasonably concluded that the effects of the Project are not likely to jeopardize the continued existence of the grizzly bear. FWS_000054.

Despite this analysis, Plaintiffs dispute the certainty of FWS's conclusions, CBD Br. 44-45, and its use of the 10-acre patch size. WELC Br. 27-32. First,

Plaintiffs contend that, because the agency "does not know" the exact time or location that temporary roads will be built, FWS's effects analysis is insufficient. CBD Br. 45. This argument is contradicted by law and fact. ESA Section 7(a)(2) provides flexibility in how agencies choose to fulfill their obligations under the Act so long as the effects of the agency action on a species have been considered and addressed. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012); *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 543-44 (Courts should not disturb the agencies' determination regarding the preferred manner they fulfill their statutory duties).

Here, in addition to evaluating effects through secure habitat, FWS considered temporary road placement. SP_004651-4759. The Biological Assessment, which FWS considered, FWS_000008, discusses that a combination of field-verified and GIS-identified temporary and proposed routes were evaluated. SP_004658; SP_041089. Regarding timing, USFS evaluated that heavy bear use occurs in the early spring/summer and late fall and tailored Project activities so effects would be "for a relatively short period of time" as operations would not occur in the winter and would be unlikely during spring break-up and late fall. SP_004710. The Project also contains measures specific to various habitats including protecting riparian areas and enhancing whitebark pine and aspen to benefit grizzly bears. SP_004703. Considering these factors, FWS reasonably

concluded that "the amount of disturbance would vary across the action area, depending on the timing, extent, and type of treatment[,]" and, because operations would unlikely occur simultaneously, disturbances to grizzly bears would be limited.[10] SP_005223-24.

Second, Plaintiffs contend there is no "scientific support" behind FWS's use of the 10-acre minimum in its secure habitat definition. WELC Br. 27-32. The record shows otherwise. As FWS explained, secure habitat calculated using a minimum patch size of 2,500 acres allows many additional roads to occur in patches less than 2,500 acres without indicating a net loss in secure habitat. SP_005403. That is because a "small minimum patch size provides greater sensitivity for determining loss of secure habitat." *Id*. Thus, both the Interagency Grizzly Bear Study Team and Yellowstone Ecosystem Subcommittee concluded that *even smaller* blocks of secure habitat are important for grizzly bears in the GYE. SP_041079, 043821 (the Grizzly Bear Recovery Office found that "all secure habitats are important for grizzly bears in the GYE, regardless of size").[11] The 10-acre patch size for secure habitat is a "reasonably sized area that is useable

---

[10] Thus, FWS's analysis is not speculation as Plaintiffs suggest. CBD Br. 44. FWS's no jeopardy determination is within its expertise and authority under the ESA. *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010).

[11] Plaintiffs' reference to the 1994 Interagency Grizzly Bear Committee Report lacks context. WELC Br. 29. The report states the "minimum size and connectivity of patches will be established at the recovery zone level." FWS_003694.

by an individual grizzly bear, while avoiding disturbance associated with motorized use on roads and trails." SP_001537.

Plaintiffs' reliance on scoping comments submitted by Mattson to argue otherwise is unpersuasive. WELC Br. 29-30; SP_007599 (comments). In addition to being opinion—not peer-reviewed literature—the comments miss the mark. Plaintiffs haven't identified any relevant scientific evidence in the record that FWS ignored, or shown that it "is in some way better than the evidence" FWS relied on here. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). Indeed, grizzly bears can move between the patches of secure habitat and, as FWS noted, they will use the landscape, including small patches of secure habitat, for movements, foraging, and other activities. FWS_000040-41. Thus, Plaintiffs engage in a logical fallacy, assuming small patch sizes must equal small secure habitat sizes. However, 10-acre secure habitat does not mean secure habitat is generally small. Rather, within the GYE recovery zone, secure habitat levels "generally are high, averaging about 87 percent over the entire recovery zone[,]" including for individual bear management subunits. SP_001538; *see* SP_001539 (increases in secure habitat in the Forest from 1998 to 2019). Indeed, FWS has utilized the 10-acre definition of secure habitat since at least 2007, SP_044521, and has seen the grizzly bear population in the GYE increase since then. SP_043895; SP_043532 (the GYE is a "high resiliency" ecosystem due to high and moderate

conditions for habitat). Plaintiffs may disagree with the methodology used, but they fail to show it is arbitrary and capricious.

> **b.      The Record supports FWS's evaluation of Forest Plan standards in its no jeopardy determination**

The Record likewise supports FWS's evaluation of the Forest Plan standards in its jeopardy analysis. FWS explained in its effects analysis that, because "sideboards, design measures, and other factors are in place (including but not limited to the Conservation Strategy application rules and Forest Plan standards for projects that temporarily reduce secure habitat below baseline levels)," the actual number of temporary roads constructed under the Project is expected to be less than the 56.8 miles authorized. SP_005218. FWS then considered the secure habitat that could be temporarily affected by the Project and still comply with these components. *See*, *e.g.*, SP_005235 (discussing the maximum acreage of secure habitat that can be affected under standard FW-STD-WLGB-03). Considering the Project's parameters, FWS reasonably concluded the Project would not appreciably reduce the likelihood of both the survival and recovery of threatened grizzly bears. FWS_000048.

Plaintiffs assert three arguments against the Biological Opinion's analysis: (1) it fails to specify how coordination with projects will occur and how coordination will avoid effects to grizzly bears; (2) it fails to provide sufficient details on "dropping treatment acres" and "staging activities;" and (3) Forest Plan

FED. DEFS.' BRIEF IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    57

components are insufficient commitments under the ESA. CBD Br. 52-53. The Record and law prove otherwise.

Regarding coordination, the Biological Opinion explains that, "[o]nce an activity or activity area (e.g. timber sale/phase, burn plan, etc.) has been defined," resource specialists would review the proposed activity. SP_005196. Resource specialists will then complete a NEPA review checklist, ensuring compliance with the Decision, an implementation coordinator will track project effects, and an internal tracking form will be updated for new project activities or phases. *Id*. The Biological Opinion explains that this process will ensure that project implementation will not exceed the decision's limitations. *Id*.

The Biological Opinion also explains a similar process tracking ESA compliance will occur. SP_005197. Under that process, review for changed conditions to the environmental baseline or affected environment, tracking of activities and their effects will occur. *Id*. This information will be provided to FWS for its review prior to the implementation of specific activities. *Id*. The Biological Opinion likewise discusses treatment acres and staging activities. *See, e.g.*, SP_005220 (discussing treatment acres and temporary roads may be reduced and sales may be staged to reduce the impact to secure habitat). This analysis is sufficient under the ESA. *Hunters v. Moore*, No. 22-126-M-DWM, 2023 WL 6626158, at *7 (D. Mont. Oct. 11, 2023) (a biological opinion was sufficient when

"the agencies adequately considered the baseline and analyzed the Plan's effects on grizzly bears").

Plaintiffs also assert that this thorough process amounts to general commitments to future improvement which are insufficient under the ESA. *See* CBD Br. at 54; *see also id.* at 51 (asserting measures are not binding). But, in addition to ignoring the record, Plaintiffs mischaracterize the measures. Forest Plan standards and compliance with them is always non-discretionary. *See* SP_000013 (defining a standard as a "mandatory constraint on project and activity decision making"); *see also B.R. v. Garland*, 26 F.4th 827, 836 (9th Cir. 2022) (discussing presumption of administrative regularity). Thus, the Forest Plan standards are quickly distinguishable from *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020). There, the plan referenced possible strategies, without selecting a specific measure. *Id*. at 746. By contrast, here, the Project identifies specific Forest Plan standards that the Project must comply with, which the Decision only authorizes. *See* SP_004715 (discussing the standards applicable to the Project). These are not unenforceable measures. Plaintiffs' argument fails as a matter of fact and law. *Forest Guardians v. Veneman*, 392 F. Supp. 2d 1082, 1094 (D. Ariz. 2005) (upholding biological opinion where measures were an enforceable part of the project).

Thus, FWS's no jeopardy determination is consistent with the best available

science, and its analysis shows the agency adequately considered the effects to grizzly bears from temporary roads associated with the Project. Plaintiffs' protests to the jeopardy analysis should be rejected because they ignore the best available science, misconstrue the analysis reflected in the record, and fail to explain how a different outcome is warranted. *See Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1068 (9th Cir. 2024) ("Merely pointing to new evidence and stating at a high level of generality that it was different from the evidence relied on by FWS, with no explanation of how it would materially affect FWS's analysis, is not enough.").

### 2. FWS Properly Analyzed the Environmental Baseline and Effects of the Action in Its No Jeopardy Determination

Plaintiffs also misunderstand how FWS calculates the environmental baseline and effects of the action under the ESA. Contrary to their arguments, FWS fully evaluated the environmental baseline and effects the Project would have on grizzly bears. *See* SP_005198-211 (environmental baseline); *see also* SP_005211-29 (effects related to temporary roads, hiding cover, the presence of ungulate prey species, and whitebark pine).

### a. FWS adequately considered the effects from the Yale Creek Project

Plaintiffs' assertion that FWS failed to consider effects from the Yale Creek Project as part of the environmental baseline fails for two reasons. CBD Br. 45-51. First, the environmental baseline only includes impacts in the action area. 50

C.F.R. § 402.02. The Yale Creek Project is outside of the Project's action area. *Compare* SP_005199 (action area is the Madison #2, Henry's Lake #2, and Plateau #1 subunits), *with* SP_004708 (Yale Creek Project affects secure habitat in the Henry's Lake #1 subunit). Thus, although the two projects are within the Henry's Lake BMU—and effects to the BMU's secure habitat were analyzed—the Yale Creek Project is outside of the action area and not part of the environmental baseline.[12]

Second, Plaintiffs' argument fails because FWS addressed how the Yale Creek Project will temporarily reduce secure habitat in its jeopardy analysis. CBD Br. 47-48. FWS recognized that the Yale Creek Project affects secure habitat below baseline up to 1% in the Henry's Lake #1 subunit. SP_005221. Because the Yale Creek Project shares the Henry's Lake BMU with the Project, FWS explained that Yale Creek Project activities must be completed, and temporary routes decommissioned prior to any Project activities affecting secure habitat below baseline in the Henry's Lake #2 subunit begin. *Id*.; *see also* FWS_000035 (standard FW-STD-WLGB-03 requires all temporary roads that would impact secure habitat below baseline be in place no longer than three years and effectively

---

[12] FWS did not concede the Yale Creek Project is within the Project's action area either. CBD Br. 47. The record states that coordination will occur between adjacent forests (here, the Caribou Targhee National Forest). SP_005221.

decommissioned within one year). In other words, while the Yale Creek Project is ongoing, the Project will not be implemented in Henry's Lake #2. FWS_000580. Thus, FWS adequately considered the Yale Creek Project's effects and explained both projects will not displace grizzly bears at the same time.[13] *Cf.* CBD Br. 48.

For the same reasons, the Project will not violate Forest Plan standard FW-STD-WLGB-03(b). *Cf. id.* at 49. As Plaintiffs acknowledge, the amount of secure habitat impacted by the Project "depends on the Yale Creek Project's impact to the 1%." *Id.* at 50. Thus, work proceeding in Henry's Lake #2 is contingent upon the Yale Creek Project's completion. Plaintiffs put the cart ahead of the horse and allege a violation of the standard even though actions authorized under the Project are contingent upon effects of the Yale Creek Project. And, since Project activities in the Henry's Lake BMU will not begin until Yale Creek Project activities conclude there, USFS will ensure compliance before beginning work. *See* SP_005196-97 (discussing this process). Plaintiffs' argument confuses the maximum amount of secure habitat authorized with the maximum amount that can be affected pursuant to the Forest Plan standards and should be rejected.

        **b.**      **The Record supports FWS's use of the 1998 baseline**

---

[13] Plaintiffs' assertion that the Project Biological Opinion conflicts with the Decision Notice likewise fails. CBD Br. 49-50. There is no conflict with acknowledging the Yale Creek Project is ongoing and that it must be completed prior to Project activities affecting the Henry's Lake #2 subunit starting.

Finally, Plaintiffs dispute USFS's use of the 1998 baseline, which they claim conflicts with the best available science. WELC Br. 32-39. The decision as to what constitutes "best available science" is one that "belongs to the agency's special expertise." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 791 (9th Cir. 2018) (cleaned up). As outlined below, Plaintiffs advance three arguments, which should all be rejected.

First, Plaintiffs' claim that the 1998 baseline adopts a flawed definition of secure habitat is belied by the record. As discussed above, Plaintiffs' challenge to secure habitat size rests on flawed assumptions that small patch size equals a small amount of secure habitat, generally. *See supra* 56. Moreover, the longevity and consistent application of the 1998 baseline shows that the 1998 baseline has made a significant contribution to the recovery of the GYE grizzly bear population. 1998 is used as a baseline for measuring secure habitat because habitat conditions up to that time provided an environment that resulted in substantial growth of the GYE grizzly bear population and subsequent achievement of all demographic recovery targets by 1998. SP_001538. Using this baseline, secure habitat levels have increased in all but two subunits on the national forest since 1998. *Id.*; SP_001539 (table showing increases). Indeed, as FWS acknowledged, the estimated population size and distribution of the GYE population has more than doubled since listing. SP_005198. All recovery criteria were met in the GYE for 2022 and have all been

met for at least the last 10 years, with some individual criteria being met even longer. *Id.* Thus, the best available science and results from nearly 30 years contradict Plaintiffs' claims.

Plaintiffs' claim that the 1998 baseline fails to account for key habitat variables likewise rests on flawed assumptions. WELC Br. 33-36. As discussed above, the 1998 baseline pertains to the baseline conditions for habitat management. SP_005201. This does not mean that key habitat variables were not considered in FWS's analysis, or those variables must be considered in the 1998 baseline. The effects of the Project on food, seasonal foraging habitat, denning habitat, hiding cover, secure habitat, displacement/mortality risk, and the cumulative effects on these features are all addressed in the EA which was analyzed by FWS. SP_041083-103. Thus, Plaintiffs' suggestion that, because those variables are not covered by the 1998 baseline, they are not considered at all is demonstrably inaccurate.

For this same reason, Plaintiffs' assertion that the 1998 baseline is outdated because the GYE has changed fails. *See* WELC Br. 36 (listing increased population, recreation, and private residential development, as well as climate change and changes in grizzly bear range, food sources, and habitat). As mentioned, the 1998 baseline represents only one of many components in FWS's analysis. A review of the record shows that these other components were

considered in FWS's analysis. *See* SP_005239 (growth of the human population); SP_005230 (recreational activities and private development); SP_005232 (climate change and food sources); SP_005225-26 (range and habitat). Thus, the use of the 1998 baseline as a tool for measuring secure habitat does not mean these other factors were ignored. The Court should therefore reject Plaintiffs' attack on the 1998 baseline as the record demonstrates the grizzly bear population has continued to expand in the GYE under this standard. SP_005198.

### D.     Remedy

For the reasons discussed above, Federal Defendants fully complied with the law in approving the Project. Further, Plaintiffs have neither recognized nor satisfied the balancing test for vacatur or attempted to satisfy their burden for the extraordinary remedy of a mandatory injunction. If the Court finds any violations of law, the Court should deny Plaintiffs' unsupported request for relief or require supplemental briefing on remedy. *See Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 388 (E.D. Cal. 2007) (noting "it is not prudent to impose a remedy without further input from the parties.").

## VI.     CONCLUSION

For the reasons stated herein, this Court should deny Plaintiffs' Motions for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment on all claims.

Submitted on this 12th day of July, 2024.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Reade E. Wilson*
READE E. WILSON, Trial Attorney
Natural Resources Section
*/s/ Christian H. Carrara*
CHRISTIAN H. CARRARA, Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0299 (Wilson)
Tel: (202) 305-0217 (Carrara)
Fax: (202) 305-0275
Email: reade.wilson@usdoj.gov
Email: christian.carrara@usdoj.gov

JESSE LASLOVICH
United States Attorney

*Attorneys for Federal Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(A), I hereby certify that this brief complies with the word limit set by this Court's July 8, 2024 Order (ECF No. 53). Excluding the caption, tables of contents and authorities, signature block, and certificate of compliance, this brief contains 13,999 words.

*/s/ Christian H. Carrara*
CHRISTIAN H. CARRARA, Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0217 (Carrara)
Fax: (202) 305-0275
Email: christian.carrara@usdoj.gov