Kris A. McLean, Bar No. 2926
Tyson A. McLean, Bar No. 55763951
Jordan A. Pallesi, Bar No. 68037652
Kris A. McLean Law Firm, PLLC
2315 McDonald Avenue, Suite 106
Missoula, MT 59801
Telephone: (406) 396-9367
Kris@krismcleanlaw.com
Tyson@krismcleanlaw.com
Jordan@krismcleanlaw.com

Sara Ghafouri, Ore. Bar #111021 *(Pro Hac Vice)*
Sarah Melton, Ore. Bar #227050 *(Pro Hac Vice)*
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, OR 97232
Telephone: (503) 222-9505
sghafouri@amforest.org
smelton@amforest.org

*Attorneys for Defendant-Intervenor Sun Mountain Lumber*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Lead Case: CV-23-110-M-DLC-KLD |
| Plaintiffs, | |
| vs. | Member Case: CV-23-154-M-DLC-KLD |
| U.S. FOREST SERVICE, et al. | |
| Defendants, | **DEFENDANT-INTERVENOR'S MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT** |
| and | |

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT

SUN MOUNTAIN LUMBER, INC.,

     Defendant-Intervenor.

_____

GALLATIN WILDLIFE ASSOCIATION, et al.,

     Plaintiffs,

          vs.

MARY ERICKSON, et al.,

     Defendants,

          and

SUN MOUNTAIN LUMBER INC., a Montana Corporation,

     Defendant-Intervenor.

_____

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................1

II.   FACTUAL BACKGROUND ...............................................................3

    A.  The 2022 Custer-Gallatin Forest Plan .........................................3

    B.  The South Plateau Project............................................................8

III.  STANDARD OF REVIEW ................................................................11

IV.   ARGUMENT......................................................................................12

    A.  The South Plateau Project Complies with the Revised Plan......12

        1.  The Project Complies with the Revised Plan's Standards for
            Temporary Changes in Grizzly Bear Secure Habitat...........13

            a.  The Project complies with FW-STD-WLGB-03(a) .........14

            b.  The Project complies with FW-STD-WLGB-03(b).........17

            c.  The Project complies with FW-STD-WLGB-03(c) .........26

        2.  The Project Complies with the Lynx Direction's VEG S2
            Standard...............................................................................28

    B.  FWS Adequately Analyzed the Project's Impacts on Grizzly Bears
       Consistent with the ESA..............................................................30

        1.  FWS adequately analyzed the effects of the Project on
            grizzly bears .......................................................................31

        2.  FWS's environmental baseline is lawful .............................35

        3.  FWS's no jeopardy determination reasonably relied on the
            Project's mitigation measures ............................................37

        4.  FWS's Revised Plan BiOp reasonably relied on a 10-acre threshold
            for secure habitat ................................................................41

5. The 1998 baseline for secure habitat is based on the best available science ...................................................................................45

C. The Forest Service Complied with NEPA's "Hard Look" Requirement.......................................................................................49

1. The Forest Service provided site-specific analysis on the impacts from regeneration harvest in lynx habitat ...............................................50

2. The Forest Service took a hard look at the effects of temporary roads ...................................................................................52

3. The Forest Service took a hard look at the Project's climate-related impacts .....................................................................................54

4. The Forest Service adequately analyzed the Project's cumulative effects .....................................................................................58

D. The Forest Service's Finding of No Significant Impacts and Determination that an EIS is Not Required Complies with NEPA...........61

V. REMEDY ............................................................................................61

VI. CONCLUSION ..................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*350 Montana v. Haaland,*
   50 F.4th 1254 (9th Cir. 2022) ....................................................................57, 58

*All. for the Wild Rockies v. Austin,*
   55 F.Supp.3d 1294 (D. Mont. 2014)..................................................................29

*All. for the Wild Rockies v. Marten,*
   No. 20-CV-156-M-DLC, 2021 WL 4551496 (D. Mont. Oct. 5,
   2021) .............................................................................................................22, 23

*All. for Wild Rockies v. Marten,*
   No. 20-CV-156-M-DLC-KLD, 2021 WL 3561178 (D. Mont. Aug.
   11, 2021) .............................................................................................................23

*Blue Mountains Biodiversity Project v. Blackwood,*
   161 F.3d 1208 (9th Cir. 1998) ...........................................................................20

*Cascadia Wildlands v. Bureau of Indian Affs.,*
   801 F.3d 1105 (9th Cir. 2015) ...........................................................................61

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971)............................................................................................15

*Conservation Cong. v. Finley,*
   774 F.3d 611 (9th Cir. 2014) .............................................................................30

*Ctr. for Biological Diversity v. Bernhardt,*
   982 F.3d 723 (9th Cir. 2020) .............................................................................40

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
   538 F.3d 1172 (9th Cir. 2008) ...........................................................................49

*Ctr. for Biological Diversity v. Rumsfeld,*
   198 F.Supp.2d 1139 (D. Ariz. 2002) .................................................................40

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
   698 F.3d 1101 (9th Cir. 2012) (*CBD v. BLM*)..............................................39, 40

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015) ..............................................34, 37, 39

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
687 F.Supp.3d 1053 (D. Mont. 2023) (*Black Ram*) ....................57, 59

*ForestKeeper v. La Price*,
270 F.Supp.3d 1182 (E.D. Cal. 2017) ................................................16

*Hapner v. Tidwell*,
621 F.3d 1239 (9th Cir. 2010) ..........................................................16

*Kettle Range Conservation Grp. v. U.S. Forest Serv.*,
No. 2:21-CV-00161-SAB, 2023 WL 4112930 (E.D. Wash. June
21, 2023) ......................................................................................51, 52

*Kisor v. Wilkie*,
588 U.S. 558 (2019).........................................................................24

*Klamath Siskiyou Wildlands Ctr. v. U.S. Fish & Wildlife Serv.*,
No. 1:21-CV-00058-CL, 2022 WL 856035 (D. Or. Mar. 23, 2022)..................39

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) .............................................................49

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) (en banc), *overruled in part on other
grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559
F.3d 1046 (9th Cir. 2009) ............................................................11, 12

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v.
U.S. Forest Serv.*,
549 F.3d 1211 (9th Cir. 2008) ..........................................................60

*League of Wilderness Defs./Blue Mountains Biodiversity Project v.
U.S. Forest Serv.*,
883 F.Supp.2d 979 (D. Or. 2012) .....................................................16

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989)..........................................................................48

*Mt. Graham Red Squirrel v. Espy*,
986 F.2d 1568 (9th Cir. 1993) ..........................................................12

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - iv

*N. Alaska Env't Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ....................................................35, 50, 56

*N. Cascades Conservation Council v. United States Forest Serv.*,
  No. 2:22-CV-00293-SAB, 2024 WL 188374 (E.D. Wash. Jan. 17,
  2024) .........................................................................................................51

*Nat. Res. Def. Council v. Haaland*,
  102 F.4th 1045 (9th Cir. 2024) ................................................................16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  524 F.3d 917 (9th Cir. 2008) ..............................................................37, 40

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) ....................................................................37

*Native Ecosystems Council v. Marten*,
  No. 18-CV-87-M-DLC (ECF No. 93, June 9, 2020).................................14

*Native Ecosystems Council v. U.S. Forest Serv.*,
  418 F.3d 953 (9th Cir. 2005) ......................................................12, 20, 23, 24

*Native Vill. of Point Hope v. Jewell*,
  740 F.3d 489 (9th Cir. 2014) ....................................................................21

*Natural Resources Defense Council v. U.S. Forest Serv.*,
  421 F.3d 797 (9th Cir. 2005) ....................................................................20

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
  137 F.3d 1372 (9th Cir. 1998) ..................................................................12

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ....................................................................59

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries
  Serv.*,
  265 F.3d 1028 (9th Cir. 2001) ..................................................................32

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989).................................................................................49

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ....................................................................31

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - v

*Save Our Cabinets v. U.S. Fish & Wildlife Serv.*,
  255 F.Supp.3d 1035 (D. Mont. 2017)....................................................35

*Te-Moak Tribe of West Shoshone of Nevada v. U.S. Dep't of Interior*,
  608 F.3d 592 (9th Cir. 2010) ...............................................................50

*Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*,
  340 F.3d 969 (9th Cir. 2003) ...............................................................30

*WildEarth Guardians v. Conner*,
  920 F.3d 1245 (10th Cir. 2019) ...........................................51, 52, 54

**Statutes**

5 U.S.C. § 706(2)(A)................................................................................11

16 U.S.C. §§ 1531 *et seq*.........................................................................2

16 U.S.C. § 1536(a)(2)............................................................................34

16 U.S.C. §§ 1600 *et seq*.........................................................................2

16 U.S.C. § 1604(i) .................................................................................12

42 U.S.C. §§ 4321 *et seq*.........................................................................2

42 U.S.C. § 4332......................................................................................49

**Other Authorities**

40 C.F.R. § 1502.2(b) .............................................................................56

40 C.F.R. § 1508.9 ..................................................................................21

50 C.F.R. § 402.02 .......................................................................35, 36, 38

50 C.F.R. § 402.14(g)(4).........................................................................30

50 C.F.R. § 402.14(g)(8).........................................................................39

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - vi

## ACRONYM LIST

| | |
|---|---|
| BMUs | Bear Management Units |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| CEQ | Council on Environmental Quality |
| DN/FONSI | Decision Notice/Finding of No Significant Impact |
| ESA | Endangered Species Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FWS | U.S. Fish and Wildlife Service |
| GYE | Greater Yellowstone Ecosystem |
| GHG | Greenhouse Gas Emissions |
| IGBST | Interagency Grizzly Bear Study Team |
| LAU | Lynx Analysis Unit |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| PCAs | Primary Conservation Areas |
| PDFs | Project Design Features |

## I.    INTRODUCTION

Before the Court is a challenge to the South Plateau Project (Project) on the Custer-Gallatin National Forest, an important forest health project intended to promote forest resiliency, provide permanent changes to Forest System roads, contribute to sustained yield of timber products, and treat hazardous fuels to reduce wildfire risk to the public and first responders.  This Project is a 15-year program of work focused on making the homogeneous lodgepole pine stands, which are highly susceptible to a devastating mountain pine beetle outbreak, more resilient to insect and disease infestations and wildfire risk.

The Forest Service took a landscape-scale approach with the South Plateau Project.  The Project's National Environmental Policy Act (NEPA) analysis identified areas suitable for treatment, providing detailed maps of possible treatment locations, and resource specialists will determine the precise location for each treatment unit by conducting surveys closer to implementation.  The Forest Service will determine treatment prescription types (regeneration harvest, commercial and noncommercial thinning, and fuels treatments) by applying the Environmental Assessment's (EA) Treatment Matrix and the Project Design Features (PDFs), which include specific requirements to ensure compliance with the 2022 Custer-Gallatin Revised Forest Plan's (Revised Plan) standards for lynx and grizzly bears.  The Forest Service's flexible, conditional approach allows the

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 1

agency to appropriately respond to changes on-the-ground during the Project's lifetime.

Center for Biological Diversity et al. Plaintiffs (CBD Plaintiffs) in the lead case (23-CV-110) and Gallatin Wildlife Association et al. Plaintiffs (Gallatin Plaintiffs) in the member case (23-CV-154) oppose the Project and seek to prevent the Forest Service from implementing the forest resilience and fuels reduction treatments. *See* CBD Pls.' Memo in Supp. of Mot. for Summ. J. (CBD's MSJ) (ECF No. 46); Gallatin Pls.' Memo in Supp. of Mot. for Summ. J. (Gallatin's MSJ) (ECF No. 48). Plaintiffs challenge the South Plateau Project under the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq.*, the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq.*, and NEPA, 42 U.S.C. §§ 4321 *et seq.*

Plaintiffs take issue with the Forest Service's compliance with the Revised Plan's standard for temporary reductions in secure habitat for the grizzly bear and limits on regeneration harvest for lynx habitat by relying on PDFs. In Plaintiffs' view, the Project's PDFs are "mere promises" to comply with the Revised Plan's standards. However, Plaintiffs' concerns are meritless because PDFs *are part of the project design* and are *binding* on the agency. Plaintiffs' ESA arguments also fail because they seek to second-guess the agencies' grizzly bear analysis under the Project and thresholds provided under the Revised Plan, requesting this Court to

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 2

substitute Plaintiffs' scientific views for those of the expert wildlife agencies who have overseen grizzly bear conservation for the Greater Yellowstone Ecosystem (GYE) for decades. Finally, Plaintiffs' NEPA hard look arguments rest on the assumption that the Forest Service must disclose the precise location and timing of the treatment units. NEPA does not require the level of site-specificity Plaintiffs claim is necessary. That said, the Forest Service disclosed the possible location of the treatments and adequately analyzed impacts by taking an overly conservative approach of assuming that the maximum treatment amounts authorized would be implemented at the same time. Under that conservative approach, the Forest Service reasonably determined that the Project's impacts were not significant and that the preparation of an Environmental Impact Statement (EIS) was unwarranted.

Because Plaintiffs have failed to show that the agencies violated NFMA, ESA, and NEPA, this Court should enter summary judgment in favor of Defendant-Intervenor.

## II.     FACTUAL BACKGROUND

### A.     The 2022 Custer-Gallatin Forest Plan.

In 2022, the Forest Service revised the 1986 Custer Forest Plan and the 1987 Gallatin Forest Plan to provide a single document to serve as an "integrated set of plan direction for social, economic, and ecological sustainability, and multiple uses" of the lands and resources of the Custer-Gallatin National Forest. FS_1134.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 3

The need to revise the previous two forest plans arose from many changes that have occurred since those plans were developed over 30 years ago. *Id.* These changes include "large wildland fires, development in the wildland-urban interface, considerable population growth around communities like Bozeman and Big Sky, land consolidations, spread of invasive species, and changing recreation uses and expectations." FS_1062. The Revised Plan was based on updated data and "address[ed] gaps in [previous] plan direction, shifting demographics, and new threats that have emerged." FS_1135.

Relevant to this case, the Revised Plan fully incorporates the 2016 Conservation Strategy for the Grizzly Bear (2016 Conservation Strategy) and the 2007 Northern Rockies Lynx Management Direction (Lynx Direction). FS_1148, FS_1428, FS_1244. Federal and State agencies developed a conservation strategy for managing GYE grizzly bears in 2003, which was updated in 2007 and in 2016. FS_1527. An interagency team, consisting of the U.S. Fish and Wildlife Service (FWS), Interagency Grizzly Bear Study Team (IGBST), National Park Service, Forest Service, and wildlife management agencies from Montana, Idaho, and Wyoming, developed the 2016 Conservation Strategy using an approach that combined their knowledge and expertise with the "best available scientific information and literature relative to grizzly bear management." FS_63. Overall, the 2016 Conservation Strategy "describes the regulatory framework for

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 4

management of the [GYE] grizzly bear population and its habitat," utilizing a management approach that identifies recovery zones/Primary Conservation Areas (PCAs) where occupancy is anticipated and acceptable.  FS_217; FWS_2198.

Just over 1 million acres of the GYE recovery zone/PCA for the grizzly bear lies inside the Forest boundary.  FS_1528.  In 2020, the GYE grizzly bear population was estimated at 727 individuals in the Demographic Monitoring Area, more than double the estimated population size of 136 to 300 at the time of the ESA listing in 1975.  FWS_803.  There is no evidence of a population decline, but instead "it may be that the GYE grizzly bear population is nearing its carrying capacity."  SUPP_FWS_105.  Within the GYE recovery zone/PCA, "bear management units [(BMUs)] were delineated to facilitate the assessment of habitat characteristics and recovery objectives."  FS_1528.  BMUs represent the "spatial scale of the lifetime home range of a female grizzly bear in the [GYE]."  *Id.* BMUs are further divided into subunits, the size of which approximate a female grizzly bear's annual home range.  FWS_797-98; FS_4697.  The Custer-Gallatin National Forest intersects with 9 out of the 18 BMUs and 14 of the 40 subunits within the GYE recovery zone.  FS_1528.  Much of the GYE recovery zone area within the Forest boundary overlaps with wilderness, wilderness study, and inventoried roadless areas, where there are restrictions on land uses.  FS_1531.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 5

The Revised Plan established areas of "secure habitat," which is defined as "areas at least 10 acres in size and 0.31 mile (500 meters) away from open or gated motorized routes, prescribed footprint of a developed site, or recurring low-level helicopter flight line during the non-denning period (March 1 through November 30)." FS_236. The Revised Plan relied on the "best available scientific information and literature relative to grizzly bear management" and adopted the habitat conditions as they existed in 1998 when the species first met recovery criteria as the baseline level (1998 baseline) for secure habitat inside the recovery zone/PCA. FS_63. "The year 1998 is used as a baseline for measuring secure habitat because habitat conditions leading up to that time provided an environment that resulted in substantial growth of the [GYE] population and subsequent achievement of all demographic recovery targets by 1998." FS_1538; SUPP_FWS_106 (noting that the 1998 baseline was the basis for the 2003, 2007, and 2016 conservation strategies). However, the 2016 Conservation Strategy identified three BMUs (Gallatin #3, Henry's Lake #2, and Madison #2) as needing improvement over the 1998 baseline. FS_1556. These increased baselines for those BMUs were formally adopted in the Revised Plan. FS_64.

The Revised Plan allows project activities in grizzly bear recovery zones/PCAs to temporarily reduce secure habitat below the 1998 baseline levels—standards FW-STD-WLGB-03(a)-(c), which were incorporated from the 2016

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 6

Conservation Strategy.  FS_65; FWS_2260.  Temporary reductions are allowed so long as they comply with three requirements: (1) only one project affecting secure habitat may be active in a BMU subunit at a time; (2) the total acreage of secure habitat affected does not exceed 1% of the acreage for the largest BMU's subunit; and (3) project activities affecting secure habitat below baseline levels shall not occur for more than four years.  FS_1556.

The Revised Plan also incorporated the Lynx Direction, which is an effort to conserve and promote recovery of the Canada lynx "by reducing or eliminating adverse effects from land management activities on National Forest System lands." FS_60, FS_514.  The Lynx Direction generally discourages expansion of snow-compacting activities.  FS_1168.  Specific to timber harvest, the Lynx Direction's VEG S2 Standard states, "Timber management projects shall not regenerate more than 15 percent of lynx habitat on NFS lands within an [land analysis unit] within a ten-year period."  FS_567.  The purpose of this threshold standard is to limit the rate of management-induced changes in lynx habitat.  FS_521.

The adoption of the Revised Plan was a six-year, collaborative process. FS_1063.  The Forest Service engaged in extensive outreach with the public, state and local governments, and tribes, which provided "transparency, understanding of the planning process, and regular dialogue among different groups."  *Id*.  FWS issued its Biological Opinion for the Revised Plan (Revised Plan BiOp) on January

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 7

20, 2022.  Supp_FWS_1-181.  Following a 60-day objection period, and extensive objection review and resolution meetings, the Forest Service adopted the Revised Plan on January 28, 2022.  FS_1067, FS_1115.

B.    **The South Plateau Project**.

The South Plateau Project area encompasses approximately 39,900 acres south and west of West Yellowstone in Gallatin County, Montana.  FS_4334.  The South Plateau Project "consists of forest resilience treatments designed to meet the need to increase landscape resilience to insects and disease, treat hazardous fuels, and contribute to a sustained yield of timber products."  FS_4475.  The Project authorizes 16,462 acres of treatments and activities including regeneration harvest, commercial thinning, forest resilience and fuels reduction treatments, and non-commercial thinning.  FS_4476, FS_4334.  The Project encompasses 56.8 miles of temporary road construction, FS_4343, and 8.2 miles of road decommissioning work, which will permanently improve grizzly bear secure habitat and water quality in the three BMU subunits.  FS_4407.  The decommissioning work will result in a permanent increase in secure habitat of about 1,109 acres (1.2% increase) in the Henry's Lake #2 Subunit and modest increases in the Madison #2 and Plateau #1 Subunits.  FS_4350.

The Project will increase landscape and stand resilience to wildfire, drought, insects, and disease.  FS_4363.  Over 90 percent of the project area (33,000 acres)

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 8

is dominated by lodgepole pine.  *Id.*  Approximately 80 percent of the lodgepole pine areas are rated as "highly susceptible" to a devastating mountain pine beetle outbreak and "highly likely" to experience a severe pine beetle outbreak.  *Id.* Mountain pine beetle infestations girdle and kill trees, and large-scale outbreaks can result in high levels of mortality.  *Id.*  The Project will reduce the area susceptible to the pine beetle from 26,000 to 16,000 acres and reduce the likelihood of a high-severity outbreak from 93% to 61% or less.  *Id.*

The Project is a landscape-scale approach that will be implemented over a 15-year period.  FS_4334, FS_4490.  The Forest Service originally identified the need for the Project under the 1987 Gallatin Forest Plan, FS_4487, but later determined that a BiOp could not be completed before the implementation of the Revised Plan.  *Id.*  The Forest Service then reanalyzed the Project under the Revised Plan, issued a revised draft EA for another round of public comment on October 6, 2022, held a public tour on October 17, 2022, and released an updated draft EA and Decision Notice/Finding of No Significant Impact (DN/FONSI) for a 45-day administrative review period on March 15, 2023.  *Id.*

The Project identifies areas as "preliminarily suitable for treatment actions," where resource specialists determine where to place small treatment units closer to implementation.  FS_4340.  The Project authorizes maximums for each treatment prescription, FS_4476, with the Forest Service determining treatment type by

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 9

applying the Treatment Matrix (EA's Appendix A) and determining the precise location and size by applying the PDFs (EA's Appendix B). *Id.*; FS_4339 (map of areas suitable for treatment). The Forest Service highlighted that this approach gives the agency the ability to appropriately respond to changes to the on-the-ground conditions and the "best tool to move toward desired conditions" during the 15-year implementation period. FS_4490.

In response to concerns that the EA lacked site-specificity, the Forest Service explained the project area is an overstocked, "homogenous lodgepole pine forest" and the treatment types are relatively routine and "well-understood based on the experience gained through repeated implementation of similar projects, interdisciplinary team members' expertise, and the scientific literature." *Id*. Moreover, the management actions will comply with the Revised Plan thresholds by using the Treatment Matrix, PDFs, Resource Review Checklists, and Monitoring Plan. FS_4352. The Forest Service must complete a Conditional NEPA Project Monitoring Form for each phase of the Project, which will be reviewed by FWS. FWS_61. This approach allows the Forest Service to make adaptive landscape-level forest management decisions, while adequately informing the public with annual updates. FS_4478, FS_4490-91.

On August 7, 2023, the Forest Service issued its DN/FONSI. FS_4471-551. There are three timber sales associated with the Project: Mosquito Gulch, Plateau

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 10

DxP SBA, and Hall Pass.  Decl. of Sean Steinbach (Steinbach Decl.) ¶ 20 (ECF No. 27-7); FS_6168-70 (maps of sale layouts for Mosquito Gulch and Plateau DxP SBA).  Defendant-Intervenor was awarded the Plateau DxP SBA Timber Sale on September 27, 2023.  Steinbach Decl. ¶ 29.  Sun Mountain Lumber intended to begin road work activities in July 2024, but the Forest Service issued a suspension letter on December 11, 2023, suspending any operations until the order is rescinded.  *Id*. ¶ 30.

## III.    STANDARD OF REVIEW

Plaintiffs' claims are reviewed under the Administrative Procedure Act's deferential arbitrary and capricious standard of review.  5 U.S.C. § 706(2)(A).  The arbitrary and capricious standard is a narrow one that precludes a reviewing court from substituting its own judgment for that of the agency.  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009).  Rather, an agency may only be reversed "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.* (internal quotation marks omitted).  In *McNair,* a unanimous en banc panel held that "the Forest

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 11

Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment . . . ." *Id.* at 994.

Courts also must defer to the Forest Service's interpretation of its own regulations, as well as its interpretations of governing forest plans. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). A deferential approach is "especially appropriate where, as here, the challenged decision implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).

## IV.   ARGUMENT

### A.    The South Plateau Project Complies with the Revised Plan.

NFMA requires projects to be consistent with the governing forest plan. 16 U.S.C. § 1604(i). To comply with NFMA, "the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1377 (9th Cir. 1998). However, "[a]gencies are entitled to deference to their interpretation of their own regulations, including Forest Plans." *Native Ecosystems Council*, 418 F.3d at 960.

Plaintiffs allege that the Forest Service violated four Revised Plan provisions: FW-STD-WLFB-03(a)-(c), regarding limits to temporary changes in grizzly bear secure habitat, and Lynx Direction's VEG S2 Standard, regarding

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 12

limits to regeneration harvest activities in lynx habitat.  Defendant-Intervenor will

address each Revised Plan standard in turn.

> **1.      The Project Complies with the Revised Plan's Standards for Temporary Changes in Grizzly Bear Secure Habitat.**

The Revised Plan has three Standards for temporary changes in secure

habitat below the 1998 baseline conditions:

> Inside the recovery zone/primary conservation area, project activities shall meet the following conditions for *temporary reductions* in secure habitat below baseline:
>
> a.      *Only one project affecting secure habitat below baseline values may be active* within a given bear management subunit at any one time.
>
> b.      Total acreage of secure habitat below baseline values within a given bear management unit *shall not exceed 1 percent of the acreage in the largest subunit* within that bear management unit. . . .
>
> c.      New temporary roads shall be limited to administrative purposes associated with project activities. *Project activities shall not reduce secure habitat below baseline levels for more than four consecutive years*. The collective set of temporary roads that affect secure habitat below baseline levels shall be closed to all motorized use after three years. Temporary roads shall be decommissioned such that secure habitat is restored within one year after closure.

FS_65 (emphases added).  The Forest Service was mindful of each of these

requirements, incorporating "Grizzly Bear Sideboards" in its PDFs, FS_4432-33,

and providing a "Treatment Screening Flow Chart–Grizzly Bear" to be applied

after the appropriate lynx screening.  FS_4434.  As explained below, the Forest

Service's coordination with other Forests, reliance on PDFs and Flow Charts,

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 13

monitoring during implementation, and potential dropping/phasing of project activities will ensure that the Project will comply with all three Standards.

###### a.    The Project complies with FW-STD-WLGB-03(a).

Plaintiffs argue that the Forest Service has failed to explain how certain projects are being factored into the agency's analysis when demonstrating compliance with FW-STD-WLGB-03(a), which requires that only one project affecting secure habitat below baseline levels can be active at any one time. CBD's MSJ at 37; Gallatin's MSJ at 31-33.  Plaintiffs' focus their argument on the North Hebgen Multiple Resource Project (North Hebgen Project), asserting that the Forest Service did not establish that the Project's activities "have been or will be completed before work on the South Plateau Project begins."  CBD's MSJ at 38. The North Hebgen Project was under litigation, but the injunction was dissolved in June 2020.  *See Native Ecosystems Council v. Marten*, No. 18-CV-87-M-DLC (ECF No. 93, June 9, 2020).[1]  Although the South Plateau BiOp stated that implementation had not started "due to ongoing litigation," project activities began in 2020 after the injunction was lifted.  FS_41090, FS_17980.

The Wildlife Report acknowledged that the South Plateau and North Hebgen Projects would both occur in the Madison #2 Subunit, thereby reducing the

---

[1] Defendant-Intervenor participated in that litigation because it had purchased two out of the three sales associated with the North Hebgen Project.  After Defendant-Intervenor acquired RY-Timber, Steinebach Decl. ¶ 8, it is now the contractor for all three sales.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 14

baseline levels when implemented.  FS_41090.  Despite Gallatin Plaintiffs' claims that the project activities affecting secure habitat would take 5-10 years to complete, the Forest Service determined that the activities in the North Hebgen Project "are largely complete" with "[s]ome clean-up work and road decommissioning remain to be completed for the 2023 season."  FS_41090, *see* FS_6145 (July 2022 internal email explaining which activities were completed and remain for the North Hebgen Project).  The Forest Service also explained that "[a]ctivities on this project will be coordinated to ensure that impacts to secure habitat below baseline on the North Hebgen Project are complete and temporary roads affecting secure effectively decommissioned prior to implementing any South Plateau activities that would affect secure habitat below baseline in the Madison #2 Subunit."  *Id.*; *see also* FS_17980 ("Because activities in the Madison #2 will be complete, there would be no temporal overlap" between the North Hebgen and South Plateau Projects); FS_17986 (explaining that even if the North Hebgen Project was not completed in 2023, "the project wildlife biologist shall be responsible for tracking implementation of the South Plateau project and other projects that may be affecting secure habitat in affected Subunits").

Plaintiffs contend that there are "no assurances" regarding coordination of the two projects.  Not so.  As an initial matter, the Forest Service is entitled to the presumption of regularity that it will coordinate between the two projects.  *Citizens*

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 15

*to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971); *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1056 (9th Cir. 2024).  More importantly, the South Plateau EA's PDF-Grizzly Bear Sideboards acknowledged the North Hebgen Project's potential effects on secure habitat but ensure that the Forest Service will have only one project at a time reduce secure habitat below the baseline.  FS_3054.  Specifically, PDF #11 and #12 provide that only one project affecting secure habitat below baseline values may be active within a given bear management subunit at any one time.  FS_3054.

The PDFs are part of the project design and are *binding* obligations. FS_4457 ("All activities must be consistent with all Design Features."); FS_4458 (noting that implementation will not occur if the projects activities are not consistent with the PDFs).  Courts have upheld the Forest Service's use of PDFs to ensure compliance with Forest Plan Standards.  *See, e.g.*, *Hapner v. Tidwell*, 621 F.3d 1239, 1248-49 (9th Cir. 2010) (holding that the Forest Service could rely on proposed mitigation measures in support of its conclusion that the project would not violate Forest Plan standards); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 883 F.Supp.2d 979, 994 (D. Or. 2012) (upholding the Forest Service's use of PDFs to show compliance with its Forest Plan); *ForestKeeper v. La Price*, 270 F.Supp.3d 1182, 1226 (E.D. Cal. 2017) (same).

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 16

Moreover, the South Plateau EA's annual monitoring requirements ensure that the Forest Service's project activities are consistent with the PDFs, including PDF #11. FS_4457, FS_4459. Annual monitoring demonstrating Revised Plan compliance is also required under the South Plateau BiOp, under the Terms and Conditions, and must be reviewed by FWS. FWS_60-61. These monitoring efforts will not only help inform the decision-maker during project implementation but will also be provided to the public. FS_4457, FS_4459; *see also* FS_4465. The Forest Service's internal tracking form "would be updated with every new activity or phase of the project to ensure the project would" not violate the secure habitat requirements. FS_4661. Whenever the Forest Service proposes a new phase of project implementation, it will seek review from FWS before implementation begins. *Id*. Therefore, even if portions of the North Hebgen Project remain active (and affect secure habitat baseline levels), the Forest Service's binding PDFs and monitoring plan ensures that only one project will be implemented at a time.

**b.      The Project complies with FW-STD-WLGB-03(b).**

Next, Plaintiffs argue that the Forest Service failed to demonstrate compliance with FW-STD-WLGB-03(b), which provides that the "[t]otal acreage of secure habitat below baseline values within a given [BMU] unit shall not exceed 1 percent of the acreage in the largest subunit within that [BMU]." FS_65 ("1%

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 17

Rule"). The Wildlife Report's Table 13 identifies the largest subunit for each

BMU and calculates the percentage of the reduction of secure habitat against the

largest subunit:

Table 13: Amount of secure habitat affected below baseline and the proportion of that reduction in relation the largest Subunit in the BMU

| Subunit | Baseline[1] Acres[2] | Baseline[1] %[3] | Temporary Reduction in Secure During Implementation[4] (Acres)[5] | Difference from Baseline (Acres)[6] | % of Largest Subunit[7] |
|---|---|---|---|---|---|
| Henry's Lake # 2 | 46,672 | 52.0% | 2,417 | -2,426 | 1.0% |
| Madison #2 | 64,455 | 67.4% | 228 | -248 | 0.2% |
| Plateau #1 | 125,685 | 68.6% | 2,328 | 1,317 | Not Applicable |

FS_41090. Neither the Madison #2 nor the Plateau #1 Subunits would exceed the

1% Rule. *Id.* For the Henry Lake #2 Subunit, the Forest Service determined that if

treatments were completed across the entire area (including temporary roads), then

2,426 acres would be below the baseline levels (2,417 acres due to the Project plus

9 acres already below the baseline level), which would equate to a 1.9% reduction

below the baseline levels over the Project's lifetime. FS_41091. However, the

Forest Service explained that the Project would comply with the 1% Rule because

"there would be no more than a 1% reduction in secure [habitat] below [the]

baseline at any one time" because the agency will either drop treatment acres *or*

"phase the project and restore secure habitat in one phase (through effective

obliteration of temporary roads affecting secure [habitat]) prior to moving to the

next phase." *Id.* These two approaches ensure that any reductions in secure

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 18

habitat will never exceed the 1% threshold. *Id.*; FS_41090 (so stating); FS_18016 (explaining in the response to comments that "another project in a different Subunit within the same bear management unit cannot affect secure until all activities affecting secure, and temp roads in the other are effectively decommissioned").

Plaintiffs take issue with the Forest Service's determination that the project activities in the Henry's Lake #2 Subunit comply with the 1% Rule for four reasons. <u>First</u>, Gallatin Plaintiffs allege that the Forest Service's calculation failed to consider the reductions in secure habitat throughout the BMU and, instead, impermissibly focused on impacts at the subunit-level. Gallatin's MSJ at 37. However, the Forest Service understood that the 1% Rule is measured "at the scale of the entire BMU (not the Subunit scale)," such that "coordination with adjacent Forests," like the Caribou-Targhee National Forest would be necessary. FS_41091; *see* FS_4662. Moreover, the Project's Biological Assessment (BA) explained that the Forest Service would complete a Review Checklist and the implementation coordinator would track the Project's effects to ensure it would not exceed the maximum thresholds for temporary effects on secure habitat. FS_4661. As stated above, this monitoring information would be provided in an annual update for the public's review. *Id*. Therefore, Gallatin Plaintiffs' contention that the Forest Service will not ensure compliance at the BMU-level is not well taken.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 19

Second, Plaintiffs argue that because the Project locations of the temporary road work are "not yet known," the Forest Service cannot demonstrate compliance with the 1% Rule and NEPA's "hard look" requirement by showing its secure habitat calculations. CBD's MSJ at 26-27. The Forest Service explained that approximately 56.8 miles of temporary roads would be constructed over the lifetime of the Project, but only some of those would occur in secure habitat. FS_41089. The Forest Service provided maps of the general locations of the temporary reductions in secure habitat (*e.g.*, FS_4741, FS_4477, FS_4420, FS_6167-70) and analyzed the impacts based on an overly conservative assumption, meaning the "maximum mileage of temporary routes that would be constructed under the project." *Id*. The Forest Service then demonstrated *numerically* how each BMU subunit's secure habitat would be impacted by the Project's activities. FS_41089-91.

Plaintiffs' reliance on *Native Ecosystems Council*, 418 F.3d at 965 and *Natural Resources Defense Council v. U.S. Forest Service*, 421 F.3d 797, 811 (9th Cir. 2005), in support of their position that the Forest Service needed to provide more analysis, is misplaced because both those cases involved EISes. The standard for an EA differs from an EIS, as the former is a "'concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact.'" *Blue Mountains*

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 20

*Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting

40 C.F.R. § 1508.9).  Such a level of site-specificity, regarding the precise

locations of the temporary roads, is not required in an EA.  *See Native Vill. of Point*

*Hope v. Jewell*, 740 F.3d 489, 498 (9th Cir. 2014) (deferring to agency's

determination of the appropriate level of analysis so long as it "provides as much

environmental analysis as is reasonably possible under the circumstances, thereby

provid[ing] sufficient detail to foster informed decision-making' at the stage in

question" (internal quotation marks omitted)); *see infra* IV.C.1.

    Third, Plaintiffs argue that BLM failed to take into consideration how the

Yale Creek Project on the Caribou-Targhee National Forest would further reduce

secure habitat within the Henry's Lake BMU, since that project is in the Henry's

Lake #1 Subunit.  CBD's MSJ at 27-28; FS_5221.  But the Forest Service

expressly acknowledged that "[i]mplementation of the South Plateau Project

(Henry's Lake #2 Subunit) depends on the Yale Creek Project's impact to the 1%,

as the allowed temporary reduction below baseline is assessed at the scale of the

entire [BMU], not the Subunit scale."  FS_4511-12.  As addressed below, the

Forest Service intends to comply with the 1% Rule by either reducing the treatment

acres or "project activities will be implemented in stages."  FS_3029, FS_41091.

Plaintiffs argue that the Forest Service is asking the public to "take the [a]gency's

word" that it will comply with the 1% Rule, but the Forest Service explained that

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 21

PDF #12 will ensure compliance.  FS_3054 (PDF #12), FS_4661-62.  These are not "vague, unenforceable measures" because, as stated above at *supra* V.A.1., these are binding on the agency and courts have held that the Forest Service may reasonably rely on PDFs to ensure compliance with its Forest Plan.

Moreover, the Forest Service will report to the public the amount of secure habitat for each BMU subunit annually.  FS_44006-13, FS_44382.  The record demonstrates that the Forest Service has already been following through with its commitment to coordinating with other Forests to ensure compliance.  *See* FWS_580 (stating that nothing will happen with the South Plateau Project in Henry's Lake BMU "before Yale Creek is done and those temp roads [are] obliterated"); FS_5655 (map with notes stating that the Forest Service "[w]ould need to offer a sale of Plateau [#]1 first to allow the C-T time to finish Yale [Creek Project].").  If the Forest Service fails to demonstrate compliance with the 1% Rule for each phase, then it must reinitiate consultation with FWS.  FWS_58.

Plaintiffs claim that the Forest Service's reliance on PDF #12 is insufficient because the agency is required to disclose the acres of secure habitat available for removal throughout each BMU.  Plaintiffs point to *Alliance for the Wild Rockies v. Marten*, No. 20-CV-156-M-DLC, 2021 WL 4551496, at *4 (D. Mont. Oct. 5, 2021) (*Marten II*), for the proposition that the Forest Service needs to "show its work."  CBD's MSJ at 30.  That case involved the adoption of the magistrate

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 22

judge's Findings and Recommendation (F&R) in *Alliance for Wild Rockies v. Marten*, No. 20-CV-156-M-DLC-KLD, 2021 WL 3561178, at *4 (D. Mont. Aug. 11, 2021) (*Marten I*). In *Marten I*, the Forest Service's own EA demonstrated noncompliance with the 50:50 ratio and the possibility that a Forest Plan amendment would be necessary. *Id*. The Forest Service then changed course and approved the project without an amendment by dropping certain treatment activities and applying "resource protection measures." *Id*., at *4-5. This Court, in adopting the F&R, held that the Forest Service failed to demonstrate compliance with the 50:50 cover to forage ratio for elk winter range because the record did not reveal how the agency's "alternative measures" (e.g., not implementing certain activities) "would ensure the Project complied with the" Forest Plan standard. *Marten II*, 2021 WL 4551496, at *4. In adopting the F&R's determination, this Court cited *Native Ecosystems Council*, 418 F.3d at 963, which held that "while [the] 'Forest Service calculations need not be perfect,' there must be at least *some* calculation by which a Court can reasonably ascertain whether the standard has been complied with." *Id*.

Unlike in *Marten II*, the Wildlife Report quantitatively demonstrated compliance with the 1% Rule. This is not a situation where the agency failed to update its analysis in its Final Decision where the previous EA determined noncompliance with the Forest Plan provision. *Marten II*, 2021 WL 4551496, at

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 23

*6. Rather, the Forest Service's analysis of impacts at the subunit-level, in conjunction with binding PDFs #11 and #12, will ensure coordination that secure habitat will not go above the threshold levels.

Finally, Plaintiffs criticize the Forest Service's use of "phasing" project activities to ensure compliance with the 1% Rule. Plaintiffs argue that the Forest Service's authorization of phasing the timber sales is inconsistent with the 1% Rule. Under the framework reiterated in *Kisor v. Wilkie*, 588 U.S. 558 (2019), when interpreting a regulation or forest plan provision, courts rely on "the 'traditional tools' of construction," including the "text, structure, history, and purpose." *Id*. at 575. Further, the arbitrary and capricious standard applies in this circumstance, meaning the Forest Service's interpretation of its Revised Plan is owed substantial deference and may be set aside only where an agency takes a position that is "contrary to the clear language" of the Plan. *Native Ecosystems Council*, 418 F.3d at 962.

Here, the Forest Service's interpretation is consistent with the 1% Rule's plain language. It provides that the "*[t]otal acreage of secure habitat* below baseline values" "shall not exceed 1 percent of the acreage in the largest subunit within that [BMU]." FS_65 (emphasis added). The Forest Service's interpretation that the agency must ensure that the total acres of secure habitat does not exceed the 1% threshold at *any time* during the project's duration is reasonable given that

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 24

there may be multiple pending projects within the same BMU[2] (on the same or different Forests) that may affect the amount of secure habitat available for temporary changes.  For that reason, the Forest Service ensures compliance by coordinating and monitoring the amount of secure habitat available to meet the threshold as project activities are being implemented.  FS_18016 (noting that "if a project in one Subunit is affecting all 1% below baseline, then another project in a different Subunit within the same [BMU] unit cannot affect secure until all activities affecting secure, and temp roads in the other are effectively decommissioned").

The Forest Service's interpretation of the 1% Rule is consistent with the context of the Revised Plan provision.  The 1% Rule allows "for some level of management flexibility, while simultaneously maintaining adequate proportions of secure habitat at the subunit level to allow options for bears disturbed or displaced by management actions to find refuge elsewhere within a bear management unit or subunit."  FS_1557.  The 2016 Conservation Strategy, where this Standard originated, states that temporary reductions in secure habitat below baseline levels should be "concentrated in time and space to minimize disturbance effects on

---

[2] Of the 14 BMUs within the Custer-Gallatin National Forest, only one BMU is entirely within the Forest and the others are shared with at least one other administrative unit.  FS_1538.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 25

grizzly bears in the project vicinity." FS_1557. The Forest Service's use of phasing is consistent with the 1% Rule's plain text or purpose.

### c. The Project complies with FW-STD-WLGB-03(c).

Finally, Gallatin Plaintiffs argue that the Project violates the FW-STD-WLGB-03(c) (4-Year Rule). FS_65. Because the project activities in the Plateau #1 and Madison #2 Subunits would not exceed the 1% Rule if all treatments were implemented at one time, FS_41090, phasing project activities would be unnecessary. *Id.* Thus, Gallatin Plaintiffs only take issue with whether the project activities in the Henry's Lake #2 Subunit comply with the 4-Year Rule. *Id.*

The Forest Service explained that it will comply with the 1% Rule in the Henry's Lake #2 Subunit by dropping units and temporary road work *or* implementing project activities in phases. FS_4707. However, if the Forest Service elected the phased approach, then the timing of the decommissioning of temporary roads in a collective set within the subunit "would be adhered to" the 4-Year Rule. *Id.*, FS_4457. The EA includes PDF #13, which incorporates the 4-Year Rule's requirements. FS_4433.

Gallatin Plaintiffs allege that the Forest Service's phased approach violates the 4-Year Rule because the standard requires that the "collective set" of temporary roads, i.e., all temporary roads associated with the Project that affect baseline levels, be closed after three years. Gallatin's MSJ at 44. Instead of

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 26

placing the 4-year limit on all project activities, the Forest Service reasonably determined that if it elects to proceed with the phased approach in the Henry Lake #2 Subunit, each phase (timber sale) is a "collective set" that must comply with the 4-Year Rule.  FWS_581.  The Forest Service's interpretation is consistent with the 4-Year Rule's plain text, which discusses that only the "collective set" of temporary roads that affect secure habitat below the baseline—*not all temporary roads*—shall be closed within three years.  FS_65.  In a 2020 email, the Forest Service explains that the 4-Year Rule means that "any reduction below the baseline secure habitat levels . . . must be brought back up to (or above) baseline levels within 4 consecutive years of the point in time where secure habitat declined below [the baseline]" and "[o]ther project work may proceed or continue so long as secure habitat stays at or above baseline levels."  FWS_2519.  This interpretation of "collective set" is consistent with the analysis provided in the EA and Wildlife Report, FS_4343, FS_ 4432, FS_41091, and the Forest Service was transparent to the public about how its phased approach would comply with the 4-year Rule.  FS_17986, FS_17982.

In sum, the Forest Service has shown that all three Forest Plan's conditions for temporary reductions in secure habitat have been met.  The Forest Service's use of PDFs and ongoing monitoring provided adequate assurances that the temporary reductions will comply with the requirements in FW-STD-WLGB-03.  Despite the

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 27

temporary changes in secure habitat, the Project will remove 8.2 miles of road and result in a *permanent increase* of secure habitat, improving the environmental base in the three BMU subunits.  FS_4407.

### 2.    The Project Complies with the Lynx Direction's VEG S2 Standard.

CBD Plaintiffs allege that the Project violates the Lynx Direction's VEG S2 Standard, which provides that "timber harvest [activities do] not change more than 15 percent of lynx habitat" within a Lynx Analysis Unit (LAU) "to an unsuitable condition (stand initiation structural stage that is too short to provide for winter snowshoe hare habitat) over a decade."  FS_521.  However, CBD Plaintiffs' argument fares no better than its grizzly bear NFMA arguments because the Forest Service clearly explained, in its Wildlife Report and EA, how this Standard would be met.

The Project is entirely within the South Madison LAU which contains 31,309 acres of lynx habitat within the Forest.  FS_41130.  Consistent with the VEG S2 Standard, a maximum of 4,696 acres[3] of lynx habitat could be regenerated over a ten-year period.  *Id.*  The Forest Service determined that within the last ten years, 14 acres have already been regenerated within this LAU and, therefore, instituted a cap of 4,600 acres of lynx habitat that could be regenerated under the

---

[3] The Wildlife Report contained a typo, identifying 4,697 acres available for regeneration, but the South Plateau EA correctly identified 4,696 acres available. FS_4429.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 28

Project.  *Id*.  This total amount in the LAU (4,600 acres + 14 acres = 4,614 acres) would occur on 14.7% of lynx habitat, which is below the 15% threshold.  *Id*.  The Forest Service expressly included the 4,600-acre cap of regeneration harvest on lynx habitat in PDF #1, which is binding on the agency.  *Supra* IV.A.1.b.

CBD Plaintiffs argue that because the DN/FONSI authorizes 5,551 acres of regeneration harvest, all of those harvest activities could arguably occur within lynx habitat and violate the VEG S2 Standard.  However, the DN/FONSI provides that "if the conditions on the ground in proposed treatment units are irreconcilable with Design Features, *then units will not be treated*."  FS_4504.  Because PDF #1 places a cap on the amount of regeneration that may occur within lynx habitat, there is no evidence that this threshold will not be met.  *See All. for the Wild Rockies v. Austin*, 55 F.Supp.3d 1294, 1305 (D. Mont. 2014) (denying the plaintiffs' claim of a violation of the VEG S1 and S2 standards).

CBD Plaintiffs suggest that because the Forest Service fails to disclose the exact number of acres that will be regenerated, it will be unable to "adequately assess any future project['s] compliance with VEG S2."  CBD's MSJ at 41.  Plaintiffs are mistaken.  Under the Forest Service's robust monitoring requirement, the agency must track "allowable thresholds for treatment acres throughout the life of the project" "at the appropriate scale discussed in the Wildlife Report," which includes the "[m]aximum allowable clearcut harvest acreage for the [Lynx

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 29

Direction] standard VEG 2."  FS_4464-65.  Moreover, the Forest Service will provide annual checklists that document compliance with the PDFs, which will be publicly available.  FS_4456-58.  Therefore, CBD Plaintiffs' purported concern that it will be impossible to assess whether future projects will comply with the VEG S2 Standard lacks merit.

> **B.     FWS Adequately Analyzed the Project's Impacts on Grizzly Bears Consistent with the ESA.**

The ESA "is a comprehensive scheme with the broad purpose of protecting endangered and threatened species."  *Conservation Cong. v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014) (internal quotation marks omitted).  Section 7(a)(2) of the ESA imposes a procedural duty on federal agencies, e.g., the Forest Service, to consult with the appropriate expert wildlife agency, e.g., FWS, either informally or formally before engaging in a discretionary action that "may affect" a listed species or designated critical habitat.  *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv*., 340 F.3d 969, 974 (9th Cir. 2003).  Formal consultation entails FWS preparing a BiOp stating whether the proposed action, taken together with cumulative effects, "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(4).

Plaintiffs argue that the South Plateau BiOp and Revised Plan BiOp violate the ESA for five reasons.  First, CBD Plaintiffs contend that the South Plateau

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 30

BiOp failed to provide site-specific analysis of the effects from temporary road work on grizzly bears.  Second, CBD Plaintiffs claim that the South Plateau BiOp failed to consider the effects from the Yale Creek Project in the environmental baseline.  Third, CBD Plaintiffs argue that the South Plateau BiOp impermissibly relied on "unspecified" mitigation measures to support its "no jeopardy" finding.  Fourth, Gallatin Plaintiffs contend that the Revised Plan BiOp's endorsement of the definition of "secure habitat" for grizzly bears to include areas that are 10 acres or more was not based on the best available science.  Finally, Gallatin Plaintiffs assert that FWS's reliance on the 1998 baseline for secure habitat thresholds in the Revised Plan was not based on the best available science.

Plaintiffs' efforts to second-guess FWS's grizzly bear analysis is misguided because it seeks to substitute their scientific views for those of the expert agency, in collaboration with other agencies, who has been working on GYE grizzly bear conservation for *decades*.  Such an effort is contrary to Ninth Circuit caselaw.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (under the ESA, an agency's scientific decisionmaking is afforded highly deferential review).

### 1. FWS adequately analyzed the effects of the Project on grizzly bears.

A BiOp is arbitrary and capricious if it fails to "consider[] the relevant factors and articulate[] a rational connection between the facts found and the

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 31

choice made." *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotation marks omitted). CBD Plaintiffs allege that because the exact amount and precise locations of the temporary road work are unknown, FWS did not adequately determine how the temporary road work would affect grizzly bears and secure habitat. CBD's MSJ at 43-45.

Contrary to CBD Plaintiffs' assertions, the South Plateau BiOp includes a robust analysis of the effects on secure habitat and took a highly conservative approach when analyzing the impacts from temporary road work. FWS_32-35, FWS_37-38, FWS_40-43. Although the timing of the temporary road work is unknown, the Forest Service's Biological Assessment (BA) provided the general locations of that road work. FS_4735, FS_4741-46. FWS analyzed the impacts based on the maximum amount of temporary road work proposed (56.8 miles), or a "worst case scenario" approach, "since the actual amounts will be unknown until each phase is planned." FWS_33. The conservative nature of this approach is underscored by FWS's determination that the actual amount *may be lower* than this maximum level, given the Project's PDFs (Grizzly Bear Sideboards), Revised Plan's Standards, and other factors that would reduce the treatment amount, and the locations of some temporary roads may be in areas that are not providing secure habitat. FWS_10, FWS_32-33.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 32

In its effects analysis, FWS determined that project activities would only affect the secure habitat below the 1998 baseline in the Henry's Lake #2 and Madison #2 Subunits.  FWS_33-34.  However, as explained above, only the Henry Lake #2 Subunit needs to consider dropping treatment acres or phasing project activities to comply with the 1% Rule.  FWS_34.  FWS explained, however, that "[a]s surveys are completed for the new individual stages/projects, the amount of secure habitat affected may be less due to dropping certain areas associated with other project design measures."  FWS_35.  FWS acknowledged that any disturbances would vary based on timing and treatment type, FWS_37, but the Forest Service would complete a "Conditional NEPA Project Monitoring Form," reviewed by FWS, when a phase/timber sale is proposed for implementation. FWS_11; *see also* FWS_60-61 (South Plateau BiOp's Terms and Conditions Reporting Requirements).  If the Forest Service fails to demonstrate compliance with the 1% Rule, then FWS would reinitiate consultation.  FWS_58.

The "open and total motorized linear route density and secure habitat for the South Plateau Project have not changed or are better than the amounts previously analyzed in the" Revised Plan BiOp.  FWS_32.  However, FWS acknowledged that "temporary and localized disturbance[s] may occur" from the temporary changes in secure habitat but "[s]uitable alternative habitats are widely available in the immediate vicinity of the treatment units located in the" three subunits.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 33

FWS_37. Although the exact location and timing are currently unknown, FWS determined that "[i]t is unlikely that operations would occur across the action area all at once and disturbance would therefore be limited in extent at any given time," which would allow the bear to move to surrounding available secure habitat. FWS_37-38, FWS_42 (analyzing the effects from temporary road work on each subunit). Given the temporary nature of the project activities and that grizzly bears "operate at a landscape level in the GYE," any such disturbances are short-term and are not expected to reduce individual bears from moving through the area. FWS_38, FWS_40 (finding that the "local grizzly bear movement would not be compromised and treatments would not create a barrier to movement or preclude travel through the action area").

Plaintiffs argue that without disclosing timing and the precise locations, FWS could not meaningfully consider the effects on secure habitat. CBD's MSJ at 44-45. The ESA jeopardy standard, however, concerns itself not with individual grizzly bears but asks whether the project is "likely to jeopardize the continued existence of any [ESA-listed] *species*." 16 U.S.C. § 1536(a)(2) (emphasis added). FWS's maximum treatment approach assumed that all temporary road work that would be implemented is defensible and permissible under the ESA. *See, e.g., Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv*., 807 F.3d 1031, 1050 (9th Cir. 2015) (in a challenge to an memorandum of agreement regarding ground water

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 34

pumping, the Ninth Circuit upheld FWS's use of a "worst-case scenario" analysis of flow rate thresholds because it was "rationally based on available evidence"); *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 981 (9th Cir. 2006) (upholding the BiOp even though it relied on projections given that there was "insufficient information about the precise locations and extent of future oil and gas activities"); *Save Our Cabinets v. U.S. Fish & Wildlife Serv.*, 255 F.Supp.3d 1035, 1052 (D. Mont. 2017) ("Although the [agency] cannot act on pure speculation or contrary to the evidence, the ESA accepts agency decisions in the face of uncertainty" (internal quotation marks omitted)).

## 2.    FWS's environmental baseline is lawful.

The environmental baseline is "the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action" and "includes the past and present impacts of all Federal, State, or private actions and other human activities *in the action area*." 50 C.F.R. § 402.02 (emphasis added). The South Plateau BiOp determined that because the Project lies at the intersection of the Plateau #1, Madison #2, and Henry's Lake #2 Subunits, and because subunits are the optimal scale for evaluating grizzly bear habitat, the action area is defined to be those three subunits. FWS_13. FWS explained that this action area "provides a sufficient landscape to assess the effects to grizzly bears that may have

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 35

home ranges affected by the project but not so large as to dilute the potential effects of the action." *Id*.

FWS then assessed the environmental baseline based on that action area. FWS_15. The "existing (baseline) condition of open and total motorized linear route density and secure habitat" "have not changed or are better than the amounts" previously analyzed in the Revised Plan BiOp. FWS_32, FWS_15. With respect to secure habitat, the South Plateau BiOp incorporated by reference the Forest Service's more detailed analysis of the baseline conditions for secure habitat, which was determined based on "the most recent grizzly bear access model data (2020), but also incorporate changes since this data was updated" in 2021. FWS_133, FWS_578.

Plaintiffs claim that the Yale Creek Project's reductions in secure habitat should have been included in the environmental baseline. CBD's MSJ at 47. But that project is in the Henry's Lake #1 Subunit, not the Henry's Lake #2 Subunit. FS_5221. Plaintiffs falsely claim that FWS "conceded" that the Yale Creek Project was in the action area, as that citation simply reveals that the Yale Creek Project is in another subunit. CBD's MSJ at 47 (citing FS_5221). Because the Yale Creek Project is not in the action area, it was reasonable for FWS to exclude those secure habitat reductions in its assessment of the environmental baseline. 50 C.F.R. § 402.02. "[T]he determination of the scope of an [action] area requires

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 36

application of scientific methodology and, as such, is within the agency's discretion." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002). Accordingly, FWS's determination that the action area is limited to the Plateau #1, Madison #2, and Henry's Lake #2 Subunits is entitled to deference and should be upheld.

### 3.    FWS's no jeopardy determination reasonably relied on the Project's mitigation measures.

FWS may rely on conservation measures to mitigate the impacts of a proposed action on a listed species but those measures "'must be enforceable *under the ESA* to factor into a biological opinion's jeopardy determination." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1045 (9th Cir. 2015) (*CBD v. FWS*). Additionally, the conservation measure must constitute a "clear, definite commitment of resources for future improvements" and be "under agency control or otherwise reasonably certain to occur." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 & n.17 (9th Cir. 2008). A "sincere general commitment to future improvements" is insufficient. *Id.* at 935-36.

In its effects analysis, the South Plateau BiOp relied on certain project design criteria that are *part of the proposed action*. Specifically, FWS relied on conservation measures, or project design criteria, to avoid or minimize the adverse effects to the grizzly bear, including either dropping treatment acres or phasing

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 37

project activities. FWS_34. These project design criteria were also included in the "factors related to the action area." FWS_49 (stating that "project activities associated with temporary roads and effects to secure habitat will meet the following conditions for temporary road reductions," which included the PDFs and the Revised Plan standards). Moreover, the BiOp's "Reasonable and Prudent Measures" incorporate the PDFs/Revised Plan's Standards "to further minimize the impacts of incidental take of grizzly bears from the South Plateau Project." FWS_59. Finally, the BiOp's "Terms and Conditions" for Incidental Take are non-discretionary and provide that: (1) after baseline conditions in Henry's Lake #2 and Madison #2 are restored, a rest period of two consecutive non-denning seasons must occur before additional effects below baseline levels may occur; and (2) activities that affect secure habitat below the baseline can only occur in one action area subunit at a time, meaning "secure habitat within the Henry's Lake #2 subunit is being affected below baseline conditions, secure habitat shall not be affected below baseline conditions in the Madison #2 subunit." FWS_60.

CBD Plaintiffs argue that FWS's "mitigation measures" contain "no specificity" and, therefore, are too vague to be binding and enforceable under the ESA. CBD's MSJ at 51. However, Plaintiffs misconstrue the ESA consultation framework. The conservation measures are *part of the project* consulted upon with FWS. *See* 50 C.F.R. § 402.02 ("Action means all activities or programs . . . [and]

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 38

include, but are not limited to: (a) actions intended to conserve listed species or their habitat.").  The BA included design features specifically related to the temporary road work, meaning they are part of the proposed action.  FWS_95-96, FWS_189 (Appendix C).  The Ninth Circuit determined that conservation measures included in the proposed action are enforceable under the ESA as part of the terms of the consultation.  *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1114 (9th Cir. 2012) (*CBD v. BLM*) ("[S]ince conservation measures are part of the proposed action, their implementation is required under the terms of the consultation."); *CBD v. FWS*, 807 F.3d at 1046 n.12 (noting "language in [*CBD v. BLM*] indicating that, had the conservation measures in that case simply been included as part of the proposed action and biological opinion, they likely would have been enforceable").

Courts have upheld conservation measures as enforceable because a departure from the proposed action that was considered in the BiOp would trigger the reinitiation of consultation under Section 7 of the ESA.  *CBD v. BLM*, 698 F.3d at 1115.  ESA consultation regulations further provide that "[m]easures included in the proposed action … that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans."  50 C.F.R. § 402.14(g)(8); *Klamath Siskiyou Wildlands Ctr. v. U.S. Fish & Wildlife Serv.*, No. 1:21-CV-00058-CL,

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 39

2022 WL 856035, at *11 (D. Or. Mar. 23, 2022) ("When conservation measures are included as part of the project and failure to comply with a measure requires reinitiation of consultation, those measures are 'enforceable' under the ESA."). Further, requirements included in the BiOp's Terms and Conditions and Reasonable Prudent Measures are also binding and enforceable. *CBD v. BLM*, 698 F.3d at 1114 n.9.

Plaintiffs' reliance on *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020), and *National Wildlife Federation*, and *Center for Biological Diversity v. Rumsfeld*, 198 F.Supp.2d 1139, 1153 (D. Ariz. 2002), is misplaced. Those cases are distinguishable because they involved an agency's consideration of uncertain mitigation measures that were not part of the proposed action. *Bernhardt*, 982 F.3d at 743 (holding that the agency's reliance on "unapproved and undefined mitigation measures under" the Marine Mammal Protection Act "cannot fulfill its obligations under Section 7" and its reliance mitigation measures of "possible strategies that could be taken" "were too vague to enforce"); *Nat'l Wildlife Fed'n*, 524 F.3d at 923 (explaining that the agency's "general desire to install structural improvements" to improve fish habitat in the future was not part of the proposed action); *Rumsfeld*, 198 F.Supp.2d at 1153 (holding that the "laundry list of possible mitigation measures related to water conservation and recharge that the Army may implement" were merely suggestions

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 40

and, FWS admitted that those mitigation measures, taken together, would be unable to mitigate the water deficit problems). Unlike the mitigation measures in those three cases, FWS's reliance on dropping treatment acres or phasing project activities, and other constraints, are concrete measures that are a fundamental part of the South Plateau Project's design features, making them enforceable under the ESA.

### 4. FWS's Revised Plan BiOp reasonably relied on a 10-acre threshold for secure habitat.

The Revised Plan defines secure habitat to include "[a]reas at least 10 acres in size and 0.31 mile (500 meters) away from open or gated motorized routes, prescribed footprint of a developed site, or recurring low-level helicopter flight line during the non-denning period (March 1 through November 30)." FS_236. Gallatin Plaintiffs criticize FWS's endorsement of the 10-acre threshold in the Revised Plan BiOp, claiming that there is "no scientific support for the notion that patches of land as small as 10 acres provide security for grizzly bears." Gallatin's MSJ at 18.

When addressing secure habitat, the Revised Plan BiOp provides that "[p]atch size of secure habitat is also an important consideration in the effectiveness of secure habitat." FWS_1242. Acknowledging that some scientific studies for other ecosystems that have identified a minimize patch size to be 2,500

acres, FWS explained why a smaller patch size would be more protective of GYE

grizzly bears:

> However, a *small minimum patch size provides greater sensitivity for determining loss of secure habitat*. Existing secure habitat calculated using a minimum patch size of 2,500 acres would allow many additional roads to occur in patches <2,500 acres without indicating a net loss in secure habitat. Comparatively, *a minimum patch size of 10 acres would be much more sensitive to net losses in secure habitat from additional roads*.

*Id*. (emphases added); *see also* FWS_1042 (noting that the Schwartz et al. (2010)

study supports this conclusion).

Gallatin Plaintiffs *falsely* claim that the 10-acre patch size is a departure

from previous grizzly bear conservation strategies.  In fact, the 2016 Conservation

Strategy provides that secure habitat "must be greater than or equal to *10 acres in

size*."  FWS_2202 (emphasis added), FWS_2258.  The 2016 Conservation Strategy

is consistent with the 2007 and 2003 conservation strategies, which also defined

secure habitat to have a 10-acre patch size.  SUPP_FWS_7242, SUPP_FWS_8075.

The 2016 Conservation Strategy is "generally considered the best, most current

reference with respect to grizzly bear management."  FS_ 41062.  While a 2,500-

acre patch size may be appropriate for the Northern Continental Divide Ecosystem,

FWS_1845, the Revised Plan BiOp explained that a 10-acre patch size for

calculating secure habitat for GYE "has been used *since 2003* and provides a more

sensitive metric to change than a larger patch size."  FWS_1268 (emphasis added).

Moreover, existing land designations for conservation (e.g., wilderness areas and

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 42

inventoried roadless area) already provide large blocks of secure habitat, and the "increase in area of designated land with these restrictions under the [Custer-Gallatin] Plan . . . increase the availability of large patches of secure habitat." *Id.* Therefore, Gallatin Plaintiffs misrepresent that the 10-acre patch size was a departure from previous conservation strategies.[4]

Moreover, the 10-acre patch size for secure habitat was also endorsed by the Yellowstone Ecosystem Committee, which included representatives from various federal agencies, states agencies, and county representatives. FWS_815. The Yellowstone Ecosystem Committee determined that "all secure habitat" "are important for grizzly bears in the GYE, regardless of size, particularly in peripheral areas." FWS_819. Moreover, the Schwartz (2010) study relied on by Gallatin Plaintiffs also supports this conclusion, demonstrating a direct link between 10-acre threshold for secure habitat and grizzly bear survival in the GYE. *Id.*; FWS_2865.

Gallatin Plaintiffs rely on one post-2003 scientific study, Proctor (2019) to suggest that the appropriate patch size should be 2,471 acres instead of 10 acres. Gallatin's MSJ at 20-21. The Proctor (2019) study focused on the effects of roads and motorized human access on bears in British Columbia and Alberta.

---

[4] Notably, Gallatin Plaintiffs knows that this assertion is false, as its own fact section expressly acknowledged that the 2003 Conservation Strategy defined secure habitat to be greater than or equal to 10 acres in size. *Compare* Gallatin's MSJ at 9, *with id.* at 19.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 43

FWS_2105-28.  The study provided suggestions for "industrial road management activities" which included, but was not limited to, providing habitat where "<60% of the vegetated land base in each Wildlife Management Unit (or Landscape Unit in some cases) is >500 m from an open road with a minimum patch size of 10 km². " FWS_2121.  However, Proctor (2019)'s minimum secure habitat patch size has little relevance to the needs of the GYE population.

The Revised Plan BiOp explained that because grizzly bears "are long-lived, opportunistic omnivores whose food and space requirements vary depending on a multitude of environmental and behavioral conditions," it is "difficult to develop universal habitat criteria across all ecosystems within the range of grizzly bears." SUPP_FWS_131.  Rather, "each *ecosystem subcommittee* applies these recommendations based on ecosystem- specific information and recommend ecosystem specific habitat conditions that should be maintained to provide habitat security." SUPP_FWS_000132 (emphasis added); FWS_3694 (the 1994 IGBC Guidance stating that the minimum size for secure habitat is recovery zone specific to support a female grizzly bear for 24 hours of foraging).  The Revised Plan BiOp acknowledged studies in Canada provide for larger patch size, but reasonably determined the 10-acre threshold was more appropriate for the GYE population. SUPP_FWS_133.  More recently, the 2022 Grizzly Bear Species Status Assessment for the lower 48 states, acknowledged that "[s]ecure habitat are core

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 44

areas managed as federal, tribal, or state lands that are at least 10 acres in size."

FWS_1031.

In sum, Gallatin Plaintiffs' criticism that FWS's endorsement of the 10-acre

patch size has no scientific support is *meritless*. FWS reasonably determined that

the 10-acre patch size provides a "more sensitive metric" for changes in habitat

conditions and is consistent with all three Conservation Strategies for the GYE

population.

### 5. The 1998 baseline for secure habitat is based on the best available science.

Gallatin Plaintiffs assert that the 1998 baseline for the thresholds for secure

habitat conflicts with the best available science, claiming that the definition of

secure habitat is "outdated" and impermissibly focuses on the distance from roads.

Gallatin's MSJ at 23-30. Gallatin Plaintiffs criticism is misguided and belied by

the record, given that the GYE population has been nearing its capacity with "no

evidence of a population decline." SUPP_FWS_105.

The 2016 Conservation Strategy determined that there are three factors that

appropriately measure human presence (or absence thereof) and impacts on grizzly

bears: secure habitat, human development, and commercial livestock grazing.

FWS_712, FWS_2253. The 2016 Conservation Strategy calls for a "no net loss"

in secure habitat and no increase in human developed sites or livestock grazing

allotments with respect to those that existed in 1998. FWS_712. The Revised

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 45

Plan's reliance on the 1998 levels for secure habitat "as a meaningful baseline is predicated on evidence that habitat conditions at that time, and for the preceding decade, contributed to 4–7% annual growth of the [GYE] population observed between 1983 and 2001." *Id.*; *see also* FWS_2253 ("The 1998 baseline for habitat standards was selected because studies showed (and recently affirmed) that the GYE grizzly bear population was increasing annually at a robust rate of 4.2 to 7.6 percent between 1983 and 2001 (Harris et al. 2006, 2007, IGBST 2012)."). The 1998 baseline imposes "measureable side boards on allowed levels of human activity inside the [primary conservation area] and establish a clear benchmark against which future improvements and impacts of habitat can be measured." FWS_2253. Moreover, the standard for "no net loss" in secure habitat with respect to 1998 baseline levels "has been consistently met in all 40 subunits inside the" recovery zone/PCA since it was initially formalized in the 2007 Conservation Strategy. FWS_725.

Gallatin Plaintiffs primarily criticize the 1998 baseline for secure habitat because it does not account for *habitat quality factors*, such as food sources, climate change, and vegetative cover, relying on the 1994 IGBC Guidance for support. Gallatin's MSJ at 25 (citing FWS_3694). But Plaintiffs' citation is taken out of context. The Guidance further states: "However, motorized access routes and human use associated with these roads are one of the most easily defined and

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 46

measurable factors that we can evaluate" and "is also one of the more influential parameters affecting habitat security." FWS_3694. Plaintiffs conflate habitat quality factors—where there are no established thresholds and are measured qualitatively—with secure habitat, which is associated with the presence of roads and is directly linked to bear displacement and mortality. FWS_817-18. While habitat factors are important to individual bears needs (and FWS monitors annually), FWS_837-38, "[a]n extensive body of literature" supports the approach of managing human access to grizzly bear habitat as the key to effective habitat management and increasing habitat effectiveness. FWS_848 (citing relevant studies). This research demonstrates that secure habitat—areas free from motorized traffic—is an important metric of grizzly bear habitat. FWS_2226.

Moreover, research has demonstrated grizzly bears are able to adequately adapt to changes in food sources, climate change, and vegetative cover. For example, FWS determined that "[a]lthough grizzly bears in the GYE have experienced a decline in the availability of whitebark pine nuts and cutthroat trout, bears are finding sufficient alternative food resources to maintain body condition." FWS_937. FWS anticipates "that grizzly bears will be able to adapt to any future potential changes in individual food sources because of the great plasticity of grizzly bear diets and the range of available foods." *Id.*; *see also* SUPP_FWS_6403-60 (Food Synthesis Report finding that GYE grizzlies can adapt

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 47

to decline in white bark pine).  FWS also examined the impacts of climate change on food sources for the grizzly bear, finding that "there is a general consensus that grizzly bears are flexible enough in their dietary needs that they will not be impacted directly by ecological constraints such as shifts in food distribution and abundance."  FWS_941, FWS_942 ("Most grizzly bear biologists . . . do not expect habitat changes predicted under climate change scenarios to directly threaten grizzly bears . . . . Climate change may even make habitat some more suitable and food sources more abundant . . . .").  The same is true with vegetative cover.  SUPP_FWS_145, FWS_2224 (The 2016 Conservation Strategy stating that "[c]hanges in the distribution and quantity and quality of cover are not necessarily detrimental to grizzly bears").

Based on the above, FWS relied on the best available science in its determination that the 1998 levels are the appropriate baseline for secure habitat thresholds.  Plaintiffs' generalizations about harm from the failure to subsume other qualitative habitat factors into the baseline cannot be squared with the fact that the GYE population has grown and is nearing its capacity.  Plaintiffs may ideologically disagree with this 1998 baseline level, but FWS is owed substantial deference.  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376 (1989) (deference is particularly appropriate in matters of scientific or technical expertise).

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 48

**C.    The Forest Service Complied with NEPA's "Hard Look" Requirement.**

NEPA establishes procedures by which federal agencies must consider the environmental impacts of their actions but does not dictate substantive results. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); 42 U.S.C. § 4332.  "Courts apply a rule of reason standard in reviewing the adequacy of a NEPA document."  *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004) (internal quotation marks omitted).  "Through the NEPA process, federal agencies must carefully consider[ ] detailed information concerning significant environmental impacts, but they are not require[d] to do the impractical."  *Id.* at 992-93 (internal citations and quotation marks omitted). However, NEPA requires an agency to take a "hard look" at the potential environmental consequences of its actions.  *Robertson*, 490 U.S. at 350-51.  A "hard look" under NEPA means "a reasonably thorough discussion of the significant aspects of the probable environmental consequences."  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008) (internal quotation marks omitted).

Plaintiffs make four separate NEPA hard look arguments.  First, CBD Plaintiffs assert that the Forest Service failed to take a hard look at the site-specific effects of the South Plateau Project on regeneration harvest in lynx habitat. Second, Plaintiffs argue that the Forest Service failed to analyze the site-specific

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 49

impacts from temporary roads.  Third, CBD Plaintiffs argue that the Forest Service failed to take a hard look at climate-driven impacts because the EA did not quantify the Project's greenhouse gas (GHG) emissions.  Finally, Gallatin Plaintiffs claim that the Forest Service failed to analyze the Project's cumulative effects.

### 1.    The Forest Service provided site-specific analysis on the impacts from regeneration harvest in lynx habitat.

CBD Plaintiffs argue that without disclosing the exact locations of the regeneration harvest activities within lynx habitat, the Forest Service failed to take the requisite hard look at impacts.  Plaintiffs, however, overstate the level of specificity that is required under NEPA.

When determining the degree of specificity, an agency is not required to do a "parcel by parcel examination of potential environmental effects." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006).  In *Te-Moak Tribe of West Shoshone of Nevada v. U.S. Department of Interior*, 608 F.3d 592, 600 (9th Cir. 2010), the Ninth Circuit rejected the plaintiffs' failure to take a hard look claim, holding that BLM did not violate NEPA "by approving the Amendment without knowing the precise locations of drill sites, access roads, and other project activities."  608 F.3d at 601.  The Tenth Circuit has similarly upheld an EA, involving similar circumstances, which analyzed the "maximum possible effect on lynx habitat" where the specific timing and location of treatments were unknown.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 50

*WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019). More recently, a district court upheld an EA as sufficiently site-specific where the Forest Service provided "decision criteria for each approved activity, specific prescriptions that will be applied if those decision criteria are met, maps identifying where those prescriptions would be applied, and estimates of the timing of implementation." *N. Cascades Conservation Council v. United States Forest Serv.*, No. 2:22-CV-00293-SAB, 2024 WL 188374, at *7 (E.D. Wash. Jan. 17, 2024) (emphasis added). Like in *North Cascades Conservation Council*, the Forest Service provided maps of the treatment locations, design criteria in its Treatment Matrix, and adequate sideboards for regeneration harvest in lynx habitat in its PDFs. FS_4339, FS_4425-29.

Plaintiffs heavily rely on *Kettle Range Conservation Grp. v. U.S. Forest Serv.*, No. 2:21-CV-00161-SAB, 2023 WL 4112930, at *9 (E.D. Wash. June 21, 2023) (*Kettle Range*), in support of their site-specificity argument. In *Kettle Range*, the plaintiffs alleged that the Sand Poil Project violated NEPA's hard look requirement because the Forest Service failed to specify the degree to which the project would rely on the Forest Plan's exception to old-growth requirements and remove larger trees. *Id.* The district court held that although the Forest Service "is not required to catalogue specific trees that will be removed," the EA was insufficient because it did not specify the frequency the project would rely on the

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 51

exception such that the impacts were speculative.  *Id.*  Here, however, the impacts are not speculative because the Forest Service explained that the maximum amount of treatment within the South Madison LAU is 4,600 acres and expressly analyzed the effects using an overly conservative approach based on that maximum amount. FS_41135-36.  Nothing more is required under NEPA.  *See Conner*, 920 F.3d at 1258.

### 2. The Forest Service took a hard look at the effects of temporary roads.

Gallatin Plaintiffs argue that the Forest Service failed to analyze how this use of "phasing" project activities, specifically temporary road construction, may affect grizzly bears' use of secure habitat.  Gallatin's MSJ at 48-49.  As stated earlier, the Project authorizes construction of up to 56.8 miles of temporary roads, but temporary roads must be closed and decommissioned consistent with the 4-Year Rule.  FS_4340, FS_4433.  Although project implementation would occur in "4 to 6 timber sale or other contracts," timber sales would be implemented "in the shortest timeframe possible before [bears] move into new areas" and any "[d]isplacement would, therefore, be limited in extent at any one time." FS_41092.  These temporary displacements (and associated disturbances) end once the temporary roads are effectively decommissioned, meaning bears would again use these areas.  *Id*.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 52

Despite Gallatin Plaintiffs' claims, the Forest Service did consider how phasing project activities would impact grizzlies. The Forest Service determined that because grizzly bears operate at a "landscape level" in the GYE, they can accommodate the consecutive, temporary disturbances at the project level by "adjusting their spatial and/or temporary use patterns within their home range . . . and within the larger Subunits." FS_41093. The South Plateau BiOp, which the EA relied on, similarly concluded that there were suitable alternative habitats in the immediate vicinity of treatment units and untreated areas in the Plateau #1, Madison #2, and Henry's Lake #2 Subunits and habitat would be available for foraging during implementation. FWS_37; FS_41093 (noting that units outside of treatment would be available for foraging during implementation). FWS concluded any short-term effects to grizzly bears from a project's phase "would be tempered by spatial and temporal factors, limiting the disturbance footprint within any season, and thus, allowing for a grizzly bear to move away from the disturbance into nearby available habitat surrounding the project." FWS_38. The EA similarly held that any disturbances "will be temporary, short distance, and at a small scale relative to the scale at which grizzly bears operate across the landscape and the size of the affected Subunits." FS_4401.

Plaintiffs insist that because the exact location and timing of roads are not yet known, the effect could not possibly be "minor." Gallatin's MSJ at 47-48;

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 53

CBD's MSJ at 8, 41, 44.  As stated above, site-specific analysis of the exact locations and timing is not required under NEPA's hard look requirement.  *Supra* IV.C.1, IV.A.1.b.

FWS acknowledged that "[t]he amount of disturbance would vary across the action area, depending on the timing, extent, and type of treatment."  FWS_37.  Although the timing of implementation is currently unknown, only a portion of the total 56.8 miles will occur at any one time, FS_4479, FS_4511-12; FWS_38, and the location of the temporary roads must be consistent with PDF-Grizzly Bear Sideboards that are subject to resource review by FWS.  FS_4479; *see* FS_4508-36, FS_4537-40.

In sum, Plaintiffs' request for the site-specific disclosures of the precise locations and timing of temporary road construction in secure habitat is not required under NEPA.  *See supra* IV.C.1, IV.A.1.b.  The Forest Service reasonably relied on a conservative approach of analyzing the maximum effects on secure habitat.  *See Conner*, 920 F.3d at 1258.

### 3. The Forest Service took a hard look at the Project's climate-related impacts.

CBD Plaintiffs allege that the Forest Service failed to take a "hard look" at the climate-related impacts of the South Plateau Project's GHG emissions.  CBD's MSJ at 9, 54.  The Forest Service's analysis, however, was robust and consistent

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 54

with the Council on Environmental Quality (CEQ) 2016 Guidance on climate change and GHG emissions in NEPA analyses.  *See* FS_39310-43.

In the EA, the Forest Service properly tiered to the programmatic analysis of carbon sequestration in the Revised Plan EIS.  FS_4372.  The Revised Plan EIS, in turn, contains a qualitative discussion of carbon effects, "with supporting estimates where possible based on the *quantitative analysis* of the impacts of past management activities on forest carbon stocks and fluxes," and "future-looking analysis where available," consistent with the 2016 CEQ Guidance.  *Id.* (emphasis added); *see* FS_1433-42.  The Revised Plan EIS relied on two assessments (Baseline Report and Disturbance Report) and determined that harvest treatments available under the Plan "result in a maximum removal of about 30,000 Mg of carbon per year from aboveground pools," but that the amount of carbon that might be removed is "small relative to the approximately 110 million metric tons (Tg) of carbon stored in the forest ecosystem of" the Forest.  FS_1440 ("With maximum intensification, potential management actions would affect up to less than 0.25 percent of the forested area and much less than 1 teragrams of carbon annually.").  The South Plateau EA concluded that "[n]o new circumstances or science have arisen" that would change the carbon analysis completed in the Revised Plan EIS.  FS_4372; *see* FS_38642 (noting that the Project was included in the program of actions in the Revised Plan EIS).

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 55

Beyond the Revised Plan EIS, the Forest Service provided a 2019 Carbon Assessment White Paper, analyzed climate impacts in the South Plateau Project Carbon Summary, and analyzed climate impacts in individual resource specialist reports. FS_4372, FS_38644-72, FS_38637-43, FS_38615-19; *see, e.g.*, FS_35063-138. In the South Plateau Carbon Summary, the Forest Service determined that the Project impacts a "small amount of forest land and carbon" and "might contribute a small quantity of carbon relative to the forests carbon uptake and stores which would be mitigated by a more resilient forest condition and future carbon uptake." FS_38618; *id.* (noting the Project's "[s]hort term release of carbon due to project activities is likely to be offset by improvements to forest conditions and resiliency"). Overall, the Forest Service adequately analyzed the Project's impacts on climate change in "proportion to their significance." 40 C.F.R. § 1502.2(b); *Kempthorne*, 457 F.3d at 975.

CBD Plaintiffs urge this Court to require a project-level quantitative analysis of the emission and carbon stock changes. CBD's MSJ at 56. But Plaintiffs fail to acknowledge the 2016 CEQ Guidance also provides that a project-level quantitative analysis is not always required: "NEPA reviews should consider *whether to include* a comparison of net [greenhouse gas] emissions and carbon stock changes … to provide information that is useful to the decision maker and the public to distinguish between alternatives." FS_39335 (emphasis added).

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 56

Given the Project's small impact on GHG emissions, the Forest Service reasonably determined that a quantitative analysis would not be useful.

CBD Plaintiffs rely on two cases in support of their argument that the Forest Service's project-level GHG emission analysis is deficient: *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F.Supp.3d 1053 (D. Mont. 2023) (*Black Ram*); and *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022). In *Black Ram*, the Forest Service provided a qualitative analysis of the carbon impacts, finding that the project would only affect a "tiny percentage" of the forest carbon stocks on the National Forest and an "infinitesimal amount" of carbon stocks of the United States. 687 F.Supp.3d at 1075. The district court found that the Forest Service's climate-impacts analysis relied "almost entirely on [a] cookie-cutter and boilerplate" report, which was copied from another project on the Idaho Panhandle National Forest, rather than utilizing "high quality and accurate information." *Id*. The *Black Ram* decision relied on *350 Montana*, where the "Ninth Circuit rejected the agency's claim that project climate impacts would be minor based on 'an opaque comparison to total global emissions.'" *Id.* (citing *350 Montana*, 50 F.4th at 1269-70).

Unlike in *Black Ram*, the Forest Service relied on a robust, project-specific analysis of carbon emissions, which was not a derivative or copy of a previous Forest's carbon analysis. Nor did the Forest dilute the carbon impacts based on a

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 57

comparison to total global GHG emissions and fail to provide any scientific

support.  Rather, the Forest determined that the impacts were small at the *Forest-

scale* based on the quantitative analysis available in the Forest Plan EIS, which

contained the most recent, quantitative data on carbon emissions.  The 2016 CEQ

Guidance encourages the Forest Service to tier their climate-related NEPA

analyses to ensure efficiencies.  FS_39340.  This is not a situation where "the

reader is left to guess how or why the GHG emissions . . . represent an

insignificant contribution to the environmental consequences identified in the EA."

*350 Montana*, 50 F.4th at 1266.

### 4.    The Forest Service adequately analyzed the Project's cumulative effects.

Plaintiffs argue that the Forest Service failed to take a hard look at the

cumulative impacts of the South Plateau Project because the agency did not

consider the impacts from the Yale Creek Project and private lands on secure

habitat.[5]  CBD's MSJ at 31-32; Gallatin's MSJ at 50.  "[I]n considering cumulative

---

[5] Gallatin Plaintiffs also claim that the Forest Service's cumulative effects analysis relied on an inaccurate existing baseline condition, mischaracterizing them as "degraded," that failed to include all current and future activities occurring in the same BMUs and subunits.  Gallatin's MSJ at 49-55.  For the same reasons stated above in response to Plaintiffs' ESA claim, *supra* IV.B.2, the Forest Service relied on the appropriate baseline conditions for the subunits.  FS_4406.  Additionally, "NEPA's and the ESA's directives for establishing baselines are not the same," and under NEPA "establishment of a baseline is not an independent legal requirement," but is a "practical" one that ensures an accurate consideration of the

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY
JUDGMENT - 58

impact, an agency must provide some quantified or detailed information; ... [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (internal quotation marks omitted; alterations in original).  "This cumulative analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Id.* (internal quotation marks omitted).

As outlined above, *supra* IV.1.b., the Forest Service took a hard look at the relevant cumulative impacts of the Project on secure habitat, including disclosing the impacts on all three subunits.  FS_41089-93.  The Forest Service considered how the Yale Creek Project would further reduce secure habitat in the Henry's Lake BMU, acknowledging that "[i]mplementation of the South Plateau Project (Henry's Lake #2 Subunit) depends on the Yale Creek Project's impact to the 1%, as the allowed temporary reduction below baseline is assessed at the scale of the entire [BMU], not the Subunit scale."  FS_4511-12, FS_4432-33; *see supra* IV.A.1.b.

---

environmental consequences of a proposed action.  *Black Ram*, 687 F.Supp.3d at 1077.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 59

Moreover, Gallatin Plaintiffs incorrectly claim that the Forest Service failed to consider the cumulative impacts from residential development on private lands on secure habitat. Gallatin's MSJ at 52-53. The Forest Service provided an analysis of the impacts from non-federal lands, including residential development, but noted that secure habitat in those areas is minimum due to "high open road densities, high levels of human activity, and private land development." FS_41100-01. The Forest Service concluded that activities on private land, including residential development, "would generally be expected to occur in areas that already avoided grizzly bears" and it is "unlikely that bears would avoid these areas to a greater degree than is currently occurring." FS_41102. Overall, the cumulative impacts from the temporary impacts to secure habitat and the minor permanent increases (post-implementation) "would combine with expected developments on private lands to increase displacement of grizzly bears to *a small extent*." *Id.* (emphasis added).

Gallatin Plaintiffs also criticize the Forest Service for merely "cataloguing" other projects in the action area in its cumulative effects analysis. Gallatin's MSJ at 54. NEPA, however, allows an agency to analyze the "aggregate effects of past actions without delving into the historical details of individual past actions." *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1217 (9th Cir. 2008) (internal quotation marks omitted);

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 60

*Cascadia Wildlands v. Bureau of Indian Affs*., 801 F.3d 1105, 1111 (9th Cir. 2015) ("An agency, however, may satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured."). That is exactly what the agency appropriately did here. FS_41102 (noting that the past activities [were] combined to create the existing conditions of secure habitat in the analysis area").

### D. The Forest Service's Finding of No Significant Impacts and Determination that an EIS is Not Required Complies with NEPA.

Defendant-Intervenor joins (and incorporates by reference) Federal Defendants' arguments regarding that the preparation of an EIS is not required. Gallatin Plaintiffs' EIS arguments, Gallatin's MSJ at 56-59, repeat assertions already rebutted above and need not be addressed again. *See supra* IV.A-B, C.1-2.

## V.  REMEDY

The foregoing demonstrates that the South Plateau Project complies with NFMA, the ESA, and NEPA. The Court thus need not reach the issue of remedy. But in the unlikely event the Court were to conclude otherwise, Defendant-Intervenor requests an opportunity to provide the Court with remedy briefing. Remedy briefing would demonstrate that neither vacatur nor an injunction should issue on the facts of this case, particularly because the Project's activities will help reduce the risk of insect and disease and improve landscape-scale resilience over

the long-term, as well as increase fire suppression effectiveness and reduce the risk to the public and first responders.

## VI.   CONCLUSION

This Court should uphold the South Plateau Project by granting Defendant-Intervenor's Cross-Motion for Summary Judgment and deny CBD Plaintiffs' and Gallatin Plaintiffs' Motions for Summary Judgment.

Respectfully submitted this 12th day of July, 2024.

/s/ Kris A. Mclean
Kris A. Mclean
Kris A. Mclean Law Firm PLLC
2315 McDonald Avenue, Suite 106
Missoula, MT 59801

/s/ Sara Ghafouri
Sara Ghafouri, *(Pro Hac Vice)*
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, OR 97232

Attorneys for Defendant-Intervenor

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 62

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that Defendant-Intervenor's Memorandum in Support of the Cross-Motion for Summary Judgment contains 13,971 words. I further certify that on July 12, 2024, I filed the above with the Court's CMS/ECF system, which will send notice to each party.

/s/ Sara Ghafouri
Sara Ghafouri