Matthew K. Bishop (Mont. Bar No. 9968)
Sarah McMillan (Mont. Bar No. 3634)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 324-8011
bishop@westernlaw.org
mcmillan@westernlaw.org

*Counsel for Plaintiffs in Member Case No. 23-154*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY *et al.*,<br><br>    Plaintiffs,<br><br>  vs.<br><br>U.S. FOREST SERVICE, *et al.*,<br><br>    Federal-Defendants,<br><br>  and<br><br>SUN MOUNTAIN LUMBER, INC.,<br><br>    Defendant-Intervenor.<br><br>GALLATIN WILDLIFE ASSOCIATION, *et al.*,<br><br>    Plaintiffs,<br><br>  vs. | Lead Case:<br>CV-23-110-DLC-KLD<br><br>Member Case:<br>CV-23-154-M-DLC-KLD<br><br><br>RESPONSE IN OPPOSITION TO FEDERAL-DEFENDANTS' AND INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

MARY ERICKSON, et al.,

      Federal-Defendants,

      and

SUN MOUNTAIN LUMBER, INC.,

      Defendant-Intervenor.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................ 1

ARGUMENT .................................................................................................. 3

    I.    ESA violations. ................................................................................. 3

        A.  There is no scientific support for defining secure habitat as patches of land as small as 10-acres. ........................................................ 3

        B.  The 1998 baseline is outdated and conflicts with the best available science. ............................................................................ 11

    II.   NFMA violations. ........................................................................... 15

        A.  Failure to demonstrate compliance with the one-at-a-time standard.... 16

        B.  More information on the location of the 56 miles of project roads is needed to demonstrate compliance with the 1% standard. ................. 18

        C.  Misapplication of the 1% standard ........................................................ 20

        D.  The South Plateau project likely violates the 1% standard ................... 21

        E.  The Forest Service's staggered approach and narrow interpretation of "project" violates the four-year standard ................................. 25

    III.  NEPA violations ............................................................................. 28

        A.  The effects of allowing over 56 miles of road work on grizzly bears was not adequately analyzed ............................................. 28

        B.  The cumulative effects to grizzly bears were not adequately analyzed. . 33

        C.  Substantial questions have been raised requiring an EIS. .................... 37

    IV.  Vacatur pending compliance with the law is appropriate. ......................... 40

CONCLUSION.................................................................................................41

CERTIFICATE OF COMPLIANCE ...........................................................41

# TABLE OF AUTHORITIES

**CASES**

*Alaska Oil & Gas Ass'n v. Pritzker,*
   840 F.3d 671 (9th Cir. 2016) .............................................................. 5

*All. for the Wild Rockies v. Gassmann,*
   678 F. Supp. 3d 1249 (D. Mont. 2023)......................................................38, 40

*All. for the Wild Rockies v. Marten,*
   2021 WL 4551496 (D. Mont. Oct. 5, 2021)........................................19, 21-24

*All. for the Wild Rockies v. Savage,*
   375 F. Supp. 3d 1152 (D. Mont. 2019)............................................................ 40

*All. for the Wild Rockies v. U.S. Forest Serv.,*
   907 F.3d 1105 (9th Cir. 2018) .......................................................... 40

*Blue Mountains Biodiversity Project v. Blackwood,*
   161 F.3d 1208 (9th Cir. 1998) ..........................................................36

*Cabinet Res. Grp. v. U.S. Fish & Wildlife Serv.,*
   465 F. Supp. 2d 1067 (D. Mont. 2006)............................................... 4

*Eberle v. City of Anaheim,*
   901 F.2d 814 (9th Cir. 1990) .......................................................... 41

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
   36 F.4th 850 (9th Cir. 2022) .......................................................... 40

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*
   857 F.2d 505 (9th Cir. 1988) ..........................................................35

*Kern Cnty. Farm Bureau v. Allen,*
   450 F.3d 1072 (9th Cir. 2006)  ........................................................ 5

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,*
387 F.3d 989 (9th Cir. 2004) ....................................................................33, 34

*Native Ecosystems Council v. Marten,*
612 F. Supp. 3d 1146 (D. Mont. 2020)........................................................... 27

*Native Ecosystems Council v. U.S. Forest Serv.,*
418 F.3d 953 (9th Cir. 2005) ...............................................................18, 22, 23

*Ocean Advocs. v. U.S. Army Corps of Eng'rs,*
402 F.3d 846 (9th Cir. 2005) .......................................................................... 38

*Ohio Forestry Ass'n v. Sierra Club,*
523 U.S. 726 (1998)......................................................................................... 19

*Pacific Dawn LLC v. Pritzker,*
831 F.3d 1166 (9th Cir. 2016) ........................................................................ 41

*SEC v. Chenery Corp.,*
332 U.S. 194 (1947)......................................................................................... 18

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior,*
608 F.3d 592 (9th Cir. 2010) ...........................................................32-33, 36-37

*WildEarth Guardians v. Conner ("Tennessee Creek"),*
920 F.3d 1245 (10th Cir. 2019) ...................................................................... 30

*WildEarth Guardians v. Jeffries,*
370 F. Supp. 3d 1208 (D. Or. 2019)..........................................................19, 24

## REGULATIONS

36 C.F.R. § 219.19 .......................................................................................... 17

40 C.F.R. § 1508.7 .......................................................................................... 34

## INTRODUCTION

Grizzly bear conservation hinges on maintaining large areas where bears can forage and meet their seasonal habitat needs away from roads and human intrusions. These areas of "secure habitat" allow grizzly bears to meet their basic needs free from the greatest threat to their survival – roads, human contact, and the attendant risk of human-caused mortality.

Maintaining sufficient levels of "secure habitat" is the central tenant of grizzly bear conservation efforts, including in the Greater Yellowstone region. Forest plans, such as the revised Custer-Gallatin Forest Plan at issue here, incorporate secure habitat benchmarks that must be maintained and include strict limitations on any temporary project reductions below these benchmarks, including for projects such as the South Plateau project. How "secure habitat" is defined and managed is therefore critical to grizzly bears' long-term survival. So too is strict compliance with forest plan secure habitat standards and a thorough analysis of a projects' impacts to the species.

Here, the U.S. Fish and Wildlife Service's ("FWS's") and Forest Service's compounding errors expose an already vulnerable grizzly bear population to more risks. The agencies arbitrarily defined secure habitat as patches of land as small as 10-acres. This benchmark, which is less than 70 times a grizzly bear's average foraging area in a single day, conflicts with *all* scientific evidence and with the agencies' own

1

recommendations for other grizzly bear populations. The agencies' secure habitat standards and analyses also rely on outdated and deficient baseline levels from 1998. The use of a static, 1998 baseline fails to account for essential aspects of grizzly bear secure habitat and increased stressors to the species that have occurred over the past 25 years.

Further, the Forest Service failed to ensure compliance with even this deficient secure habitat standard when evaluating the South Plateau project at issue here. The project is already located in degraded grizzly bear habitat and its new roads and logging prescriptions will make a bad situation for bears even worse. Yet, the Forest Service never accounted for this situation when evaluating compliance with forest plan standards for grizzly bears. Instead, the Forest Service took a number of short cuts, failed to show its work, and adopted a "wait-and-see" and "trust us" approach that this Court already rejected. The Forest Service also erred in calculating the project's impacts to secure habitat and attempts to subvert the forest plan standards by "staging" the project. The Forest Service likewise failed to adequately analyze the effects of new road work on grizzly bears or engage in a meaningful cumulative effects analysis. Substantial questions have also been raised about the effects of the project, triggering the need for a more thorough analysis in an EIS.

## ARGUMENT

**I.     ESA violations.**

> **A.     There is no scientific support for defining secure habitat as patches of land as small as 10-acres.**

Secure habitat for grizzly bears must be large enough for a female grizzly bear to forage for a single day (or two). FWS-003694; *see also* FWS-003897 (explaining the same); SP-046203 (discussing same); SUPP-FWS-008476 (discussing same). This allows "a grizzly bear the space to forage while concurrently maintaining its wariness to humans." FWS-003897. Foraging areas for grizzly bears vary but are at least roughly 715 acres (based on 0.96 km radius) according to the scientific literature. *Id.*; *see also* FWS-002867 (explaining average daily activity area for female grizzly bears to be 939 acres (based on a 1.1 km radius); SUPP-FWS-008474 (calculating average daily foraging area for grizzly bears at roughly 2,244 acres).

The scientific studies thus recommend grizzly bear secure habitat blocks be between 2,000 to 7,000 acres in size. *See* FWS-003897 (Mattson (1993) recommending roughly 7,000 acres); SUPP-FWS-008474 (Gibeau (2001) recommending roughly 2,224 acres); SP-027111 (Proctor (2019) recommending 2,471 acres); SUPP-FWS-005147 (noting study in Montana recommended 2,000 acres).

The Forest Service and FWS have followed this scientific consensus in other contexts. For example, the Forest Service and FWS, along with other state and federal agencies, defined secure habitat as at least 2,500 acres for grizzly bears in the Northern Continental Divide Ecosystem. SUPP-FWS-005031. The Forest Service also took a similar approach for a portion of the Caribou-Targhee National Forest in the Greater Yellowstone by mandating secure habitat be at least 7,000 acres. SP-046203. Even in the much smaller Cabinet-Yaak and Selkirk ecosystems, the best available science still recommends "larger blocks" of secure habitat to benefit bears, likely between 1,280 and 5,120 acres in size. *See Cabinet Res. Grp. v. U.S. Fish & Wildlife Serv.*, 465 F. Supp. 2d 1067, 1090 (D. Mont. 2006) (discussing study).

Here, by contrast, the Forest Service chose to define secure habitat for grizzly bears as only 10-acres in size, i.e., at least 200 times smaller than the scientific consensus on secure habitat and 250 times smaller than state and federal agencies, including the Forest Service and FWS, recommended for grizzly bears in the Northern Continental Divide Ecosystem. And FWS signed off on this approach in the biological opinions issued for the Custer-Gallatin National Forest revised forest plan and South Plateau project. As previously mentioned, not a single paper, study, or report supports the 10-acre patch size for secure habitat.

Indeed, on its face, this 10-acre approach defies the very purpose of defining and managing areas of secure habitat for grizzly bears. The agencies' 10-acre approach expressly allows grizzly bear BMUs and subunits in the Greater Yellowstone to be carved up into tiny patches or small islands of "secure" habitat separated by roads, which is the opposite of security and clearly not beneficial for bears. *See* FWS-002869 (Schwartz (2010) discussing issue). Indeed, the average grizzly bear foraging over 715 acres a day might need to access more than 70 islands of "secure habitat" to meet its daily needs and cross over 70 roads in the process. There is nothing secure about this approach.

The ESA's requirement to utilize the best available science in biological opinions does not require "ironclad and absolute" science, *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 680 (9th Cir. 2016), but it does prohibit FWS from disregarding superior scientific evidence or scientific evidence that is in some way better than the evidence it relies on. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006). That is precisely the situation here.

In response, FWS attempts to defend the 10-acre patch size on a number of grounds, none of which have merit.

First, FWS maintains the 10-acre patch size is consistent with the 2007 and 2016 Greater Yellowstone conservation strategies. Doc. 55 at 60. This is accurate.

5

The 10-acre patch size first emerged in the 2003 Greater Yellowstone conservation strategy and was carried over to the 2007 and 2016 versions. *See* SUPP-FWS-008075; SUPP-FWS-007242; FWS-002202. The conservation strategies, however, do not provide *any support* for FWS' position because they do not provide any scientific findings, data, reports, studies, or rationale supporting 10-acre patch size for secure habitat. Nor could they (as discussed above). Furthermore, the documents themselves are contradictory, noting on the one hand that secure habitat for grizzly bears "should meet the seasonal habitat needs of the bear," SUPP-FWS-008211, but then blindly adopting the 10-acre patch size which is too small to meet *any* needs for bears.[1]

Second, FWS insists *there is* scientific support behind its use of the 10-acre patch size because they provide "greater sensitivity for determining the loss of secure habitat" than larger patches. Doc. 55 at 63. The problem is that there is no scientific support for this "smaller is better" theory and none is provided by the agency in the biological opinions (or record). Indeed, under FWS's "smaller is better" theory, five or even one acre size patches would presumably do more to protect secure areas because they would be even more sensitive than 10-acre patches. This is illogical.

---

[1] The Greater Yellowstone conservation strategy was developed jointly by Wyoming, Montana, Idaho, and federal agencies to guide grizzly bear management "upon recovery and delisting." FWS-002198. That has yet to occur.

For support, FWS cites the Species Status Assessment ("SSA") for grizzly bears. That document, though, merely describes how the Greater Yellowstone conservation strategies defined secure habitat. *See* SP-043821. The SSA also references Schwartz (2010), but that paper likewise merely described how the conservation strategies defined secure habitat. *See* FWS-002865. Schwartz (2010) never endorsed the 10-acre patch size for secure habitat. On the contrary, Schwartz (2010) explained that the "estimated average daily activity radius" for female grizzly bears is roughly 1.1 km, FWS-002867, which equates to a minimum daily area requirement of 939 acres (well above the 10-acre patch size).

FWS also cites a statement from the Forest Service's EIS for the revised forest plan concluding the 10-acre patch size is a reasonably sized area "useable by an individual grizzly bear, while avoiding disturbance associated with motorized roads and trails." Doc. 55 at 63-64 (citing SP-001537). Yet again, no supporting scientific information or rational is provided for this claim. Nor can there be, as it is directly contrary to the best available – indeed, all available – science.

As explained in Schwartz (2010), small patch sizes for "secure" habitat greatly increases the risk of grizzly bear mortality: when secure habitat areas become "isolated islands surrounded by heavily roaded areas" grizzly bear travel "among secure islands then becomes more hazardous, effectively fragmenting the landscape."

7

FWS-002869; *see also* SUPP-FWS-008477 (Gibeau (2001) explaining compromised secure habitat and habitat fragmentation is likely resulting in decreasing population size and a threat to long-term viability). This is precisely what the 10-acre patch size definition adopted here does as illustrated by FWS's own figure in the revised forest plan biological opinion (showing small islands of "secure habitat" in green):



FWS-001241.

In the end, therefore, the 10-acre approach adopted here does nothing but artificially inflate the actual amount of "secure habitat" on the landscape by defining it to encompass small patches or islands of land that are not secure. This approach also conveniently allows the Forest Service to claim it is creating *more* secure habitat

by simply adding up small patches of land in the project area, as it has done here, for the South Plateau project. *See, e.g.,* SP-041094 (explaining that after logging, the closure of certain roads will create new patches of "secure habitat" as small as 16 acres in size).

FWS counters that small patch sizes need not equal secure habitat size because the areas can be used for movement, foraging, and other activities. Doc. 55 at 60. The small patch sizes referenced by FWS, however, are not just small patch sizes used for movement or other needs; they are areas specifically designated, managed, monitored, and treated as "secure habitat" for threatened grizzly bears. That is the problem. FWS also touts that "secure habitat levels are generally high" in the Greater Yellowstone, "averaging about 87 percent." Doc. 55 at 64. This number, however, is based on the arbitrarily small 10-acre definition at issue here. The amount of truly secure habitat – as defined by the best available science – is likely smaller.

FWS also asserts that it has utilized the 10-acre definition of secure habitat "at least since 2007" and it is apparently working because the grizzly bear population has "increase[d] since then." Doc. 55 at 64. But this is incorrect. As previously mentioned, the 10-acre definition first emerged in the 2003 conservation strategy, and while grizzly bears' range in the Greater Yellowstone has increased, the

9

population has remained largely static since 2001 and even declined some years, due largely to an escalation in human-caused mortality:



FWS-000637; SP-046201-02 (discussing spike in mortality). The jump in grizzly bear mortality, especially since 2008, also calls into question any "equivalence" between road-defined security and the fitness of Greater Yellowstone grizzly bears. SP-046202.

Finally, FWS maintains Plaintiffs engage in a "logical fallacy" and "merely disagree with the methodology used" and have not shown that the science FWS relies on is worse than the science Plaintiffs cite. Doc. 55 at 64-65. Not so. This is not a disagreement over methodology because FWS does not have one to defend the 10-acre patch size. Nor is this a battle of the experts' situation because *every* scientific paper written on this topic demonstrates zero support for 10-acre patches of "secure

10

habitat." Dr. Mattson said it best: the 10-acre threshold used by FWS (and the Forest Service) for defining secure habitat for grizzly bears in the forest plan and South Plateau biological opinions is merely "faith-based rather than evidence-based and contravenes the best available science." SP-046203.

**B.    The 1998 baseline is outdated and conflicts with the best available science.**

As previously explained, the Forest Service and FWS's approach to maintain and manage secure habitat for grizzly bears at 1998 levels ("1998 baseline") is arbitrary because it: (1) relies on the 10-acre patch size definition; (2) is not a valid proxy for secure habitat for grizzly bears; and (3) is outdated as it fails to account for significant changes in the Greater Yellowstone over the last 25 that have significantly impacted the species. Doc. 48 at 32-39. Even the 2016 Greater Yellowstone conservation strategy noted the 1998 baseline needed to be updated and has "not kept pace" with more recent changes, including significant increases in visitor use to the Greater Yellowstone. FWS-002252.

In response, FWS and intervenors defend the continued use and application of the 1998 baseline but none of their grounds for doing so have merit.

First, FWS maintains the 1998 baseline is working as evidenced by secure habitat increases in "all but two subunits" and grizzly bear population growth and

11

range expansion in the Greater Yellowstone since the standard was adopted. Doc. 55 at 71. This, however, is misleading.

As Dr. Mattson explains, grizzly bear population growth prior to 1998 was not due simply to secure habitat levels. SP-046197. While secure habitat levels are essential, equally so are habitat quality, food resources, and external stressors. Population growth prior to 1998 was "driven by a combination of lower bear densities, abundance of high-quality natural foods, the removal of anthropogenic attractants near humans and human infrastructure, comparatively low levels of conflict catalyzed by livestock depredation and encounters with hunters – as well as configurations of roads and other human infrastructure." SP-046197 (referencing studies). "High-quality foods were indeed abundant and heavily used by grizzly bears during this period." *Id.*

But such growth rates have not continued since the 1998 baseline was adopted. Since 2001, for instance, the Greater Yellowstone grizzly bear population has expanded its range in the region, but population levels have remained largely static and even declined in some years. FWS-000637. During this same period the population experienced a significant spike in human-caused mortalities due in large part to changes in food sources, which brought grizzly bears to lower elevations and increased human contact, and a lack of truly secure habitat. SP-046202.

For example, from 1980-2001 an average of 8.2 annual human-caused grizzly bear mortalities occurred in the Greater Yellowstone (both inside and outside the monitoring area). *See* FWS-001107 (Table 1). From 2002-2020, that number jumped to 31.5. FWS-000886 (Table 16). This is more than a three-fold increase and the numbers continue to grow. In 2021, there were 78 grizzly bear mortalities in the Greater Yellowstone alone, 59 of which were attributed to human causes. FWS-000643. Such levels of mortality are now having population level effects. *See* FWS-000637.

As explained by Dr. Mattson, grizzly bears have responded to habitat changes and loss of important food sources like whitebark pine seeds since the mid-2000s by shifting their diet to greater meat consumption, leading to increased human-caused morality from conflicts with big game hunters and more livestock conflicts and attendant bear deaths. SP-007608. None of these changes, however, are accounted for in the 1998 baseline. In fact, FWS's continued use of the 1998 baseline is entirely based on the assumption that there have been *no changes* to grizzly bear habitat and food sources or behaviors, which, as previously mentioned, is demonstrably untrue and has had significant implications for the species. *See* SP-007605 (discussing issue).

13

Second, FWS and intervenors maintain the 1998 baseline's failure to account for variables other than secure habitat levels, such as vegetative cover, food resources, and amount and type of human-uses is a "flawed assumption" because the agencies considered and addressed them in the EA when approving the South Plateau project, at issue here. Doc. 55 at 72. This is a red herring. The issue is not the sufficiency of the analysis in an EA but rather whether the 1998 baseline, as relied on in the challenged biological opinions, is a valid proxy for managing secure habitat for grizzly bears 25 years after it was adopted. The best available science reveals it is not. *See* SP-046195-97.

For example, under the 1998 baseline, FWS (and the Forest Service) can subject virtually all patches of secure habitat in the South Plateau project area to industrial scale logging – as is planned over 16,000 acres of the project area, SP-004340 – including clearcutting, without adversely affecting *a single acre of* secure habitat. This is because there is *no* vegetative or cover component in the 1998 baseline. Indeed, as per the 1998 baseline, an 11-acre clear-cut surrounded on all sides by logging roads, busy county roads utilized by fall hunters, or popular motorized ATV routes would qualify and be counted as "secure habitat" for grizzly bears in the affected subunits as per the 1998 baseline. There is no scientific support for this approach.

14

Finally, FWS insists the 25-year-old 1998 baseline is not outdated. Doc. 55 at 64-65. Yet, FWS never explains why. Nor does FWS address the changes that have occurred since 1998 affecting secure habitat, i.e., sharp increases in visitation, development, and population growth in the area, climate change, changes in food resources, and the spike in mortalities. Such changes since 1998, as Dr. Mattson notes, have had and will continue to have "demonstrable effects on grizzly bear diets, distributions, and habitats." SP-046198. These dynamics have implications for "the adequacy of current levels of presumed habitat security" that are not accounted for – at all – in the 1998 baseline. *Id*. Instead of addressing such changes, however, FWS simply notes that such changes are accounted for in the project EA. At issue, however, is the validity of the 1998 baseline, not the adequacy of the NEPA analysis.

## II.     NFMA violations.

Even if one assumes, *arguendo*, that the Forest Service and FWS's 10-acre approach to defining secure habitat and managing it under the 1998 baseline is valid, the Forest Service nonetheless violated relevant forest plan standards restricting temporary reductions in secure habitat – specifically FW-STD-WLGB-03. *See* SP-000065 (forest plan); *see also* SP-041106 (discussing standards). In response, the Forest Service and intervenors insist the South Plateau project complies with all such restrictions. The record, however, demonstrates otherwise.

A.      **Failure to demonstrate compliance with the one-at-a-time standard.**

Forest plan standard FW-STD-WLGB-03(a) states that "only one project affecting secure habitat below baseline values may be active within a given bear management subunit at any one time." SP-000065. Both the Henry's Lake #2 and Madison #2 subunits are already below baseline for secure habitat, SP-004433 (Table 12), which means only one project having *any* effect to secure habitat can operate within these subunits at a time.

The record, however, reveals the Forest Service is violating this standard in the Madison #2 subunit because multiple ongoing projects affecting secure habitat in that subunit are ongoing, including the Rendezvous Trail Improvement and North Hebgen projects. *See* Doc. 48 at 40-41; *see also* FWS-000022 (describing projects); FWS-000572 (describing scoping for Rendezvous Trail Improvement project and on-going work on North Hebgen).

In response, the Forest Service explains that these projects may proceed in parallel with the South Plateau project provided temporary reductions are restored to baseline *before* the South Plateau project commences. Doc. 55 at 29. This is because, according to the Forest Service, the standard is focused solely on activities affecting secure habitat, not the overall projects themselves. *Id.*; *see also* SP-041106 (explaining the same).

16

The plain language of standard FW-STD-WLGB-03(a), however, speaks to projects affecting secure habitat: "Only *one project* affecting secure habitat below baseline values may be active within a given bear management subunit at any one time." SP-000065 (emphasis added). A "project" is defined under the forest plan as an "organized effort to achieve an outcome on National Forest System lands identified by location, tasks, outputs, effects, times, and responsibilities for execution." SP-000228 (citing 36 C.F.R. § 219.19). Here, the North Hebgen project is on-going in the Madison #2 subunit and that project – which affects secure habitat – remains to be completed so the standard is violated. This interpretation is consistent with the standard's intent to circumscribe reductions in secure habitat. Under the Forest Service's interpretation, however, multiple projects could simply alternate secure habitat reductions in a subunit like Madison #2, which is at or below the threshold level. This would, effectively, result in ongoing reductions below baseline, which is not consistent with the standard's intent to keep such reductions "temporary."

The Forest Service also insists there is "no evidence" other ongoing projects (other than North Hebgen) in the Madison #2 subunit impact secure habitat below baseline. Doc. 55 at 29 n. 5. But the opposite is also true: multiple projects are ongoing in the subunit, it is already below baseline, and there is no evidence in the

record those project *do not* impact secure habitat below baseline. *see* FWS-000572 (discussing projects). And under NFMA, the onus is on the agency – not Plaintiffs – to demonstrate compliance: courts must "be able reasonably to ascertain from the record that the Forest Service is in compliance with the [forest plan] standard." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 963 (9th Cir. 2005). This is impossible here. "If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196–197 (1947)).

**B.     More information on the location of the 56 miles of project roads is needed to demonstrate compliance with the 1% standard.**

Forest plan standard FW-STD-WLGB-03(b) requires the total acreage of secure habitat below baseline values within a grizzly bear BMU not exceed 1% of the acreage of the largest subunit within that BMU. SP-00065. In order to ensure compliance with this 1% standard, therefore, the Forest Service must first know where the over 56 miles of proposed road work will be located – specifically how many roads will be built in each grizzly bear subunit. Yet, this information is missing.

18

In response, the Forest Service relies on a map projecting where some of the roads might be located. Doc. 55 at 33-34. This is misleading, though, because the Forest Service expressly states such maps "have not been vetted and are *entirely subject to change*." SP-004344 (emphasis added). In other words, the Forest Service has adopted a more "dynamic approach" deferring such information to a later date, when the contracts are signed but before timber sales are implemented. Doc. 55 at 31. But this is not how NFMA works.

As this Court previously explained, the Forest Service must show its work at the time the decision is made so courts can reasonably ascertain whether the standard is met. *All. for the Wild Rockies v. Marten*, No. CV 20-156-M-DLC, 2021 WL 4551496, at *4 (D. Mont. Oct. 5, 2021). "The duty to demonstrate Forest Plan consistency applies at the time of the decision, not at a speculative future date." *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1234 (D. Or. 2019) (*citing Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998)). Plaintiffs and the courts, therefore, do not have to take the agency's word for it, engage in future monitoring of the project, and hope that compliance with the 1% standard is met at a later (less public) date when timber sale contracts are signed and the project is implemented. *See Marten*, 2021 WL 4551496 at *4 (rejecting approach).

C.  **Misapplication of the 1% standard.**

To ensure compliance with the forest plan's 1% standard, the Forest Service must first know how many acres of secure habitat fall below baseline levels for *all subunits* within a BMU, not just the subunits impacted by the project. *See* SP-000065. The standard mandates that total acreage of secure habitat "within a given *bear management unit* [BMU] shall not exceed 1 percent of the acreage in the largest subunit" in that BMU. SP-000065 (emphasis added). Indeed, the Forest Service concedes as much, admitting that information on the "cumulative acreage below baseline for all subunits within that BMU" is relevant information for ensuring compliance with the 1% standard. Doc. 55 at 34. This information, however, is absent from the analysis and the record.

Total acres of secure habitat below baseline levels in each impacted BMU – Henry's Lake, Madison, and Plateau – is nowhere in the agency's forest plan analysis. For example, the Forest Service only provides acreage below baseline for impacted subunits, such as Henry's Lake #2 and Madison #2, not the other subunits in these BMUs—including Henry's Lake #1 and Madison #1. *See* SP-004433 (Table 12).  That information, however, is essential to determine compliance with the 1% standard. The Forest Service must calculate how much secure habitat is cumulatively below baseline in *all subunits* within the Madison BMU and Henry's Lake BMUs and

then compare that figure with the 1% threshold for each BMU. Without it – i.e., without knowing the total, cumulative acreage of secure habitat below baseline levels in all subunits in the larger BMU – there is simply no way to ensure compliance with the 1% standard and thus no way to comply with NFMA. *See* SP-000065.

In response, the Forest Service explains that the EA identifies the 1% threshold for each BMU and baseline conditions for each subunit affected by the project. Doc. 55 at 30-31. That is true. But the essential information is the total or cumulative acreage of secure habitat below baseline in *all subunits* within each BMU. This information is missing and without it, forest plan compliance simply cannot be determined. This is a major oversight and violation of NFMA. *Marten*, 2021 WL 4551496 at *4.

### D. The South Plateau project likely violates the 1% standard.

The South Plateau project likely violates the 1% standard in both the Madison and Henry's Lake BMUs. The 1% threshold for the Madison BMU is 1,458 acres. SP-004433. The existing condition in the Madison #2 subunit is 20 acres below baseline, the South Plateau project will result in a loss of an additional 248 acres below baseline, and the North Hebgen project removed 862 acres below baseline for a total of 1,130 acres in the Madison #2 subunit alone. SP-004432-33,

SP-041106. Assuming, *arguendo*, the Madison #1 subunit is at baseline, that leaves only 328 acres that can be reduced in *the entire* BMU without violating the standard.

The amount of secure habitat below baseline in the Madison #1 subunit, however, is never disclosed (as previously explained). Indeed, projects occurring in the Madison #1 subunit are nowhere mentioned in the EA, wildlife report, or any analysis on forest plan compliance. This subunit is simply ignored. On its face, this is a violation of NFMA because without this information neither the public nor this Court can reasonably ascertain whether the 1% standard is met. *See Marten*, 2021 WL 4551496 at *4 (citing *Native Ecosystems Council*, 418 F.3d at 963). Further, there are also likely a number of other projects occurring in the Madison #1 subunit that are also likely impacting secure habitat (including portions of the North Hebgen project). But again, no activities or projects in the Madison #1 subunit were mentioned or discussed at all.

Notably, in response, the Forest Service never addresses compliance with the 1% standard in the Madison BMU. Nor does it address its failure to discuss and analyze other projects in the Madison #1 subunit or confirm no other projects are affecting secure habitat below baseline in the Madison #1 subunit. *See* Doc. 55 at 30-35. As this Court previously explained, it cannot simply take the Forest Service's word for it when it comes to forest plan compliance. *Marten*, 2021 WL 4551496 at

22

\*4. The Forest Service's calculations "need not be perfect" but there "must be at least some calculations by which a Court can reasonably ascertain whether the standard has been complied with." *Id.* (citing *Native Ecosystems Council*, 418 F. 3d at 963). No such calculations are provided for the Madison BMU.

The Forest Service is also violating the 1% standard in the Henry's Lake BMU. The 1% threshold for the Henry's Lake BMU is 1,285 acres. SP-004433. The Henry's Lake #2 subunit is already 9 acres below baseline (not counting conditions already below baseline in the Henry's Lake #1 subunit), *id.*, and the South Plateau project will result in a total of 2,426 additional acres below baseline. SP-041106. The Forest Service explains in the EA, however, that it will ensure the project reduces no more than 1,276 acres below baseline at a time by using a staggered approach. SP-004511. This means 1,276 acres will be reduced, baseline conditions will presumably then be restored, and then another 1,276 acres will be reduced after a rest period. *See* Doc. 55 at 32 (explaining approach).

On its face, this stagged approach violates forest plan standard FW-STD-WLGB-03(c), *see infra* § II.E., but even if one assumes, *arguendo*, that it is valid, the numbers provided reveal the Forest Service is already right at the 1% threshold for the Henry's Lake BMU with the existing condition and South Plateau project alone (9 + 1,276). And, as previously explained, this figure does not account for any other

projects occurring in the Henry's Lake #1 subunit which must also be accounted for in the 1% standard.

Evidence in the record reveals there are likely other projects in the Henry's Lake #1 subunit that will reduce secure habitat below baseline, including the Yale Creek project. The agency concedes this project is reducing secure habitat further below baseline and, therefore, must be completed before the South Plateau project can be implemented. SP-004432. The Forest Service says it will make changes at some future date during project implementation to ensure the South Plateau project complies with the 1% standard in light of the Yale Creek project, Doc. 55 at 70. But as previously explained, this is not how NFMA works.

Compliance must be evaluated and ensured at the time the decision is made. *Marten*, 2021 WL 4551496 at *4; *see also WildEarth Guardians*, 370 F. Supp. 3d at 1234 (explaining same). At present, there are no assurances that secure habitat reductions from the Yale Creek project or other projects in the Henry's Lake #1 subunit will be fully restored and remediated before the South Plateau project is implemented, and the public and this Court should not have to take the agency's word for it. *Marten*, 2021 WL 4551496 at *4.

24

**E.     The Forest Service's staggered approach and narrow interpretation of "project" violates the four-year standard.**

Standard FW-STD-WLGB-03(c) limits the time project activities may reduce secure habitat below baseline to four consecutive years and requires the "collective set" of temporary project roads that affect secure habitat below baseline be closed to all motorized use after three years and decommissioned and secure habitat restored within one year of closure. SP-000065. As the Forest Service explained, this standard is intended to ensure project reductions below baseline are "in fact temporary." SUPP-FWS-002519.

Here, as previously explained, Doc. 48 at 55, the Forest Service's staggered approach of approving projects that reduce secure habitat below baseline for four years only for another project to do the same and reduce secure habitat for four subsequent years, and yet another project after, etc., defeats the very purpose of the standard. There is nothing "temporary" about this staggered approach.

In the Madison BMU, for example, once the multi-year North Hebgen project is completed (or at least once roads are obliterated according to the Forest Service) the South Plateau project will commence. *See* FWS-000572 (describing approach). The same is true for the Yale Creek project in the Henry's Lake BMU. *See id.* A series of projects or timber sales and associated "temporary" road work always keeps secure habitat from ever achieving baseline conditions for a meaningful amount of

25

time for grizzly bears. In other words, secure habitat is reduced for four years, the clock is reset, and then additional reductions in baseline occur for the next four years and so on. This is in large part why the Madison and Henry's Lake BMUs have been and remain problematic "population sinks" for grizzly bears. *See* SP-046204 (describing situation in these BMUs in the project area).

Compounding the problem is the Forest Service narrow interpretation of the four-year standard. *See* Doc. 55 at 35. As explained by the agency, the standard does not "apply to all temporary roads in a project" like South Plateau, *id.*, but only temporary roads in individual timber sales. This means if the agency approves a "project" with multiple timber sales – like it plans to do here, *see* SP-006167 – each timber sale can reduce secure habitat for four consecutive years, even concurrently, without running afoul of the standard. Put differently, under the Forest Service's interpretation, even if timber sale A and timber sale B are part of the same "project" and evaluated in the same EA, timber sale A can reduce secure habitat below baseline from year 1 to 4 and timber sale B can do the same from years 3 to 7 – i.e., reductions in secure habitat below baseline can occur for seven consecutive years – without violating the four-year standard. The Forest Service's interpretation, therefore, effectively defines each timber sale contract as its own "project" subject to

26

the four-year standard. *See* FWS-000573 (explaining approach to FWS and referring to the timber sale as a "sale ('project')," "project (sale)," and "sale/project").

This approach conflicts with how the South Plateau project was defined and evaluated throughout the EA, *see* Doc. 48 at 54, and effectively reads the "collective set of temporary roads" language out of the standard. The plain language is clear: "Project activities shall not reduce secure habitat below baseline levels for more than four consecutive years. The *collective set* of temporary roads that affect secure habitat below baseline levels shall be closed to all motorized use after three years." SP-00065 (emphasis added); *see also Native Ecosystems Council v. Marten,* 612 F. Supp. 3d 1146, 1164-65 (D. Mont. 2020) (applying plain language interpretation of forest plan standard).

Indeed, as explained by the Forest Service – at least outside of this litigation – the standard is "intended to ensure that reductions in secure habitat are in fact temporary, and therefore apply to any and all projects, or parts thereof that result in reductions below baseline secure habitat values. *It does not matter whether there are multiple timber sales used to implement a project . . . .*" SUPP-FWS-002519 (emphasis added); *see also* SP-007257 (explaining same when describing other project in area). The agency's post-hoc position (in litigation) directly undermines this approach and violates the plain language and purpose of the four-year standard.

### III. NEPA violations.

#### A. The effects of allowing over 56 miles of road work on grizzly bears was not adequately analyzed.

The South Plateau project authorizes over 56 miles of roads in an area that is already problematic for grizzly bears, due mainly to low levels of secure habitat and high mortality levels. SP-046204; *see also* FWS-002869 (showing area as a "population sink" for grizzly bears). The project will thus make an already bad situation for grizzly bear worse over the next 15 years, and perhaps longer.

Despite this fact, there is little information or analysis in the EA about where the roads will be located or their frequency and intensity of use. This is because such information is not yet known by the agency, SP-004479, and what little information has been provided is "entirely subject to change." SP-004344. Also missing is information and analysis on how the agency's proposed staggered approach to construction and use of the 56 miles of roads for future timber sales, *see supra* § II.E, may adversely affect grizzly bears, which tend to avoid areas for several generations after prolonged human disturbance. *See* SP-041077 (discussing issue); FWS-000026 (same).

In response, the Forest Service insists its "wait-and-see approach" is valid and Plaintiffs misunderstand the "analysis" they undertook because the agency adopted a worst-case scenario that considered the maximum total mileage of temporary roads

28

to be built – 56.8 miles – in the project area. Doc. 55 at 43. The problem, however, is that the information provided on the total mileage of roads, while important information and a good start, only tells you so much. The key to providing, managing, and retaining secure habitat for grizzly bears in the Greater Yellowstone is *the location* and *use* of roads and, in particular, limiting road-density in certain subunits or BMUs. The location of the roads is critical.

FWS acknowledged as much, noting the level of effects to grizzly bears from roads will "depend on such things as *location* of the routes [and] length of the routes." FWS-000032 (emphasis added); *see also* SP-004406-08, 004432 (analyzing effects based on individual subunits); SP-0004432 (grizzly bear "sideboards" based on the location of roads in subunits); SP-00065 (forest plan standards based on the location of roads in specific BMUs and subunits). Effects will also depend on the "frequency and intensity of use" of such roads. FWS-000032. Yet despite acknowledging the importance of road location and use, the Forest Service then punts on providing such information, noting projected road locations are "entirely subject to change." SP-004344.

Plaintiffs are not alone in raising this issue. The EPA also raised an "overarching concern" about the EA's lack of site-specific analysis, noting it adopts a "programmatic" approach and analysis that authorizes a host of site-specific activities

but "without requiring future, site-specific" NEPA analysis. SP-009298. The EA "does not contain the actual locations of the timber sales and harvest units or where the temporary roads will be built and therefore it cannot disclose, analyze, or described the localized impacts that can potentially occur." SP-009300; *see also* SP-016504 (raising same concerns); SP-014730 (same); SP-012025 (same).

In response, the Forest Service relies heavily on *WildEarth Guardians v. Conner* (*"Tennessee Creek"*), 920 F.3d 1245, 1258 (10th Cir. 2019), to defend its approach. Doc. 55 at 43. But that case is inapposite. *Tennessee Creek* did not involve linear features like roads or the need to limit road densities in grizzly bear subunits. In that case, the Forest Service also did what the agency failed to do here, i.e. it undertook a valid worst-case scenario analysis by assuming that "*every acre* of mapped lynx habitat" in the project area was to be treated in the lynx analysis units. *Id.* at 1257 (emphasis added). In other words, the agency accounted for any uncertainty over the lack of site-specific information about logging units in *Tennessee Creek* by analyzing and assuming "all the mapped lynx habitat" in the project area would be logged. *Id.* at 1258. This type of approach was not undertaken here with respect to the 56 miles of road work. Nor could it have been because linear features like roads do not lend themselves to that type of "worst case scenario" analysis based on mileage alone as impacts differ based on location. Building five miles of road in downtown Missoula

30

is not the same as doing so on the outskirts of the city. Both have impacts, but the type and extent depend significantly on location.

A road through an important habitat area for grizzly bears, for example, will have a significantly greater impact than one through a previous clearcut. *See* SP-046210. More importantly, impacts to secure habitat are entirely dependent on road location. The project area overlies three grizzly bear subunits, each with unique secure habitat thresholds and current baseline levels. SP-004433. The project's impact to secure habitat in each subunit hinges on where project roads are constructed – specifically, in which subunit. But that required information is not provided here and to the extent it is, the information is "entirely subject to change." SP-004344.

The Forest Service also maintains the project roads are not a problem because grizzly bears can adjust their "spatial and/or temporal use patterns" as necessary. Doc. 55 at 43 (citing SP-044298). But this is a reference to a statement made in an internal email that is taken out of context, not an analysis or discussion in the EA. Notably, the email goes on to explain that location and context matter: building more roads in already roaded areas and where other logging projects have occurred or are occurring can "eventually result in an overall decrease in habitat quality" and lead to "lower bear densities." SP-044298. That is precisely the issue here.

31

Intervenors make the additional argument that any temporary grizzly bear displacement will end abruptly after project roads are decommissioned. Doc. 57 at 61. There is no merit to this claim. The wildlife report (relied on by intervenors) expressly notes that displacement does not abruptly end once roads are closed: grizzly bears may avoid a disturbed area for several generations "because females pass on the avoidance behavior to their cubs." SP-041077.  FWS similarly notes that if road densities in specific subunits reach certain levels and security levels decrease, grizzly bears may experience "significant impacts" for long periods of time and learn to avoid areas for extended periods, well after the roads are closed. FWS-000026.

Intervenors also maintain that a site-specific analysis is not required under NEPA and rely on *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 600 (9th Cir. 2010), for support. Doc. 57 at 59, 63. This case, however, is unhelpful.

In *Te-Moak*, the Ninth Circuit noted that project details – i.e., what it entails, where it will occur, and when it will be implemented – are *required* to properly analyze environmental effects under NEPA. *Id.* at 600. "NEPA's ultimate focus is on the assessment of environmental impacts and a project's details are usually a means to that end." *Id.* The only exception is for mineral exploration projects where "activities cannot reasonably be ascertained until sometime after the project is

32

approved." *Id.* Such projects inherently involve uncertainties: "if mining companies knew the precise location of mineral deposits before drilling, exploration would not be required." *Id.* An agency may therefore approve an exploration project "without knowing the exact locations of drill sites and other project activities" so long as the agency analyzes the impacts of all project activities in all parts of the project area and imposes effective avoidance and mitigation measures. *Id.*

Unlike *Te-Moak*, this case does not involve mineral exploration. The Forest Service could have identified specific treatment and road locations, or it could have done programmatic environmental review with future, tiered site-specific review as EPA urged. But it did neither, in violation of NEPA.

### B.     The cumulative effects to grizzly bears were not adequately analyzed.

The Forest Service must evaluate and analyze the cumulative effects of the South Plateau project on grizzly bears, including how existing, degraded baseline conditions and other projects and private development in the project area may cumulatively affect grizzly bears. This requires the agency to analyze the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (citation omitted). "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of

33

time." *Id.* (quoting 40 C.F.R. § 1508.7). "Sometimes the total impact from a set of actions may be greater than the sum of the parts." *Id.* at 994.

In response, the Forest Service maintains it properly: (1) accounted for the degraded baseline conditions in the project area; and (2) analyzed how the project, in combination with such conditions and other projects or private land developments, may cumulatively affect grizzly bears. Doc. 55 at 43-45. Evidence in the record reveals otherwise.

The Forest Service insists, for example, that baseline conditions in the project area were accounted for by noting the area is occupied by grizzly bears and the population remains "stable to increasing." Doc. 55 at 43. Yet none of the information or statements relied on actually discuss, evaluate, or even mention the project area's degraded and alarming habitat conditions or how the project will exacerbate this problem, at least over the 15-year life of the project. As explained by Dr. Mattson, "[e]very reckoning of habitat security for grizzly bears in the Madison 2 [and] Henry's Lake 2 . . . subunits has shown levels to be inadequate." SP-046204. The project area is "among the most deficient in the [Greater Yellowstone] . . . to the extent of being sinks for the Yellowstone grizzly bear population." *Id.*

As described by Dr. Mattson, the Forest Service's own reports show the area is not secure, Johnson (2004) shows the area to be one with a "high risk of mortality,"

34

and Schwartz (2010) identified the area as a "population sink" where bear deaths exceed births. *Id*. (Figure 6); *see also* FWS-002869-70. This is consistent with similar findings from FWS who noted that the "baseline condition related to motorized access is likely resulting in some level of ongoing adverse effects to grizzly bears in some portions of the action area (Henry's Lake #2 and Madison #2 subunits)." FWS-000014.

Yet none of these degraded baseline conditions or how they may cumulatively affect grizzly bears are analyzed in the EA. This is a major oversight: "Without establishing the baseline conditions which exist . . . before [the project] begins, there is simply no way to determine what effect the proposed [project] . . . will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

The cumulative effects of other projects and private land developments in the project area were also overlooked. For example, there are over 13,000 acres of private and non-federal lands inside the three subunits affected by the project: 6,584 acres in the Henry's Lake #2 subunit, 2,851 acres in the Madison #2 subunit, and 3,149 acres in the Plateau #1 subunit. SP-041099. Most of the private land in the project area "is well roaded, has high disturbance, and has very little secure [habitat]." FWS-000436. Further development is expected in the area, including

35

possible subdivisions. *Id.*; *see also* SP-046201 (describing increase in permanent residents in Gallatin County); FWS-000670-73 (describing same).

The best available science reveals private land growth and development in areas like this can have significant impacts on grizzly bears, resulting in habitat loss, habitat fragmentation, and more conflicts. FWS-000044. Schwartz (2010) goes further and explains that the "number of homes per section and the roads associated with those developments were the *best predictors* of grizzly bear survival on private lands." FWS-002869 (emphasis added). But again, nowhere in the EA does the Forest Service consider, evaluate, or analyze how the South Plateau project, in combination with private land development in the same area, as well as various other logging and development projects, may cumulatively affect grizzly bears. This is a violation of NEPA. An "agency must take a 'hard look' at all actions," *Te-Moak*, 608 F.3d at 603, and it failed to do so here.

Notably, for support, the Forest Service cites a sentence from the biological assessment (not the EA, where the analysis must be found, *see Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998)) about acreage estimates of private land in the project area and a few general and vague statements about how private land development can harm grizzly bears in the wildlife report. *See*

36

Doc. 55 at 44 (citing SP-004712-14 and SP-041100-01). This does not suffice under NEPA.

"An EA's analysis of cumulative impacts must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment.'" *Te-Moak*, 608 F.3d at 603 (internal quotation marks omitted). General statements about "possible effects" or "some risks" are inadequate. *Id*. Some "quantified or detailed information is required. Without such information, neither the courts nor the public can be assured that the agency provided the hard look that it is required to provide." *Id*. (cleaned up).

## C.    Substantial questions have been raised requiring an EIS.

The South Plateau project involves over 16,000 acres of logging – including over 5,000 acres of clearcuts in older, mature stands using heavy machinery – and over 56 miles of road work adjacent to Yellowstone National Park and inside the Greater Yellowstone recovery zone. The project will have direct effects to unroaded lands and Inventoried Roadless Areas ("IRAs"). *See* Doc. 48 at 66. The project will also make an already precarious situation for grizzly bears worse during the 15 years of implementation (and thereafter).

Despite the size, scale, and location of this massive project, however, the Forest Service chose to simply prepare an EA and one that utilizes: (1) a "wait-and-see" approach to analyzing effects with no details on the location, timing, or frequency of use of over 56 miles of roads in occupied grizzly habitat; (2) a controversial 10-acre definition of "secure habitat" that lacks scientific foundation; and (3) an outdated 1998 baseline approach for managing grizzly bear habitat. *See* Doc. 48 at 27-39. The project also violates forest plan standards for grizzly bears. *See id.* at 40-53.

For these reasons, an EIS is required because substantial questions have been raised about whether the South Plateau project may cause significant effects. *All. for the Wild Rockies v. Gassmann*, 678 F. Supp. 3d 1249, 1293 (D. Mont. 2023). The project and the uncertainty, controversy, and speculation surrounding it would certainly benefit from additional review and analysis in an EIS. *See Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

In response, the Forest Service insists an EIS is not required, Doc. 55 at 55, but it fails to address many of the relevant factors, including the degraded baseline conditions, lack of information on road location and use, controversial 10-acre definition for secure habitat, 1998 baseline, and forest plan violations, noted above. *See id.* The few arguments the Forest Service does advance are also meritless.

The Forest Service, for instance, maintains there are no effects to ecologically important areas because the spatial scale of the project is small and no logging will occur in the wilderness areas or IRAs. Doc. 55 at 56. But, as previously mentioned, the agency never analyzed how 15 years of logging and road work in an area already problematic for bears will make a bad situation worse. Evidence in the record also reveals there will be effects to ecologically important areas. No logging will occur inside the IRA but visitors to the area will be able to "see evidence of timber harvest in areas adjacent to the IRA" during project implementation and "up to 20 years" after. SP-039389. There will also be adverse effects to solitude and primitive recreational experiences due to logging operations and "associated increased logging traffic." *Id.* Most of the logging and road work for the project will also occur in "unroaded areas" which are adjacent to and have characteristics similar to IRAs. SP-039390. Most of these areas have wilderness attributes and some contain segments of the Continental Divide Trail. SP-039390, 039393. Roughly 7,700 acres of logging will occur in these unroaded areas, including 5,551 acres of clearcuts. SP-039392.

Evidence in the record, including Dr. Mattson's declaration, SP-046204, Schwartz (2010), FWS-002869, as well as the FWS's own findings, FWS-000032, also reveal the cumulative effects to grizzly bears may be significant.

The Forest Service insists that its "may adversely affect" finding for grizzly bears under the ESA does not influence the need for an EIS. Doc. 55 at 57 n.9. In *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, however, the Ninth Circuit said just the opposite and noted that a "likely to adversely affect" determination can be "prima facie evidence that an EIS should have been prepared." 36 F.4th 850, 879 (9th Cir. 2022). But even if it is not, such findings are a relevant factor and one of many factors that, alone and combined, raise substantial questions. *See, e.g., mn*, 678 F. Supp. 3d at 1293-97 (weighing multiple factors).

## IV.    Vacatur pending compliance with the law is appropriate.

Plaintiffs respectfully request this Court declare FWS violated the ESA and the Forest Service violated NFMA and NEPA as outlined above, vacate the challenged biological opinions and decision approving the South Plateau project, and remand this matter for a new analysis, including an EIS consistent with its opinion.

Vacatur normally accompanies remand in these types of cases, *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018), except when rare equity considerations demand otherwise. *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019). No such rare equity considerations exist here. Nor did the agencies allege any in their response. Objections to Plaintiffs'

40

request for relief are therefore waived. *Pacific Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016). FWS and the Forest Service have not met their burden of demonstrating "equity demands" remand without vacatur and the agencies cannot attempt to raise new arguments for the first time on reply. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

## CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion for summary judgment and the relief requested.

Respectfully submitted this 14th day of August 2024.

/s/ Matthew K. Bishop
Matthew K. Bishop

*Counsel for Plaintiffs in Member Case No. 23-154*

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 9,000 words in accordance with this Court's July 8, 2024 order (Doc. 52).  I relied on Microsoft Word to obtain the word count.

/s/ Matthew K. Bishop
Matthew K. Bishop

41