TODD KIM, Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
READE E. WILSON, Trial Attorney (ME Bar No. 4992)
CHRISTIAN H. CARRARA, Trial Attorney (NJ Bar No. 317732020)
Natural Resources Section, Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611GE
Washington, DC 20044-7611
Tel: (202) 305-0299 (Wilson)
Tel: (202) 305-0217 (Carrara)
Fax: (202) 305-0275
Email: reade.wilson@usdoj.gov
Email: christian.carrara@usdoj.gov

*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> and <br><br> GALLATIN WILDLIFE ASSOCIATION, et al., <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> U.S. FOREST SERVICE, et al., <br><br> Federal Defendants, <br><br> and | Lead Case No. <br> 9:23-cv-110-DLC-KLD <br><br><br> Member Case No. <br> 9:23-cv-00154-DLC-KLD <br><br><br> FEDERAL DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT |

SUN MOUNTAIN LUMBER, INC.,

Defendant-Intervenor.

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   ARGUMENT.........................................................................................2

      A.   USFS Complied with NFMA............................................................2

           1.   The Project Complies with Grizzly Bear Standards ...................2

                a.   FW-STD-WLGB-03(a) ......................................................2

                b.   FW-STD-WLGB-03(b) ......................................................4

                c.   FW-STD-WLGB-03(c) ......................................................8

           2.   The Project Complies with Lynx Standards ............................10

      B.   USFS Complied with NEPA ...........................................................10

           1.   USFS Took a Hard Look at the Project's Potential Effects......14

                a.   Grizzly bears....................................................................14

                b.   Canada Lynx....................................................................20

                c.   Climate impacts ..............................................................20

           2.   USFS Complied with NEPA by Completing an EA ................22

      C.   Federal Defendants Complied with the ESA .....................................24

           1.   The Record Supports Secure Habitat Standards.......................25

           2.   The Record Supports Use of the 1998 Baseline .......................29

           3.   FWS Analyzed the Effects on Grizzly Bears...........................31

           4.   Plaintiffs Waived their ESA Argument Against USFS.............34

      D.   Remedy.......................................................................................35

III.  CONCLUSION...................................................................................35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Akiak Native Cmty. v. United States Postal Serv.*,
213 F.3d 1140 (9th Cir. 2000)..................................................................11

*All. for the Wild Rockies v. Christensen*,
663 F. App'x 515 (9th Cir. 2016)..............................................................27

*All. for the Wild Rockies v. Higgins*,
535 F. Supp. 3d 957 (D. Idaho 2021)........................................................35

*All. for the Wild Rockies v. Krueger*,
950 F. Supp. 2d 1196 (D. Mont. 2013) .....................................................27

*All. for the Wild Rockies v. Savage*,
375 F. Supp. 3d 1152 (D. Mont. 2019) .....................................................35

*Allied-Signal v. United States Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ..................................................................35

*Anderson v. Evans*,
371 F.3d 475 (9th Cir. 2004).....................................................................22

*Cal. Cmtys. Against Toxics v. United States EPA*,
688 F.3d 989 (9th Cir. 2012).....................................................................35

*Ctr. For Biological Diversity v. U.S. Forest Serv.*,
687 F. Supp. 3d 1053 (D. Mont. 2023) ................................................ 22, 23

*Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*,
18 F.4th 592 (9th Cir. 2021).......................................................................2

*Ctr. for Sierra Nevada Conservancy v. U.S. Forest Serv.*,
832 F. Supp. 2d 1138 (E.D. Cal. 2011)......................................................16

*Del Norte Cty. v. United States*,
732 F.2d 1462 (9th Cir. 1984)......................................................................1

*Eberle v. City of Anaheim*,
901 F.2d 814 (9th Cir. 1990)......................................................................34

*Environmental Defense Center v. Bureau of Ocean Management*,
36 F. 4th 850 (9th Cir. 2022).....................................................................23

*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003) .......................................................................4

*ForestKeeper v. La Price*,
   270 F. Supp. 3d 1182 (E.D. Cal. 2017) ...................................................... 1, 35

*Friends of the Wild Swan v. Weber*,
   767 F.3d 936 (9th Cir. 2014) ............................................................ 19, 20, 33

*Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*,
   378 F.3d 1059 (9th Cir. 2004) .....................................................................25

*Guardians v. Conner*,
   No. 15-cv-00858-CMA, 2017 WL 5989046 (D. Colo. July 25, 2017)................16

*Hapner v. Tidwell*,
   621 F.3d 1239 (9th Cir. 2010) .....................................................................21

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) .......................................................................18

*Kettle Range Conservation Group v. United States Forest Service*,
   No. 2:21-CV-00161-SAB, 2023 WL 4112930 (E.D. Wash. June 21, 2023).......15

*Klamath Forest All. v. United States Forest Serv.*,
   No. 23-cv-03601-RFL, 2024 WL 4017202 (N.D. Cal Aug. 23, 2024)................20

*Klamath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
   No. 1:12-cv-1558-CL, 2014 WL 525116 (D. Or. Feb. 6, 2014)..........................16

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ................................................................... 2, 10

*Morongo Band of Mission Indians v. F.A.A.*,
   161 F.3d 569 (9th Cir. 1998) .......................................................................18

*N. Cascades Conservation Council v. U.S. Forest Serv.*,
   No. 2:22-cv-292-SAB, 2024 WL 188374 (E.D. Wash. Jan 17, 2024) ......... 14, 15

*Nat. Res. Def. Council v. Haaland*,
   102 F.4th 1045 (9th Cir. 2024).....................................................................24

*Native Ecosystems Council v. Dombeck*,
   304 F.3d 886 (9th Cir. 2002) .......................................................................33

*Native Ecosystems Council v. Krueger*,
   946 F. Supp. 2d 1060 (D. Mont., 2013) .........................................................27

*Native Ecosystems Council v. Marten*,
   612 F. Supp. 3d 1146 (D. Mont. 2020) ........................................................... 4, 11

*Neighbors of Cuddy Mountains v. United States Forest Service*,
   137 F.3d 1372 (9th Cir. 1998) ...................................................................................7

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
   475 F.3d 1136 (9th Cir. 2007) ...................................................................................1

*Or. Nat. Desert Ass'n v. United States Forest Serv.*,
   957 F.3d 1024 (9th Cir. 2020) ...................................................................................4

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ..................................................................................................14

*San Luis & Delta-Mendota Water Auth.*,
   747 F.3d 581 (9th Cir. 2014) ....................................................................................1

*Southeast Alaska Conservation Council v. United States Forest Service*,
   443 F. Supp. 3d 995 (D. Alaska 2020) ........................................................... 11, 34

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
   671 F.3d 1113 (9th Cir. 2012) .................................................................................21

*WildEarth Guardians v. Conner*,
   920 F.3d 1245 (10th Cir. 2019) ...............................................................................23

*WildEarth Guardians v. Jeffries*,
   370 F. Supp. 3d 1208 (D. Or. 2019) ..........................................................................5

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................................35

**Regulations**

36 C.F.R. § 220.3 .........................................................................................................20

40 C.F.R. § 1501.3(b) ............................................................................................ 22, 24

40 C.F.R. § 1508.27(9) .................................................................................................24

50 C.F.R. § 402.02 .......................................................................................................33

50 C.F.R. § 402.14(g)(3).............................................................................................32

## I.   INTRODUCTION

Approximately 90% of the South Plateau Landscape Area Project ("Project") area is at risk of "severe" pine beetle outbreak and high-severity, stand replacing wildfire, threatening "the health and safety of the public, first responders, and the town of West Yellowstone." SP_004485. The Project is designed to increase forest resiliency to these risks, while also protecting wildlife habitat through binding Design Features that ensure compliance with the Custer Gallatin National Forest Plan ("Plan"). *ForestKeeper v. La Price*, 270 F. Supp. 3d 1182, 1226 (E.D. Cal. 2017) (concluding design features "ensure" compliance with forest plan). Federal Defendants analyzed the *maximum* possible effects of the Project, notwithstanding that those effects will be lessened by the Project's Design Features and notwithstanding that the actual acres treated and temporary roads constructed will be less than those analyzed in the EA.

Plaintiffs ask this Court to assume the U.S. Forest Service ("USFS") will exceed the scope of its Decision. But agency decisions are presumed to be valid. *San Luis & Delta-Mendota Water Auth.*, 747 F.3d 581, 601 (9th Cir. 2014) (citation omitted); *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). And courts presume that government officials will lawfully implement those decisions. *Del Norte Cty. v. United States*, 732 F.2d 1462, 1468 (9th Cir. 1984). Merely speculating about whether USFS will adhere to

its Decision is not enough. Instead, Plaintiffs bear the burden of proving the Decision is arbitrary or capricious. *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*, 18 F.4th 592, 599 (9th Cir. 2021). Plaintiffs fail to carry that burden, and the Court should grant summary judgment in favor of Federal Defendants.

## II.    ARGUMENT

### A.    USFS Complied with NFMA

USFS met its obligation of showing the Project is consistent with the Forest Plan. SP_003092-268 (Plan Consistency Table); SP_041104-7 (consistency with grizzly bear standards); SP_041128-35 (consistency with lynx standards). A court will set aside a decision under the National Forest Management Act ("NFMA") only if the record "plainly demonstrates" USFS made a "clear error in judgment." *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008). Plaintiffs' insinuations that the Project "likely" violates the Plan is insufficient to meet their burden of proof.

#### 1.    The Project Complies with Grizzly Bear Standards

##### a.    FW-STD-WLGB-03(a)

The Decision authorizes Project activities such that only one project affecting secure habitat below baseline is active in a subunit at a time, consistent with Plan Standard FW-STD-WLGB-03(a). SP_004511. USFS considered other

projects within the relevant subunits, documented the projects that would and would not affect secure habitat, and staggered Project implementation in Madison #2 until the North Hebgen project is complete and baseline is restored in that subunit. *Id.*; SP_006145; SP_041099-103 (discussing projects that do not affect secure habitat); FWS_000572.

Plaintiffs argue that the Project violates the Plan because the status of North Hebgen is "unclear," ECF No. 59 ("CBD Reply") at 24, but the Record is clear that Project activities will not commence in Madison #2 until North Hebgen is complete and baseline is restored. SP_004511; SP_041090 (noting North Hebgen project "largely complete"); SP_041106 (compliance with Plan standard). Requiring an agency to state with certainty when a different project will conclude is impractical given litigation and changing project timelines. Plaintiffs' reference to the Rendezvous project[1] exemplifies this impracticality. ECF No. 58 ("WELC Reply") at 22. The Rendezvous project was initiated while the South Plateau Project was in the objection period, SP_032679, and was subsequently suspended.[2]

Plaintiffs further argue USFS has misinterpreted and violated the Plan because North Hebgen was "ongoing" at the time of the Decision. WELC Reply at

---

[1] The Record demonstrates that the Rendezvous Project would not have affected secure habitat regardless. FWS_000572.

[2] *See* https://www.fs.usda.gov/projects/custergallatin/landmanagement/projects [last visited Sept. 19, 2024].

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    3

22. But the clear language of the Standard states:

> [P]roject *activities* shall meet the following conditions for temporary reductions in secure habitat below baseline:
>
> a. Only one project affecting secure habitat below baseline values may be *active* within a given bear management subunit at any one time….

SP_000065 (emphasis added). USFS's interpretation of its own Standard—as limiting *activities* affecting secure habitat below baseline—is consistent with the plain language of the Standard and entitled to "substantial deference." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020); *Native Ecosystems Council v. Marten*, 612 F. Supp. 3d 1146, 1152 (D. Mont. 2020) ("This deference may be set aside only where an agency takes a position that is 'contrary to the clear language' of the forest plan." (quoting *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003))). Because the Decision only authorizes Project activities in Madison #2 after North Hebgen is complete and baseline is restored, only one project will be active in a subunit at a time.

### b.       FW-STD-WLGB-03(b)

The Decision authorizes Project activities such that temporary reductions in secure habitat below baseline will not exceed 1% of the acreage of the largest subunit in the BMU. SP_004511. Specifically, the Decision dictates that temporary reductions in secure habitat below baseline *will not exceed 1,276 acres at a time* in Henry's Lake #2, and no Project activities in the subunit will commence until the

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    4

Yale Creek project is complete and secure habitat in Henry's Lake #1 is returned to baseline. SP_004511-2; SP_041091.

Plaintiffs cite the Findings and Recommendations in *WildEarth Guardians v. Jeffries* for the proposition that an agency must demonstrate plan consistency at the time of the decision. CBD Reply at 18 (quoting 370 F. Supp. 3d 1208, 1234 (D. Or. 2019)). There, the forest plan directed USFS to "[p]rotect the character of elk calving sites." 370 F. Supp. 3d at 1233-34. Although the decision in that case limited construction activities in elk calving areas, it did not identify the location of calving areas or limit motorized use. 370 F. Supp. 3d at 1234. In adopting the Findings and Recommendations in part, the district court did not order USFS to map calving sites to *prove* compliance, as Plaintiffs argue here. *Id.* at 1221. Rather, it clarified that USFS must merely explain how the project complies with the forest plan. *Id.*

Here, USFS used GIS and field surveys to map temporary roads and the corresponding impact to secure habitat. SP_004344; SP_041089; SP_041205. The following map shows the likely location of temporary roads and the *total* temporary reductions in secure habitat over the 15-year Project, *i.e.* the maximum extent:



SP_041205. Notably, the temporary roads, and thus the temporary reductions in secure habitat, will not occur at the same time because the Project will be implemented in phases. SP_041091. Prior to implementing a contract or phase, USFS and U.S. Fish and Wildlife Service ("FWS") will confirm that the 1% standard is being met, even if the temporary road locations change. SP_004540. *WildEarth Guardians v. Jeffries* is thus clearly distinguishable.

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    6

Plaintiffs cite *Neighbors of Cuddy Mountains v. United States Forest Service*, 137 F.3d 1372, 1377-78 (9th Cir. 1998), arguing that USFS must "show that after the project is implemented, there would be compliance with applicable numerical standards."  CBD Reply at 11. The Decision does this. Additionally, upon Project completion, Henry's Lake #2 and Madison #2 will see a *permanent increase* in secure habitat, as shown below:



SP_041208.

Finally, Plaintiffs argue that USFS misapplied the 1% standard because it must consider other projects impacting secure habitat at the BMU level. The Record shows that USFS *did* consider the entire BMU, SP_004511-12 ("[T]he allowed temporary reduction below baseline is assessed at the scale of the entire Bear Management Unit, not the Subunit scale."), and that there are no other projects impacting secure habitat below baseline in the applicable BMUs besides Yale Creek and North Hebgen. SP_041091. The Project will not impact secure habitat below baseline in the Plateau BMU. SP_041106. After North Hebgen is complete and baseline in Madison #2 is restored, the Project will temporarily reduce secure habitat below baseline in Madison #2 by 0.2%. *Id.* There are no activities in Madison #1 affecting secure habitat below baseline. SP_007309 (noting Madison #1 is 7.9% above baseline during North Hebgen project implementation). And no Project activities in Henry's Lake BMU will commence until Yale Creek is complete and baseline is restored. SP_004511-12; SP_041091. The Decision complies with FW-STD-WLGB-03(b) through binding Design Features, and calculations showing Plan consistency are in the Record. SP_004511-2. Plaintiffs' arguments to the contrary fail.

### c.    FW-STD-WLGB-03(c)

As with the 1% standard, FW-STD-WLGB-03(c) limits project *activities*

with respect to secure habitat in a subunit. SP_000065 ("Project *activities* shall not reduce secure habitat below baseline levels for more than four consecutive years."). It does not pertain to entire projects. The Project is consistent with FW-STD-WLGB-03(c) because temporary roads affecting secure habitat in a subunit will be decommissioned within four years. SP_004512. "If implementation is staged, temporary roads in one stage will be effectively decommissioned (and secure habitat restored) before moving onto another stage." SP_004511.

FWS terms and conditions are even more restrictive than the Plan. FWS terms and conditions state that no more than one subunit in the Project area may be below baseline at a time. SP_004534. And a mandatory two-year rest period applies between the return to baseline and the next contract in a subunit. *Id.*

Plaintiffs argue that Federal Defendants are asserting a *post-hoc* interpretation of the Standard for litigation, but USFS's interpretation has been consistent. Regardless of whether this Project was authorized on the landscape level or by individual contracts, the temporary roads associated with each contract will be decommissioned and baseline restored within four years. The mandatory rest period between contracts makes this Project more restrictive than independently authorizing successive projects to accomplish the same forest treatments.

## 2.    The Project Complies with Lynx Standards

Plaintiffs misconstrue Lynx Plan Standard Veg S2 and the Decision. Veg S2 limits timber regeneration harvest to no more than "15 percent of lynx habitat on NFS lands within an LAU in a ten-year period." SP_000567. Because there are 31,309 acres of lynx habitat on Forest lands within the South Madison Lynx Analysis Unit, up to 4,696 can be regenerated over 10 years. SP_004508. Plaintiffs claim USFS violates this standard by authorizing regeneration harvest on 5,551 acres over 15 years. But the Decision authorizes such harvest on no more than 4,600 acres in lynx habitat. SP_004508. Not all 5,551 acres are in lynx habitat— 951 acres may be regenerated outside of lynx habitat—and not all authorized acreage would be regenerated in 10 years since this is a 15-year project. SP_041122; *see also* SP_004658 ("This includes a maximum of 4,600 acres in lynx habitat and approximately 951 acres outside of lynx habitat."). The Decision limits both the acreage and time for timber regeneration harvest and the calculations are in the Record. SP_004508.

In sum, Plaintiffs have failed to prove that the Project is "plainly" inconsistent with the Plan or otherwise violates NFMA. *McNair*, 537 F.3d at 994.

## B.    USFS Complied with NEPA

USFS complied with the National Environmental Policy Act ("NEPA") by taking a hard look at the environmental effects of the Project's maximum potential

treatments and completing an EA. Plaintiffs attempt to paint the EA as

"programmatic,"[3] arguing USFS should now complete a tiered analysis.[4] CBD

Reply at 7. But programmatic reviews are prepared for "forest-wide projects

spanning multiple habitat and vegetation types." SP_018037. The Forest Plan EIS,

for example, is a programmatic review. SP_001131; *Native Ecosystems Council v.*

*Marten*, 612 F. Supp. 3d 1146, 1152 (D. Mont. 2020). Here, the Project area is

relatively homogenous lodgepole pine forest, and the proposed actions are "routine

and well-understood[.]" SP_004490; SP_018037. The Project EA, while

landscape-scale, contains all necessary site-specific analysis of the proposed forest

treatments based on the areas suitable for treatment, shown below:

---

[3] Plaintiffs cite *Southeast Alaska Conservation Council v. United States Forest Service*, 443 F. Supp. 3d 995, 1007-12 (D. Alaska 2020), which is readily distinguishable. In that case, USFS proposed condition-based management on *1.8 million acres*, including timber harvest on 125,529 acres, of which nearly two-thirds were old-growth forest, and authorized 46 different types of activities without identifying the location of the harvest units. 443 F. Supp. 3d at 1000-02, 1008. Conversely, the South Plateau Project is considerably smaller, authorizing treatments on 16,000 acres, and the Decision identifies not only where activities will occur, but the analysis for determining what activities are appropriate.

[4] Plaintiffs cite EPA's comments for the same. USFS is not required to defer to EPA. "NEPA requires only that the responsible agency 'consider []these agencies' initial concerns, address[] them, and 'explain[] why it found them unpersuasive.'" *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1147 (9th Cir. 2000). That was done here. SP_018037.



SP_004339, and the temporary roads likely to be needed to access those treatment

areas. SP_041205. The exact location and type of treatment—and corresponding

temporary roads—within these areas are determined by on-the-ground conditions

and application of the treatment matrix and Design Features. SP_004476. The

preliminary draft of the first two sales demonstrates the application of the decision

framework, including the proposed location of temporary roads:

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    12



SP_006170. By analyzing the maximum potential scenario, SP_041089, USFS

considered the maximum potential environment effects, resulting in informed public participation and decisionmaking. *N. Cascades Conservation Council v. U.S. Forest Serv.*, No. 2:22-cv-292-SAB, 2024 WL 188374, at *7 (E.D. Wash. Jan 17, 2024) (USFS satisfied NEPA by estimating location and type of treatments and "disclosing to the public the maximum potential effects."). NEPA requires nothing more.

### 1. USFS Took a Hard Look at the Project's Potential Effects

#### a. Grizzly bears

NEPA mandates a process, not a specific result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). USFS adhered to that process by identifying where temporary roads may be needed based on existing roads and suitable treatment areas, SP_041205, and analyzing the effects on grizzly bears, including the effects on secure habitat and road density, as if all temporary roads were open at the same time. SP_041077-103 (Wildlife Report); SP_004400-3 (summary in EA). But temporary roads will not all exist at the same time, so the effects will necessarily be less than those disclosed in the analysis. SP_004479 ("At any one time, only the temporary roads needed for a contract (only a portion of the total 56.8 miles) will exist on the ground[.]"). And conditions on the ground may result in some temporary roads not being built at all. SP_034969 ("If changing conditions preclude vegetation management on some acres in the project area, then

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    14

the temporary roads associated with accessing those acres would not be constructed[.]"). Further, these temporary roads will be open for administrative purposes only, not to the public. SP_004435. While the final road locations may change slightly, USFS analyzed the maximum effects, and Design Features ensure final locations will be just as protective of grizzly bears as the potential locations analyzed in the EA. *N. Cascade Conservation Council*, 2024 WL 188374, at *7 ("Here, the Final EA disclosed detailed decision criteria that will be applied during [project] implementation to ensure actual conditions on the ground meet the expected conditions disclosed in the Final EA.").

Plaintiffs argue that the *exact* location of roads must be known to "meaningfully evaluate" the effects on grizzly bears, citing *Kettle Range Conservation Group v. United States Forest Service*, No. 2:21-CV-00161-SAB, 2023 WL 4112930, *9 (E.D. Wash. June 21, 2023) (quoting FSH § 1909.15.01(1)). CBD Reply at 10. But the court in *Kettle Range Conservation Group* quoted the Forest Service Handbook out of context. FSH section 1909.15.01(1) sets forth when a "proposal" for a major federal action triggers NEPA. FSH § 1909.15.01.[5] There is no dispute that this Project is subject to NEPA.

Plaintiffs also fail to explain how greater specificity would inform the NEPA

---

[5] *available at* https://www.fs.usda.gov/about-agency/regulations-policies/handbook/190915-zero-code [last visited September 19, 2024].

process. *Ctr. for Sierra Nevada Conservancy v. U.S. Forest Serv.*, 832 F. Supp. 2d 1138, 1160 (E.D. Cal. 2011) (holding lack of more specific data on roads "did not prevent the EIS from sufficiently 'foster[ing] both informed decision-making and informed public participation.'" (citation omitted)); *see also Klamath Siskiyou Wildlands Ctr. v. Bureau Land Mgmt.*, No. 1:12-cv-1558-CL, 2014 WL 525116, at *13 (D. Or. Feb. 6, 2014) (holding EA analysis of tractor skids adequate even though the exact number and location of trails not disclosed); *Guardians v. Conner*, No. 15-cv-00858-CMA, 2017 WL 5989046, at *5 (D. Colo. July 25, 2017) ("[T]he exact location of treatment units was unnecessary to reach an informed conclusion that the Project will not have a significant impact on lynx."). Siting of temporary roads is not guesswork. It is where additional temporary roads beyond existing roads are needed to access identified treatment areas, and they are laid out on maps in the Record. *See, e.g.*, SP_006170; SP_041205.

Plaintiffs further claim that the Project will affect grizzly bears for generations. This assertion does not hold water. The Greater Yellowstone Ecosystem ("GYE") is classified as "highly resilient." SP_043533. The grizzly bear population has grown "robustly," SP_004403, and "remains stable to increasing," SP_043895, notwithstanding the history of logging. SP_004354; SP_004421-22. And studies show no change in behavior related to intermittent road use for timber harvest and administration. SP_041077-78. While the Project

will temporarily reduce secure habitat below baseline levels—within the allowable limits of the Plan—the Project will benefit grizzly bears in the long term by *permanently increasing* secure habitat. SP_041094-95.

Plaintiffs next challenge timber contract phasing as a "new approach," CBD Reply at 22, but there is nothing new about implementing a project over several years. And USFS fully analyzed the impacts of phasing:

> [I]mplementation would occur in 4 to 6 timber sales or other contracts. These sales would be implemented in portions of the project area in the shortest timeframe possible before they move into new areas. Displacement would, therefore, be limited in extent at any one time. While short-term disturbance of grizzly bears would occur during implementation to some degree (dependent on-site factors such as screening vegetation, distance to roads, and type of treatment that occurs), it would be temporary. Once activities are completed, associated disturbance ends, and temporary roads are effectively decommissioned, bears would again use these areas.

SP_041092; SP_041092-93 (explaining that grizzly bears can accommodate phasing "by adjusting their spatial and/or temporal use patterns within their home range (van Manen 2016, personnel communication) and within the larger Subunits"). As evidenced by the preliminary layout of the first two sales, other areas of each subunit remain undisturbed during project implementation, *compare* SP_006168 *with* SP_004402, and "[s]uitable alternate habitats are widely available[.]" SP_041093. Design Features ensure that disturbance ends within four years, SP_004512, and FWS's terms and conditions—including the mandatory two-year rest period and limitation on one subunit being below secure habitat

baseline conditions at a time—further limit grizzly bear temporary displacement. SP_004534. The Decision's use of staging minimizes the effects on grizzly bears.

Finally, Plaintiffs challenge USFS's cumulative effects analysis, including the grizzly bear's existing condition, spatial scope of the analysis, and future development. USFS properly considered the grizzly bear's existing condition across applicable subunits. SP_041073-83; SP_041099-103. Plaintiffs rely exclusively on the opinions of Dr. Mattson to claim a degraded ecosystem and "population sink," but those opinions are not facts, and USFS is entitled to rely on its own experts' opinions. *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 577 (9th Cir. 1998). Further, "population sinks" do not equate to bear mortality. SP_027964 ("[S]election and use of source or sink habitats by grizzly bears likely changes according[]" to season.).

USFS's use of subunits for the cumulative effects analysis was also appropriate and entitled to deference. *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). The Project intersects portions of three subunits, and USFS analyzed the cumulative effects across the entirety of all three subunits, totaling 368,598 acres.[6] SP_041072.

---

[6] Yale Creek is in a different subunit and outside this scope. SP_004432; FWS_000035.

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.          18



**Grizzly Bear Management Subunits in the South Plateau Project Area**

Henry's Lake 2
89,754 acres

Madison 2
95,630 acres

Plateau 1
183,214 acres

Legend
ProposedAction
☐ ProposedAction
☐ Bear Management Subunit
☐ South Plateau Project Area
☐ CGNF_Ownership

Sources: Esri, HERE, Garmin, Intermap, increment P.Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

SP_004402. The Ninth Circuit has upheld use of a subunit for cumulative effects

analysis where, as here, it is the size of a female grizzly bear's annual home range.

*Friends of the Wild Swan v. Weber*, 767 F.3d 936, 944-45 (9th Cir. 2014);

SP_041072. Subunits "provide the optimal scale for evaluation of seasonal feeding

opportunities and landscape patterns of food availability[.]" SP_041072;

SP_044369 ("Monitoring habitat at a subunit scale provides greater spatial

resolution and proved to be better suited for analyzing habitat use patterns[.]"). In

contrast, considering all three BMUs in total would be "impractically large and

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.          19

dilute the project's apparent environmental impact." *Friends of Wild Swan*, 767 F.3d at 945.

Lastly, USFS considered reasonably foreseeable future projects that may affect grizzly bears, including private development. SP_041100-02. NEPA does not require USFS to speculate as to projects that are not reasonably foreseeable. 36 C.F.R. § 220.3; *Klamath Forest All. v. U.S. Forest Serv.*, No. 23-cv-03601-RFL, 2024 WL 4017202, at *9 (N.D. Cal Aug. 23, 2024) ("Nothing required the Forest Service to list every single future action in order to take an adequately hard look at cumulative effects."). Non-federal land represents only approximately 7% of Henry's Lake #2, 3% of Madison #2, and 2% of Plateau #1. SP_041072; SP_041099. Very little of this non-federal land provides secure habitat, as Plaintiffs concede, WELC at 41, and thus activities on that land would not have a meaningful impact on secure habitat. SP_041100 (noting private land "already generally developed"). USFS analyzed the impacts of the Project on grizzly bears in accordance with NEPA, and Plaintiffs have not met their burden of proof.

### b.     Canada Lynx

Plaintiffs failed to respond to Federal Defendants' NEPA arguments on lynx, thereby conceding their merit. *See* ECF No. 55 at 45-46.

### c.     Climate impacts

Finally, Plaintiffs fail to meet their burden of establishing a NEPA violation

regarding climate impacts. USFS took the requisite hard look at the effects of the Project on climate, *see* ECF No. 55 at 46-54, and in their reply, Plaintiffs have not identified what additional information would better inform public participation or agency decisionmaking. *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012); *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010) (holding agency considered project's impact on climate "in proportion to its significance").

Contrary to CBD's assertion, USFS explains why quantification of GHG emissions is not reasonably available:

> Because actions that are consistent with the Plan are likely to increase carbon storage and reduce emissions over the longer term, and the sum of management activities have historically been a fraction of the effects of natural disturbances, a *quantitative analysis of carbon effects at the project level is not meaningful for a reasoned choice among plan alternatives*[.]

SP_038616. The Plan EIS analyzes the carbon impacts of management actions, SP_038620-32, and determined that "[w]ith maximum intensification, potential management actions would affect up to less than 0.25 percent of the forested area and much less than 1 [teragram of carbon] annually." SP_038628; SP_001440. In doing so, the Plan EIS analyzed the potential climate effects of *implementing the maximum treatments* identified in the Forest-wide Plan alternatives. USFS tiered its Project climate analysis to the Plan EIS, SP_004372, in addition to preparing a standalone carbon report on the Project. SP_038615-19. USFS also addressed

Plaintiffs' comments related to climate. SP_017870-87.

This is not a case of "merely discussing carbon impacts and concluding they will be minor." *Ctr. For Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053, 1073 (D. Mont. 2023). Nor did USFS rely on "cookie-cutter and boilerplate analysis." *Id.* at 1075. USFS provided detailed analysis of the carbon impacts of management activities on *this* Forest and *this* Project. While logging may cause immediate carbon losses, forest treatments result in a more resilient forest and "will improve the ability of the Custer Gallatin [National Forest] to maintain carbon stocks and enhance carbon intake[.]" SP_038617. Tree mortality from disturbances such as wildfire and insects have the potential to cause much greater carbon losses, SP_038616, SP_020091-92 (comparing lost potential carbon storage from insects, disease, wildfire, and harvesting); SP_0200093 (showing majority of carbon losses on the Custer and Gallatin National Forests from insects and wildfire), the risk of which the Project is designed to reduce. SP_004485. USFS's climate analysis is proportionate to the significance of the Project's effects on climate, and Plaintiffs have not met their burden of proving more is required under NEPA.

### 2.   USFS Complied with NEPA by Completing an EA

USFS considered all required factors to evaluate significance pursuant to 40 C.F.R. § 1501.3(b) (2020), SP_004492-94, and Plaintiffs fail to prove the FONSI

was arbitrary, capricious or a violation of law, *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004), or what would be accomplished by an EIS. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1263-64 (10th Cir. 2019). In their reply, Plaintiffs recycle arguments addressed above, and conflate unroaded areas with Inventoried Roadless Areas ("IRAs") and wilderness areas. USFS considered the impacts on adjacent IRAs and unroaded areas, SP_004378-80 (effects expected to be minor); SP_039360-61; no management activities will occur in IRAs, SP_004492; and USFS is not required to manage unroaded areas like wilderness or IRAs. SP_039355 (noting recommended wilderness area administered by National Park Service).

Plaintiffs cite *Environmental Defense Center v. Bureau of Ocean Management*, 36 F. 4th 850, 879 (9th Cir. 2022), for the proposition that a "may adversely affect" finding under the Endangered Species Act ("ESA") is evidence an EIS is required. WELC Reply at 46. In that case, however, the agency issued an EA and FONSI *before* engaging in ESA consultation, and the court determined significance was met in part because of this procedural defect. *Env't Def. Ctr.*, 36 F. 4th at 879. Conversely, here, USFS consulted with FWS on grizzly bears, and reasonably relied on FWS's determination that the Project would not jeopardize the species. SP_004499. Thus, the "may adversely affect" determination does not mandate an EIS. *Ctr. for Biological Diversity*, 687 F. Supp. 3d at 1079 ("[B]ecause

the record does not reflect that grizzly bears would be affected or jeopardized *as a species*, Federal Defendants . . . are correct that this factor does not mandate the preparation of an EIS." (emphasis added)).[7]

USFS took a hard look at all environmental effects, resulting in informed public participation and decisionmaking. Plaintiffs have not met their burden of showing more information or analysis was required under NEPA, and the Court should grant summary judgment to Federal Defendants.

### C.      Federal Defendants Complied with the ESA

FWS reasonably concluded that neither the Plan nor the Project would jeopardize the continued existence of the grizzly bear species, and those determinations are entitled to deference. *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1066 (9th Cir. 2024) ("Our standard of review in this context is 'highly deferential.'" (citation omitted)). Plaintiffs challenge the definition of "secure habitat" and use of the 1998 baseline, proposing a complete sea change in land management across the GYE. But FWS's use of the secure habitat definition and 1998 baseline, which is consistent with long-standing regional practice across agencies and states in the GYE, does not undermine FWS's no jeopardy determinations.

---

[7] Additionally, the Project was approved under the 2020 NEPA regulations, SP_004502, which removed "may adversely affect" from significance factors. *Compare* 40 C.F.R. § 1508.27(9) (2018) *with* 40 C.F.R § 1501.3(b) (2020).

Plaintiffs also challenge FWS's analysis of the Project's effects on grizzly bears, but the Record is clear FWS considered the maximum effects of temporary roads and cumulative effects within the action area, and properly accounted for binding Design Features as part of the proposed action. Plaintiffs essentially challenge FWS's methodology, but FWS's methodology is entitled to deference. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004) ("An agency's scientific methodology is owed substantial deference[.]"). Plaintiffs have not met their burden of proving the no jeopardy determinations were arbitrary, capricious, or a violation of law.

### 1.    The Record Supports Secure Habitat Standards

Plaintiffs argue that the 10-acre standard disregards vegetative cover and foraging needs. WELC Reply at 9, 20. Secure habitat is not synonymous with habitat quality or preservation, however, and nowhere in the Forest Plan, Biological Opinion, or Conservation Strategy is it defined to address foraging. *See* SP_000236 (Forest Plan); Supp_FWS_000133-34 (Biological Opinion noting habitat quality not part of the standard); FWS_002202 (2016 Conservation Strategy); FWS_002216 ("Secure habitat . . . will be maintained in the PCA to limit motorized access-related disturbances and reduce human-caused mortality."). It is the "area outside the zone of influence of high levels of human disturbance to grizzly bears," and best available science shows that 500 meters is a reasonable

"zone of influence." Supp_FWS_000131. Plaintiffs do not contest this "zone of influence." Rather, they contest the 10-acre patch size—the means of quantifying acreage outside the zone of interest for purposes of analysis. *See* SP_041068.

Small patch size provides greater sensitivity to tracking the amount of secure habitat across a landscape. Supp_FWS_000133. If the patch size were 2,500 acres, the baseline amount of secure habitat would drop, and it would be easier to build more roads. *Id.* ("Existing secure habitat calculated using a minimum patch size of 2,500 acres would allow many additional roads to occur in patches <2,500 acres without indicating a net loss in secure habitat."); Supp_FWS_000307 ("Had the minimum patch size for secure habitat been much larger, it would mean that larger patches of secure habitat could be eliminated by road-building in compliance with plan components to maintain secure habitat (F. vanManen, pers. Comm. 2016)."). 10-acre patches ensure that these areas are not roaded, and they serve as stepping-stones to larger secure habitat patches, thereby increasing connectivity. Supp_FWS_000133; Supp_FWS_000139 (noting the GYE provides secure habitat patches larger than foraging requirements); Supp_FWS_003876 (stating the Grizzly Bear Recovery Office applies the 10-acre patch size because "all secure habitats are important for grizzly bears in the GYE, regardless of size").

The 10-acre patch size is consistent with the Grizzly Bear Conservation Strategies since 2003, Supp_FWS_008075, and is commonly used as the metric for

studying grizzly bears in the GYE, Supp_FWS_006743, Supp_FWS_003760, SP_032455, SP_020880, and in other land management plans. FWS_002200-1 (calling for incorporation of standard into management plans); *Native Ecosystems Council v. Krueger*, 946 F. Supp. 1060, 1096 (D. Mont. 2013) (Beaverhead-Deerlodge National Forest); *All. for the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1209 (D. Mont. 2013) (Gallatin National Forest). This Court has upheld the 10-acre secure habitat standard as supported by the best available science. *Native Ecosystems Council*, 946 F. Supp. 2d at 1096 (noting secure habitat intended to provide "areas that are less impacted by humans and that maintain connectivity and linkage across the Forest"); *All. for the Wild Rockies*, 950 F. Supp. at 1209 ("[T]he agencies are entitled to deference on their determination of the best available science and the use of the secure habitat metric."), *aff'd sub nom. All. for Wild Rockies v. Christensen*, 663 F. App'x 515 (9th Cir. 2016).

Despite the agencies' longstanding use of this existing methodology, Plaintiffs propose a different approach: the patch size required to meet foraging needs, up to 7,000 acres according to Dr. Mattson's 1993 paper. WELC Reply at 9. The Interagency Conservation Strategy Team has repeatedly declined to adopt this approach, however, because protecting foraging habitat is not the purpose of the secure habitat metric. FWS_002216; Supp_FWS_008239 (2003 Conservation Strategy). Plaintiffs also cite a 1994 report from the Interagency Grizzly Bear

Committee discussing "core areas" and "connectivity of patches." FWS_003694. But the 10-acre patch size provides for greater connectivity, allowing bears to move and rest throughout the landscape. Supp_FWS_000151 (stating Plan elements "improve connectivity of secure habitat"); SP_000063 ("Availability of secure habitat contributes to habitat connectivity[.]"). Even Dr. Mattson acknowledges that a "functional network" of secure habitat can meet grizzly bear foraging needs. FWS_003897.

Plaintiffs note the Conservation Strategy for the Northern Continental Divide Ecosystem ("NCDE") defines "secure core" habitat as 2,500 acres, but the NCDE allows up to a 5% increase in open road density and 2% decrease in "secure core," based on a *10-year running average*, to "accommodate projects." Supp_FWS_0004950. NCDE thus allows much higher levels of disturbance than the Plan here at a given point in time. *Id.*

Plaintiffs also misrepresents Schwartz (2010). Schwartz (2010) cites the 10-acre secure habitat patch size and uses it to analyze hazards to bear survival. FWS_002865; FWS_002869 (concluding a direct link between 10-acre secure habitat and grizzly bear survival in GYE). Schwartz (2010) does not advocate for larger secure habitat patch size, equate it to foraging needs, or state that smaller patch sizes increase mortality. FWS_002869.

Finally, Plaintiffs include a map of secure habitat out of context. WELC

Reply at 14. This map lacks location and scale data, so it is impossible to determine the size of secure habitat blocks. If anything, this map shows that smaller patches of secure habitat in more developed areas provide connectivity with larger secure habitat patches. Without protections for smaller patches, greater development would impede bear movement.

In short, the secure habitat standard is only intended to address distance from motorized routes, "one of the most powerful tools available to balance the needs of grizzly bears with the needs and activities of humans." FWS_002226. Plaintiffs' claim contesting the secure habitat standard misses the mark.

### 2.       The Record Supports Use of the 1998 Baseline

Like with secure habitat, Plaintiffs misunderstand the purpose of the 1998 baseline. The 1998 baseline is a tool for comparing potential secure habitat impacts to the estimated amount of secure habitat in 1998, when grizzly bear populations in GYE first met demographic recovery targets. Supp_FWS_000105 (noting GYE has met or exceeded most targets since then). "Habitat conditions in 1998 were chosen as a meaningful baseline because they are believed to have supported and contributed to the population growth observed between 1983 and 2001[.]" Supp_FWS_000106; FWS_002223 ("Due to this ongoing bear population increase, 1998 was chosen as the baseline year for measurement of levels of human activities."). The 1998 baseline is foundational to how multiple agencies and states

evaluate effects on grizzly bears in the GYE.[8] FWS_002253 ("Habitat standards, as they apply to the 1998 baseline, impose measurable sideboards on allowed levels of human activity in the PCA and establish a clear benchmark against which future improvements and impacts of habitat can be measured.").

Plaintiffs claim the 1998 baseline is outdated, relying on a statement from the 2016 Conservation Strategy that is taken out of context. The 2016 Conservation Strategy says that "[a]dherence to the habitat standards . . . has contributed to the successful recovery of the GYE grizzly bear population." FWS_002252. It continues by saying that with recent increased visitation, agencies need greater *flexibility* for managing recreation use by building more administrative infrastructure. *Id.* The Conservation Strategy does not say that the secure habitat baseline should be more restrictive. Additionally, the 1998 baseline has been revised to reflect disturbance from non-road development, a "more accurate depiction of human disturbance that was occurring in 1998 and today." Supp_FWS_000139.

Plaintiffs argue the 1998 baseline is insufficient to evaluate changes in

---

[8] The 1998 baseline does not apply to Gallatin #3, Madison #2, or Henry's Lake #2, the latter two of which are in the Project area, because they were considered in need of improvement over the 1998 levels of secure habitat in the 2007 Conservation Strategy. SP_000064; FWS_002258. Baseline values for these subunits were set by the 2006 Gallatin National Forest Travel Management Plan. *Id.* The 1998 baseline applies to all 37 other subunits in the GYE. FWS_002254.

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    30

secure habitat because, according to Dr. Mattson, the grizzly population has not continued to grow and there has been a "spike in human-caused mortalities." WELC Reply at 12. But the Record demonstrates the slowing of the growth *rate* is due to the population nearing carrying capacity, FWS_000805, and the population remains "stable to increasing." SP_043895. Any increases in human-caused mortalities are proportionate to the growing population size. Supp_FWS_003941.

Further, as detailed in the Biological Opinions, FWS also considered the effects on grizzly bears from other stressors such as climate change, food availability, and development. Supp_FWS_000140-64 (analyzing other Plan effects on grizzly bears); FWS_000011 (incorporating species status assessment into Project Biological Opinion); FWS_000868-942 (analyzing other effects on grizzly bears).

In sum, the 1998 baseline has been critical to maintaining grizzly bear recovery in the GYE. Plaintiffs have not identified scientific studies supporting a different baseline or explained how the 1998 baseline itself impacts the species. FWS's use of the 1998 baseline was not arbitrary, capricious, or a violation of law.

### 3. FWS Analyzed the Effects on Grizzly Bears

Like in their claim against USFS, Plaintiffs mischaracterize FWS's review and evaluation of the Project as "programmatic," evidencing their misunderstanding of tiered consultation. FWS completed a programmatic

evaluation of the Plan, and site-specific evaluation of the Project. FWS_000008 ("The intent of this second-tier consultation is to evaluate whether the adverse effects on grizzly bears related to the South Plateau Project are consistent with the 2022 programmatic biological opinion and incidental take statement."). FWS analyzed the effects on grizzly bears by assessing impacts to secure habitat and road density, FWS_000031-37, as well as effects unrelated to motorized access. FWS_000037-41. Like USFS, FWS considered the maximum impact scenario that all temporary roads would be constructed and open at the same time. FWS_000032-33. After considering the status of the species, the environmental baseline for the action area, the maximum effects of the action, and the cumulative effects within the action area, FWS determined that the Project will not jeopardize the species. FWS_000047. USFS's submission of Conditional NEPA Reporting to FWS before each contract is implemented will confirm that secure habitat standards are met with each Project phase and that there are no additional effects on grizzly bears. FWS_000061.

Contrary to Plaintiffs' argument, FWS had sufficient information to assess the Project's effects and determine it would not jeopardize the species. During formal consultation, FWS analyzes the effects of the proposed action. 50 C.F.R. § 402.14(g)(3). The Design Features are part of that proposed action. FWS_000010. Thus, FWS appropriately considered that the Design Features—as protective of

secure habitat—would ultimately limit the maximum effects analyzed. FWS_000033-35 ("[W]e will use the maximum metrics associated with proposed treatments so as to not miss any effects to grizzly bear."). While the *exact* location of temporary roads and contract timing may be uncertain, the effects to grizzly bears are not. Given Project Design Features, knowing the exact location of the temporary roads would not change FWS's analysis or conclusion.

Plaintiffs next argue that FWS failed to consider the effects of Yale Creek. But FWS was not required to consider Yale Creek because it is in a different subunit outside the Project "action area." 50 C.F.R. § 402.02 (defining "cumulative effects" and "action area"); *Friends of the Wild Swan*, 767 F.3d at 950 ("The choice of appropriate action areas 'requires application of scientific methodology and, as such, is within the agency's discretion.'" (quoting *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002))) (holding FWS not required to consider effects of a project in a different subunit); FWS_000013 (identifying "action area" as Madison #2, Henry's Lake #2, and Plateau #1); FWS_000035 (noting Yale Creek in Henry's Lake #1). This alone should end the inquiry. Nevertheless, FWS recognized that USFS coordination is required, and that Yale Creek must be complete and secure habitat in Henry's Lake #1 restored before the Project affects secure habitat below baseline in Henry's Lake #2 in compliance with Plan standards. FWS_000035.

Finally, Plaintiffs challenge so-called "unspecified" "mitigation measures," but binding Design Features that ensure compliance with Plan standards are part of the Project, not "mitigation measures." FWS_000010-11; FWS_000034. Contrary to Plaintiffs' argument, FWS relied on numeric calculations and the maximum secure habitat that could be affected at one time. FWS_000034-37. Coordination among projects is not mitigation—it is necessary since BMUs transcend administrative boundaries. Supp_FWS_000135. USFS reporting requirements to FWS will confirm that Plan standards are met at each stage of the Project. FWS_000061. Plaintiffs essentially argue against condition-based management.[9] However, the binding Design Features and checklists result in "the same outcome as a traditional project." FWS_000010.

### 4.    Plaintiffs Waived their ESA Argument Against USFS

By failing to raise the issue in their opening brief, Plaintiffs waived any argument that USFS violated the ESA by relying on the Project Biological Opinion. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (holding "legal issues raised for the first time in reply briefs are waived."). Regardless, for the reasons stated above, the Biological Opinion satisfied the ESA; USFS was entitled to rely upon it; and USFS met its obligation in ensuring the Project would

---

[9] CBD's citation to *Southeast Alaska Conservation Council v. U.S. Forest Service* is unpersuasive for the reasons discussed above, and because plaintiffs in that case did not assert ESA claims. 443 F. Supp. 3d at 1005.

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.                    34

not jeopardize the species.

### D.   Remedy

Vacatur "has the effect of an injunction," and thus Plaintiffs must make a "clear showing" that they are entitled to this extraordinary relief. *ForestKeeper*, 270 F. Supp. 3d at 1226 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)). Whether vacatur is appropriate depends in part on the "seriousness of the offenses." *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)); *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019) (declining to vacate decision where agency error "limited in scope and severity"). Vacatur is unnecessary where an agency need only further explain its decision. *All. for Wild Rockies v. Higgins*, 535 F. Supp. 3d 957, 980 (D. Idaho 2021). Accordingly, Federal Defendants properly requested supplemental briefing on remedy if the Court finds any legal errors.

### III.   CONCLUSION

For the reasons stated above and in Federal Defendants' Opening Brief (ECF No. 55), this Court should deny Plaintiffs' Motions for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.

Submitted on this 20th day of September, 2024.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Reade E. Wilson*
READE E. WILSON, Trial Attorney
Natural Resources Section
CHRISTIAN H. CARRARA, Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0299 (Wilson)
Tel: (202) 305-0217 (Carrara)
Fax: (202) 305-0275
Email: reade.wilson@usdoj.gov
Email: christian.carrara@usdoj.gov

JESSE LASLOVICH
United States Attorney

*Attorneys for Federal Defendants*

FED. DEFS.' REPLY IN SUPPORT
OF CROSS-MOT. FOR SUMM. J.          36

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(A), I hereby certify that this brief complies with the word limit set by this Court's March 4, 2024 Order (ECF No. 39). Excluding the caption, tables of contents and authorities, signature block, and certificate of compliance, this brief contains 7,000 words.

*/s/ Reade E. Wilson*
READE E. WILSON, Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0299 (Wilson)
Fax: (202) 305-0275
Email: reade.wilson@usdoj.gov