Kris A. McLean, Bar No. 2926
Tyson A. McLean, Bar No. 55763951
Jordan A. Pallesi, Bar No. 68037652
Kris A. McLean Law Firm, PLLC
2315 McDonald Avenue, Suite 106
Missoula, MT 59801
Telephone: (406) 396-9367
Kris@krismcleanlaw.com
Tyson@krismcleanlaw.com
Jordan@krismcleanlaw.com

Sara Ghafouri, Ore. Bar #111021 *(Pro Hac Vice)*
Sarah Melton, Ore. Bar #227050 *(Pro Hac Vice)*
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, OR 97232
Telephone: (503) 222-9505
sghafouri@amforest.org
smelton@amforest.org

*Attorneys for Defendant-Intervenor Sun Mountain Lumber*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Lead Case: CV-23-110-M-DLC-KLD |
| Plaintiffs, | |
| vs. | Member Case: CV-23-154-M-DLC-KLD |
| U.S. FOREST SERVICE, et al. | |
| Defendants, | **DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION** |
| and | |

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION

SUN MOUNTAIN LUMBER, INC.,

     Defendant-Intervenor.

_____

GALLATIN WILDLIFE ASSOCIATION, et al.,

     Plaintiffs,

               vs.

MARY ERICKSON, et al.,

     Defendants,

               and

SUN MOUNTAIN LUMBER INC., a Montana Corporation,

     Defendant-Intervenor.

_____

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION

## TABLE OF CONTENTS

I.   INTRODUCTION................................................................................................1

II.  STANDARD OF REVIEW .................................................................................4

III. ARGUMENT ......................................................................................................5

   A. The Project Complies with the 1% Standard (Plaintiffs' Objection
      No. 1).............................................................................................................5

      1. The Forest Service demonstrated compliance with the 1% Standard ......5

      2. Phasing project activities is consistent with the 1% Standard ...............10

   B. The Project Complies with the Four-Year Standard (Gallatin's
      Objection No. 2) ..........................................................................................13

   C. The Project Complies with the VEG S2 Standard (CBD's Objection
      No. 1)........................................................................................................... 15

   D. The Forest Service's Grizzly Bear Effects Analysis Complies with
      NEPA and FWS's Grizzly Bear Effects Analysis Complies with the
      ESA (CBD's Objections No. 1 and 3; Gallatin's Objection No. 3)............17

      1. The Forest Service took the requisite "hard look" at  impacts to
         grizzly bear secure habitat under NEPA........................................ 17

      2. FWS analyzed the effects of temporary roads on grizzly bear
         secure habitat ....................................................................... 21

   E. The Forest Service Reasonably Excluded the Yale Creek Project
      from its Cumulative Impacts Analysis (CBD's Objection No. 5) ..............22

   F. The Forest Service's Climate Change Analysis Complies with
      NEPA (CBD's Objection No. 7) ..................................................................23

   G. An EIS is Unwarranted under NEPA (Gallatin's Objection No. 4) ............26

   H. FWS's Definition of Grizzly Bear Secure Habitat Complies with
      the ESA (Gallatin's Objection No. 5) .........................................................26

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - i

I.  FWS's No Jeopardy Determination Reasonably Relied on Design
    Features (CBD's Objection No. 4) ...............................................................27

J.  FWS's Analysis of the Environmental Baseline is Lawful (CBD's
    Objection No. 6) .......................................................................................28

III.  CONCLUSION ...................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Bradford*,
720 F.Supp.2d 1193 (D. Mont. 2010)..................................................................23

*All. for the Wild Rockies v. Marten*,
No. 20-CV-156-M-DLC, 2021 WL 4551496 (D. Mont. Oct. 5,
2021) ..........................................................................................................10, 16, 17

*Churchill Cty. v. Norton*,
276 F.3d 1060 (9th Cir. 2001) .............................................................................12

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015) .............................................................................22

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
687 F.Supp.3d 1053 (D. Mont. 2023) ...........................................................24, 25

*ForestKeeper v. La Price*,
270 F.Supp.3d 1182 (E.D. Cal. 2017) ...................................................................8

*Friends of the Wild Swan v. U.S. Forest Serv.*,
875 F.Supp.2d 1199 (D. Mont. 2012)...................................................................23

*Friends of the Wild Swan v. Weber*,
767 F.3d 936 (9th Cir. 2014) .........................................................................22, 23

*Hapner v. Tidwell*,
621 F.3d 1239 (9th Cir. 2010) ...............................................................................8

*Kettle Range Conservation Grp. v. U.S. Forest Serv.*,
No. 2:21-CV-00161-SAB, 2023 WL 4112930 (E.D. Wash. June
21, 2023) ...............................................................................................................19

*League of Wilderness Defs./Blue Mountains Biodiversity Project v.
U.S. Forest Serv.*,
883 F.Supp.2d 979 (D. Or. 2012) ...........................................................................8

*Myers v. Fulbright*,
    367 F.Supp.3d 1171 (D. Mont. 2019)......................................................................4

*N. Alaska Env't Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ...............................................................................17

*N. Cascades Conservation Council v. U.S. Forest Serv.*,
    No. 2:22-CV-00293-SAB, 2024 WL 188374 (E.D. Wash. Jan. 17,
    2024), *aff'd in part*, No. 24-1422, slip op. (9th Cir. May 2, 2025) .............18, 19

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002) ....................................................................22, 28, 29

*Selkirk Conservation All. v. Forsgren*,
    336 F.3d 944 (9th Cir. 2003) ................................................................................23

*Te-Moak Tribe of West Shoshone of Nevada v. U.S. Dep't of Interior*,
    608 F.3d 592 (9th Cir. 2010) ..........................................................................17, 18

*WildEarth Guardians v. Conner*,
    920 F.3d 1245 (10th Cir. 2019) ............................................................................18

**Statutes**

28 U.S.C. § 636(b)(1).......................................................................................................4

**Other Authorities**

36 C.F.R. § 212.1 ..........................................................................................................14

40 C.F.R. § 1502.2(b) ....................................................................................................25

50 C.F.R. § 402.02 .........................................................................................................28

## I.    INTRODUCTION

Before this Court is the Center for Biological Diversity et al.'s (CBD) Objections (ECF No. 72) and Gallatin Wildlife Association et al.'s (Gallatin) Objections (ECF No. 73) to the Findings and Recommendation (F&R) (ECF No. 69) regarding their challenge to the South Plateau Project on the Custer-Gallatin National Forest.  The F&R found in favor of Federal Defendants and Defendant-Intervenor on all of CBD's and Gallatin's claims under the National Forest Management Act (NFMA), the National Environmental Policy Act (NEPA), and the Endangered Species Act (ESA).

The Project takes a landscape-scale approach to help promote forest resiliency by authorizing a maximum treatment of 16,462 acres, relying on a range of treatment prescriptions over a 15-year period, that will help reduce the risk of a mountain pine beetle outbreak in the overcrowded, homogenous lodgepole pine stands.  FS_4334, FS_4363.  Additionally, the Project will reduce 8.2 miles of forest system roads, which will permanently increase grizzly bear secure habitat by about 1,143 acres and will improve water quality by eliminating sediment sources. FS_4350, FS_4486.

Contrary to Plaintiffs' characterization that there is a lack of site-specific information regarding the Project's activities, the agency identified areas suitable for treatment (FS_4339, FS_4477):

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 1



More importantly, the Forest Service provided an extensive decision framework

outlined in the Decision Notice's Appendix A (FS_4504), where the Forest Service

explained it will:

- determine the precise location and treatment prescription types within the areas suitable for treatment by applying the Treatment Matrix (FS_4505-07) and the Project Design Features (PDFs) (FS_4508-36), which include

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 2

specific requirements to ensure compliance with the 2022 Custer-Gallatin Revised Forest Plan's (Revised Plan) standards for lynx and grizzly bears;

- rely on the Resource Specialist to complete a Resource Review Checklist (FS_4537-38) for each activity, and treatment activities will not be implemented until the specialist has completed the Resource Review Checklist and resource surveys (FS_4504);

- complete a Conditional NEPA Project Monitoring Form to Fish and Wildlife Service (FWS) for each phase of the project or timber sale (FS_4540-43);

- notify the public about the project activities and provide annual updates of the Project's status (FS_4504); and

- conduct monitoring during the preparation, implementation, and post-treatment to demonstrate compliance with the Biological Opinion (BiOp) (FS_4544-50).

This conditional approach allows the Forest Service to comply with the Revised Plan's Standards for the grizzly bear and lynx, while also providing the agency flexibility to respond to changes on-the-ground resulting from dynamic insect and disease infestations during the Project's lifetime.

Plaintiffs' objections merely rehash their summary judgment arguments, rather than identifying specific errors in the F&R.  First, Plaintiffs object to the F&R's determination that the Forest Service complied with the Revised Plan's standards for temporary reductions in secure habitat for the grizzly bear and limits on regeneration harvest for lynx habitat by relying on PDFs.  Plaintiffs reassert that PDFs are "mere promises" to comply with those standards, but that argument fails because it continues to ignore the record and caselaw that PDFs *are part of the project* and are *binding* on the agency.  Second, Plaintiffs' NEPA arguments fail because the Forest Service's analysis provided the requisite site-specificity to

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 3

analyze the effects to grizzly bears and climate change, and correctly determined that an environmental impact statement (EIS) was unwarranted.  Finally, Plaintiffs' ESA objections should be rejected because they request that this Court substitute Plaintiffs' scientific views for those of the expert wildlife agencies who have overseen grizzly bear conservation for the Greater Yellowstone Ecosystem (GYE) for decades.  Accordingly, this Court should adopt the well-reasoned F&R in its entirety.[1]

## II.    STANDARD OF REVIEW

When a party objects to any part of a magistrate judge's findings and recommendation, the district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  The remaining findings and recommendation are reviewed for clear error, meaning the district court is left with a "definite and firm conviction that a mistake has been committed."  *Myers*, 367 F.Supp.3d at 1173-74 (cleaned up).

---

[1] Plaintiffs do not object to the F&R's determinations that the Forest Service complied with the One-Project-at-a-Time Standard (F&R at 18-25); the Forest Service took the requisite hard look at the effects on lynx habitat (F&R at 50); the Forest Service relied on the appropriate baseline (F&R at 59); the Forest Service analyzed impacts on private land developments (F&R at 59-60); and FWS appropriately relied on 1998 levels for secure habitat (F&R at 41-43).  Therefore, this Court should adopt the F&R as to those claims because they were not in clear error.  *Myers v. Fulbright*, 367 F.Supp.3d 1171, 1173 (D. Mont. 2019).

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 4

## III.   ARGUMENT

### A.   The Project Complies with the 1% Standard (Plaintiffs' Objection No. 1).

#### 1.   The Forest Service demonstrated compliance with the 1% Standard.

Plaintiffs assert that the Forest Service's Project failed to comply with the 1% Standard, which limits *temporary reductions* in secure habitat below the 1998 baseline levels within a given Bear Management Unit (BMU) to 1% of the acreage in the largest subunit within that BMU.  FS_65; *see* Intv.'s Br. at 13 (ECF No. 57). The Project overlaps with three Bear Management Subunits—Plateau #1, Henry's Lake #2, and Madison #2.  FS_41089.

The Project authorizes a maximum of 56.8 miles of temporary roads, some of which would temporarily reduce secure habitat below baseline levels.  *Id.* Although Plaintiffs claim that the Forest Service did not know where these temporary roads would be located, the Forest Service's determination of the maximum amount of temporary roads was based on GIS data, the current road system locations, and field surveys.  FS_4344.  The Forest Service also provided a map of the general locations of the temporary roads in relation to existing secure habitat.  FS_4344; FS_41205 (Map).

The Project's EA's Table 12 (FS_4433) and the Wildlife Report's Table 13 (FS_41090), together, show compliance with the 1% Standard.  Table 12

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 5

identifies:  (1) the acreage for the largest subunit in each BMU (Plateau #2, Henry's Lake #1, and Madison #1, which do not overlap with the Project);[2] (2) the acreage below baseline levels allowed based on the 1% acreage of the largest subunit; (3) the percentage of secure habitat based on the baseline level; (4) the acreage of baseline levels for the subunits that overlap with the Project (Plateau #1, Henry's Lake #2, and Madison #2); (5) the existing secure habitat acreage in each subunit that overlaps with the Project; (6) the acreage below or above the baseline *before* project implementation; and (7) the maximum temporary reduction acreage allowed under the 1% Standard:

Table 12. Project area bear management subunit secure habitat baselines and 1% baseline totals.

| Subunit | Largest Subunit Size (acres) | 1% Below Baseline (Acres) | Baseline % Secure | Baseline Secure (acres) | Existing Secure (acres) | Acres to Baseline | Max Acres Affected to Meet 1% Rule |
|---|---|---|---|---|---|---|---|
| Plateau #1 | 275,711 | 2,757 | 68.6% | 125,685 | 129,330 | 3,645 | **6,402** |
| Madison #2 | 145,847 | 1,458 | 67.4% | 64,455 | 64,435 | -20 | **1,438** |
| Henry's #2 | 128,549 | 1,285 | 52.0% | 46,672 | 46,663 | -9 | **1,276** |

FS_4433.  Table 13, in turn, identifies the acreage of secure habitat affected below baseline levels by the Project's activities and the proportion of that reduction in relation to the largest subunit in the BMU, to determine whether the activities comply with the 1% Standard for each subunit:

---

[2]  There are only two subunits within each BMU that overlap with the Project. FWS_1679; FS_4402.

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 6

Table 13: Amount of secure habitat affected below baseline and the proportion of that reduction in relation the largest Subunit in the BMU

| Subunit | Baseline[1] Acres[2] | Baseline[1] %[3] | Temporary Reduction in Secure During Implementation[4] (Acres)[5] | Difference from Baseline (Acres)[6] | % of Largest Subunit[7] |
|---|---|---|---|---|---|
| Henry's Lake # 2 | 46,672 | 52.0% | 2,417 | -2,426 | 1.0% |
| Madison #2 | 64,455 | 67.4% | 228 | -248 | 0.2% |
| Plateau #1 | 125,685 | 68.6% | 2,328 | 1,317 | Not Applicable |

FS_41090.

The Madison #2 and Plateau #1 Subunits will not exceed the 1% Standard. *Id.* For the Henry Lake #2 Subunit, the Forest Service determined that if treatments were completed all at once, then 2,426 acres would be below the baseline levels (2,417 acres due to the Project, plus 9 acres already below the baseline level), which would equate to a 1.9% reduction below the baseline levels. FS_41091. However, the Forest Service explained that the Project would comply with the 1% Standard by either dropping treatment acres *or* "[p]hasing the project and restoring secure habitat in one phase (through effective obliteration of temporary roads affecting secure [habitat]) prior to moving to the next phase[.]" *Id.* The Project's PDF #12 expressly limits the temporary reduction below baseline levels to 1,276 acres at any one time to ensure compliance with the 1% Standard. FS_4511-12.

Plaintiffs argue that PDF #12's 1,276-acre limit on temporary reductions in Henry's Lake #2 is a "mere promise" to show compliance and that this Court

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 7

"cannot simply take defendants['] word." CBD's Obj. at 9. Plaintiffs' argument continues to ignore the record and caselaw demonstrating that PDFs are *binding* and can be used to show compliance with forest plan standards. FS_4457 ("All activities must be consistent with all Design Features[.]"); *see, e.g.*, *Hapner v. Tidwell*, 621 F.3d 1239, 1248-49 (9th Cir. 2010) (holding that the Forest Service's reliance mitigation measures showed compliance with the forest plan standards); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 883 F.Supp.2d 979, 994 (D. Or. 2012) (holding the Forest Service's use of PDFs showed compliance with its Forest Plan); *ForestKeeper v. La Price*, 270 F.Supp.3d 1182, 1226 (E.D. Cal. 2017) (same).

Next, Gallatin argues that the Forest Service's calculations failed to consider the reductions in secure habitat throughout the BMU and impermissibly focused only on the impacts in the subunits that overlap with the Project. Gallatin's Obj. at 6-7. Not so. As the F&R acknowledged, the Forest Service's assessment of temporary reductions below baseline levels was assessed at the scale of the entire BMU, not the subunit scale. F&R at 28; FS_41091. For the Plateau #1 Subunit, the Forest Service demonstrated that even with the Project's temporary reductions of 1,317 acres, the subunit will be over the baseline levels because 6,402 acres could be reduced and still meet the 1% Standard. FS_4433, FS_41090. For Madison #2 Subunit, the temporary reductions in secure habitat equate to 0.2%,

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 8

well below the 1% threshold, and will occur only after the North Hebgen Project (located in the Madison #2 Subunit) is completed and the secure habitat is restored. FS_4511, FS_41090. The record also demonstrates that there are no activities in the Madison #1 Subunit that affect secure habitat below baseline levels. FS_7309 (Madison #1 Subunit is 7.9% above the baseline levels).

For the Henry's Lake #2 Subunit, the Forest Service explained that it would comply with the 1% Standard by either dropping treatments or phasing project activities. FS_4511, FS_41091. The Forest Service provided that no project activities will commence until the Yale Creek Project (in the Henry's Lake #1 Subunit on the Caribou-Targhee National Forest) is completed and secure habitat is restored. *Id.* To the extent Gallatin claims that the Forest Service relied on secure habitat conditions that are outdated, Gallatin's Obj. at 7 n.2, 8 n.3, the Project's Biological Assessment explained that the agency would complete a Review Checklist and the implementation coordinator would track the Project's effects to ensure it would not exceed the maximum thresholds authorized.[3] FS_4661. Therefore, the F&R correctly determined that the Forest Service reasonably considered all subunits within each BMU. F&R at 29.

Finally, Plaintiffs argue that because the exact locations of the temporary

---

[3] The Forest Service's commitment to coordinate is necessary given that, of the 14 subunits that overlap with the Forest, only one subunit is entirely within the Forest and the others are shared with other forests or national parks. FS_1538.

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 9

roads are unknown, the Forest Service cannot show compliance with the 1% Standard, conflating their NEPA's "hard look" argument with their NFMA argument. CBD's Obj. at 8; Gallatin's Obj. at 10-13; *but see supra* III.D. The F&R correctly concluded that even if the precise locations of the temporary roads are unknown, the Forest Service complied with the 1% Standard by identifying the general locations of the maximum amount of temporary roads, providing PDFs that impose threshold limits on temporary reductions below baseline levels, and (if necessary) requiring phasing of temporary road construction to ensure those threshold limits are met. F&R at 27-28.

Because the Forest Service demonstrated numerically how each BMU subunit would be impacted by the Project and calculated the threshold limits for temporary reductions of secure habitat, which are provided in PDF #12 and are binding, the Project complies with the 1% Standard. *See All. for the Wild Rockies v. Marten*, No. 20-CV-156-M-DLC, 2021 WL 4551496, at *4 (D. Mont. Oct. 5, 2021) (*Solider Butler*) (concluding that "calculations need not be perfect, [but] there must be at least *some* calculation by which a Court can reasonably ascertain whether the standard has been complied with" (cleaned up)).

## 2. Phasing project activities is consistent with the 1% Standard.

The F&R correctly determined that the plain language of the Revised Plan's 1% Standard is concerned with the impacts to secure habitat at a given time, not

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 10

the Project's lifetime, and that the Forest Service's interpretation of the 1%

Standard is entitled to deference.  F&R at 26 (noting that the 1% Standard is

concerned with "temporary" impacts that will "change over time as secure habitat

is impacted and restored").

CBD argues that the Forest Service's interpretation is not entitled to

deference because it failed to explain what "phasing" entails.  CBD's Obj. at 11.

As an initial matter, the F&R relied on the *plain language* of the Revised Plan in

making the determination that phasing activities is consistent with the 1%

Standard.  F&R at 26.  Additionally, the Forest Service's use of phasing to ensure

that the reductions in secure habitat do not exceed the 1% threshold at any one time

is reasonable given that there may be multiple pending projects within the same

BMU (on the same or different Forests) that may affect the amount of temporary

reductions authorized. [4]  Accordingly, the Forest Service must coordinate and

monitor the amount of secure habitat available to meet the thresholds as project

activities and/or individual timber sales are being implemented.  FS_18016 (noting

that "if a project in one Subunit is affecting all 1% below baseline, then another

project in a different Subunit within the same [BMU] unit cannot affect secure

until all activities affecting secure, and temp roads in the other are effectively

---

[4] The BiOp's Terms and Conditions, which are non-discretionary, are even more restrictive because they mandate a two-year rest period between the moment the baseline is restored, and the next contract or phase is implemented.  FWS_60.

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 11

decommissioned"). Plaintiffs' criticism that "more details" are required does not demonstrate a violation of the Revised Plan, and courts may not "impose procedural requirements [not] explicitly enumerated in" the Revised Plan. *Churchill Cty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001) (noting courts are "not free to impose on the agency [its] own notion of which procedures are best or most likely to further some vague, undefined public good") (cleaned up). Such additional information is unnecessary, given that PDF #12 is binding on the agency and the Forest Service cannot implement activities that are inconsistent with PDF #12. FS_4457.

Next, CBD contends that phasing activities is inconsistent with the Conservation Strategy and "how the Forest Service has applied it to other forest projects on the Custer-Gallatin." CBD's Obj. at 15. CBD points to the North Hebgen Project as an example of the Forest Service's inconsistent interpretation, but that project was approved under the 1987 Gallatin Forest Plan (as amended in 2015), which did not include the 1% Standard. FS_7245. Rather, the 1% Standard was adopted in 2022 (FS_1115), one year before the South Plateau Project's Decision Notice. Moreover, an examination of CBD's citation to Table 2 in the Conservation Strategy (Doc. 46 at 32 (citing FS_45848)) does not support the finding that phasing activities is inconsistent with the 1% Standard. Therefore,

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 12

Plaintiffs' contention that the Forest Service has relied on inconsistent interpretations and is not entitled to deference fails.

> **B.    The Project Complies with the Four-Year Standard (Gallatin's Objection No. 2).**

Gallatin contends that the temporary roads in the Henry's Lake #2 Subunit fail to comply with the 4-Year Standard, which provides that a "collective set of temporary roads that affect secure habitat below baseline levels shall be closed" after three years and baseline levels shall be restored one year later.  FS_65.  The Forest Service explained that it will comply with the 1% Standard in the Henry's Lake #2 Subunit by dropping units and temporary road work *or* by implementing project activities in phases.  FS_4707.  If the Forest Service elected the phased approach in Henry's Lake #2, then the Forest Service explained that the timing of the decommissioning of temporary roads in a collective set "would [] adhere[] to" the 4-Year Standard.  *Id*.  The Project's PDF #13 incorporates the 4-Year Standard.  FS_4433.

The F&R correctly rejected Gallatin's narrow interpretation of the 4-Year Standard, *i.e.*, an interpretation that a "collective set" of temporary roads means *all* temporary roads associated with the Project's lifetime that affect baseline levels. The F&R reasonably rejected that interpretation because it would mean that "all Project roads would have to be closed after three years of the initiation of the Project."  F&R at 32, 34-35.  Instead of placing the 4-year limit on *all* temporary

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 13

roads, the F&R reasonably determined that if the Forest Service elects to proceed with the phased approach in the Henry's Lake #2 Subunit, each phase (or timber sale) is a "collective set" that must comply with the 4-Year Standard. FWS_581.

Gallatin argues that the Forest Service's approach to the 4-Year Standard is inconsistent with the agency's approach under the One-Project-at-a-Time Standard. But the language of those two standards differs. The One-Project-at-a-Time Standard states that "[o]nly one *project* affecting secure habitat below baseline values may be active . . . at any one time"; whereas, the 4-Year Standard states that *"[p]roject activities* shall not reduce secure habitat below baseline levels for more than four consecutive years." FS_65 (emphases added). The Forest Service's use of the phrase "project activities" in the 4-Year Standard means individual (or "collective set" of) actions that are associated with the project as a whole. Therefore, the Forest Service's distinction between an entire "project" under the One-Project-at-a-Time Standard and "project activities" under the 4-Year Standard is not inconsistent.

The Forest Service's interpretation is entitled to deference because temporary roads are associated with timber sale contracts. 36 C.F.R. § 212.1. Accordingly, the term "collective set" equates to an individual timber sale that authorizes temporary road work. F&R at 34 (citing FWS_581; FS_4343, FS_4432, FS_41091); *see* Intv.'s Br. at 26-28.

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 14

### C.    The Project Complies with the VEG S2 Standard (CBD's Objection No. 1).

CBD asserts that the Forest Service failed to comply with the Revised Plan's VEG S2 Standard, which provides that "timber harvest [activities must] not change more than 15 percent of lynx habitat" within a Lynx Analysis Unit (LAU) "to an unsuitable condition (stand initiation structural stage that is too short to provide for winter snowshoe hare habitat) over a decade." FS_521. CBD's lynx argument fares no better than their grizzly bear arguments because the Forest Service clearly explained in its Wildlife Report and EA how the VEG S2 Standard would be met.

The Project is within the South Madison LAU, which contains 31,309 acres of lynx habitat within the Forest. FS_41130. Consistent with the VEG S2 Standard, a maximum of 4,696 acres of lynx habitat may be regenerated over a ten-year period. *Id.* The Forest Service determined that, within the last ten years, 14 acres have already been regenerated within this LAU and, therefore, instituted a cap of 4,600 acres of lynx habitat that could be regenerated under the Project. *Id*. This total amount in the LAU (4,614 acres) would occur on 14.7% of lynx habitat, which is below the 15% threshold. *Id.* The Forest Service expressly included the 4,600-acre cap on regeneration harvest in lynx habitat in PDF #1, which is binding on the agency. FS_4508.

CBD claims that without identifying the exact locations of the total amount of regeneration harvest authorized (5,551 acres), the Forest Service cannot

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 15

demonstrate compliance with the VEG S2 Standard. CBD's Obj. at 3. Not only has the Forest Service provided the locations suitable for treatment, FS_4339, but the Forest Service explained that 951 acres of regeneration harvest authorized is *outside* of lynx habitat, meaning the 4,600 acres remaining is within lynx habitat. FS_41122. More importantly, the Decision Notice provided that "if the conditions on the ground in proposed treatment units are irreconcilable with Design Features, then units will not be treated." FS_4504. Because PDF #1 places a binding cap on the amount of regeneration that may occur within lynx habitat, there is no evidence that this threshold will not be met. *See* Intv.'s Br. at 29-30 (explaining the Forest Service's monitoring requirements).

Plaintiffs' reliance on *Solider Butler*, for the proposition that the Forest Service needs to "show its work," is unavailing. In *Soldier Butler*, the Forest Service's own EA showed noncompliance with a forage coverage standard for elk and that a forest plan amendment would be necessary to move forward with certain project activities. *Soldier Butler*, 2021 WL 4551496, at *4. The Forest Service then changed course and approved the project without an amendment by dropping certain treatment activities. *Id.*, at *4. This Court, in adopting the F&R, held that the Forest Service failed to demonstrate compliance with the standard because the record did not reveal how the agency's "alternative measures" (e.g., not implementing certain activities) "would ensure the Project complied with the"

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 16

forest plan standard.  *Id*.  Unlike in *Soldier Butler*, the Wildlife Report

quantitatively demonstrated compliance with the VEG S2 Standard.  *See* F&R at

37 (noting that the Forest Service's calculations "allow the Court to reasonably

ascertain compliance with the relevant standard").

> **D.    The Forest Service's Grizzly Bear Effects Analysis Complies with NEPA and FWS's Grizzly Bear Effects Analysis Complies with the ESA (CBD's Objections No. 1 and 3; Gallatin's Objection No. 3).**

>> **1.    The Forest Service took the requisite "hard look" at impacts to grizzly bear secure habitat under NEPA.**

Plaintiffs argue that the Forest Service's effects analysis for the grizzly bear

was insufficient under NEPA's "hard look" requirement because it failed to

identify the *precise* locations, timing, and amount of temporary road construction.[5]

CBD's Obj. at 8; Gallatin's Obj. at 18-23.

Here, the Forest Service analyzed the areas suitable for treatment and

corresponding treatment types (FS_4339) by relying on an overly conservative

"maximum effects" approach.  The agency is not required to perform a "parcel by

parcel examination" of the potential environmental effects.  *N. Alaska Env't Ctr. v.

Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006).  In *Te-Moak Tribe of West*

---

[5] In their objections, CBD merely cites to NEPA without providing any argument in support.  CBD's Obj. at 6.  To the extent a response is necessary to this perfunctory objection, Intervenor incorporates its summary judgment brief arguments addressing how the Forest Service's maximum effects analysis on lynx habitat complies with NEPA.  Intv.'s Br. at 50-52.

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 17

*Shoshone of Nevada v. U.S. Department of Interior*, 608 F.3d 592, 600 (9th Cir. 2010), the Ninth Circuit rejected the plaintiffs' failure to take a "hard look" claim, holding that the agency did not violate NEPA "by approving the Amendment without knowing the precise locations of drill sites, access roads, and other project activities" 608 F.3d at 601. In fact, the Tenth Circuit expressly upheld the Forest Service's "maximum effects" approach for a project where the specific timing and location of treatments and temporary roads were unknown. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019).[6]

Most recently, the Ninth Circuit upheld an EA for a 21,149-acre project using condition-based management and a maximum effects analysis as sufficiently site-specific where the Forest Service provided "decision criteria for each approved activity, specific prescriptions that will be applied if those decision criteria are met, maps identifying where those prescriptions would be applied, and estimates of the timing of implementation." *N. Cascades Conservation Council v. U.S. Forest Serv.*, No. 2:22-CV-00293-SAB, 2024 WL 188374, at *7 (E.D. Wash. Jan. 17, 2024), *aff'd in part*, No. 24-1422, slip op. at 21 (9th Cir. May 2, 2025) (*Twisp*).

---

[6] Gallatin attempts to distinguish *Conner* by claiming that decision (and its progeny) do not apply to "linear features like roads" and their effects on grizzly bears. Gallatin Obj. at 22-23. The plaintiffs in *Conner*, however, challenged the project at issue for lack of site-specificity regarding the size, location, and type of treatment activity, *and* the location of the 21 miles of temporary road work. *Conner*, 920 F.3d at 1257. The Tenth Circuit expressly rejected both of those arguments. *Id.* at 1258.

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 18

The Ninth Circuit affirmed the district court's ruling on condition-based management, holding that "the Forest Service's site-specific maximum effects analysis was sufficient" because of the size of the project and because the Forest Service "identified specific methods of understory thinning, overstory treatments, and fuels reduction and provided unit-by-unit maps of the maximum effects of each treatment." *Twisp*, No. 24-1422, slip op. at 22.  The exact same type of analysis was applied here—the Forest Service's 16,462-acre Project (which is smaller than the Twisp Project) provided treatment location maps (identifying treatment units), design criteria in its Treatment Matrix, and adequate sideboards for temporary road construction for the benefit of grizzly bears in its PDFs.  FS_4339, FS_4425-28, FS_4432-34.  Thus, the Ninth Circuit's *Twisp* decision is outcome determinative here.[7]

The Forest Service also analyzed how phasing project activities in the Henry's Lake #2 Subunit would impact the bear.  Although multiple timber sale

---

[7] Plaintiffs rely on *Kettle Range Conservation Grp. v. U.S. Forest Serv.*, No. 2:21-CV-00161-SAB, 2023 WL 4112930, at *9 (E.D. Wash. June 21, 2023).  In *Kettle Range*, the plaintiffs alleged that the Sand Poil Project violated NEPA's "hard look" requirement because the Forest Service failed to specify the degree to which the project would rely on the Forest Plan's exception to old-growth requirements and remove larger trees.  *Id.*  The district court held that the EA was insufficient because it did not specify the frequency the project would rely on the exception, such that the impacts were speculative.  *Id.*  Unlike *Kettle Range*, the impacts here are not speculative because the Forest Service's analysis of effects are based on the maximum amount of temporary roads authorized and was analyzed in a manner consistent with the Ninth Circuit's decision in *Twisp*.  FS_41089-94.

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 19

contracts would be authorized, the Forest Service determined that the timber sales would be implemented "in the shortest timeframe possible before [bears] move into new areas" and any "[d]isplacement would, therefore, be limited in extent at any one time." FS_41092. These temporary displacements (and associated disturbances) end once the temporary roads are effectively decommissioned, meaning bears would again use these areas. *Id*. The Forest Service concluded that because grizzly bears operate at a "landscape level" in the GYE, they can accommodate the consecutive, temporary disturbances at the project level by "adjusting their spatial and/or temporary use patterns within their home range . . . and within the larger Subunits." FS_41093; Intv.'s Br. at 53-54 (providing additional record citations).

Plaintiffs' demonstrative diagram—in support of their argument that effects on the grizzly bear depend on the size of the area where phasing may occur—is misleading. CBD's Obj. at 14. The boundary where the phased temporary reductions[8] of secure habitat may occur is known—the Henry's Lake #2 Subunit. The Forest Service clearly explained, and PDF #12 requires, that only 1,276 acres of secure habitat may be reduced within that subunit at any one time and appropriate analyzed effects to the bear accordingly. FS_4511, FS_41089-94.

---

[8] Plaintiffs seem to suggest that these are permanent reductions in secure habitat and that phasing project activities will "whittle" secure habitat down to nearly nothing. CBD's Obj. at 17. Again, these are *temporary reductions* in secure habitat will be restored to baseline levels within 4 years. FS_65.

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 20

**2.      FWS analyzed the effects of temporary roads on grizzly bear secure habitat.**

Like with their NEPA argument, CBD asserts that the BiOp did not adequately analyze impacts to the secure habitat without knowing the locations of the temporary roads and timing of the implementation.[9]

The BiOp includes a robust analysis of the effects on secure habitat and relies on a maximum effects analysis when analyzing the impacts from temporary road work.  FWS_32-43.  The Biological Assessment provided estimations of the temporary road locations, FS_4735, FS_4741, and FWS analyzed the impacts based on the maximum amount of temporary roads authorized (56.8 miles). FWS_10.  That said, the actual amount of temporary roads authorized may be *lower*, given the sideboards in the PDFs, the Revised Plan's Standards, and other factors that would reduce the treatment amount, and because the locations of some temporary roads may be outside of secure habitat.  FWS_32-33; Intv.'s Br. at 31-35.  Given the temporary nature of project activities and that grizzly bears "operate at a landscape level in the GYE," any such disturbances are short-term and are not expected to reduce individual bears from moving through the area. FWS_38, FWS_40.  FWS's maximum effects analysis is permissible under the ESA and

_____

[9] CBD's criticism that FWS's analysis is deficient because the timing of the individual timber sales is currently unknown is not well taken.  Beyond the 4-Year Rule, the Project imposes timing restrictions, such that the construction would not occur during the winter and is unlikely during spring break-up and late fall, given the ground conditions during that time.  FS_4710, FS_4516, FWS_51.

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 21

should be upheld. *See, e.g., Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1050 (9th Cir. 2015) (in a challenge to an memorandum of agreement regarding ground water pumping, the Ninth Circuit upheld FWS's use of a "worst-case scenario" analysis of flow rate thresholds because it was "rationally based on available evidence"); Intv.'s Br. at 34-35 (citing relevant caselaw).

### E.    The Forest Service Reasonably Excluded the Yale Creek Project from its Cumulative Impacts Analysis (CBD's Objection No. 5).

CBD claims that the Forest Service failed to take the requisite "hard look" at the cumulative impacts because it did not rely on the BMU scale, which includes the Yale Creek Project located on the Caribou-Targhee National Forest in the Henry's Lake #1 Subunit, as the appropriate geographic scope.  FS_4409, FS_41096-103.

"Identifying the appropriate geographic scope is a task assigned to the special competency of the appropriate agenc[y]." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014) (cleaned up); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002).  The Forest Service defined the geographic boundary for its effects analysis to be limited to the three subunits that overlap with the project area (Plateau #1, Henry's Lake #2, and Madison #2).  FS_ 41072.  The Forest Service determined that these subunits provide the "optimal scale for evaluating seasonal foraging opportunities and landscape patterns of food

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 22

availability." FS_4403, FS_41072.  CBD's preference to expand the geographic boundary to the BMU scale would dilute the impacts, given that the three BMUs collectively comprise 918,705 acres.  *See* FS_4402, FS_4433.

For the first time in their objections, CBD relies on *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 960 (9th Cir. 2003), for the proposition that the agency "must at least have considered the cumulative effect in creating the boundaries of its analysis."  Although the Forest Service must provide "articulable reasons [that] support[ ] the agency decision," it does not need to explain project-by-project why certain impacts were excluded from its analysis as outside of the boundary, as CBD seems to suggest.  *See All. for the Wild Rockies v. Bradford*, 720 F.Supp.2d 1193, 1220 (D. Mont. 2010) (quoting *Selkirk*, 336 F.3d at 960); *see Friends of the Wild Swan v. U.S. Forest Serv.*, 875 F.Supp.2d 1199, 1211 (D. Mont. 2012) (so stating).  Here, the Forest Service explained why the subunit scale was appropriate and selected.  FS_4403.  Other courts have upheld the Forest Service's reliance on the subunit scale for its grizzly bear effects analysis.  *See, e.g.*, *Friends of the Wild Swan*, 767 F.3d at 944-45 (upholding the subunit scale for the geographic boundary because the BMU scale "would be impractically large and would dilute the project's apparent environmental impact").

F.     **The Forest Service's Climate Change Analysis Complies with NEPA (CBD's Objection No. 7).**

CBD alleges that the Forest Service failed to take a "hard look" at the

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 23

climate-related impacts of the South Plateau Project's greenhouse gas emissions, relying heavily on *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F.Supp.3d 1053 (D. Mont. 2023) (*Black Ram*).

CBD claims that the Forest Service's forest-wide and project-level carbon analysis was deficient in the same manner as the analysis in *Black Ram* because it "merely discusses carbon impacts and concludes they will be minor." CBD's Obj. at 27. As Intervenor explained on summary judgment, the Forest Service thoroughly analyzed the climate impacts: (1) the Revised Plan EIS contains a qualitative discussion of carbon effects, "with supporting estimates where possible based on the quantitative analysis of the impacts of past management activities on forest carbon stocks and fluxes" (FS_4372); (2) the Carbon Storage and Sequestration Report analyzed climate impacts at the project-level; and (3) climate impacts were included in individual resource specialist reports. FS_1433-1442 (Revised Pan EIS); FS_4372 (South Plateau EA); FS_38615-19 (Carbon Storage and Sequestration Report) FS_38637-43 (Climate Change and Carbon Storage Report); *see, e.g.*, FS_35063-138. Further, the agency's analysis is consistent with the 2016 CEQ Guidance. FS_39310-43.

The Revised Plan EIS determined that the total harvest treatments "result in a maximum removal of about 30,000 Mg of carbon per year from aboveground pools," but that the amount of carbon that might be removed is "small relative to

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 24

the approximately 110 million metric tons (Tg) of carbon stored in the forest ecosystem of" the Forest.  FS_1440.  The Carbon Storage and Sequestration Report determined that the Project impacts a "small amount of forest land and carbon" and "might contribute a small quantity of carbon relative to the forests carbon uptake and stores which would be mitigated by a more resilient forest condition and future carbon uptake."  FS_38618.  Overall, the Forest Service adequately analyzed the Project's impacts on climate change in "proportion to their significance."  40 C.F.R. § 1502.2(b); *see* Intv.'s Br. at 55-58 (explaining in detail the climate analysis).  Even CEQ's 2016 Guidance provides that a project-level quantitative analysis is not always required:  "NEPA reviews should consider *whether to include* a comparison of net [greenhouse gas] emissions and carbon stock changes … to provide information that is useful to the decision maker and the public to distinguish between alternatives."  FS_39335 (emphasis added).

CBD concedes that the F&R, in distinguishing *Black Ram*, "correctly note[d] that *Black Ram* involved a 'verbatim reproduction of analysis from another forest'" rather than utilizing "high quality and accurate information."   F&R at 62; *Black Ram*, 687 F.Supp.3d at 1074 n.7.  CBD argues that, despite that important distinction, the South Plateau Project makes "strikingly similar analytical flaws" as in *Black Ram*, without identifying what those flaws are.  Although CBD attempts to recharacterize the analysis in the Revised Plan's EIS and the Carbon Storage and

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 25

Sequestration Report as merely perfunctory—which they are not—CBD fails to show how the analyses are not based on high quality and reliable information.

G.     An EIS is Unwarranted under NEPA (Gallatin's Objection No. 4).

Intervenor joins (and incorporates by reference) Federal Defendants' responses to Gallatin's arguments that an EIS was required.  Fed. Defs.' Response at 11-13 (ECF No. 75).  The F&R correctly rejected those arguments, and this Court should adopt the F&R.

H.     FWS's Definition of Grizzly Bear Secure Habitat Complies with the ESA (Gallatin's Objection No. 5).

Gallatin contends that there is no scientific support for FWS's endorsement of the 10-acre threshold for secure habitat in the Revised Plan BiOp, rehashing their arguments made on summary judgment.  However, the administrative record is clear that FWS did provide a rationale for relying on a 10-acre threshold for GYE grizzly bears rather than a larger patch size, like the Northern Continental Divide Ecosystem 2,500-acre patch size, noting that the 10-acre size is a "more sensitive metric to change than a larger patch size."  Supp_FWS_159.  Accordingly, smaller patch sizes do not equate to smaller amounts of secure habitat, as Gallatin seems to suggest.

Moreover, the Yellowstone Ecosystem Committee determined that "all secure habitat" is "important for grizzly bears in the GYE, regardless of size, particularly in peripheral areas."  FWS_819.  Although Gallatin claims that there is

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 26

"no scientific support" for the 10-acre patch size, the 2016 Conservation Strategy provides that secure habitat "must be greater than or equal to *10 acres in size*." FWS_2202 (emphasis added).  The 2016 Conservation Strategy is consistent with the 2007 and 2003 conservation strategies, which all defined secure habitat to have a 10-acre patch size.  SUPP_FWS_7242, SUPP_FWS_8075.  These conservation strategies are considered the "best, and most current reference with respect to grizzly bear management."  FS_41062, FS_63.  Gallatin relies on pre-2003 studies to support their patch size argument, which are outdated and irrelevant to the GYE grizzly bear.  *See* Intv.'s Br. at 42-45 (distinguishing the studies relied on by Gallatin).

## I.    FWS's No Jeopardy Determination Reasonably Relied on Design Features (CBD's Objection No. 4).

CBD claims that FWS's reliance "mitigation measures" in support of its no jeopardy determination violates the ESA because they are "vague" and "unenforceable."  CBD's arguments hinge on inappropriately conflating "mitigation measures" with the Project's PDFs that were incorporated in the BiOp. The PDFs were included in the BiOp's "factors related to the action area." FWS_49 (stating that "project activities . . . will meet the following conditions for temporary reductions in secure habitat," including the PDFs and Revised Plan Standards).  Thus, the PDFs are *part of the project* consulted upon with FWS, not future "mitigation measures" to offset any adverse effects.  *See* 50 C.F.R. § 402.02

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 27

(definition of action).  The difference between design features and mitigation measures is meaningful, as the Ninth Circuit determined that conservation measures included in the proposed action are enforceable under the ESA as part of the terms of the consultation.  *See* Intv.'s Br. at 39-41 (citing relevant caselaw).  Therefore, CBD's reliance on caselaw involving the enforceability of "mitigation measures" is irrelevant because, unlike PDFs that are binding on the agency, those mitigation measures were not part of the proposed action.  *See* Intv.'s Br. at 40-41 (distinguishing cases relied on by CBD).

> **J.     FWS's Analysis of the Environmental Baseline is Lawful (CBD's Objection No. 6).**

CBD asserts that FWS failed to explain how it determined the "action area" for its environmental baseline, citing to *Dombeck*, 304 F.3d at 902, for support.  The record demonstrates that FWS *did* explain how it determined the appropriate action area for the environmental baseline.  The BiOp determined that because the Project lies at the intersection of the Plateau #1, Madison #2, and Henry's Lake #2 Subunits, and because subunits are the annual home range of adult female grizzly bears and are the optimal scale for evaluating grizzly bear habitat, the action area is defined to be those three subunits.  FWS_13.  FWS explained that the action area "provides a sufficient landscape to assess the effects to grizzly bears that may have home ranges affected by the project but not so large as to dilute the potential effects of the action."  *Id*.  Like with their NEPA cumulative effects argument,

DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION - 28

CBD incorrectly asserts that FWS is required to analyze projects within the three BMUs (collectively, almost 1 million acres).  Neither the ESA nor caselaw requires that type of analysis.  Here, FWS appropriately linked the Project's potential impacts with the subunit's boundaries, and that interpretation is entitled deference.  *See Dombeck*, 304 F.3d at 902.

## III.   CONCLUSION

Based on the foregoing, this Court should adopt the F&R in its entirety and uphold the South Plateau Project.

Respectfully submitted this 5th day of May, 2025.

/s/ Kris A. Mclean
Kris A. Mclean
Kris A. Mclean Law Firm PLLC
2315 McDonald Avenue, Suite 106
Missoula, MT 59801

/s/ Sara Ghafouri
Sara Ghafouri, *(Pro Hac Vice)*
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, OR 97232

Attorneys for Defendant-Intervenor

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that Defendant-Intervenor's Response In Opposition to Plaintiffs' Objections is proportionally spaced, has a typeface of 14 points, and contains 6,496 words in compliance with Local Rule 72.3(b). I further certify that on May 5, 2025, I filed the above with the Court's CM/ECF System, which will send a notice to each party.

/s/ Sara Ghafouri<br>Sara Ghafouri